## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | :  **Crim. No. 05-359-01,-2, -3 (RMU)** |
| | : |
| **DOUGLAS JEMAL, et al** | : |

### GOVERNMENT'S CONSOLIDATED OPPOSITION TO
### 1) DEFENDANTS' MOTION TO SEVER COUNTS BASED
### ON IMPROPER JOINDER UNDER RULE 8(b) AND
### PREJUDICIAL JOINDER UNDER RULE 14; AND
### 2) NORMAN D. JEMAL'S MOTION TO SEVER
### COUNTS 6-8 UPON PREJUDICIAL JOINDER UNDER RULE 14

The United States, through its attorney, the United States Attorney for the District of

Columbia, respectfully Opposes 1) Defendants' Motion to Sever Counts Based

On Improper Joinder under Rule 8(b) and Prejudicial Joinder under Rule 14; and 2) Norman D.

Jemal's Motion to Sever Counts 6-8 upon Prejudicial Joinder under Rule 14 (Defendants'

Severance Motions)..   In support of this opposition, the Government respectfully submits:

### I. JOINDER OF ALL THE COUNTS IS PROPER AND
### NO GROUND EXIST FOR SEVERANCE OF ANY COUNTS

#### A. Introduction

The Indictment sets forth a tightly related set of charges involving, inter alia, the efforts of

Douglas Jemal, through Norman Jemal and Blake Esherick (Esherick), to generate revenues by

first leasing and then refinancing the Douglas Jemal's building at 77 P Street in 2001 and 2002.

Many critical acts to achieve these ends were undertaken by Esherick and the Indictment sets

forth the manner in which Esherick was compensated by Douglas Jemal.  Counts One through

Eight of  the Indictment are logically related and properly joined.

### B.  Overview of the Counts in the Indictment

### 1.  Introduction

Each of the 8 counts of the Indictment stems from the concerted and determined efforts by Douglas Jemal - acting through his company Douglas Development Corporation (DDC) and in concert with codefendants Norman D. Jemal and Blake Esherick (Esherick) - to work his way out of a financial pressures arising from his highly speculative and risky investment at 77 P Street, N.W.  Douglas Jemal had purchased this property, formerly the "Peoples Warehouse," with a partner in 1999 for approximately $5 million.[1]  Over the next several years, Douglas Jemal borrowed increasing sums of money in a series of construction loans for purposes of improving the property.  Going into 2001, Douglas Jemal had taken out approximately $39 million in construction loans to improve this property, but there was no tenant in place.  Not only was the property consuming resources and not generating income, but Douglas Jemal owed a partner substantial sums based on debts incurred in connection with this property and other properties.  In short, Douglas Jemal needed to lease 77 P Street and then refinance it.   By refinancing the property, Douglas Jemal would replace the short-term construction loans with permanent financing, would repay his partner, and would have a source of cash.

### 2.  Counts One through Four

Counts One through Four set forth the bribery and fraud schemes associated with all three defendants' dealings with the DC Government and Michael A. Lorusso (Lorusso), Deputy

---

[1]        The partner had invested 50%, and loaned Douglas Jemal 50% for Douglas Jemal's ownership share of the property.  Douglas Jemal, through DDC, managed the property and was responsible for the development of it, and the discussion below treats him as being the owner of the property notwithstanding his silent partner's ownership interest.

Director of the District of Columbia (DC) Government's Office of Property Management, during 2001 and 2002. In those years, the DC Government, through Lorusso, executed a series of leases with Douglas Jemal, whereby the DC Government leased the entire 77 P Street building.[2] In addition, the Indictment alleges that Lorusso or his direct subordinate approved for payment by the DC Government a variety of fraudulent or inflated invoices submitted by DDC, including claims related to 77 P Street. As a result of the conduct of the defendants set forth in Counts One through Four, tens of millions of taxpayer dollars flowed from the DC Government treasury to accounts under the control of Douglas Jemal.

Counts One through Four allege that Esherick, in particular, was the agent for Douglas Jemal and Norman Jemal in dealing with Lorusso and the DC Government.

### 3. Count Five

Once having leased 77 P Street in full, Douglas Jemal was able to refinance the property and obtain permanent financing in the form of a $67 million loan – "permanent financing" – from Morgan Stanley (secured by the property and the rental income). Douglas Jemal was then able to use this "permanent financing" to pay off the construction loan (approximately $39 million), complete the construction of the building to permit the DC Government to move in, and use the substantial funds in surplus – close to $19 million – to repay his partner. Most critically, as alleged in Count Five, Douglas Jemal also sought and obtained funds from this loan for personal purposes, that is, to complete the purchase of yet another property for himself and Norman Jemal. The leasing of 77 P Street to the DC Government in stages through 2001 and

---

[2]     The Indictment also sets forth aspects of the defendants' relationships with the Lorusso and the DC Government surrounding the property at 4800 Addison Road.

