**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 05-359-01,-2, -3 (RMU)** |
| | : | |
| **DOUGLAS JEMAL, et al** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE ALLEGED IN**
**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE RULE 404(b) EVIDENCE**

The Government hereby opposes Defendants' Motion in Limine to Exclude Evidence Alleged in Government's Notice of Intent to Introduce Rule 404(b) Evidence ("Defendant's Motion in Limine"). In support of this Opposition, the Government respectfully submits:

I.  BECAUSE A "CLOSE RELATIONSHIP" EXISTS BETWEEN
THE PROFFERED EVIDENCE AND
THE CHARGES SET FORTH IN THE INDICTMENT,
THE "BALANCE SHOULD BE STRUCK IN FAVOR OF ADMISSION"

The Indictment charges that the defendants acted with criminal intent. Evidence of a given defendant's intent must necessarily be proved by circumstantial evidence, and, in this case, as with many cases where proof of intent is an issue, the conduct of a given defendant – including conduct which occurred prior to, during, and subsequent to the crimes charged in a Indictment – provides the very best evidence of the defendant's intent. "Extrinsic acts evidence may be critical, ...especially when th[e] issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." Huddleston v. United States, 485 U.S. 681, 685 (1988).

The Government has provided the defendants detailed notice of the defendants' conduct that it intends on proving at trial. This conduct is described in the Indictment and in various "particulars" provided in response to specific requests. In addition, in its Government's Notice

of Intent to Introduce Evidence under Fed. R. Evid. 404(b) ("Government's 404(b) Notice"), the Government provided notice to the defendants of other evidence it intends on proving, including: 1) conduct which in fact is "intrinsic" to the charged offense but not otherwise specified in the Indictment; 2) conduct in the nature of "bad acts" which is "extrinsic" to the charged offenses but is relevant to proof of charged offenses, that is, pure "404(b) evidence;" and 3) conduct which may not fall into either category but nonetheless has relevance to proof of the charged offenses.[1]

The proposed evidence involves proof of similar acts with similar intents (false documents to the government or other large entities), proof of the origins of the relationships leading to the commissions of the crimes, proof of the common plan or scheme which embraces the charged conduct but includes other uncharged conduct, and proof of motive. The conduct set forth in the Government's pleading is closely related the charged conduct and generally involves documents or conduct intertwined with the same goals or events charged in the Indictment. For the most part, it is conduct which occurred at the same time involving either the DC Government, 4800 Addison Road, 77 P Street, "MTD Real Estate" or the federal government (income taxes). As far as the tax counts are concerned, it is evidence of the events which preceded and succeeded the charged years but which explain the conduct within the charged years. These are all proper grounds for admission under Rule 404(b); none involve proof of "bad character," and none of the evidence is so inflammatory – certainly not so inflammatory or so potentially prejudicial as evidence of prior or subsequent drug sales in the drug context – as to require exclusion under

---

[1]    Although notice is (arguably) required only for the second of these categories (that is, for "pure" 404(b) evidence), the Government recognizes that these categories are not always clearly defined and has thus provided notice of all three categories of the "non-charged" conduct. It has done so nine months in advance of trial so as to avoid surprise and to permit the defendants an opportunity to prepare.

Rule 403. In short, in light of the close relationship between the proposed evidence and the charges in the Indictment, the evidence described in the Government's 404(b) Notice is precisely of the sort of evidence for which the Court of Appeals for this Circuit has commanded that "the balance should be struck in favor of admission." United States v. Clarke, 24 F.3d 257, 265-66 (D.C. Cir. 1994) (As a "rule of thumb," "in determining whether the probative value is substantially outweighed by the danger of unfair prejudice it is a sound rule that the balance should be struck in favor of admission when the evidence indicated a close relationship to the event charged." (quoting United States v. Moore, 732 F.2d 983, 989 (D.C. Cir. 1984) and United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978) (internal quotation marks omitted)).

    The defendants throughout their pleading repeatedly fail to recognize the narrow grounds on which "other crimes" evidence may be excluded. Indeed, the only forbidden purpose associated with proof of "other crimes" evidence is when proof of the defendant's bad character "is offered for the sole purpose of proving that a person's actions conformed to his or her character," United States v. Long, 328 F.3d 655, 661 (D.C.Cir.1993), cert. denied, 540 U.S. 1075 (2003). See also United States v. Moore, 732 F.2d at 987 n.30 ("Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question." (quoting 2 Weinstein's Evidence 404-45 to 46)).

