UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>DOUGLAS JEMAL, *et al.*,<br><br>Defendants. | Crim. No. 05-0359-1, -2, -3 (RMU) |

### DECLARATION OF DOUGLAS JEMAL IN SUPPORT OF DEFENDANTS' MOTION TO RESCHEDULE TRIAL DATE

Pursuant to 28 U.S.C. § 1746, I, Douglas Jemal, hereby declare:

1. I take full responsibility for the facts in this declaration, but my attorneys drafted it for me.

2. I am the owner and President of Douglas Development Corporation ("DDC"), a company that supervises the management, renovation, and leasing of commercial real estate properties that I own (in some cases with partners) in the District of Columbia metropolitan area and elsewhere.

3. The success and viability of my business depends heavily on the ability to obtain financing for the properties I own or seek to acquire. This financing takes many forms, including loans to acquire property, refinancing loans to obtain cash from the equity value of a property that has appreciated, construction loans to finance the renovation and improvement of property, and "permanent" loans to finance a property after it is leased and generating rent income.

4.     In the ordinary course of one of my typical real estate projects, I obtain a construction loan to finance the renovation and improvement of a property. These loans are typically short term loans and have fluctuating interest rates. In addition, most of the construction loans that I obtain are recourse loans, which means that they are personally guaranteed by me. Once construction is near completion and tenants have been located for the building, in the normal course we transition the financing from a construction loan to a permanent loan. Unlike a construction loan, a permanent loan is typically a long term loan (usually 10 years) at a fixed interest rate, which eliminates the risk of rising interest rates that could negatively impact fluctuating interest rate construction loans. In addition, permanent loans are typically non-recourse loans, which means that I do not have to personally guarantee the loan. It is necessary to obtain alternate financing for a property with a construction loan in place before the date on which the construction loan expires.

5.     Between approximately the Fall of 2002 and the Summer of 2003, the D.C. City Council held a series of hearings relating in part to the relationship between DDC and Michael Lorusso. The Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office also commenced investigations of these matters, which continued into 2004 and 2005. In February 2005, the FBI executed a search warrant at DDC. The City Council and government investigations generated a significant amount of negative publicity for my business. In general, the media reports relating to these investigations contained allegations similar to the public corruption allegations in the Indictment in this case.

6.     The commercial mortgage lenders who make permanent loans -- the types of loans that I have regularly obtained for my real estate projects -- typically pool these loans and sell them to investors as commercial mortgage backed securities. In my experience, lenders will

not make these types of permanent loans if they do not believe they will be able to sell them to investors as part of commercial mortgage backed securitization pools.

7.  Since approximately the Spring of 2005, to my knowledge none of my loans have been included in any commercial mortgage backed securitization pool. Since that time, I have also been unable to obtain any permanent financing for my real estate projects. I believe our inability to obtain such permanent financing is due to the fact that the publicity associated with the investigations and the Indictment has shut us out of the commercial backed securities market. At present, several of my real estate projects with construction loans in place are at the point where construction is nearly complete and tenants are in place. This is the point at which we typically convert the fluctuating interest rate, short term construction loans into longer term, fixed interest rate permanent loans. These permanent loans are a source of cash flow for my business, which funds operating expenses and the payment of wages for the more than fifty employees of DDC. However, because I have been unable to obtain any permanent financing since the date of the Indictment, I am currently unable to convert the financing on these properties from construction loans into permanent loans.

8.  Between 2000 and 2004, Morgan Stanley was one of the largest lenders that provided financing for my real estate projects. We obtained approximately $200 million in financing from Morgan Stanley on multiple projects during this time period. In approximately the Summer of 2004, Morgan Stanley had underwritten and approved another significant loan relating to several properties and was in the documentation process of the loan. However, Morgan Stanley abruptly terminated discussions and declined to extend the loan. One of my employees subsequently learned that Morgan Stanley terminated the loan after it was contacted

by the government in connection with this investigation. Since August 2004, DDC has been unable to obtain any real estate financing from Morgan Stanley.

9.  DDC has had a long-standing financing relationship with Wachovia. Wachovia made a number of significant loans to DDC over the years, including a $75 million loan in approximately February 2005 secured by 111 Massachusetts Avenue, N.W., Washington, D.C. Wachovia had planned to include this loan and another DDC loan in one of its commercial mortgage backed securitization pools. However, in March 2005, Wachovia removed the two loans from its securitization pool. On March 18, 2005, the Commercial Mortgage Alert published an article reporting that Wachovia had pulled these two loans from its securitization pool because DDC was being investigated for bribery in connection with leasing contracts by federal authorities. A copy of this article is attached as Exhibit A.

10. In the Fall of 2005, DDC was in negotiations with Wachovia to obtain a substantial permanent financing loan for the Woodies building located at 1025 F Street, N.W., Washington, D.C., which I own with a partner. After the Indictment was returned on September 27, 2005, Wachovia terminated the negotiations and declined to provide permanent financing for the project. Wachovia has not made any loans to DDC since the date of the Indictment.

11. In the Fall of 2005, I entered into an agreement to purchase a commercial office building in Richmond, VA. The property had an existing loan in place that was made by Wachovia, which I agreed to assume as part of the purchase. However, in November 2005, I was notified that my application to assume the loan was denied by Wachovia because a search of the public record revealed information that Wachovia determined will affect my credit

worthiness -- *i.e.* the Indictment in this matter. As a result of Wachovia's denial, the entire transaction was terminated and I had to forfeit a $500,000 deposit on the property.

