**Transcribed Excerpt from July 14, 2003, Hearing of District of Columbia City Council Subcommittee on Human Rights, Asian-Pacific Islander and Latino Affairs, and Property Management.**

| | |
|---|---|
| | |
| **Video Files 07_14_03_Human_Rights_1 through 07_14_03_Human_Rights_4** | |
| CHAIRMAN JIM GRAHAM: | Good morning.  Uh, my name is Jim Graham, and I am the Chairperson of the Subcommittee on Human Rights, Asian-Pacific Islander and Latino Affairs, and Property Management.  The time is 10:02 on Monday, July 14, 2003, and we are here in our historic council chamber in the John Wilson Building at 1350 Pennsylvania Avenue to continue our series of oversight and investigative hearing on the Office of Property Management's lease management functions.  This subcommittee initially began its inquiry into these issuing following an attempt — following a proposal, rather, by the mayor to seek council approval for the purchase of an impoundment lot, uh, in Prince George's County for $12.5 million.  Uh, after the council did not act favorably on this purchase, the subcommittee joined with, uh, Councilmember Schwartz, on the Committee on Public Works and the Environment, and jointly held a hearing on October 21, 2002.  Since that time we have held a series of hearings — a series — a hearing which has involved a series of sessions beginning on February the 11th, then February 27th, April the 11th, May 19th, June 6th, 19th, and 30th, and, uh, July 10th to inquire into OPM's budget leasing management practices and fiscal responsibility. |
| | On Friday, May 16th, I participated in a hearing held by the Committee on Public Works and the Environment regarding the D.C. Auditor's report, which, of course, concerned the purchase and lease of 4800 Addison Road.  On Tuesday, May 20th, the committee, the whole officially conferred investigative status on this inquiry and provided us with subpoena authority. |
| | Today we will hear from Fernando Villegas.  Um, we have sought Mr. Villegas' testimony, uh, four times in connection with this investigation.  He testified under subpoena on June 6, 2003, in response to the first subpoena.  And at that time, uh, he produced five boxes of documents, and I have the documents right in front of the dais.  Uh, we have taken the, uh, the binders out of the boxes so that everyone can see very plainly the large amount of materials which have been submitted, uh, by Mr. Villegas to this investigation.  He was subsequently properly served on June 16th, but declined to appear at that hearing.  On June 19th, uh, because that, uh, uh, his new counsel had advised us that he was — the — the new counsel was not prepared, uh, to engage in these hearings.  However, uh, the — the new, uh, law firm, Akin Gump, presented us with a letter assuring us that Mr. Villegas was "anxious to cooperate with the investigation." Uh, Mr. Villegas was again properly served on June 23rd, but when he appeared on June 30th, uh, his attorneys once again asked for an accommodation to see whether or not, uh, we could better define his testimony.  A — a — again we granted that accommodation.  At that time, his attorney indicated that Mr. Villegas would return for our next hearing on July 14th.  However, subsequent to to — to today, uh, we had a conver — I had a conversation with Mr. Mark MacDougall, one of his attorneys, and we informed Mr. M — MacDougall that Mr. Villegas would be subpoenaed to testify on July 10th.  Uh, and thereafter followed the discussion which we've recounted in other hearing — in — in the prior hearing.  Uh, and, uh, and so even though he was properly |

served, uh, at 9:45 a.m. on July 7th, he did not appear at the hearing on July 10th. Instead, at 3:30 p.m. on July 9th, the day before the hearing, I received a letter indicating that Mr. Villegas would not be appearing at our hearing the following day. Well, that is the very brief history of Mr. Villegas' participation with this, um, uh, investigation. I'm pleased to see that he is here today with counsel and I am anxious to hear his response to the questions that we are going to put to him.

Um, in the course of our inquiry and investigation, we have discovered numerous instances of ethical lapses, disregard for proper procedures, fraud, and theft. Previous testimony has indicated that invoices were submitted and paid for work that was not completed. I have personally examined thousands of documents relating to the construction activities at One Judiciary Square. And the conclusions they lead to are extremely troubling. Um, there are also a number of entries, uh, and invoices, uh, from International Builders, which deserve very close examination. This project at One Judiciary Square was supervised by Cushman & Wakefield at a cost of over $7 million, and at least 2.5 million appears to be unaccounted for. You will recall that One Judiciary Square, or also known as 441 4th Street, was the former headquarters of the council and the mayor. Uh, we moved from that — from that — from those, uh, uh — from that building just before, uh, September 2001. And thereafter, a restacking, as it's called, or a rearrangement, a reconstruction of the space of 441 4th Street was, uh, was mandated. Uh, we have evidence of fraud and theft that occurred over the course of that project. It is instructed to note that the penalty for false claims for payment submitted to the District includes treble damages. It is our hope that today's witness will help us reconstruct what actually happened during this project.

Now, I do want to note that this subcommittee will stand in recess from approximately noon to 1:00 p.m. to accommodate a special legislative session of the council. Uh, testimony will then resume at a — approximately 1:00 with top government — D.C. government officials, including John Koskinen, City Administrator; Herbert Tillery, the Deputy Mayor for Operations; Eric Price, the Deputy Mayor for Economic Development; and Robert Spagnoletti, the Acting Corporation Counsel. Um, at a later hearing, we will have the Chief Financial Officer, Dr. Natwar M. Gandhi; and the head, or the Chief Procurement Officer, uh, Jacques Abadie, uh, to answer questions about, uh, uh, problems associated with both of their areas of responsibility. Uh, neither of them were able to attend today. Mr. Abadie is in California, and so we did not, uh, wish to proceed without him. Uh, but the — the witnesses that we will be hearing from today we will be asking about the Administration's actions, uh, relating to the problems associated with the Office of Property Management.

Um, this will be the last subcommittee investigative and oversight session on the Office of Property Management before the council's summer recess period, uh, which actually begins today. Uh, I do want to acknowledge, uh, that to my left is Charlotte Brookins-Hudson, who is the General Counsel, uh, of the Council of the District of Columbia. Uh, uh, Ms. Brookins-Hudson is here, and I appreciate it very much that you are here, uh, in order to assist me with any legal questions, which might occur in the course of this testimony. Uh, Mr. Catania is with us. And, uh, Mr. Catania, do you have an opening statement?

| | |
|---|---|
| COUNCILMEMBER DAVID CATANIA: | Um, thank you, Mr. Chairman, no opening statement. I do want to, uh, to indicate for the record that Mr. Villegas is represented by Mark MacDougall and Anthony Swisher, both from Akin Gump. Uh, as you know, Mr. Chairman, I am affiliated with Akin Gump. Uh, it is a law firm in excess of 300 lawyers here in Washington. We have established, um, ethical roles between myself and Mr. MacDougall and mister — Mr. Swisher with respect to Mr. Villegas. It is my understanding Mr. Villegas has waived any of his, um, uh, perceived, real, or imagined, uh, conflicts. Uh, Mr. Chairman, in addition, I have received a letter from the Office of Campaign Finance indicating that there is, uh, from the counsel's perspective there is no, uh, conflict of interest, and with the ethical wall and the waive of — the waiver of the conflict by Mr. Villegas there is no conflict on that side. So I wanted to put — put that on the record, Mr. Chairman, and make sure everyone is aware of it. Uh, certainly, it'll have no indication or no bearing on my, um, my questions of Mr. Villegas [CLEARS THROAT] — pardon me — one way or another. I look forward to the hearing, Mr. Chairman [UNINTELLIGIBLE]. |
| CHAIRMAN JIM GRAHAM: | Thank you very much, Mr. Catania. Now we would ask, uh, Mr. Villegas to stand forward, uh, with his counsel. Mr. Villegas, if you would remain standing and raise your right hand to take the oath. Please respond to this oath. Do you swear or affirm under penalty of law that the testimony you are about to give to the Council of the District of Columbia is the truth, the whole truth, and nothing but the truth so help you God? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | I do. |
| CHAIRMAN JIM GRAHAM: | Thank you. Please be seated. Mr. Villegas, do you have an opening statement? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Uh, no, mis — |
| CHAIRMAN JIM GRAHAM: | Or we should have the lawyers introduce themselves, please. I'm sorry. |
| MARK MACDOUGALL: | Mr. Chairman, as I think you, uh, noted, Mr. Catania noted, uh, my name is Mark MacDougall, uh, thank you. I'm a, uh, uh, partner with the law firm of Akin, Gump, Strauss, Hauer and Feld here in Washington, D.C. With me is Anthony Swisher, uh, one of our counsel. And I — I — I would — I would add, uh, um, my confirmation to what, uh, Councilmember Catania said a few minutes ago concerning, um, his, uh, association with our firm, of which we are very proud and happy, and — and the fact that a, uh, uh, an ethical wall has been established and we — and we've taken every, uh, step necessary to ensure that — that both the council's interest and Mr. Villegas' interests are protected, uh, including, uh, in particular, uh, Mr. Villegas' waiver. |
| CHAIRMAN JIM GRAHAM: | And — and, uh, may I — may I inquire, uh, you — you mentioned the word "waiver." May I understand what — what you are referring to by "waiver?" |
| MARK | Well, I — I — I — I don't want to get into a — a — a — a privileged |