2002 was an absolutely essential step to the refinancing of the property which occurred in late 2002.

This $67 million loan was far more significant to Douglas Jemal's personal fortunes than the income stream associated with the leases, and the need to refinance was part and parcel a motive for the need to lease the property in full. Count Five alleges that Esherick (among others) played an instrumental role in preparing a particular invoice, alleged to be false, for purposes of obtaining for Douglas Jemal and Norman Jemal over $400,000 of the loan proceeds held by the lender in escrow.

<u>4. Counts Six through Eight</u>

Esherick, DDC's "Director of Leasing," was the principle actor on behalf of Douglas Jemal and DDC in dealing with the DC Government and Lorusso on matters concerning the 77 P Street leases and other financial issues, though he did not personally or directly benefit from the huge income that he generated for Douglas Jemal and Norman Jemal. Counts Six through Eight, and certain of the allegations in the conspiracy count (Count One), sets forth allegations concerning the financial arrangement between Douglas Jemal and Blake Esherick during the time period spanning 2001 through 2003 – the time period when it is reasonable to conclude he would be compensated for his efforts and results. The essence of the tax allegations is that Douglas Jemal, through DDC (and uncharged Norman Jemal), provided Esherick substantial unreported compensation during this time-frame in numerous forms. These consisted of payments directly to Esherick and payments to third parties for Esherick's use and benefit.

For reasons set forth more fully below, there is a "logical relationship" among these counts, and they are properly joined.

-4-

### B. Rule 8(b) - Legal Principles

Fed. R. Crim. P. 8(b) permits the joint trial of defendants if "they are alleged to have participated in the same act or transaction or series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."[3]  Joinder of counts under Rule 8(b) is appropriate if there is "'a logical relationship between the acts or transactions' so that a joint trial produces a 'benefit to the courts." United States v. Spriggs, 102 F.3d 1245, 1255 (D.C. Cir. 1997) (quoting United States v. Perry, 731 F.2d 985, 990 (D.C. Cir. 1984)), cert. denied, 522 U.S. 831 (1997).  The District of Columbia Circuit "has repeatedly declared that joint trials may be preferred, given the heavy and increasing criminal caseload in our criminal courts." United States v. Gibbs, 904 F.2d 52, 56 (D.C. Cir. 1990) (citations omitted). "Joint trials are generally preferred in order to, among other reasons, preserve judicial resources, produce consistent verdicts and  minimize the burden on jurors, witnesses, defendants, and attorneys." United States v. Gray, 173 F. Supp.2d 1, 5-6 (D.D.C.  2001).   There are countless cases addressing joinder and severance, however, the Ninth Circuit said it well:  "We have stated 'that Rule 8(b) should be construed broadly in favor of initial joinder.' ... The goal of 'maximum trial convenience consistent with minimum prejudice is best served by permitting initial joinder of charges against multiple defendants whenever the common activity constitutes a substantial

---

[3]        "Rule 8(b)  governs the joinder of defendants *and* offenses when there are multiple defendants. . . . Although the title and language of rule 8(a) state that it governs the joinder of offenses, [] 'the weight of authority in this circuit and elsewhere regards Rule 8(b) as providing the sole standard for determining the permissibility of joinder of offenses where more than one defendant is involved.'"  United States v. Halliman, 923 F.2d 873, 882 (D.C. Cir. 1991) (emphasis in original; footnote omitted) (quoting United States v. Jackson, 562 F.2d 789, 793 (D.C. Cir. 1977)).

portion of the proof of the joined charges.'" United States v. Vasquez-Valesco, 15 F.3d 833, 844 (9th Cir. 1994) (citations omitted).

A district court may properly rely on the language of the indictment, as well as any pretrial evidence proffered by the government, in determining whether joinder under Rule 8(b) is proper. Spriggs, 102 F.3d at 1255-56.[4] And, joinder can be determined to be proper under Rule 8(b) by reference to the indictment alone or by reference to the indictment in conjunction with the government's pretrial representations. Id. Finally, decisions involving joinder may be properly made on the basis of the evidentiary relationship among the various offenses and the admissibility of one offense (or set of offenses) at the trial of the other.[5]

For reasons set forth below: 1) there is a tight "logical relationships" among the Counts; 2) concerns for judicial efficiency strongly support keeping these counts joined, and 3) defendants' arguments are flawed. Accordingly, defendants' motions to sever based on misjoinder must be denied.