    Evidence of other crimes has particular force when the Government is required to prove specific intent. "'[T]he intent with which a person commits an act on a given occasion can many times be best proven by testimony of evidence of his acts over a period of time thereto.'" United States v. Moore, 732 F.2d at 991 (citing United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir.

1982)).  In connection with drug offenses, for example, courts have routinely recognized that proof of a defendant's intent to commit an (uncharged) drug offense makes it more likely than not that he had the requisite intent to commit the charged drug offense.  See, e.g., United States v. Latney, 108 F.3d 1446, 1448  (D.C. Cir.) ("Given Latney's involvement in the crack cocaine trade in May 1995, it was less likely that he was merely a bystander in the September 1994 transaction ...."), cert. denied, 540 U.S. 940 (1997); United States v. Clarke, 24 F.3d at 264 (because defendants sold drugs in the past, it was inferable that the drugs in their possession were for purposes of distribution); United States v. Moore, 732 F.2d at 988 (evidence of prior drug dealings "forceful evidence that the defendants possessed the necessary ability and desire to sell drugs a scant few days later"); United States v. Harrison, 679 F.2d at 948 (past drug dealings established a course of dealing and constituted proof of, inter alia, intent, preparation, plan and knowledge).  Similarly, evidence of prior drug-dealings among coconspirators is admissible on the grounds that such evidence "shows or tends to show the existence of a relationship between the defendants, and ... shows or tends to show the defendants had a common scheme or plan which included the offenses for which they are now charged."  United States v. Gavira, 116 F.3d 1498, 1532  (D.C. Cir 1997) (quoting instruction of Judge Hogan), cert. denied, 522 U.S. 1082 (1998).  Indeed, the Government "is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how the illegal relationship between the participants in the crime developed.'" United States v. Mathis, 216 F.3d 18, 26 (D.C.Cir. 2000)

(quoting United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000)).[2]

The rationale for admissibility of "other crimes" evidence on issues of intent, common plan or scheme, or to prove the relationships among the defendants and the origins of the conspiratorial activities is even more compelling in the context of this case than in the drug cases. This case presents difficult issues associated with proof of the specific intent of the defendants. There will be little question, for example, as to the documents that were prepared and submitted to the DC Government, or the monies provided to Esherick, or certain of the items provided to Lorusso. The main issue is likely to be the intent of the defendants in committing these acts, and the law well allows the Government to prove "extrinsic" and "intrinsic" conduct of the defendants as part of its proof of intent. Although the defendants characterize certain of the government's arguments as constituting "propensity" evidence, they make little effort to define what they mean by this term and fail to distinguish between the sole forbidden inferences associated with proof of other crimes from the numerous legitimate inferences – including those related to proof of intent – sanctioned by law. On these facts, therefore, where the proffered conduct is so closely related to the charged offenses, the law specifically is clear that the balance be struck in favor of admission.

---

[2]    United States v. Graham, 83 F.3d 1466, 1473 (D.C. Cir. 1996) (events prior to charged conspiracy admitted: "[B]ecause it focused on the origin and scope of the Newton Street conspiracy in which appellants participated, it was relevant to establish the formation and contours of the conspiracy and to show appellants' knowledge of the conspiracy and their intent to join." (citing United States v. Prevatte, 16 F.3d 767, 776 (7th Cir.1994) (holding prior bad acts evidence admissible to "show the formation of the conspiracy or the prior relationship between conspirators")); United States v. Gray, 292 F.Supp.2d 71, 80 (D.D.C. 2003) (evidence of prior acts of defendants admitted "because it is inextricably intertwined with and tells the stories of how relationships necessary to the establishment of the criminal enterprise began, developed, and operated within the conspiracy.").

## II.  THE DEFENDANTS' SPECIFIC ARGUMENTS MUST BE REJECTED

The Government hereby addresses specific aspects of the defendants' arguments related to the Government's proposed evidence.