12. DDC's relationship with other lenders has also been damaged as a result of the investigations and the Indictment. For instance, in approximately late-2004 or early-2005, I was in negotiations with Barclays Capital to refinance a property at 2131 K Street N.W. The existing loan on the property had an interest rate of approximately 10%. We were able to lock in a 5.2% interest rate for the new loan we were attempting to obtain from Barclays. However, in January 2005, Barclays notified me that it declined to approve the refinancing loan because of concerns that had been raised by its legal department. DDC has not obtained any financing from Barclays Capital since January 2005. In addition, although we worked with other lenders for several months, we were unable to secure alternate financing for the 2131 K Street property and carried the higher interest loan during this entire period. I sold the property in approximately October 2005 because we were unable to obtain permanent financing for the building.

13. Several other lenders have notified me since the date of the Indictment that they are unable to provide any financing to DDC projects until my legal situation is resolved. These lenders include Mercantile Potomac Bank and Virginia Commerce Bank. I had long standing, extensive prior lending relationships with each of these banks prior to the return of the Indictment.

14. In summary, since the return of the Indictment, I have been unable to obtain any large-scale financing for my real estate projects. Although some local or smaller lenders continue to be willing to provide financing, this financing has been for smaller projects. Since the Indictment, the largest financing I have been able to obtain is an approximately $9

- 6 -

million construction loan. The other loans I have been able to obtain since the Indictment have been considerably smaller in amount.

15.  My business will be severely damaged if the trial in this matter does not take place until September 2006, and I continue to be unable to obtain any substantial real estate financing. In addition, the current situation affects numerous current and ongoing projects, which impacts hundreds of jobs and the revitalization of the D.C. metropolitan area. For these reasons, I respectfully ask the Court to reschedule the trial in this matter to the Court's first available trial date.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 3, 2006.

_____
Douglas Jemal

**EXHIBIT A TO THE
DECLARATION OF DOUGLAS JEMAL
IN SUPPORT OF DEFENDANTS'
MOTION TO RESCHEDULE TRIAL DATE**

March 18, 2005    COMMERCIAL MORTGAGE ALERT    4

## Loans Pulled Amid Bribery Probe

Wachovia this week removed two loans totaling $81 million from a $2.8 billion fusion offering because of legal issues surrounding the borrower.

The firm in question, Douglas Development of Washington, D.C., is being investigated by federal authorities in connection with "bribery conspiracy charges involving leasing contracts," according to an SEC filing on Wednesday by Wachovia.

The filing noted that no charges have been filed against Douglas or its principal, Douglas Jemal, and that it was not known if charges would be filed. Norman Jemal, a company executive, said in an e-mail that "the offering was pulled as a result of a lease not being completed." The company, which Douglas Jemal formed in 1985, owns 8 million square feet of retail, office, residential and warehouse space.

Wachovia originated the two loans to Douglas. A $75 million mortgage — which was the fourth-largest in the collateral pool — is backed by the 278,000-square-foot office building at 111 Massachusetts Avenue NW in Washington. More than half of the space is leased by the federal government, while Douglas itself occupies 20% of the space. The other loan, which has a $6 million balance, is backed by a store leased to CVS in Washington.

The securitization, whose size was reduced to $2.7 billion, is collateralized by loans supplied by Wachovia, Countrywide Commercial, Citigroup and Artesia Mortgage Capital. The deal (Wachovia Bank Commercial Mortgage Trust, 2005-C17) was expected to price today. ❖

## Tishman ... From Page 1

pursued by just about every securitization program with a large-loan unit. The buzz is that Tishman has narrowed the field to about eight lenders, including Wachovia, Deutsche Bank and J.P. Morgan Chase. Tishman has had a long relationship with Goldman Sachs, which arranged the current debt package. But the expectation is that pricing will be the key factor.

The Tishman partnership, which includes the Crown family of Chicago, estimates that Rockefeller Center is valued at $4 billion — more than double the $1.85 billion it paid in 2001. The property could clearly qualify for a larger debt package than $1.7 billion, but the Tishman team evidently prefers a more moderate debt level.

The 6.4 million-square-foot complex is currently encumbered by a $1.2 billion senior loan, which Goldman securitized in 2001, and $140 million of mezzanine debt, which was provided by Hypo Real Estate (which at the time was known as HypoVereinsbank). The senior loan matures in April 2011, while the junior debt matures in May 2008. The senior loan has a 6.9% coupon, while the mezzanine loan is pegged to Libor plus 350 bp.

Rockefeller Center, one of the nation's best-known office complexes, consists of 10 buildings with 4.7 million sf of office space and 1.7 million sf of retail and entertainment space. Its components include Radio City Music Hall and the Christie's auction house.

Since the loan was securitized, the property's income stream has improved along with Midtown's rising tide. At the time of the securitization, the complex was 96% occupied at an average rent of $43/sf. But rents have since climbed sharply, enabling the Tishman team to increase rates as leases roll over.

For example, asking rents for the 1 million-sf building at 1270 Avenue of the Americas are now $53-59/sf, up from the average rent of $32/sf in 2001. Asking rents at the 500,000-sf building at 10 Rockefeller Plaza are nearly $60/sf, compared to $36/sf four years ago. According to MrOfficeSpace.com, asking rents at the complex range as high as $120/sf. The main tenants include Lazard Freres, Chadbourne & Parke, Simon & Schuster, USA Networks and Bessemer Securities.

Rockefeller Center's first building was erected in 1932 by John D. Rockefeller Jr. In 1985, the family created a REIT, Rockefeller Center Properties, in order to place a $1.3 billion mortgage on the property. The complex was later sold to Mitsubishi Estate, which relinquished its ownership in 1995 when it couldn't make its mortgage payments. Later that year, Rockefeller Center was sold to a Whitehall Street Real Estate Fund partnership, in which Tishman held a 5% stake. The Whitehall group sold the complex to Tishman and Crown in 2001. ❖

[Advertisement: A Lemon Law for Buildings — M]