| | |
|---|---|
| MACDOUGALL: | conversation, uh, Mr. Chairman, but, uh, uh, Mr. Villegas understands, uh, uh, Mr. Catania's association with our firm.  He understands Mr. Catania is a member of this subcommittee. Uh, and he understands that, uh, that we've taken the requisite steps to ensure that — that none of those relationships affect our representation of him. |
| CHAIRMAN JIM GRAHAM: | Thank you very much.  Uh... yes, I — I should correct that.  Ma — Mr. Catania is — is not a member of the subcommittee, although, of course, he is totally entitled to full participation as a member of the Council, and we are a subcommittee of the Committee of the whole, which he is a member of, so it's a — it's a fine distinction. |
| | Uh, I wanted to begin by — by — by discussing, uh, your bank accounts, Mr. Villegas.  And, uh, I'm going to ask Ms. Keller — |
| MS. KELLER: | Yes, yes, [INAUDIBLE]. |
| CHAIRMAN JIM GRAHAM: | Oh, could you provide that information?  Uh, we — we have information, uh, for you that we are going to be referring to.  Um... uh, on or about the — the 23rd of June 2002, uh, we served a subpoena on United Bank, uh, uh, regarding your bank records.  Um, and I have questions regarding, uh, those — that information that we have received.  Ush, two thou — did I say 2002?  Thank you.  It's so good to have our General Counsel here.  [LAUGHS].  2002, uh, on or about June 23rd, 2002... and three.  I'm sorry.  I'm determined to do that.  Uh, 2003.  Um, and we have received information from both the Business Bank, uh, and from the United Bank, uh, where we had, uh — where — where you have, Mr. Villegas, a number of accounts.  Uh, we, uh... were most interested in an account that you established, um, at United Bank, which you entitled "The D.C. Government Projects Account," which, uh, by its title would appear to be limited to D.C. government projects.  Uh, Mr. Villegas, I — I did have one preliminary question.  Uh, do you have — do you have construction projects in Panama with the International Builders, Incorporated. |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right, uh, right under the Fifth Amendment to the Constitution and respectly — respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, you also established a bank account for Global Furniture Resources, and we have the bank records from that bank account, um, and, uh, that was a furniture company, which you established, according to prior testimony that you provided to us, uh, on or about the 1st of September, uh, 2002.  And, uh, you provided us with information, uh, on — on the, uh — you charted your — Global Furniture Resources is chartered in the District of Columbia, uh, as a D.C. corporation.  Uh, and thereafter, you established at United Bank a Global Furniture Resources account.  Um, Mr., uh, Villegas, you have our materials in front of you.  If you turn to Page 1 of the materials.  Not the bank materials, but the other materials.  Actually, it's now become Page... I beg your pardon.  It has now become... Page 6.  Now, the numbers that I'm going to be referring to — it's a little bit confusing — are at the center of the page at the bottom, Page 6.  And this is your statement of reconciliation to Mr. Timothy Dimond.  Uh, Mr. Villegas, you provided this document as part of our subpoena, and your response to our subpoena on June 6th. |
| | Uh, this document indicates that — is an explanation for $411,761.08, which was paid from the pool controlled by the Office of Property Management and Staubach.  This is the tenant representation pool.  And |

| | |
|---|---|
| | this is your letter of December the 17th, which you submitted to us. In this letter you indicate that — that — and the next page, Page 7, you will see that this is the request for payment, uh, for, uh, the $411,000. Uh, you were in fact paid the $411,000 shortly thereafter the May 17th, 2002 request that you submitted and that, uh, Mr. Lorusso approved. |
| | Um, Mr. Villegas, how was it possible for you to purchase furniture for Global Furniture Resources for the Office of Property Management for $198,000 in May 2002, when the company did not exist until months later, and you had no bank account until months later, and the furniture was in fact not purchased until many months later? How is it possible for you to have been paid at that point for this purpose? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, if you will turn with me now to the bank documents. Starting on page -  I think this is number, page ten isn't it? Do you have the bank documents in front of you? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Yes. |
| CHAIRMAN JIM GRAHAM: | The first ba — the first document should be, uh, dated — it should be for $200,000, dated April the 25th, 2002.  It — it should be the very first document.  Am I right it should be Page 10?  If you look on the lower right-hand corner, do you see Page 10? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | I see a Page 3. |
| MARK MACDOUGALL: | Mr. Chairman, uh, Page 10 in our package is captioned "Outgoing Message Print," and it appears to be a fax cover sheet of some kind. |
| CHAIRMAN JIM GRAHAM: | Just one moment.  This is the copy of the documents that has just been handed to you by — by our — our clerk. |
| | [TALKING TO CLERK]:  Could you go forward and see what you handed him? [PAUSE].  Could — could you bring it to me so that we can reconcile this quickly?  [PAUSE].  Yes, this is correct.  This is the Page 10 I want to be on. |
| | Starting on Page 10 through Page 17, there are a series of wire transfers from the D.C. Government Projects Account at United Bank. Again assuming that the D.C. Government Projects Account at United Bank is limited to D.C. government projects, and assuming further that at this particular point in time beginning in April of 2002 the only D.C. government projects that were — that — that, uh, International Builders had was at One Judiciary Square and at one of the first projects with the Emergency Management Agency.  Mr. Villegas, what we find here is that between April 2002 and October 2002, uh, you transferred $1,160,000 to International Builders, Incorporated, Latin America Account at Ocean Bank in Miami, Florida.  Is that an accurate statement, Mr. Villegas? |

| | |
|---|---|
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, on April the 25th, 2002, you transferred 200,000 — according to these records, you transferred $200,000 to IBI Latin America, Ocean Bank, Miami.  On May 6th, you transferred 100,000 to that account.  On June 6th, you transferred 200,000.  On July 11th, you transferred 200,000.  On August 1, you transferred 100,000.  On September the 10th, you transferred 200,000.  On September the 13th, you transferred 75,000.  On the 21st of October, you transferred 85,000.  All according to these bank records.  Mr. Villegas, why would you be transferring — and keeping in mind that the — the total amount of money that was available to you during this period of time was less than $6 million, and presumably all of it going through the D.C. Government Projects account — how could you have transferred such a large amount of money and still paid your subcontractors, and still met your other obligations in terms of your responsibilities at One Judiciary Square? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, if you turn with me to the balance of the documents that had been provided to you from your bank, you will find that if we include your International Builders, Incorporated account at the Business Bank, the total amount that you transferred in a period of less than 11 months to International Builders, Incorporated, Latin America, was $1,658,861.70.  In addition to that, you transferred from these accounts to bank accounts in Panama and to bank accounts at the Ocean Bank in Miami, Florida an additional $198,000.  Uh, and in addition to that, you transferred $349,233 to Cambridge Trust, for a grand total of wire transfers in less than 11 months of $2,206,807.36 from a $2,206,807.36, which is a whopping amount of money from a business, as you previously testified, had an annual gross of approximately $13 to $15 million.  Mr. Villegas, how do you explain such substantial transfers from these bank accounts to bank accounts outside the District of Columbia area? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, from Ocean Bank, Miami, or from any account in Panama, did you disperse funds to Michael Lorusso, to Scott Frankel, to any other — or to any other person who works for the D.C. government or has a D.C. government contract of any kind? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, did you use your bank accounts of International Builders, Latin America and your bank accounts in Panama as a way to |

| | |
|---|---|
| | divert funds from the District of Columbia government projects so that those funds could be dispersed from those other locations to other persons? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, are you willing to supply this investigation with a statement of your accounts and cancelled checks from International Builders, Incorporated of Latin America at the Ocean Bank in Miami, Florida?  Are you willing to provide this investigation with copies of those checks and bank statements? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | I am. |
| CHAIRMAN JIM GRAHAM: | And when would you be willing to do that? |
| MARK MACDOUGALL: | Mr. Chairman, without setting a deadline for ourselves, uh, Mr., uh, Villegas, uh, can't know sitting here how long it will take for either the bank or his company, the company that you identified, to, uh, assemble those records.  So we will work diligently with, uh, with you and your staff.  But I — want I don't want to do is say that by a particular date this week or next week we'll have them in hand because I just can't know sitting here that we will. |
| CHAIRMAN JIM GRAHAM: | Well, the — the reason I press a little bit on this, counselor, I think before you were involved, uh, Mr. Villegas volunteered to provide us with the bank records for Global Furniture Resources.  Uh, I believe he did so at — at the hearing on June 6th, when he testified.  And we — we did not receive that information, except under subpoena.  And so I want to be very clear, uh, concerning this matter.  Um, would it be possible for you to have this?  And — and we're not, uh, uh — I mean, would it be possible to have it within 30 days? |
| MARK MACDOUGALL: | Sitting here today Mr. Graham I don't see any reason why not.  But, uh, I don't know all of the facts, so, uh, if — if we can, uh, have the, uh, the committee's indulgence to, uh, uh, look into where those records are. Uh, Mr. Villegas has stated he's prepared to produce them, and we'll, uh, produce them in a — in a diligent fashion. |
| CHAIRMAN JIM GRAHAM: | Um, are there banks — we appreciate that.  Uh, are there bank accounts that Mr. Villegas controls in Panama? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | If you control or own bank accounts in Panama, are you willing to provide this investigation with copies of the bank statements and cancelled checks for those accounts? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |

| | |
|---|---|
| BUILDERS: | |
| CHAIRMAN JIM GRAHAM: | Well, let me — let me be clear, uh, because I — I just, uh, you know, and counsel, perhaps you can help with this, perhaps you can't.  But — but your — uh, the witness has agreed to provide bank records for the account International Builders, Incorporated, Latin America at the Ocean Bank in Miami, Florida.  But he is taking the fifth amendment as to whether or not he is willing to provide the same records for accounts which he may or may not own and control — own or control — in Panama.  Do — do I — do I have that correct? |
| MARK MACDOUGALL: | That's right, you have it correct. |
| CHAIRMAN JIM GRAHAM: | So, insofar as the Miami, Florida, Ocean Bank accounts, he is going to provide the information.  But insofar as any bank account in Panama which he may own or control, he is taking the fifth amendment, uh, in terms of that question. |
| MARK MACDOUGALL: | He has asserted his fifth amendment privilege in response to that que — that question, that's correct. |
| CHAIRMAN JIM GRAHAM: | Thank you.  And before I call on Mr. Catania, uh, I just wanted to get through these banking questions first in a coherent way.  Uh, Mr., uh, Villegas, uh, your a — account with, uh, Business Bank shows a transfer of $349,000 — actually, there are two transfers — to Cambridge Trust, Incorporated.  Would you care to explain to us who Cambridge Trust is and why you transferred $349,000 to that bank? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Before calling on, uh, Mr. Catania, I'd like to have a clarification. We're going to proceed to our next set of questions, which are based either on the hearing that — where you participated on June 6th, or will be based on documents, which Mr. Villegas has provided to this investigation.  Uh, are — are you prepared to — to comply with our subpoena in terms of answering the question — questions that either had been previously asked of you and you've answered, or had been previously asked of you, you've answered and relate to those earlier questions, or are based on documents, such as what we have right in front of us?  These documents, Mr. Villegas, all came from you.  These are your business records for One Judiciary Square.  Are you prepared to comply with our subpoena in terms of those responses? |
| MARK MACDOUGALL: | Uh, mis — Mr. Chairman, uh, Mr. Villegas has complied with your subpoena.  He's — he's here today and testifying to the extent he's asserting a fifth amendment privilege on the advice of counsel.  That is his right.  Uh, International Builders is a corporation, uh, of which he, uh, uh, has an ec — in which he has an equity interest.  Uh, and that, uh, that corporation, I believe, has fully complied with your subpoena as well.  Um, this witness can only answer questions he's asked, and he will do that to the best of his ability subject to counsel's advice. |
| CHAIRMAN JIM GRAHAM: | Thank you very much, counsel.  Uh, Mr. Cata — |
| COUNCILMEMBER DAVID CATANIA: | Uh, thank you, Mr. Chairman.  Uh, Mr. Villegas, I've not seen the — the wire transfer documents that Mr. Graham has and that are before |

| | |
|---|---|
| | you.  Uh, there is a confidentiality agreement, um, in the corporation — our — our General Counsel has suggested that these documents — it's my understanding, um, and I'll ask the General Counsel that — it's, uh, my understanding that the General Counsel has advised Mr. Graham not to share certain of these documents, uh, with the other members of the committee.  Is that your understanding?  And the — the reason I'm putting this on the record is that I — I may not be able to ask you specific questions, um, and my questions are not as informed as Mr. Graham's about the content of, uh, these bank accounts and where they exist — |
| CHAIRMAN JIM GRAHAM: | [MIXED VOICES/UNINTELLIGIBLE].  Mister — [MIXED VOICES/INAUDIBLE] — |
| COUNCILMEMBER DAVID CATANIA: | Yes.  Yes — yes, Mr. Graham. |
| CHAIRMAN JIM GRAHAM: | — if I may interrupt you just for a moment.  We're going to provide you with a copy of these documents forthwith. |
| COUNCILMEMBER DAVID CATANIA: | Oh, thank you, Mr. Graham.  Um, Mr. Villegas, I recall from the last time you were before us, and I looked at one of your — one of your International Builders, uh, checks.  It listed a Virginia address.  Do you recall that question? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advac — advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. |
| COUNCILMEMBER DAVID CATANIA: | Okay. |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Well, the reason I raise this, and, Mr. Graham, you may recall that there were a number of addresses of the checks that Mr. Villegas had sent.  They ranged from various places in Virginia.  And — and it struck me when I ask you why you didn't — and this is my recollection — why I ask why hadn't moved your company's bank account into the District, you said, well, you would ha — it was just more convenient for you to keep it in Virginia. You used to live there, you lived close by, you established the account and you found it more convenient to have the, uh — uh to keep that account.  I — I'm wondering why a local business would have need for a Miami bank. |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Okay.  Um, well, I — I understand that, and I — I guess I could y — um, it'll be a bit difficult to ask questions.  I'm not doing this, Mr. Villegas, to — to get you to recite that.  I mean, I think I know it my — my — my — my sleep at this point.  But these are questions, though, that I, you know, I very much want to know the answer to.  Why would you — you know, why would you have need for, uh, a Miami bank account?  Why would have need for offshore accounts, |

| | |
|---|---|
| | given that you were largely a small, local construction business?  Did your business, um — did — did you have construction work outside of the continental United States that would require a bank account in Panama or someplace else? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Um, Mr. Villegas, you mentioned that you would share with us the bank records, um, inclu — does that include cancelled checks from the Miami bank account at Ocean Bank? |
| MARK MACDOUGALL: | Mr. Catania, again, sitting here, uh, today, we don't know what those records look like, what Mr. Villegas has access to, and — and how long that will take.  Those records are — are of a bank, as I understand it, in the United States.  And to the extent that it's a bank in the United States, Mr. Villegas has said he would provide those records, um, and, uh, we will undertake to do so.  I just can't tell you what they will entail until we look at them.  I — typically, as — as we both know, uh, bank records include cancelled checks.  And to the extent they're within the scope of that definition, we'll provide them. |
| COUNCILMEMBER DAVID CATANIA: | Um, Mr. Villegas, are you a signatory on the account?  Is there one account in osh — in the Ocean Bank?  Is there one bank, one bank account? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectally — respectfully — decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Well, I — I think this would be of some interest to the Chairman of the Committee, so, uh, Mr. Graham, I'd ask that you — you may want to follow this line.  Um, Mr. Villegas has agreed to produce bank account records from the Ocean City, the Ocean Bank, but has not told us how many accounts there are on which to obtain those records.  And so this, in order to have a complete record, I — I — I believe we need to know how many accounts there are so that we in fact know that we are receiving all of the, um, transactions on the accounts that are there.  In other words, if you have two or three accounts, you know, and two are legitimate and one is not, I would very much like to have the documents of all three accounts, most especially the ones that are probably not legitimate.  And so, Mr. MacDougall, are you — is your client not going to tell us how many accounts exist in the Ocean Bank in Miami? |
| MARK MACDOUGALL: | Mr. Catania, I would object to the — to the characterization of an illegitimate bank account.  Uh, Mr. Villegas is a businessman.  He — he runs a company that has performed, uh, a valuable service for the District, and, uh, and I would — I would object to that.  Uh, Mr. Villegas, uh, is not in a position to begin answering questions concerning what — what those bank accounts may entail.  Those are corporate accounts, as I understand it, and, uh, and — and as corporate accounts, he's prepared, as the — the Chief Executive Officer of his company, to produce them. |
| COUNCILMEMBER DAVID CATANIA: | Well — well then, can he tell us how many accounts there are?  Uh, eh, you know, you — uh, Mr. MacDougall, you leave me no choice but to draw |