### C. The Counts Are Properly Joined

#### 1. Introduction

---

[4] The Indictment provides nearly all the information necessary for this Court to rule on the defendants' motions. There is little that is advanced in this pleading by way of a discussion of the facts that is not explicitly set forth in the detailed Indictment, or otherwise provided in the Government's letters to the defense counsels.

[5] United States v. Hubbard, 474 F.Supp. 64, 86 (D.D.C. 1979) (joinder of perjury charges with substantive acts). See also United States v. Leonard, 445 F.2d 234 (D.C. Cir. 1971) (joinder of forgery and uttering charges to burglary charges is proper: 'The critical element of the case 'is the simple fact that this uttering of the credit cards stolen from the [victims] would have been admissible in evidence in a trial for burglary. In this situation, the joinder of offenses promotes the kind of efficiency in administration that is the objective of Rule 8. '').

As we demonstrate below, there is a "logical relationship between the acts or transactions," United States v. Perry, 731 F.2d at 985, evidenced by a "consistent, logically interlocked set of goals." United States v. Hubbard, 474 F.Supp. 64, 86 (D.D.C. 1979). See also United States v. Brown, 823 F.2d 591, 598 (D.C.Cir. 1987) (a "logical relationship" encompasses offenses which were "committed at the same times, by the same persons, and in accordance with the same general methods and in pursuance of the same broad schemes. . . .").

### 2. The Wire Fraud Count (Count Five) Is Logically Related to the Bribery and Fraud Counts Involving the Dc Government (Counts One Through Four)

Going into 2001, Douglas Jemal had pressing financial concerns. Central among them was the need to deal with the problem of 77 P Street – a huge speculative project with no tenants in place. Leasing would, of course, generate revenues from this non-performing tenantless property. However, the real financial payoff would come when and if the property could be refinanced. This would permit Douglas Jemal to obtain permanent financing thereby pay off his construction loan, pay off millions of dollars of personal debts to his partner, and provide him with ready cash for personal and business purposes.

In order to obtain such a loan, it was absolutely necessary to lease the building. The appraised value of a commercial property such as 77 P Street is largely a function of the anticipated income stream, as lenders value a commercial asset according to its ability to generate income, and, moreover, require assurances that the property will generate sufficient income to service the loan. The need to have tenants in place in 77 P Street – something which had not been achieved prior to 2001 despite substantial marketing – goes to the heart of Douglas Jemal's motivations in dealing with the Lorusso. Lorusso, for the DC Government, filled the

building with DC Government tenants. Indeed, not only did Lorusso facilitate the leasing of property at 77 P Street, but Lorusso spoke to the lenders and provided them with necessary assurances as to the nature of the DC Government's lease commitments.

Once 77 P Street was fully leased to the DC Government in late 2002, the property was appraised at approximately $96 million – largely as a result of the anticipated income stream flowing from the DC Government leases. This appraisal provided sufficient comfort to the lender to make a $67 million loan secured by the property and its rental income. Douglas Jemal settled on the Morgan Stanley loan on November 19, 2002. The $67 million loan was the single largest of many loans executed by Douglas Jemal in 2002.

Thus, Counts One through Four as well as Count Five involved the efforts by all three defendants to generate revenues and profits from 77 P Street. The series of events related to 77 P Street in 2001 and 2002 comprise tightly related aspects of a single financial strategy: to enrich Douglas Jemal (by providing him cash and paying off debts) by leasing 77 P Street, and once having leased it, by refinance it. Simply put, there is a "logical relationship" between Counts One through Four and Count Five.

Indeed, the evidence associated with Count Five directly bears on the financial motives of Douglas Jemal – it demonstrates his desperate need for tenants in 77 P Street in order to work his way out of substantial debts associated with that property and as a source of cash. Thus, in a trial of Counts One through Four alone, the Government would introduce evidence of the Morgan Stanley loan, to demonstrate the particular importance of the DC Government leases in relation to the broader financial goals of Douglas Jemal, including his use loan proceeds for personal purposes.

Moreover, there are "404(b)" relationships that flow from Count Five and which would be admissible in a trial of Counts One through Four. The heart of the fraud in Count Five is a false invoice prepared at the direction of Esherick which was submitted to Morgan Stanley to support a "draw" of loan proceeds held in escrow. This invoice, discussed at length in the Government's 404(b) Motion, was used to generate monies for use by Douglas Jemal. A jury would be permitted to infer that if Esherick had criminal intent in creating a false or misleading invoice to submit to a large institution (e.g., Morgan Stanley) to obtain funds for Douglas Jemal (and Norman Jemal), then it is more likely than not that he had criminal intent in creating false or misleading invoices which were submitted to a large institution (the DC Government), also to obtain funds for Douglas Jemal and Norman Jemal. This sort of evidence tends to rebut claims of good faith, error or innocent mistake.