Items of Value to Other City Officials.  The defendants make various arguments in support of their claim that their provision of items of value to other city officials who dealt directly with the defendants on 77 P Street or Addison Road is not relevant and not admissible. Each of these arguments are meritless.  First, they claim this conduct is de minimus and may not be a crime at all.  If so, they are hardly prejudiced.  Second, they claim that the government does not allege that these items were given with the quid pro quo that they insist is required for bribery and that the Government has identified no "official acts" of the officials.  However, the Government has provided discovery which shows that certain invoices were approved by Lorusso's direct subordinate and that the other city official was directly involved in the transfer of $863,000 from the DC Government to Douglas Development Corporation (DDC) as alleged in the Indictment.  This conduct is well-known to the defendants.  The fact that these other items of value may have more the feel of uncharged gratuities instead of bribes is hardly a compelling reason to exclude the evidence.[3]  Third, they argue the Government has improperly labeled this conduct "intrinsic" evidence and failed to argue its admissibility as "extrinsic" 404(b) evidence. We submit that this conduct, involving the provision of things of value both to a superior of

---

[3]    Moreover, the defendants are hard-pressed to disavow that providing items of value to city official in the nature of gratuities is far removed from the bribery statute, in that they base their entire argument support of their motion to dismiss on an interpretation of the gratuities statute – a lesser included offense of bribery.  Even if these were mere gifts to a public official on account of their position, this would be in the nature of causing a violation of the official's ethical duties (involving the receipt of such gifts) and an attempt to deprive the city of the honest services of its employees.

Lorusso's as well as a subordinate, at approximately the same time all three were taking acts of benefit to the defendants, can fairly described as "intrinsic" to the charged conspiracy.  We have acknowledged that the intrinsic-extrinsic line is not always clear.  Even if considered "extrinsic" evidence, however, such conduct demonstrates part of a common plan or scheme and the intent of the defendants to provide items of value to city officials as a means of rewarding and influencing their conduct encompassing the charged corruption offenses.

Defendant Esherick's Discussions of other Frauds with Lorusso.  The Government has put the defendants on notice that there were discussions of fraud which were not set forth in the Indictment, but which are part of the conspiracy.  This evidence is clearly "intrinsic" to the various offenses, as both the bribery and honest services fraud charges involve the commissions of frauds on the DC Government.  Although the defendants do not dispute that this is evidence is an "intrinsic" part of the conspiracy, they characterize this evidence as a forbidden form of "propensity" evidence.  For reasons set forth in the first section of this pleading, the defendants use the term "propensity" in a way which bears no relationship to grounds for exclusion.

Tax Evasion Conduct by Esherick and Douglas Jemal Prior to Tax Year 2001 and Subsequent to 2003, and the Compensation of Esherick by Douglas Jemal in 2005.  The proffered evidence demonstrates the origins of the tax evasion conduct in years prior to 2001.  It demonstrates that the charged criminal conduct did not emerge in full form in 2001, but is rooted in less significant tax evasion activities in prior years.  It shows that though Esherick's reported compensation remained constant from 1998 thorough 2004, his true compensation went up year after year, and the salary increases were effectuated over time by increases in unreported compensation.  Furthermore, the evidence reveals the full temporal scope of the conspiracy by

demonstrating that the tax evasion conduct did not come to a screeching halt at the end of 2003,

but persisted until the investigation commenced in approximately early fall of 2004. The

Government further seeks to show that upon being put on notice of a tax investigation in October

2004, the Douglas Jemal and Esherick ceased their (allegedly fraudulent) tax evasion scheme.

Instead of paying Esherick $70,000 in paychecks significant additional unreported "in-kind"

compensation, Douglas Jemal, through DDC, paid $300,000 per year, with the "in-kind"

compensation coming to an end.

  The defendants advance two arguments. First, focusing on the events of 2005, they

analogize certain post-investigation conduct to a "remedial measure"which should be excluded.

However, it is not remedial at all. Esherick did not "remedy" the prior false tax returns by filing

amended returns or paying taxes dues and owing for calendar years 2001 through 2003.

Moreover, if, in January 2005, Douglas Jemal had stood on a platform and shouted "I believe

Esherick is no longer worth $70,000 to me but is now worth $300,000 per year to me," such a

statement could be used by the Government as an admission, and such evidence could hardly be

excluded as a "remedy." The fact that instead, Douglas Jemal commenced writing checks

(actually, making direct deposit) to Esherick based on a yearly salary of $300,000 is a different

species of proof of the same admissible fact.