| | |
|---|---|
| | a conclusion that something is illegitimate when — and I understand your client is exercising he's fifth amendment, and he — uh, fifth amendment rights, and he has every reason and every right to do so. But when we have no evidence that there are any outside construction activities outside the continental United States, when we have, uh, evidence of offshore transfers of significant amounts of cash that — that really are coming from District accounts. Um where Mr. Villegas has shown a particular practice in the past of an odd, you know, uh, an odd familiarity with this bank, I mean, there's — there's no justification for him, as a local businessperson, to have a Miami bank account if he's not doing work there.  Uh, so to the extent that Mr. Villegas in answering questions has agreed to provide us the bank records, I — I don't believe it's too much of a stretch to ask how many bank accounts exist, and is he the signatory on each of those accounts, and will he provide the cancelled checks, um, on those accounts. |
| MARK MACDOUGALL: | Well, Mr. Catania, I — I believe Mr. Villegas has asserted his fifth amendment privilege in response to each of those questions.  If you have another question, we'll — |
| COUNCILMEMBER DAVID CATANIA: | Okay. |
| MARK MACDOUGALL: | — we'll do our best to respond to it. |
| COUNCILMEMBER DAVID CATANIA: | Okay.  Well, um... I be — I believe Mr. Graham has covered most of the questions that — that, uh, were in my mind, especially as it relates to his relationship with Mr. Lorusso and whether or not, um, whether or not he conspired with Mr. Lorusso to defraud the District government.  Um, based on that, I have no more questions at this time.  Thank you, Mr. Graham. |
| CHAIRMAN JIM GRAHAM: | Uh, thank you very much, Mr. Catania.  Let — let me, uh, for the purposes of clarification, let me just mention that the — the account that we most particularly mentioned in terms of the Ocean Bank, uh, Miami, is, of course, International Builders, Inc., Latin America, is the account, because it is to that specific account, uh, that, uh, uh, the lion's share of this money was transferred by wire.  Now, you are right, Mr. Catania, there are other Ocean Bank accounts, and, uh, let's clarify that now.  Uh, your willingness to cooperate in terms of the Ocean Bank accounts would include all of the accounts at Ocean Bank which Mr. Villegas either controls, or owns, or has an interest in? |
| MARK MACDOUGALL: | We're not in position to respond to that, Mr. Chairman, today.  Uh, uh, uh, we don't have an answer that question.  And, uh, uh, Mr. Villegas has said he's willing to produce the accounts you asked him about a few minutes ago.  He is — he — he will do that.  We will assist him in that.  Uh, beyond that, uh, uh, Mr. Villegas, as I understood his answers to Mr. Catania, has asserted his fifth amendment privilege. |
| CHAIRMAN JIM GRAHAM: | But — but it — it is, uh, counselor, it — it's a little puzzling for those of us up here, at least for — for me, you know, that — that you were forthwith in saying you would provide all of the bank records, uh, for the period — and — and did we stipulate the period of time?  We're interested in the period of time of the D.C. government projects.  So we're interested in, say, from January the 1st, 2002 until, um, shall we say June 1st, 2003.  uh, but — but you were forthwith, and — and — and — and very, uh, direct in agreeing to |

| | |
|---|---|
| | cooperate in terms of the International Builders, Inc., Latin America account. Uh, why — I — I'm puzzled as to why that wouldn't be extended to all of the accounts at Ocean Bank. The fact of the matter is, is they're much small transfers made to other accounts, the numbers of which I would be glad to give you. |
| MARK MACDOUGALL: | Well, Mr. Graham, thi — thi — this — this committee does not have the authority to compel, uh, that company to do anything at all. Uh, it has — uh, Mr. Villegas says it's, uh, as its President, has agreed to produce the corporate accounts, in particular, that you asked about that received the wire transfers. What you're now doing is seeking to turn that response into a, uh, a — a full disclosure by Mr. Villegas', of uh, uh, uh, uh, uh, personal, perhaps, and — and, uh, and — and perhaps not, uh, activities. And he's, uh, he has asserted his fifth amendment privilege in response to any of those questions. |
| CHAIRMAN JIM GRAHAM: | Okay. I think we've probably, uh, got as much agreement as we're going to get on that subject. Uh, Mr. Villegas, you appeared before this investigation and before this hearing on June 6th, 2003. You took your affirmative — you were under oath at that time. You were accompanied by your attorney, so you had legal advice. A Mr. Dickson Young represented you for the purposes of that hearing. When you arrived at that hearing on June 6th, you brought these five boxes of materials that are in front of the dais. Subsequent to that, on at least two, possibly three different sit — uh, circumstances, you provided additional documents to this investigation. And so, now I'm going to proceed to ask a — a series of questions based on that prior hearing and based on documents which you have provided to this investigation. |
| | Uh... could you give us a — a — could you recount for us the circumstances under which, uh, you were hired by Cushman & Wakefield as the subcontractor for One Judiciary Square under the original agreement, which was Task Orders 1 through 9, totaling some $4.1 million? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr., uh, Villegas, does Michael Lorusso has a — have a financial interest, or has he had a financial interest, in any company in which *you* have an interest, or control, or own? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Have any payments or anything of value been transferred by any company which you own, or control, or have an interest in to Michael Lorusso? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectically — respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | In response to questions, uh, from this investigation, you testified on June 6th, 2003, "We," referring, I — I assume, to yourself and to your company, "We did over-bill and under-bill" in terms of the work |

| | |
|---|---|
| | at One Judiciary Square.  Would you please give of – us an example of a case in which you submitted an invoice for an amount in excess of the work that you did? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | On June 6th, 2003, at our hearing, you were asked whether Michael Lorusso had instructed you to increase the amount of an invoice that you were prepared to submit.  In other words, you had drafted an invoice; it was for a certain amount; Mr. Loru – I questioned you as to whether Mr. Lorusso asked you to increase the amount – not decrease the amount, increase the amount – before you submitted it.  In response to that question, you said, "Yes."  In other words, you a – you acknowledged that there was a situation where Mr. Lorusso, having examined one of your invoices in preparation, and asked you to increase the amount.  Do you recall that particular invoice? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, in response to a subpoena duces tecum, which we issued, uh, and properly served on you, uh, we asked you to submit documents before the close of business on Thursday, June 26th, regarding specific, eh, eh, uh, uh, questions.  You, in fact, did submit documents in response to our subpoena.  Would you be willing to provide us with — with a second copy of those documents? |
| MARK MACDOUGALL: | Mr. Graham, if I could just make a clarification.  Uh, International Builders has been the recipient of — of several subpoenas from this committee.  And — and that is a — a — a corporation duly organized, uh, and is — and is different from Mr. Villegas and his — and his personal capacity.  Now, Mr. Villegas has also received subpoenas and responded to them.  I just respectfully ask the Chairman if you could draw the distinction between documents produced by the corporation and documents produced by Mr. Villegas personally. |
| CHAIRMAN JIM GRAHAM: | Well, thank you very much, counselor.  I — I — I don't know, uh, who produced these documents, but the subpoena was served on Fernando Villegas, International Builders, Incorporated, 1424 K Street, uh, Suite Number 500, Washington, D.C.  Uh, and you did respond to the subpo — someone, whether it be the company or Mr. Villegas himself, did respond.  I'm just simply asking if you would provide us with an additional set of those documents. |
| MARK MACDOUGALL: | Yeah, uh, Mr. Villegas, uh, uh, understood that subpoena to be a subpoena served on — on him as President of the corporation, and therefore, on the — on the corporation.  Is your question would we produce the photocopies of the same — |
| CHAIRMAN JIM GRAHAM: | Yes. |
| MARK MACDOUGALL: | — documents again? |
| CHAIRMAN JIM GRAHAM: | That's correct. |

| | |
|---|---|
| MARK MACDOUGALL: | Has — has the committee misplaced the set that was — |
| CHAIRMAN JIM GRAHAM: | Uh, we — we are currently hunting — |
| MARK MACDOUGALL: | — previously [MIXED VOICES/INAUDIBLE] — |
| CHAIRMAN JIM GRAHAM: | — for them.  We think we know where they are, but I just wanted to ask, as a matter of convenience, if you could resubmit them to us. |
| MARK MACDOUGALL: | If the committee is unable to locate a set, we — we can certainly take that up, certainly, yeah.  We'll — we'll do what we can to cooperate on that front. |
| CHAIRMAN JIM GRAHAM: | Mis — Mr. Villegas, is — is Douglas Jemal your landlord at 1424 K Street NW? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Uh, Mr. Villegas, at 1424 K Street NW, Suite Number 500, are you — are you paying below-market rent to Douglas Jemal or Douglas Development? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | What is — what is your relationship with Douglas Jemal, and how did it come about that Mr. Jemal agreed to pay for $636,000 worth of furniture, which your company, Global Furniture Resources, ordered from Italy, ostensibly for the Department of Human Services?  Now, as you will recall, Mr. Villegas, we've gone over this in considerable detail on June 6th.  Um, Mr. Jemal was under no legal obligation whatsoever under any agreement that we are aware of to buy furniture for the Department of Human Services for 77 P Street.  Uh, and yet he did pay for at least half of that furniture in a check, which you have provided to us.  You — you submitted the check to us as part of the documents you provided.  I mean, how did it come about that Douglas Jemal or — and/or — Douglas Development agreed to pay for this furniture? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respect — respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr., uh, Villegas, have you been paid for the $223,000 for furniture for the Emergency Management Agency, uh, so-called "outside the box?"  When you were last here, you indicated that there was a change order pending.  Have you been paid since then for that furniture? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |

| | |
|---|---|
| CHAIRMAN JIM GRAHAM: | Now, in our prior hearing of June 6th, you indicated — and — and this is also confirmed in the letter that you provided — that you yourself provided — dated December the 17th, 2002, clarifying the $411,000 tenant representation pool payment.  And you indicated in that letter, and you've indicated in your testimony before this investigation — under oath, you stated that Global Furniture Resources didn't have the funds, so International Builders, Incorporated stepped in in terms of — "stepped in" was your language — stepped in in terms of the $198,000 furniture purchase for the Office of Property Management.  Mr. Villegas, how could you have said that when there was no Global Furniture Resources existing at the time of that payment in May 2002? How could you have made a statement that g — because GFR didn't have the funds, IBI, another of your companies, stepped in in order to make this, uh, deliver — uh, pay for and deliver this furniture? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, in May 2002, thereabouts, you received $198,000 for furniture for the Office of Property Management.  Now, this is what you said.  But at the time you submitted the invoice for the $411,000 payment, you made no reference to the OPM furniture.  Indeed, the OPM furniture was not even installed until nearly nine months later.  It was only in December 2002, once you were queried by, apparently, Mr. Dimond, that you came up with this in — as way of an explanation for how the $411,000 was spent.  Mr. Villegas, did you steal $411,000 from the — from the tenant representation pool from monies owned and controlled by the District of Columbia?  Did you take this $411,000 unlawfully and illegally? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Was the December 17th, 2002, letter, which is number, uh, it's number, uh, it's Number 6 in the mater — Page 6 in the materials that I've provided to you. Uh, was this December 17th letter just a way to — y — you know, you were — you were caught red-handed.  You had to explain $411,000; you had no *real* explanation for the $411,000.  This was a way of — of manufacturing an explanation.  And even then, you came up $36,000 shy.  This is for an invoice that you submitted in December — you submitted it in May.  In December, you couldn't even then justify all $411,000, and so the three — $36,000 you fell short, you said, "Well, we'll apply it to Task Order 13."  I mean, is this just a way of fabricating explanations for money that you took? |
| MARK MACDOUGALL: | Uh, Mr. Graham, could you give us a reference to the documents you're referring to? |
| CHAIRMAN JIM GRAHAM: | It's Page 6, Page 6 in the material.  Not the bank materials, the — the materials you have in your hand, Mr. MacDougall.  It's — it's in the middle of the bottom of the page, Page 6.  Page 6 and Page 7.  Page 6 is the — |
| MARK MACDOUGALL: | [MIXED VOICES/INAUDIBLE] — |

-15-

| CHAIRMAN JIM GRAHAM: | — is the — is Mr. Villegas' explanation on December the 17th, 2002. Page 7 is the invoice, which had been submitted, uh, by, um, uh, by — by, uh, uh, Mr. Villegas. And we have that document. Um... but this is — this is this is the authority to pay, uh, Mr., uh, Villegas, uh, $411,761. |
|---|---|
| MARK MACDOUGALL: | I'm — I — I'm — I'm sorry to, uh, break your train of thought, Mr. Graham, but I — the let — I have a letter addressed to Tim Dimond dated December 17th that's marked Page 1. Is that the letter you're referring to? |
| CHAIRMAN JIM GRAHAM: | No. If you look at the — it's a little confusing. If you look in the center of the bottom of the page, you'll see another page number. |
| MARK MACDOUGALL: | I see that. And — |
| CHAIRMAN JIM GRAHAM: | Uh, that's Page 6. |
| MARK MACDOUGALL: | — and that's the letter I just described. |
| CHAIRMAN JIM GRAHAM: | Right, that's Page 6. This is Mr. Villegas' explanation for how he spent $411,761. But Mr. Villegas, here's the point. The way this is customarily done is that a contractor does the work. Well, typically, an architect reviews to see whether the work is done. But we never had architect review on One Judiciary Square. We're unable to find a single invoice that you submitted with architectural review. But typically, the work is done, the invoice is prepared. I mean, here's an example of — quite frankly, numerous examples — where there was no work done, the invoice was prepared, the payment was made. And in this case, we come back to the issue some seven months later and make an attempt to explain it. Mr. Villegas, is this just trumped-up? Is this just a way of explaining $411,000 that you put into your pocket? |
| MARK MACDOUGALL: | Is that your question, Mr. Chairman? |
| CHAIRMAN JIM GRAHAM: | That's my question. |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | I'm — I — Mr. Catania, did you have questions? |
| COUNCILMEMBER DAVID CATANIA: | Uh, thank you, Mr. Graham. Uh, Mr. Villegas, I just, uh, received this copy from Mr. Graham of the various bank accounts um, and I'm curious as to a couple things. If could tell me who is — you are Fernando Villegas, correct? [PAUSE]. And who is, uh, Edwardo — and there are several mis — there are several spellings of this last name, but one is V-R-M-U-D-E-Z; there's another B-R-E-R-N-U. Who — who is that person, do you know? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |

| | |
|---|---|
| COUNCILMEMBER DAVID CATANIA: | Um, mi — Mr. Villegas, you are — wa — your middle name begins with a "J," is that correct? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Yes, sir. |
| COUNCILMEMBER DAVID CATANIA: | And what is that? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Jose. |
| COUNCILMEMBER DAVID CATANIA: | Okay.  And who is Raysha Villegas? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | My wife, sir. |
| COUNCILMEMBER DAVID CATANIA: | Okay.  And who is, um, Eduardo Antonio Villegas? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mis — Mr. Catania, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Well, the — it's interesting because I see under these beneficiary, it's an Eduardo Antonio Villegas, and then Edwin C. Villegas, and a Raysha Villegas.  There are a number of Villegas beneficiaries of these checks.  Um, Mr. Vi — Villegas, with respect to the Miami account, um, who, besides yourself, is — is a signatory to this account, or to these accounts? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advice of counsel I must — must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Well, presumably, Mr. Villegas, when you hand over the bank records there will be some evidence, you know, with these cancelled checks of one or more signatories.  So it is either you, or it is you in concert with others.  Um, Mr. Chairman, have we asked for Mr. Villegas' personal tax returns?  Um, have we asked, Mr. Chairman, for Mr. Villegas' corporate income tax returns?  Because I think therein lies a very interesting opportunity for the, uh, federal authorities.  When we are looking at millions of dollars, Mr. Chairman, that's being transferred out the country, um, a quick reconciliation between the assets, um, as reported to the Internal Revenue Service versus the assets that are somehow accounted for, uh, via bank transfers and various accounts, there will be an opportunity for some reconciliation, Mr. Villegas.  Um... Mr. Villegas, what percentage of IBI do you control or own?  My recollection was from the last time you testified that you have a partner but you are the majority owner in IBI.  Is this — uh, we can make this short.  If you just simply want |

| | |
|---|---|
| | to say, "I assert my fifth amendment rights," that's easier than going through the whole [UNINTELLIGIBLE]. So you're — you're not interested in answering that question or you're not going to answer that question? Okay. |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | I assert my fifth amendment rights. |
| COUNCILMEMBER DAVID CATANIA: | Okay. Um, and the last time your directors and officers — the last time your directors and officers of IBI met? Could you tell us that, Mr. Villegas? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Catania, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| COUNCILMEMBER DAVID CATANIA: | Okay. Um, m — Mr. Villegas, uh, my recollection was that you are the majority but not the entire owner of IBI, but that you are, um, the en — you are the whole — you — you — you own the furniture company, um, the Global Securities, I believe, completely. I know you're not going to answer that, either, so. I'm just trying to work through this, Mr. Villegas. And whether or not your — the minority interest owners of IBI, um, along with you, have retained counsel to represent IBI, or is Mr. MacDougall and Mr. Swisher acting as both your attorney and that of IBI? Mr. MacDougall, would you care to answer that? |
| MARK MACDOUGALL: | We are here as Mr. Villegas' counsel. We also — we are also counsel to IBI, but, uh, my understanding is Mr. Villegas has been subpoena here in his own capacity. |
| COUNCILMEMBER DAVID CATANIA: | Um, very good. Would — let me ask you, Mr., um, Villegas, would you be willing to in your capacity as an individual, uh, turn over your, um, tax returns for the last three years to this committee? And in your capacity as majority owner of IBI, would you be, uh, willing to, uh, hand over your — your tax returns for the last three years? |
| MARK MACDOUGALL: | Uh, Mr. Catania, as you know, there are — are various statutory protections for that kind of information. If the committee serves a subpoena on Mr. Villegas, we will, uh, abide by the law, as — as the law stands when the subpoena is served. But I — I'm not going to permit Mr. Villegas to commit here to providing any personal financial information of any kind. |
| COUNCILMEMBER DAVID CATANIA: | Well, in — in your own admission, Mr. MacDougall, you're also serving as ca — as chairman — or as, uh, counsel for International Builders. Mr. Villegas, as the Chairman of the Board or as the principle owner of the company, that's a decision that Mr. Villegas presumably could make right now. |
| MARK MACDOUGALL: | Well, as I said, Mr. Catania, if a subpoena is served, uh, on IBI, IBI will — will abide by the law. |
| COUNCILMEMBER DAVID CATANIA: | Same with Global Securities, the furniture company? |
| MARK MACDOUGALL: | Um, Global Securities will, uh, abide by, uh, the law, and will — will respond to any subpoena appropriately. |
| COUNCILMEMBER DAVID CATANIA: | All right. Well, uh, Mr. Chairman, I have no more questions, uh, at this point. But I do believe that there is, uh, a real opportunity |