### 3. The Tax Counts (Six Through Eight) Are Logically Related to the Other Counts in the Indictment

Counts Six through Eight detail Esherick's compensation from Douglas Jemal (through DDC). Such evidence explains the financial motives of Esherick, the primary actor on behalf of Douglas Jemal in Counts One through Five, and goes to the heart of the conspiratorial relationship between Douglas Jemal and his trusted and loyal employee.

There is little question that in a stand-alone prosecution of Counts One through Five – in which the evidence would tend to show Esherick to be the primary actor on behalf of Douglas Jemal and Norman Jemal – the Government would be permitted to introduce evidence of the exact financial reward Esherick received or expected to receive as compensation from Douglas Jemal (through DDC). In this case, this compensation was provided in the form of unreported

income and constituted a basis for federal income tax charges. It would be just as relevant if Esherick received huge bonuses or commissions which were reported to the Internal Revenue Service, but that is not how defendants Douglas Jemal and Esherick chose to structure their financial affairs. Evidence of the financial understandings and interactions among defendants charged jointly with financial crimes in this case, as with most cases, is undeniably relevant to understanding their motives and behavior. This evidence suggests the leverage of Douglas Jemal over Esherick and Esherick's financial dependence on Douglas Jemal.[6]

The defendants take particular issue with the fact that the allegations associated with the financial relationship between Esherick and Douglas Jemal are included in the conspiracy count, and seek to "sever" those allegations (though they provide little legal support for the relief they seek). However, courts are uniform in recognizing that allegations concerning the financial understandings of members of a conspiracy with each other and payments among the conspirators are appropriate components of an overall conspiratorial agreement.[7] We

---

[6]     In United States v. Pierce, 62 F.3d 818, 828-29 (6th Cir. 1995), cert. denied, 516 U.S. 1136 (1996), an arson prosecution, the Government introduced evidence of prior property crimes by the two defendants to demonstrate why one of the defendants (Tackett) would commit the arson at the behest of the other defendant (Pierce): "In this case, the government explained that it sought to introduce the evidence under Rule 404(b) for the following two reasons: (1) to show that Tackett's motive to burn the Church was to keep in Pierce's good graces; and (2) to show that Pierce utilized his economic control over Tackett to make him burn the Church. At trial, the government developed a theory that presented Tackett as financially dependent upon Pierce. Pierce allegedly wanted the Church burned down. The only way for the government to prove Tackett's motive and Pierce's intent was to establish their relationship." The evidence in this case is far less inflammatory (involving tax evasion and not prior instances of fencing stolen property), but, like the evidence in Pierce, explains the financial relationship between Esherick and Douglas Jemal.

[7]     This particular issue has received pointed appellate scrutiny in the statute of limitations context where the only act within the statute of limitations was splitting the proceeds. The issue could not thus be presented in starker terms: if the acts consisting of payments among

_____

conspirators cannot be considered part and parcel of the conspiracy, the conviction must be set aside; if the payments are considered part of the conspiratorial undertaking, the convictions stand.  Faced with this issue, courts have uniformly held that the payments and financial agreements among the perpetrators form an essential part of the conspiratorial undertaking – and that the conspiracy persists, even after the commission of the substantive crime, so long as proceeds are being distributed..

As an example, in United States v. Dynelectric Co., 859 F.2d 1559 (11th Cir. 1988), cert. denied, 490 U.S. 1008 (1989), the defendants were convicted of a Sherman Act bid-rigging conspiracy related to an electrical subcontracting portion of a major construction project.  After receiving payment on the contract, one of the defendants (Paxson) paid about $880,000 (approximately 50% of the profits) to his bid-rigging conspirator.   This payment was the only act that occurred within the statute of limitations.  This payment (among other financial terms) was charged in the Indictment, which alleged, in pertinent part:

> [¶18(c).]  in return for defendant Fischbach and Moore's participation in the conspiracy, defendant Paxson Electric would forgive a pre-existing debt of $89,330.06; and
>
> [¶18(d).]  in return for defendant Dynalectric's participation in the conspiracy, defendant Paxson Electric would form a silent joint venture with defendant Dynalectric pursuant to which defendant Dynalectric would receive 50% of the profits earned from the performance of the electrical construction portion of the Snapfinger Creek project."