  Moreover, courts have routinely permitted the government to use amended returns as part

of the Government's proof in a tax evasion prosecution. Indeed, amended returns have been

treated as admissions of the defendant, signed under oath, as to the existence of a prior tax

deficiency. See, e.g., United States v. Dale, 991 F.2d 819, 830-31 (D.C. Cir.), cert. denied, 510

U.S. 906 (1993).[4]  See, also, United States v. Sanpietro, 948 F.Supp. 145, 154 (D.Conn. 1991)

(jury permitted to consider amended return filed by defendant after commencement of

investigation); United States v.  Dowell, 446 F.2d 145, 147 (10th Cir.) (amended returns

introduced at trial "reveal[ed] a consistent pattern of underreporting large amounts of income."),

cert. denied, 484 U.S. 984 (1971); United States v. Rosenblum, 176 F.2d 321, 330 (7th Cir.)

(amended returns filed after commencement of investigation used to demonstrate tax deficiency);

cert. denied, 338 U.S. 893 (1949).  Even United States v. Dyer, 922 F.2d 105, 107-08 (2nd Cir.

1990), cited by the defendant, recognized that a jury may consider an amended return as proof of

the existence of a tax deficiency.  The Second Circuit in Dyer merely held that "[w]ithout  more,

an amended return cannot provide an inference of fraud; it can only support an inference of

mistake."  Dyer,  922 F.2d at 108.

 We recognize that taxpayers and employers – such as Esherick and Douglas Jemal – may

attempt to characterize filing of an amended return (or, in this case, the change in the means of

compensation) as affirmative evidence of good faith and a demonstration of efforts, after learning

of a tax issue or mistake, to rectify a prior innocent error or practice.  See, e.g., United States v.

Pirro, 2001 WL 474647 *1 fn. 1 (2nd Cir., May 4, 2001) ("[T]hroughout the trial, defense counsel

had attempted to downplay the Pirros' culpability by stressing that, after the government

commenced its investigation, Albert [Pirro] had voluntarily filed amended tax returns and paid

---

[4]  In Dale, the defendants came under investigation for a variety of tax matters,
including two allegedly false deductions of $316,000 and $500,000 in their 1986 corporate tax
returns.  After the criminal investigation commenced, the defendants filed two amended tax
returns which reversed the deductions and paid the additional taxes due and owing.  These
amended returns were used by the government at trial as proof of the inaccuracy of the original
return and as proof of the amounts due and owing.  The defendants attempted to portray these
amended returns as evidencing their good faith.

his back taxes."). The Government is likewise permitted to argue a different set of inferences, namely, that the jury may infer the true intended compensation of Esherick in the years immediately preceding 2005 by the dramatic increase in his compensation which occurred after the tax investigation commenced, and that the defendants changed the manner of Esherick's compensation once they knew they were caught doing things illegally. It is for the jurors to draw the conclusions they deem appropriate. United States v. Nunan, 236 F.2d 576, 589 (2d Cir. 1956) ("[T]he filing of the amended returns under the circumstances could give appellant no immunity on account of any prior wilful misstatement or omission of taxable income. It was for the jury to consider these items of proof together with all the other evidence in the case and give them such probative weight on the issues as the jury might decide upon."), cert. denied, 353 U.S. 912 (1957).

    The defendants more broadly take issue with the Government's claim that the tax conduct of the prior years is "intrinsic." They claim the Government has put the conduct in the intrinsic box instead of the extrinsic box. The Indictment charges counts of evasion for 2001, 2002 and 2003, reflecting that the "unit of prosecution" for tax evasion is the given calendar year. Though charged as separate substantive counts, the tax conduct involving Douglas Jemal and Esherick is in the nature of an on-going conspiracy – albeit not charged as such – spanning several years. The acts associated with the years prior to and subsequent to the charged years form an "intrinsic" part of this conspiracy, which commenced prior to 2001 and persisted subsequent to tax year 2003 into tax year 2004. Moreover, there is cited case law in the Government's initial pleading which describes preceding and succeeding conduct in the tax prosecution conduct as "intrinsic."

-10-

However, even if this Court sees this behavior as "extrinsic" conduct, or some mixture of "intrinsic" and "extrinsic" conduct, such evidence is entirely relevant as proof of the formation of the scheme (prior to 2001) and "to explain to the jury how the illegal relationship between the participants in the crime developed." Mathis, 216 F.3d at 26. It is relevant to proof of a "common plan or scheme" commencing prior to 2001 and continuing subsequent to 2003 encompassing the events of the charged years and it is relevant to proof of Esherick's true intended compensation over time and his value to Douglas Jemal, starting from the date he was hired through 2005. None of these offers of proof involve the "forbidden" 404(b) inferences associated with the proof of "bad character."