| | |
|---|---|
| | here for us to do a quick reconciliation, and this committee certainly has limited resources that we know. Um, you know, when we're looking for friends in this prosecutorial process, it might make sense for us to do a — a subpoena of the various IR — IRS records, personal income tax records , corporate income tax records, and then do a — a reconciliation.  And we will know whether or not the numbers add up.  And if the numbers don't add up, you know, we then are going to have to refer these matters, in addition to the U.S. Attorney's Office, ref — refer them to, um, the Internal Revenue Service as well as the U.S. Attorney's Office.  Thank you, Mr. Chairman. |
| CHAIRMAN JIM GRAHAM: | Thank you, Mr. Catania, and we will take into consideration your suggestion that we subpoena the — the tax records for both, uh, for Global Furniture Resources, International Builders, Incorporated, and, uh, Mr. Villegas personally. |
| | Um, I just have one more question on the furniture, uh, before I move away from that.  Um, y — you know, in — in two different situations, Mr. Villegas, you — you — you and your company — and I want to keep the distinction. You and your company appear out of the clear blue. First, we have you being selected as the contractor — not the general contractor because the general contractor was Cushman & Wakefield — but having Cushman & Wakefield, directed by Mr. Lorusso to select you as the I don't know, I guess we'd say the principle subcontractor, and — and — and entrust to you between $6 to $8 million worth of government work at Emergency Management Agency and at One Judiciary Square.  And so here's a company that has not heretofore had any D.C. government work at all, and Michael Lorusso, and perhaps Scott Frankel from Cushman & Wakefield, reach down and pull you up and award you these contracts sole source without compa — competition of any kind. |
| | Then again, we have Douglas Development, specifically Douglas Jemal, agree out of the clear blue to write a check for $318,000 to Global Furniture Resources, a company, which, by your testimony, you are the only employee and you are the owner.  But you have no interest in 77 P in terms of DHS, uh, you have no relationship with Douglas Development in terms of DHS.  But the shrewd and wise businessperson, Douglas Jemal, agrees to write you a check I April of this year — not last year, in April of this year — long after Lorusso is gone.  Lorusso is history; Mr. Jemal is writing you a check, signing it himself for $318,000 with no apparent obligation whatsoever to provide furniture for the Department of Human Services.  By the way, Mr. Catania, at 1:00 today we're going to be hearing from Mr. Koskinen, who is going to tell us among other things that they're not — the D.C. Government's not paying for this furniture.  So, it [LAUGHS] it looks like Mr. Jemal has paid for this furniture the extent to which he's paid. |
| | But — but here we have in two separate instances reaching out of the clear blue and pulling International Builders, a small company, an LSDB, a minority firm, no question about that, but in a sea of minority firms.  And at that point, you weren't even a D.C. minority firm; you were Virginia when all of this began.  So, I — I'm trying to understand what the relationship is between you and your company International Builders, and your company Global Furniture Resources, and Douglas Jemal.  And here's the question.  Did Michael Lorusso speak on your behalf to Douglas Jemal in terms of this DHS furniture and say, "Mr. Jemal, we want you to work with the financing or the purchase of this furniture for Global Furniture Resources, for Fernando Villegas, as part of an overall deal whereby the D.C. government would be filling 77 P Street?"  Was this part of an overall |

-19-

| | |
|---|---|
| | scheme where you were favored because others were favored — a tit for tat, Mr. Villegas? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, if you'll turn with me now to the materials that were submitted to you.  Not the bank materials, but the other materials.  Page 1, the very first document.  Uh, if you go to Page 5, you will see that this is the sole sor — sole-source authorization for International Builders, Incorporated signed by Jacques Abadie, who is the direc — the Chief, uh, uh, the Director of the Office of Contracts and Procurement, on August 19th, 2002.  You'll see that on Page 5, you'll see his signature on Page 5.  August the 19th, 2002.  If you go back to Page 1, you will see, uh, the International Builders invoice submitted on August the 13th, 2002.  Now that's — let me think.  August 19th to August 31st, that's 12 days.  That's 12 days.  And here you represent that the job is 65 percent complete, and so please pay me, please pay International Builders $648,659.  Mr. Villegas, how could you possibly have completed the work — and this is all under PAOM2002C0036-8 — HS.  Let me repeat that.  PAOM2002C0036-HS.  All under the same [UNINTELLIGIBLE].  You — you — you had authorization and in 12 days, you did 65 percent of the work?  Mr. Villegas, how is that possible?  Is this another example of you submitting an invoice for work that was not done but just getting the money?  Mr. Villegas? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Well, speaking of legal advice, are you aware that the submission of a false claim for payment to the District of Columbia, if proven, could result in you being liable for treble damages — treble damages under D.C. law?  Are you aware of that law? |
| MARK MACDOUGALL: | If that's a question to Mr. Villegas, Mr. Graham, [MIXED VOICES/INAUDIBLE] — |
| CHAIRMAN JIM GRAHAM: | It is a question to Mr. Villegas. |
| MARK MACDOUGALL: | Mr. Villegas is not an attorney, and you're asking him for a legal conclusion. |
| CHAIRMAN JIM GRAHAM: | But Mr. — Mr. Villegas is very much involved in the construction business.  He ought to know, or it's reasonable for us to assume that he would know that he would have certain information about practices and laws in the District of Columbia relating to construction.  Mr. Villegas, are you aware that submitting a false claim for payment, uh, for services rendered, or not rendered, in this case, could make you liable for treble damages? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM | Mr. Villegas, if you turn with me now to Page 14.  Again, we're |

| | |
|---|---|
| GRAHAM: | looking at the numbers at the bottom of the page in the center — the bottom of the page in the center.  Now, here we have invoices submitted by you.  If you look at Page Number 15, Page Number 15.  Are you with me?  Page Number 16.  Page Number 17.  Page Number 18.  Page Number 19.  Page Number 20.  Page Number 21.  Page Number 22.  These are invoices totaling... approximately $1.4 million.  Mr. Villegas, on each one of these pages — 15 through 22 — we have your signature.  I know your signature now, Mr. Villegas.  This is your signature.  I can say that without you taking the fifth amendment.  $1.4 million, and on each and every one of these pages there is not one word describing the work that was done In each and every case where there is a box for the description of the work.  At least in the prior invoice you put "65 percent complete."  On these boxes you put absolutely nothing, and signed, and submitted.  And Mr. Villegas, these were all submitted and signed, uh, March 10th, March 10 — this all concerns One Judiciary Square, by the way — March 10th, March 10th, March 10th, March 10th, March 10th, March 10th, March 10th.  All submitted on the same day for $1.4 million.  March 10th, 2002.  And the contract for these Task Orders 1 through 9 — Mr. Villegas the Task Orders 1 through 9 Agreement — it wasn't a contract, agreement — was not signed until the 26th of March — 16 days *after* you had the audacity to submit $1.4 million worth of invoices without a word of description. |
| | Joseph Phillip, working in the Office of Property Management, on the 15th of March — and you see this memo on Page 14, uh, it's a memo from Sean Frasier, who worked for you, we know that from other testimony.  From Sean Frasier to Henry Louis, Cushman & Wakefield, - it's — it's — and — and — and saying, "Joseph called me and told me to fax him directly the invoices for the task orders.  Attached you will see these invoices."  Mr. Phillip, to his credit, was intervening to say, "What's going on here?  What's going on here?"  But, Mr. Villegas, to your *dis*credit, you signed $1.4 million worth of invoices without having done that much work, without maybe having done *any* work, *and* prior to there being any contract authorization to submit any invoices at all.  Mr. Villegas, did Michael Lorusso instruct you to submit this $1.4 million worth of invoices at this time on the 10th of March 2002? |
| MARK MACDOUGALL: | Uh, Mr. Chairman, be — before, uh, Mr., uh, Mr. Villegas answers, uh, if — if I could respectfully ask the committee or the staff, is there additional documentation supporting these task orders in hand? |
| CHAIRMAN JIM GRAHAM: | You know, that is the question I asked myself very early — |
| MARK MACDOUGALL: | Well — |
| CHAIRMAN JIM GRAHAM: | — on. |
| MARK MACDOUGALL: | We have — we have — |
| CHAIRMAN JIM GRAHAM: | And — and — and, if I may answer the question that you've put, counsel.  Uh, if there is, we — in all of our efforts with OFRM and the chief financial officer, in OPM, the Office of Property Management, from Mr. Villegas himself, uh, in terms of the invoice itself, we have no backup.  And that's one of the issues that I'm going to get to shortly.  This is it.  And this is what Mr. Phillip found.  And we've had testimony by Mr. Phillip.  And he in fact intervened, you know, to substantially reduce, in some cases cancel |