Id. at 1565 at fn. 7.  The Eleventh Circuit concluded that payments were acts in furtherance of the conspiracy:  "The case law, applied to the particular facts of this case, amply supports the district court's conclusion that the payments [among the conspirators] were elements of a continuing conspiracy to restrain trade rather than merely the results of a completed conspiracy."  Id. at 1563.  Moreover: "[A]lthough the payments and payoffs were not necessary elements of a criminal antitrust conspiracy to restrain trade, they constitute overt acts made in furtherance of the conspiracy. " Id. at 1565 (footnote omitted).  See also, United States v. Walker, 653 F.2d 1343, 1347 (9th Cir. 1981) (in a Section 371 conspiracy bid rigging prosecution, the conspiracy continued for statute of limitations purposes until the profits were received and divided among the conspirators, even through the contract was awarded outside the statute of limitations: "Without the continuing cooperation of his co-conspirators, bought by the payoffs to them in various forms, the scheme would have fallen apart"), cert. denied, 455 U.S. 908 (1982); United States v. Fletcher, 928 F.2d 495, 500 (2d Cir.) (A "conspiratorial agreement that includes a payoff ... continues ...  until the conspirators receive their anticipated profits."), cert. denied, 501 U.S. 815 (1991); United States v. Knuckles, 581 F.2d 305, 313 (2d Cir.) ("[W]here a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the

recognized that in this case, where the crimes occurred in the context of an ongoing business and

ongoing employer-employee relationship, the financial relationship involves compensation by

Douglas Jemal to Esherick in the form unreported income and not, as in other cases, a pure

"splitting of proceeds."[8]   However, this is a distinction without a difference.  The financial

understandings of conspirators involved in the commission of financial crimes are inherently part

and parcel of their conspiratorial agreement.

    Thus, as a purely evidentiary matter, the financial relationship of Douglas Jemal and

Esherick is relevant to establishing their motives and the workings of their conspiratorial

relationship.  More broadly, allegations concerning their financial relationship are appropriately

set forth as part of a conspiracy count charging financial crimes.  The logical relationship of

Counts Six through Eight with the remaining counts is manifest, and the propriety of including

---

spoils are divided among the miscreants."), cert. denied, 439 U.S. 986 (1978).  The overarching
principle is that the financial agreements can appropriately form an inherent  part of a conspiracy,
even where the payments at issue would  have little or nothing to do with the commission of
elements of a charged substantive offense.

    The defense alleges that the Indictment's allegations are mere speculation.  This is a jury
matter of course.  However,  we submit it is inferable that Esherick, striving to secure tenants in
competitive world of commercial real estate, was motivated by the hopes of compensation, where
commissions and bonuses are the norm for successful salesmen.  It would be implausible to
believe otherwise.  One can readily infer intent through conduct.

    [8]      Although the typical facts relating to joinder of tax offenses with substantive
offenses involve failure to pay taxes on the proceeds of crime, this is a hardly a requirement for
admissibility.  In United States v. Turoff, 853 F.2d 1037, 1043-44 (2d Cir.1988), the Second
Circuit permitted the joinder of tax charges (unreported interest income) with the fraud charges,
even though "the funds that formed the basis of the unreported income, with one exception, were
not derived directly from the Compumeter [fraud] scheme."  Id. at 1043.  The tax charges were
properly joinable on "financial relationship" grounds: "the [bank accounts at issue which
generated the unreported interest income] were used to facilitate the personal and financial
relationships that enabled the Compumeter [fraud] scheme to proceed."  Id. at 1043.

-12-

such allegations concerning Douglas Jemal's financial relationship with Esherick in Count One is fully supported by the law.  Accordingly, the joinder of the tax counts with the remaining counts is proper.

Finally, there is yet again a "404(b)" relationship at play.  The tax counts, just like Counts One through Four, involve Esherick's use of false documents to obtain taxpayer money from the government (albeit the federal government and not the DC Government).  Indeed, the tax returns set forth false claims of expenses he incurred – just as the allegedly false invoices submitted to the DC Government sought reimbursement for claims of expenses allegedly incurred by DDC. Again, the jury is entitled to conclude that if Esherick had criminal intent in using false documents to advance false claims on a governmental entity in one context, it is more likely than not that he had such criminal intent involving false documents to advance false claims on a governmental entity in another context.  This is not propensity or "bad character" evidence – this is legitimate "404(b)" evidence related to Esherick's preparation and use of false documents in a variety of circumstances involving large institutions, with all events occurring in a tight time-period and arising from his employment at DDC.