The Evidence Involving the Tax Evasion Conduct by Douglas Jemal Related to Other DDC Employees. The Government stands by its description of this evidence related to the tax evasion conduct related to other senior DDC employees, its evidentiary significance, and the ability of the Court to protect the Esherick and Norman Jemal by means of proper limiting instructions.

The defendants pose the prospect of a parade of horribles as to the prospect of a "trial within a trial" and threaten dire consequences if such evidence were permitted to be introduced. The Government is acutely aware of this concern and has profound incentives to carefully use every moment of trial time in a manner to most effectively prove the charges in the Indictment. The Government seeks to avoid diversions involving the proof of matters which either cannot be proved, or if proved, will not provide evidentiary value worth the efforts. However, the nature of "other crimes" evidence in this context will not require proof of each of the elements of the "other crime," and will not require anywhere near the full range of proof that would be associated

with a stand-alone trial.  For example, the Government will not have to prove technical aspects associated with the "tax loss" for the other employees.  Similarly, once the Government explains the accounting operations of DDC or identifies DDC records obtained by subpoena, it is only marginally more difficult to introduce records related to three employees than it is to introduce the records related solely to Esherick.  Moreover, there are virtually no additional witnesses who would need to be called solely on the tax matters involving the other DDC employees.

        Representations to Prince George's (PG) County and Representations to Erie Insurance Company.  In a nutshell, in December 2001, DDC, through its Construction Vice President, made a series of representations as to the work performed by DDC to improve the impound lot at 4800 Addison Road and provided a list of costs incurred by DDC to accomplish this task.  In particular, he provided an itemized list of labor costs which he represented as having been incurred in connection with the DC Government's impound lot.  In February 2002 – about two months later -- DDC submitted an invoice to the DC Government as to work performed at Addison Road for the impound lot.  This invoice tracks nearly item for item the list of costs provided in PG County in December, but includes a different set of labor costs.  Part of the evidence surrounding the DC Government claim will show how the invoice was created and its initial use in PG County, and part of the proof of the falsity of the DC Government claim will be proof that it is inconsistent with the representations made by DDC in PG County.  The February invoice was paid by the DC Government.

        In addition, the same February 2002 invoice to the DC Government contained itemized claims for reimbursement which were also provided by DDC to its insurance company and were in fact paid by DDC's insurance company.  In order to rebut the claim of innocent mistake in

preparing the two sets of claims, the Government intends to prove that the defendants advanced other false claims to the insurance company as well as other false claims to the DC Government which are charged in the Indictment.

We urge the Court to hold off consideration of the issues associated with the February 2002 invoice until trial. We recognize this proffer is difficult to weigh on a cold record without a more having a more tangible feel for the actual evidence.

MTD Real Estate Services ("MTD"). The Government stands by its arguments as to the relevance of the defendants' use of MTD – especially their preparation of an invoice purportedly in the name of an unwitting third party – for use in other circumstances. This is pure "common plan or scheme" evidence.

WHEREFORE, the Government maintains the Defendant's Motion in Limine should be denied.

RESPECTFULLY SUBMITTED,

KENNETH L. WAINSTEIN
DC Bar No. 451058.
UNITED STATES ATTORNEY

By:  _____

MARK H. DUBESTER
ASSISTANT UNITED STATES ATTORNEY
DC Bar No. 339655
555 Fourth Street, N.W., Room 5917
Washington, D.C.  20530
Ph. (202) 514-7986

-13-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused to be sent by fax or by electronic means a copy of the attached pleading, to:


Michele Roberts, Esq.
Counsel for Douglas Jemal
Akin Gump
1333 New Hampshire Avenue, NW
Washington, DC 20036

Paul Kemp, Esq.
Carol Elder Bruce
Counsel for Blake C. Esherick
Venable LLP
One Church Street,
Rockville, MD    20850


Reid Weingarten, Esq.
Brian M. Heberlig
Counsel for Douglas Jemal
Steptoe and Johnson
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795

Stan Brand, Esq.
Counsel for Norman D. Jemal
923 15th Street, NW
Washington, DC  20005


Christopher Mead, Esq.
Counsel for Douglas Jemal
London & Meade
1225 19th Street, NW, Suite 320
Washington, DC  20036


this 31st day of January, 2006.


_____
Mark H. Dubester
Assistant United States Attorney
DC Bar No. 339655
555 Fourth Street, NW
Rm. 5917
Washington, DC 20001
(202) 514-7986