|  | the payment for these invoices. Thereafter, of course, Mr. Phillip was moved out of the process. He was moved out of the process. He was — he was trouble. So, you know, he — it — it reached the point very quickly by April where the invoices — he didn't even see the invoices. Of course, Mr. — Mr. Louis at Cushman & Wakefield didn't see the invoices. So the short answer to your question is this is what we have — $1.4 million, no description, no backup, signed by Fernando Villegas. |
|---|---|
| MARK MACDOUGALL: | Let me clarify my question, Mr. Graham. I didn't mean to interrupt you a moment ago. I apologize. Uh... does the com — does the committee know one way or another whether the District government has additional documentation supporting these task orders? |
| CHAIRMAN JIM GRAHAM: | Well, uh, again, an excellent question. And — and I can only say to you, in the, uh, time that we've been actively investigating this, uh, we — we have asked that question over and over again. In fact, if you go to our subpoena duces tecum, uh, which we issued to your client, or his company, on June 26th. Uh, you know, I specifically asked for, uh, backup information as to technology, as to technology integration, uh, as to the — the two, uh, tenant rep pool payments. Uh, and — and, uh, none was supplied. None were supplied. So we — we have endeavored to get that information. If it exists, we don't have it. We certainly would be most interested in having it. If your client has, uh — you know, and, again, we're going on the five boxes of material that your client submitted pursuant to subpoena to this — to this investigation. But, uh, and so we didn't have that attached to the invoices. Now, were there miscellaneous bills and expenses, you know, submitted? Yes. But where they attached to an invoice in directly justification, say for amount now due $150,000? No. |
| MARK MACDOUGALL: | My question specifically was whether the — the D.C. government has records to which Mr. Villegas would not have access or would not even have knowledge that reflected task orders. |
| CHAIRMAN JIM GRAHAM: | Uh, none that ha — I have been able to uncover. None that — would — would you like to respond to my question, Mr. Villegas? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, you were paid — for One Judiciary Square, you or your company were paid approximately $6.1 million. What percentage of the work did you actually do? Was it less than 50 percent or more than 50 percent? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Mr. Catania, do you have questions? |
| COUNCILMEMBER DAVID CATANIA: | No, Mr. Chairman. [PAUSE]. Uh, Mr. Chairman, if I could. Um, uh, it's obviously that the witness is, uh, not going to answer questions, is going to exert — is going to, uh, for the duration of the hearing is going to extend his fifth amendment privileges to himself and not testify. Uh, Mr. Chairman, I would just like to ask that — once again |

| | |
|---|---|
| | reiterate my prior position that an easy way to double the council's resources is to simply request or subpoena the Internal Revenue Service documents, in fact, the — the, uh, tax returns both for Mr. Villegas and for his corporate entities over the last three years. Compare them with the transfers, and — and simply refer the information over to the Internal Revenue Service that has expertise in re — and, uh, uh, an investigative arm, Mr. Chairman, that's longer than ours. So whereas we might have some difficulty in accessing the bank accounts in Florida and other points within the United States, the Internal Revenue Service certainly will not, uh, Mr. Chairman. So I would just urge we take that approach rather than this approach. Um, we're not getting any new information out of Mr. Villegas here. I — I suspect we would probably do better to begin drafting a letter to the Internal Revenue Service and beginning drafting the subpoena documents for the tax returns for the last three years. Thank you. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, if you'll turn with me now to Page 26 of the materials. On page — and these are again documents. These particular documents, actually, that we used to copy for this information actually came from Cushman & Wakefield. But we had identical documents that were submitted by you. And we have — on Page 26 and 27, we have invoices for removal of furniture totaling $200,000. Uh, Mr. Villegas, do you have any backup information, any — any — any invoices to support, uh, spending $200,000 for the removal of furniture? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | On Page 28 and 29 there are invoices, for which again you were paid, totaling $124,000 for cable and video technology. Uh, do you have any documentation to support that this technology, or cable, or, uh, anything related to these issues was actually purchased? Do you have any backup information for this at all? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | On Page Number 33, uh, you submitted and you were paid for $241,000 — $241,171 for Task Order Number 7, uh, for, uh, "construction." Uh, Joseph Phillip has testified that he specifically objected to this invoices being paid and that he was overruled in a meeting involving the Office of Contracts and Procurement, OFRM representatives Michael Lorusso. Uh, Mr. — Mr. Villegas, do you have any backup information whatsoever for this claim for payment? |
| MARK MACDOUGALL: | Mr. Graham, I want to be certain we're looking at the right documentation. This has at the bottom of the page the number 33 and then Roman numeral III-14. |
| CHAIRMAN JIM GRAHAM: | No. Please stay with the — the — the — the number that is in the middle of the bottom of the page — Page 33. |
| MARK MACDOUGALL: | Thirty-three. That — that's the document I'm looking at. |
| CHAIRMAN JIM GRAHAM: | $241,171. |

| | |
|---|---|
| MARK MACDOUGALL: | Okay.  The reason I asked, uh, Mr. Chairman, is that — that this is a letter from Cushman & Wakefield to Michael Lorusso, signed by Scott Frankel.  It doesn't have Mr. Villegas' name or any reference to him on it at all. |
| CHAIRMAN JIM GRAHAM: | Right.  But this was — m — Mr. Villegas was the general subcontractor.  And these were — the — the actual claim for payment was submitted in every instance by Scott Frankel on behalf of Cushman & Wakefield.  But it was predicated on an invoice from International Builders, and there is an invoice to support this from International Builders.  Mis — Mr. Villegas, do you have any backup information for the $241,171 on Page 33, *or* the $252,088.35, uh, on, uh, invoice — on the invoice on Page 34?  Do you have any backup information to support those two requests for payment? |
| MARK MACDOUGALL: | Well, a — again, Mr. Chairman, the — the objection I would have to interpose is that, uh, Mr. Villegas, uh, uh, has never seen these documents before.  And, uh, they — they obviously do not involve him.  They're not addressed to him, they're not authored by him, and they're not documents of a company with which he is employed. |
| CHAIRMAN JIM GRAHAM: | Well, I — I could pursue that with you because *all* of the work came from — *all* of the work at One Judiciary Square came from International Builders, Incorporated to Cushman & Wakefield to Michael Lorusso, payment back to International Builders.  But, it's — it's — it's okay.  Well, the — we — we have no — we previously asked this question.  I'm simply laying — Mr. Catania, I'm laying the record here.  I'm creating the record for what we will need. |
| | Uh, Mr. Villegas, there are — we have information which you submitted to us indicating that the District of Columbia bought six plasma screen TVs.  We've only been able to locate one of them.  Do you know where the other five are? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Okay.  On Pages 35, 36, 37, and 38 of the materials that we have submitted to you, there — these are documents, uh, Mr. Villegas which you submitted to the investigation.  These are *your* documents, Mr. Villegas.  Uh, these documents indicate that you spent a total of $1,620 and $917.40 — approximately $2,500 — on a fundraiser for Erik Gaull, who was running for the City Council from Ward 3.  Uh, Mr. Villegas, uh, are you aware that this far exceeds the limit that can be contributed to a council — uh, a Ward candidate for the City Council, and that limit is $500?  So that it appears as though — and we have your checks, which you submitted to us, uh, both checks totaling 100 — uh, $2,500 — are drawn on International Builders, Incorporated Business Bank account.  Both checks totaling $2,500 were drawn on that account.  Uh, Mr. Villegas, are you aware that that is five times the legal amount that you can contribute to a Ward 3 — uh, to Ward candidate for the City Council? |
| MARK MACDOUGALL: | Again, Mr. Chairman, I'd have to object.  Mr., uh, Villegas, as he stated repeatedly, is not a lawyer, and he's now being asked to — to offer a legal conclusion. |
| CHAIRMAN JIM GRAHAM: | Mr. Villegas, would you please respond to the question? |

| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
|---|---|
| CHAIRMAN JIM GRAHAM: | Was your support for Erik Gaull, indeed your very enthusiastic support for Erik Gaull, premised in some kind of a quid pro quo, tit for tat, in terms of what was being done for you, uh, at One Judiciary and elsewhere, uh, uh, Global Furniture Resources, and so on? Was this part of an overall agreement in terms of how you would respond and what *you* would do for *your* part in responding? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer. I am not a lawyer and must rely on the advice of my lawyer in this matter. |
| CHAIRMAN JIM GRAHAM: | Okay. Uh, I'm now going to conclude the hearing with a statement. Uh, Mr. Catania, before I do that, do you have any additional questions? Mr. Villegas, uh... and I — I would say that we have still present with me the General Counsel of the District of Columbia. I as Chairman — excuse me of the Council of the District of Columbia. I as Chairman of this investigation do now order and direct you to answer the questions I have previously put to you. Under authority of the case of *Presser* v. *United States*, D.C. Circuit, um, by answering questions to put — put to you on June 6th, 2003, when you appeared before this investigation, you appeared with your attorney, um, you were advised in terms of the ramifications of your questions and answers. Um, in addition, you brought these five boxes of materials. You subsequently provided other information to us. So I have asked you questions, which are the same questions or are inextricably related to the questions I have previously asked you. And by answering those questions on June 6th, by providing this information on June 6th, it is our position that you have waived your fifth amendment privilege insofar as these specific questions and insofar as questions that can be asked as the result of these documents. Now, I want to say that we could have gone through — I mean, we could have spent the whole day marching through every single document in these boxes, and so we've only used illustrative questions. |
|  | Um, if you continue in your refusal to answer these questions, then I as the Chairman of this investigation will cons — will consider and declare your behavior to be contumacious under D.C. Code 1-204.13. Wa — D.C. Code 1-204.13 provides that the council, or any committee or person authorized by it, shall have the power to investigate any matter relating to the affairs of the District, and for that purpose may require the attendants and testimony of witnesses, *and* the production of books, papers, and other evidence for such purpose any member of the council, if the council is conducting the inquiry, or any member of the committee, may issue subpoenas and administer oaths upon resolution adopted by the council or committee as appropriate. This council has indeed passed such a resolution. |
|  | B. In case of contumaciously by or refusal to obey a subpoena issued to any person, the council by resolution may refer the matter to the Superior Court of the District of Columbia, which may by order require such person to appear and give or produce testimony or books, papers and other evidence bearing upon the matter under investigation. Any failure to obey such order may be punished by such court as a contempt |