### 4.  Concerns of Judicial Efficiency Require Keeping the Counts Together

Finally, even if there is question as to the "logical relationship" between the counts - which there is not –  there are overwhelming grounds rooted in judicial efficiency to keep these Counts joined.  Although the defendants suggest the Government could, should or must necessarily present the narrowest case involving the narrowest set of facts in support of each Count, in fact, there are a significant aspects of proof which would be common throughout the various Counts.  As noted, the financial relationship of Esherick to Douglas Jemal permeates all

the Counts, and the defendants' dealings related to leasing and refinancing 77 P Street are found

in Counts One through Five.  Thus, if the Counts were severed as suggested, the Government

would present certain evidence twice or even three times.  Some of this evidence would be

404(b) evidence, other aspects of this evidence would simply be the background evidence

involving, for example, the operations of Douglas Development, the identification of

documentary evidence, or evidence related to aspects of the development of 77 P Street.  The

burdens on witnesses (and the Court) would be significant.  The D.C. Circuit has made it clear

that the balance should tilt strongly to joinder.  United States v. Manner, 887 F.2d 317, 324

(1989) ("In general we strike a balance in favor of joint trials."),  cert. denied, 493 U.S. 1062

(1990).[9]  See also, Zafiro v. United States, 506 U.S. 534, 537 (1993) ("There is a preference in

the federal system for joint trials of defendants who are indicted together.").

---

[9]       The Court of Appeals in Manner cited to United States v. Leonard, 494 F.2d 955
(D.C. Cir. 1974), which set forth the salient principles as follows:

> In  reviewing the exercise of the district court's discretion, this
> court has approvingly concluded that "the balance has been struck
> in favor of joint trials." United States v. Hines,, 455 F.2d 1317,
> 1334 (D.C. Cir.), cert. denied, 406 U.S. 975 (1972), quoting
> United States v. Krechevsky, 291 F.Supp. 290, 294 (D.C.1967).
> This reflects the strong federal policy favoring joinder because it
> expedites the administration of justice, reduces the congestion of
> the trial dockets, conserves judicial time, lessens the burden upon
> citizens who must sacrifice both time and money to serve upon
> juries, and avoids the necessity of recalling witnesses who would
> otherwise be called upon to testify only once. Hines, 455 F.2d at
> 1334, quoting Parker v. United States, 404 F.2d 1193, 1196 (9th
> Cir.1968), cert. denied, 394 U.S.1004 (1969).

United States v. Leonard, 494 F.2d at 965-66.

<u>5.  Defendants' Arguments Are Flawed</u>

There are numerous flaws which underlie defendants' factual arguments, some of which include:

- Defendants fail to give  weight to the obvious connections among the Counts, even when that relationship is explicitly set forth in the Indictment itself; indeed, they barely acknowledge that Count Five involves the attempt to generate revenues and profits from 77 P Street, the same property at issue in Counts One through Four;

- They characterize the first four counts as the 'Public Corruption counts,' when, in fact, the fraud allegations are central to those counts.  We reject the use of that phrase as being incomplete to the point that it is misleading.  Indeed, working backwards, Count Four is a 'pure' fraud count, Count Three charges that the defendants defrauded the DC Government of money (as well as the honest services of its employee), and the first two counts charge that the defendants submitted fraudulent documents to the DC Government which were either personally approved for payment by Lorusso or his direct subordinate.  The fraud elements of these counts help provide the 404(b) glue which links all the counts together;

- The obvious relevance of Esherick's compensation is set forth in the Indictment, yet the defendants' response to is argue that those

allegations be stricken (presumably this would make the relevance of the evidence disappear);

• The defendants go so far as to insist that the series of events occurred in different time-frames when in fact the events occurred nearly contemporaneously. They observe that the tax charges are alleged to have been committed from 2001 through 2004 while the bribery count conduct went from 2001 and 2002. This argument fails to reflect the reality of the financial relationship. The tax charges relate to Douglas Jemal's ongoing compensation of Esherick in 2001, 2002 and into 2003 when Douglas Jemal's conduct vis-a-vis the DC Government came under scrutiny. This 2003 income was not due to be reported until 2004. The connection of these tax events to the bribery and fraud conspiracy is tight, even though Esherick's 2003 tax return was not due until April 2004. The wire fraud count occurred during the same time as both the tax counts and the fraud and bribery schemes.

## 6. Conclusion

The events at issue, tightly woven through all eight counts, all occurred in the same place (the offices of Douglas Development), by the same individuals, in the same time-frame, through the same means (false documents in the nature of invoices and claims to the Government or other large institutions, generally prepared under the direction of Esherick on DDC computers). These offenses evolved from the financial needs of Douglas Jemal, Norman Jemal and Esherick, and

the financial circumstances and motives of each of the three men is at issue.  The evidence is limited to two properties (77 P Street  and Addison Road).  The corrupt relationship with Lorusso was but one aspect of this sequence of events, yet even this relationship is intertwined with other events.  For example, as a condition of obtaining the Morgan Stanley loan, not only was it necessary for 77 P Street to be fully leased (accomplished by Lorusso), but Lorusso, on behalf of the DC Government, as requested by the defendants, spoke directly to the lenders and executed various documents requested by the lenders.   For the reasons discussed above, there is a "logical relationship" among the counts, and defendants' factual arguments to the contrary are unavailing. Furthermore, concerns for judicial efficiency further support they be tried together.  Counts One through Eight are properly joined under Fed. R. Crim. P. 8(b).