| | thereof, as in the case of failure to abor — to obey a subpoena issued or to testify in a case pending before such court. |
|---|---|
| | Mr. Villegas, in light of this information, will you now answer each and every question that I have asked you today following the information I have provided you on your bank accounts? |
| MARK MACDOUGALL: | Mr. Chairman, I need to respond to — to that question and to the — to the Chair's statement.  Uh, Mr. Chairman, you cited *U.S.* v. *Presser*, and, uh, I know that case well.  And I'm quite convinced — and we'll have the opportunity, I — I suspect, to — to, uh, debate this in another forum, uh — that that case doesn't control the facts here.  And I would respectfully refer the — the General Counsel and the Chairman to *United States* v. *Larry* in the, uh, 6th Circuit in 1976; *United States* v. *Stephen*, uh, in the, uh, U.S. District Court, uh ,for the Eastern District of California in 1951, and most importantly, um, *U.S.* v. *Malone*, also for the, uh, Northern District of California, 1953.  I believe those facts, uh, are, uh, far, uh, closer to the facts we're dealing with here, and that, uh, Mr. Villegas has not, um, uh, waived his fifth amendment privilege under any circumstance. |
| | Um, more specifically, Mr. Villegas was, as — as the Chairman noted, represented by other counsel on June 6th.  Uh, I — I don't mean to speak for whatever took place that day, but subsequent to our engagement by Mr. Villegas, uh, Mr. Chairman, you went on a radio program on June 20th and made some very serious allegations of criminal conduct directed at Mr. Villegas and others.  Under those circumstances — and I have a transcript here that I'd be prepared to hand up.  Under those circumstances, Mr. Villegas was left, and — and his counsel, ourselves, were left with no option but to advise Mr. Villegas, as he has today, to assert his fifth amendment privilege.  Uh, he was anxious to, uh, to cooperate and willing to cooperate.  But unfortunately, with a conclusory accusation of criminality having been made in a public way, he had no — no option and we had no option but to advise him to assert his fifth amendment privilege, as is his Constitutional right. |
| CHAIRMAN JIM GRAHAM: | Uh, mis — Mr. Villegas, are — are you, uh, prepared now to answer the questions, and, therefore, respond to the subpoena that has been lawfully served on you? |
| FERNANDO VILLEGAS, PRESIDENT, INTERNATIONAL BUILDERS: | Mr. Chairman, on the advice of counsel I must assert my right under the Fifth Amendment to the Constitution and respectfully decline to answer.  I am not a lawyer and must rely on the advice of my lawyer in this time — in this matter. |
| CHAIRMAN JIM GRAHAM: | Thank you very much, Mr. Villegas.  Uh, I do want to say before we close this hearing that, uh, each — pardon me? — before we recess this hearing.  Uh... each and every step along the way in terms of the legal situation regarding waiver of fifth amendment, uh, privileges, you know, this investigation has consulted very carefully with the General Counsel of the Council of the District of Columbia.  In addition, we have benefited from the expert advice from the firm of Bredhoff & Kaiser.  Mr. Robert Weinberg, who has prepared lengthy and detailed memoranda on the subject of wheth — of what constitutes a waiver, uh, in terms of controlling law in the District of Columbia.  So we have preceded this with extreme care.  I also want to note that while we have gone, or we're about to go to court in terms of the waiver of fifth amendment privilege by Mr. Douglas Jemal of Douglas Development — and the council has authorized that — uh, we have chosen, uh, not to |

|   | seek — not to challenge Mr. Jemal's uh, otherwise — his — his other assertions of fifth amendment privilege.  Uh, we have not challenged Mr. Esherick of Douglas Development, his assertion of fifth amendment privilege.  We have not challenged Mr. Milstein, also of Douglas Development, his assertion of fifth amendment privilege.  We have not challenged the attorney, Mr. Potkin, who came and testified on February the 27th under oath.  We have not challenged his assertion of attorney-client privilege.  Uh, nor will we challenge Mr. Villegas' a — assertion of the fifth amendment privilege insofar as questions or documents, which were not part of his June 6th, uh, 2003 testimony or which were not submitted voluntarily or under subpoena thereafter. |
|---|---|
|   | But insofar as the narrow element, the narrow situation of questions asked, previously answered, documents provided, and here again I refer you to binder after binder after binder — five pa — boxes of documents, which Mr. Villegas *with* counsel, with the benefit of counsel. It may not have been you, Mr. MacDougall, but he did have counsel with him at that time. Uh, we believe that we're entitled to question him and he is responsible to provide answers for those questions.  He is obligated to provide answers to those questions under oath because of the fact that he waived his fifth amendment privilege, uh, during the course of the June 6th testimony, during the course of providing five boxes of information, during the course of submitting additional information, and, by the way, responding to the June 26th, uh, subpoena while — while — while *you* were representing him and submitting documents. |
|   | So we think there is such a thing as waiver of fifth amendment privilege, and we think in this case, uh, he has waived his fifth amendment privilege.  And thus, for all of those reasons, and believing, also, that we have accommodated Mr. Villegas on three separate occasions, and so we have extended, you know, uh, you know, our — our accommodation to him repeatedly.  But with all of that information and all of those facts in mind, we will now prepare — we will now consider action to obtain a court order to compel Mr. Villegas to testify as to this class of questions.  And let me repeat again, it's questions that we previously asked you and you previously answered under oath.  It's questions which are inextricably related to those questions that you've previously answered, and it's questions relating to documents which you have provided to this investigation.  Insofar as that class of information, we believe you have waived your fifth amendment privilege and we are entitled to seek a court order to compel your testimony.  Uh, that concludes this hearing. |
| MARK MACDOUGALL: | Mr. Graham, may — may I make one distinction because I think it — this is an important issue and it's important that when it's litigated that the right issue be litigated.  Uh, Mr., uh, Villegas, uh, in his capacity as a — as an employee and officer of, uh, International Builders has produced corporate documents.  And I — I — I — I believe that General Counsel would agree with me that except for some very narrow exceptions, corporation do not have fifth amendment privileges, and certainly not with regard with corporate records.  So the documents that have been produced have been produced by IBI.  Those are not personal to Mr. Villegas.  And — and the production of those records, uh — I — I think the law is quite clear — uh, does not constitute a general waiver of — of, uh, the fifth amendment privilege by Mr. Villegas. |
|   | With regard to, uh, his, uh, his testimony on June 6th accompanied by other counsel, we simply disagree on what the law is.  And, uh, uh, uh, |

| | |
|---|---|
| | if, uh, if the committee and the council, uh, proceeds with si — with, uh, an action in Superior Court, uh, we'll be — we'll be there, and, uh, we'll be prepared to, uh, to argue that law with you.  Thank you. |
| CHAIRMAN JIM GRAHAM: | Well, and has been — as has been pointed out in the debate on this resolution, uh, w — we're not deciding what the law is.  We are proceeding on what has been advice given to us by attorneys who are skilled in this particular area of the law.  Uh, this decision will be made by a judge, and it will be made after full consideration of all of the points of view.  I mean, that's the way our system works, and we recognize that.  Uh, and — and I do want to say that, uh, you know, we respect the fifth amendment privilege against self-incrimination, we most definitely do.  I'm an attorney, 30-year standing in the D.C. Bar.  Uh, but — but we also believe that there is a point that can be reached where that privilege is waived.  The extent to which that privilege has been waived in this case is going to be a matter for the court to determine.  And we'll — everyone will have the opportunity to pra — to provide their point of view. |
| | So I am now going to recess this hearing until appropriate 1:00, when we will reconvene, uh, with witnesses, uh, who are the top government officials in the District of Columbia — the City Administrator, two deputy mayors, um, and the Acting Corporation Counsel — so that we can get, uh, uh, questions answered about the role of the District of Columbia government in all these matters.  Uh, let me again, Mr. Villegas, thank you very much for your cooperation.  You have, uh, cooperated with this investigation previously.  And, uh, Mr. MacDougall and Mr. Swisher, thank you very much for being here today. So we will stand in recess until 1:00.  Thank you. |
| MARK MACDOUGALL: | I take it we're excused, Mr. Graham?  Thank you. |