## II.  Grounds Do Not Exist to Justify Severance

Rule 14 of the Federal Rules of Criminal Procedure permits a court to grant a severance motion '[I]f it appears that a defendant or the government is prejudiced by a joinder of offense or of defendants.'  Fed. R. Crim. P. 14.  The Supreme Court has defined "prejudice" for severance purposes as a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgement about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 593 (1993).   A decision to deny a severance motion will be reviewed  under the "abuse of discretion standard," and is subject to reversal only if a defendant did not receive a fair trial.  United States v. Manner,  887 F.2d 317, 324 (D.C. Cir. 1989), cert. denied, 493 U.S. 1062 (1990).   Finally, for reasons of judicial economy, and fairness to the witnesses and parties, the balance in favor of joinder. United States v. Manner, id. ("In general we strike a balance in favor of joint trials.").

"A finding of prejudice is logically precluded if, had the counts been tried separately, the evidence concerning each count would have been admissible in the trial on each other count.' United States v. Levi, 45 F.3d 453, 455 (D.C. Cir.), cert. denied, 515 U.S. 1133 (1995). As discussed in Section I of this pleading, there are substantial interrelationships and overlapping proof among the eight counts. Douglas Jemal's financial relationship with Esherick and his compensation of Esherick would be relevant and admissible in a trial on each of the eight Counts as bearing, inter alia, on the substantive offenses, the relationship of the two men, and Esherick's motives to take actions for Douglas Jemal. Evidence associated with the defendants' dealings with the DC Government and refinancing of 77 P Street would be admissible, to some significant extent, in separate trials of Counts One through Four and Count Five as reflecting Douglas Jemal's overall financial motives and strategy. The bases of relevance and admissibility have been discussed in detail and satisfy Rule 404(b) as proof of reflecting a common plan or scheme, modus operandi and intent, and, moreover, as proof of the relationship of the defendants to one another. More to the point, such evidence does not fall in the one impermissible 404(b) category, that of proving "bad character." In light of the mutual admissibility of much of the evidence, the severance claims must be denied.

The defendants' claims of prejudice associated with the joinder of these various white collar fraud counts are, in any event, truly insubstantial. The defendants suggest that the jury may in some way misuse the evidence associated with one count in connection with its consideration of the evidence associated with other counts. Douglas Jemal and Esherick point to the possible prejudice from what they claim to be a set of unrelated charges and Norman Jemal complains of the potential "spillover prejudice" arising from the fact that he is not charged in the

tax counts and claims the evidence associated with those counts would unfairly prejudice him.

However, on the facts of this case, any such prejudice (and we maintain there is little to be found) can easily be addressed by the Court through proper curative instructions.  See, e.g., United States v. Tarantino, 846 F.2d 1384, 1398 (D.C. Cir.) ("The trial judge is usually in the best position to evaluate the resulting degree of prejudice, and jury instructions generally are sufficient to minimize any disparities in evidence."), cert. denied, 488 U.S. 840 (1988); United States v. Spriggs, 102 F.3d at 1256 ("Further, the district court cured any vestigial risk of such prejudice by repeatedly instructing the jury to consider the evidence against each defendant separately." Id. at 450 at fn.13 (citation omitted); United States v. Cisneros, 26 F.Supp.2d 13, 22 (D.D.C. 1998) ("Any possible spillover can be cured with a sharply worded limiting instruction."); United States v. Gray, 173 F.Supp.2d at 7. ("Curative instructions are the preferred method of preventing prejudice to defendants; to assert severance over curative jury instructions, the defendant must show that jury instructions would be inadequate to cure any potential prejudice.").[10]  The defendants utterly fail to make the case that curative instructions will be

---

[10]     The Supreme Court in United States v. Lang, 474 U.S. 438 (1986) stressed the ability of curative instructions to address potential issues associated with evidence being offered against some but not all the defendants at trial: "When there are few defendants and the trial court is aware of the potential for prejudice, 'the risk of transference of guilt over the border of admissibility [may be] reduced to the minimum' by carefully crafted limiting instructions with a strict charge to consider the guilt or innocence of each defendant independently." Id. at 450 at fn. 13 (citation omitted).  See also, United States v. Houle, 237 F.3d 71, 76  (1st Cir. 1991) ("[T]he district court took adequate measures to safeguard against the possibility of spillover prejudice by repeatedly instructing the jury to consider the evidence separately as to each defendant. In fact, the district court instructed the jury at the outset of the trial, several times throughout the trial, and during the final charge that it must consider the evidence against each defendant individually.);  United States v. Faulkner, 17 F.32d 745, 759 (5th Cir. 1994)  ("Further, the court instructed the jury to 'consider each offense and the evidence pertaining to it separately as to each Defendant. The fact that you might find some or all of the Defendants guilty of one of the offenses charged should not control your verdict with respect to any other offense charged

insufficient to address their concerns or that the drastic remedy of severance is therefore required.[11]

Indeed, there are only eight Counts, and despite its length, the Indictment is not particularly complex. The factual issues will be quickly joined. The charges can be easily compartmentalized (even accepting that there are some legitimate inferences associated with the relationships among the counts). There is little risk that jury will be unable to keep straight the evidence associated with the eight counts, or will somehow be unaware that Norman Jemal is not charged in the three tax counts, or will be unable to follow fairly straightforward curative instructions to prevent "spillover" prejudice. Indeed, to alleviate some of the concerns, the

---

against him or any of the other Defendants.' Similar instructions have been held sufficient to cure any possibility of prejudice." (citations omitted)); United States v. Weiss, 491 F.2d 460, 467 (2d Cir. 1974) ("Mrs. Weiss was further protected against 'spillover' prejudice by the court's instructions to the jury, repeated on four occasions, that it must consider each charge against each defendant separately on the basis solely of the evidence introduced with respect to the defendant on that count.").

[11] We note what is not at stake here, or even alleged to be at stake: this is not a case where the defendants claim to have conflicting defense which are "so prejudicial that differences are irreconcilable." See, e.g., United States v. Caldwell, 543 F.2d 1333, 1356 (D.C. Cir. 1975), cert. denied, 423 U.S. 1087 (1976). This is not a case where a given defendant claims that his ability to receive a fair trial is threatened by a truly vast disparity of evidence among the defendants or where the defendant is being tried with individuals who have committed truly heinous or shocking crimes. See, e.g., United States v. Sampol, 636 F.2d 621, 646 (D.C. Cir. 1980) (severance should have been granted where defendant was charged with misprison of a felony and making false statements while codefendants tried for conspiracy and murder, and where evidence at trial revealed "an intentional and extremely violent assassination scheme, gory details of which were described with extreme accuracy to the jury"). Even so, some "disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance." United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991) (citation omitted). The claims of prejudice in this case, involving concerns that the jury may misuse the evidence of the different counts or otherwise be confused or confounded, would appear to be the most benign of the types of prejudice which may suggest the need for severance, and the easiest to address by curative instructions.

Government will strive to present evidence of the various offenses in a logical sequence, and, in order to minimize the potential for jury confusion, may request leave of the Court to excuse and recall a witness who has discrete portions of testimony related to one set of Counts and then another.[12]

      WHEREFORE, the defendants' motions to sever should be denied.

RESPECTFULLY SUBMITTED,


KENNETH L. WAINSTEIN
DC Bar No. 451058.
UNITED STATES ATTORNEY

By:    _____
MARK H. DUBESTER
ASSISTANT UNITED STATES ATTORNEY
DC Bar No. 339655
555 Fourth Street, N.W., Room 5917
Washington, D.C.  20530
Ph. (202) 514-7986

---

[12]    See, e.g., United States v. Spriggs, 102 F.3d at 1256 ("The Government minimized the likelihood of "spillover prejudice," that is, that the jury would use evidence of one defendant's guilt against another, by presenting the evidence of each transaction, consisting largely of tape recordings of the participants' own words, separately and in chronological order.")

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that I have caused to be sent by fax or by electronic means a copy of the attached pleading, to:

Michele Roberts, Esq.                Paul Kemp, Esq.
Counsel for Douglas Jemal        Carol Elder Bruce
Akin Gump                        Counsel for Blake C. Esherick
1333 New Hampshire Avenue, NW    Venable LLP
Washington, DC 20036          One Church Street,
                             Rockville, MD   20850

Reid Weingarten, Esq.
Brian M. Heberlig             Stan Brand, Esq.
Counsel for Douglas Jemal        Counsel for Norman D. Jemal
Steptoe and Johnson            923 15th Street, NW
1330 Connecticut Avenue, N.W.    Washington, DC  20005
Washington, D.C.  20036-1795

Christopher Mead, Esq.
Counsel for Douglas Jemal
London & Meade
1225 19th Street, NW, Suite 320
Washington, DC  20036

this _____day of January, 2006.

                        _____
                        Mark H. Dubester
                        Assistant United States Attorney
                        DC Bar No. 339655
                        555 Fourth Street, NW
                        Rm. 5917
                        Washington, DC 20001
                        (202) 514-7986