UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) ) ) | |
| v. | ) ) | Crim. No. 05-0359-1, -2, -3 (RMU) |
| **DOUGLAS JEMAL, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

**DEFENDANTS' MOTION FOR JUDGMENT OF
ACQUITTAL ON COUNT FIVE OF THE INDICTMENT**

Defendants Douglas Jemal, Norman D. Jemal, and Blake Esherick ("Defendants"), through counsel, hereby move this Court, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal on Count Five of the Indictment because the evidence is insufficient to sustain a conviction. Defendants respectfully request oral argument on this motion. A proposed Order is attached.

                                                                   Respectfully submitted,

                                                                   /s/
                                        Reid H. Weingarten (D.C. Bar #365893)
                                        Brian M. Heberlig (D.C. Bar #455381)
                                        Steptoe & Johnson LLP
                                        1330 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036-1795
                                        (202) 429-3000

                                        Michele A. Roberts
                                        Jeffrey M. King
                                        Akin Gump Strauss Hauer & Feld LLP
                                        1333 New Hampshire Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334

Counsel for Douglas Jemal


Stanley M. Brand
Ross Nabatoff
The Brand Law Group
923 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 662-9700

Counsel for Norman Jemal


Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4400

Counsel for Blake Esherick

Dated: October 14, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES | ) |
| v. | ) Crim. No. 05-359-1, -2, -3 (RMU) |
| DOUGLAS JEMAL, *et al.*, | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT OF
<u>ACQUITTAL ON COUNT FIVE OF THE INDICTMENT</u>**

The Court should enter a judgment of acquittal on Count Five of the Indictment because the evidence is insufficient to sustain a conviction. The government has utterly failed to prove that Defendants Douglas Jemal, Norman D. Jemal, and Blake Esherick ("Defendants") engaged in any scheme to defraud Joseph Cayre or Morgan Stanley Mortgage Capital ("Morgan Stanley") by submitting an invoice from MTD Real Estate Services ("MTD") with the requisite fraudulent intent to obtain money or property that did not belong to them. Mr. Cayre and Benjamin Black, Morgan Stanley's relationship manager for Douglas Development Corporation ("DDC" or "Douglas Development"), both testified that they did not lose a dime as a result of the transaction. Tr. 2180 (Cayre); 1268 (Benjamin Black). As Mr. Cayre made clear, he and Douglas Jemal "fought like cats and dogs" over commissions. Tr. 2117. Defendants used MTD to avoid these fights, not to collect a commission to which Defendants were not entitled.

The government has also failed to prove that any misrepresentations made by Defendants as part of the purported scheme to defraud were material. Mr. Cayre testified that because the total commissions at the 77 P Street project were less than six percent, he "didn't

care where the money went" -- i.e. he did not care "if Douglas Jemal got the money, if brokers [he] never heard of got the money, or if the money went to charity . . . ." Tr. 2180.  Likewise, Mr. Black testified that the Morgan Stanley loan agreement did not require Douglas Development to disclose its relationship with MTD, did not prohibit Douglas Development from obtaining commissions in any event, and was not violated by the MTD transaction.  Tr. 1267-68.

Finally, there is a complete lack of evidence in the record upon which a reasonable juror could conclude that Defendants defrauded the Internal Revenue Service (IRS) in connection with this transaction.  Accordingly, the Court should enter a judgment of acquittal on Count Five of the Indictment.

**I.   INTRODUCTION**

Count Five charges the Defendants with violating the wire fraud statute, 18 U.S.C. § 1343, by allegedly devising a scheme to defraud relating to a commercial loan obtained by Cayre Jemal's Gateway, the entity that owned the 77 P Street property, from Morgan Stanley.  In essence, Count Five alleges that the scheme to defraud involved obtaining leasing commissions by way of a false MTD invoice in order to:  (a) obtain partnership funds from Cayre Jemal's Gateway without Mr. Cayre's knowledge, and (b) obtain funds from Morgan Stanley out of a tenant improvement reserve that was part of the loan without disclosing that MTD was affiliated with the Defendants.  Count Five further alleges that the Defendants defrauded the IRS in connection with the transaction.

During its case-in-chief, the government failed to prove that the Defendants intended to defraud Mr. Cayre by obtaining Cayre Jemal's Gateway partnership funds to which the Defendants were not entitled.  To the contrary, the evidence from the government's own witnesses has established that the Defendants merely used MTD as a vehicle to avoid disputes

with Mr. Cayre over commissions to which the Defendants were otherwise entitled. Indeed, Mr. Cayre has testified that he did not lose a single penny as a result of the MTD commission. Tr. 2150.

Similarly, Benjamin Black, the relationship manager for Douglas Development Corporation ("DDC" or "Douglas Development") at Morgan Stanley, testified that Morgan Stanley did not lose any money in connection with the payment of the leasing commission to MTD. Tr. 1268. Given this testimony, no rational juror could conclude that the Defendants acted with criminal intent to defraud by obtaining money or property to which they were not entitled. In addition, Messrs. Black and Cayre both testified that it did not matter whether the funds at issue were obtained by DDC or MTD. Tr. 1267-68 (Black); 2179 (Cayre). This testimony established that the alleged misrepresentations in the MTD invoice were immaterial.

Finally, the government has presented no evidence regarding the tax consequences of the MTD transaction. Notwithstanding the allegation in the Indictment that the Defendants concealed the transaction from their tax preparer, the government failed to call a witness from the tax preparer firm and did not present any evidence on this topic. The government failed to present any evidence at all regarding the tax returns of Douglas Jemal, Norman Jemal, or Douglas Development. The only "evidence" offered by the government on this topic was testimony from an IRS records custodian that no MTD corporate tax return could be located in the IRS system. That testimony alone is woefully insufficient to sustain the IRS prong of Count Five.

## II.   ARGUMENT

### A.   Rule 29 Legal Standard

Federal Rule of Criminal Procedure 29(a) provides in relevant part:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

Fed. R. Crim. P. 29(a).  In considering a Rule 29 motion, the court must grant relief "when the evidence . . . is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime."  United States v. Payton, No. 81-1792, 1982 U.S. App. LEXIS 21154, at *8 (D.C. Cir. Mar. 9, 1982) (citing United States v. Staten, 581 F.2d 878, 882 (D.C. Cir. 1978) (citation omitted)).  While the evidence must be viewed in the light most favorable to the government, the Court is required to take a "hard look at the evidence and accord the government the benefit of only 'legitimate inferences.'"  United States v. Recognition Equip., Inc., 725 F. Supp. 587, 588 (D.D.C. 1989) (noting that the court should not "indulge in fanciful speculation or bizarre reconstruction of the evidence" when considering a Rule 29 motion).  "'The trial judge should not allow the case to go to the jury if the evidence is such as to permit the jury to merely conjecture or to speculate as to defendant's guilt.'"  United States v. Morrow, No. 04-355 (CKK), 2005 U.S. Dist. LEXIS 11753, at *11 (D.D.C. June 13, 2005) (quoting United States v. Bethea, 442 F.2d 790, 792 (D.C. Cir. 1971)).

In resolving this motion, the Court should consider all evidence presented in the government's case-in-chief and on cross-examination of the government's witnesses.  United States v. Brodie, 403 F.3d 123, 133-34 (3d Cir. 2005).  Defendants contend that the Court should grant this motion immediately due to the lack of sufficient evidence to sustain a conviction.  However, if the Court reserves decision on this motion under Rule 29(b), the Court must later

- 4 -

resolve this motion solely on the basis of the evidence at the time the ruling was reserved without consideration of any evidence that may be presented in the defense case-in-chief. Fed. R. Crim. P. 29(b); see also United States v. Wahl, 290 F.3d 370, 375 (D.C. Cir. 2002).

### B. The Government Has Failed To Prove That Defendants Possessed The Requisite Fraudulent Intent To Obtain Money Or Property To Which They Were Not Entitled

In order to prove a violation of the wire fraud statute, the government must establish that the defendant engaged in a "scheme or artifice to defraud." 18 U.S.C. § 1343. "[T]he critical element in a 'scheme to defraud' is 'fraudulent intent.'" United States v. Reid, 533 F.2d 1255, 1264 n.34 (D.C. Cir. 1976) (quoting United States v. Regent Office Supply Co., 421 F.2d 1174,1180 (2d Cir. 1970)) (quotation marks omitted); see also United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) ("Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent."). In order to establish that the defendant had the requisite fraudulent intent, the government must show "'that some actual harm or injury was contemplated by the schemer.'" Reid, 522 F.2d at 1264 n.34 (quoting Regent Office Supply, 421 F.2d at 1180); see also Starr, 816 F.2d at 98 (government must, "at a minimum, prove that defendants contemplated some actual harm or injury to their victims"). The intended harm that the government must prove the defendant intended is "harm to the property rights of their victims." United States v. Stouffer, 986 F.2d 916, 922 (5th Cir. 1993) (emphasis added). It is "[o]nly a showing of intended harm [that] will satisfy the element of fraudulent intent." Starr, 816 F.2d at 98; see also United States v. St. Gelais, 952 F.2d 90, 95 (5th Cir. 1992) (same); Regent Office Supply, 421 F.2d at 1182 ("the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful"). Whether any injury resulted from the fraud

goes to the defendant's fraudulent intent, or lack thereof. See Reid, 522 F.2d at 1264 n.34 ("'proof that someone was actually victimized by the fraud is good evidence of the schemer's intent'") (quoting Regent Office Supply, 421 F.2d at 1181).

In this case, the government has presented no evidence that the Defendants contemplated any harm to Mr. Cayre or Morgan Stanley arising out of the MTD transaction. The fact that the Defendants may have benefited from the payment of the leasing commissions to MTD does not establish that the Defendants possessed the requisite fraudulent intent because there was no injury to the property rights of the purported victims. See Starr, 816 F.2d at 101 ("While a finding that defendants garnered some benefit from their scheme may be helpful to the jury to establish motive, it cannot be probative of fraudulent intent unless it results, or is contemplated to result, from a corresponding loss or injury to the victim of the fraud."). Indeed, Messrs. Cayre and Black both testified that the alleged scheme to defraud did not result in any actual loss.

The evidence has established that the Defendants created MTD to avoid the conflict that had typically occurred following the submission of Douglas Development commission invoices to Mr. Cayre; not to obtain funds to which the Defendants were not entitled. Mr. Cayre testified that he and Douglas Jemal "fought like cats and dogs" over fees and leasing commissions that Douglas Development charged to the Cayre-Jemal partnerships because Mr. Cayre did not understand the real estate business. Tr. 2117. Mr. Cayre further testified that he ultimately reached an agreement with Douglas Jemal "that there would be a 6 percent commission paid, and [that he] really didn't care who it was paid to. [Douglas Jemal] could either take it all or give it all away . . . ." Tr. 2119. Yet Mr. Cayre acknowledged that

throughout their business partnership, he and Mr. Jemal "hollered at each other a lot and screamed at each other a lot."  Id.

The undisputed evidence in the record establishes that MTD was used to obtain the leasing commission at issue to avoid precisely this sort of conflict with Mr. Cayre.  In fact, the government elicited from Mr. Cayre the after-the-fact explanation that Douglas Jemal gave to Mr. Cayre about the purpose behind using MTD to obtain the commission:  "[H]e sa[id] the reason that I did it that way is because you always break my balls and call me up and scream and holler, so we did it that way, it was within our 6 percent, so what do you care anyway."  Tr. 2150.  Similarly, Douglas Development's former-Controller David Medding testified that he learned that MTD was used to collect the commission "so that there wouldn't be the fighting between the two of them, [and] they could collect the commission that they were entitled to."  Tr. 864.  No rational juror could conclude from this evidence that Defendants intended to harm Mr. Cayre's property interests because it is clear that Defendants did not obtain Cayre Jemal's Gateway partnership assets to which they were not entitled.

Indeed, the undisputed evidence establishes conclusively that Mr. Cayre was not "victimized" in any respect and suffered no harm to his property interests as a result of the MTD transaction.  Mr. Cayre provided the following testimony that is flatly inconsistent with any intent to defraud:

```
2179:19 Q.  Now, you obviously testified that in your view you have not
     20 lost any money as a result of this MTD commission, correct?
     21 A.  That's correct.
     22 Q.  And the reason for that is that you contemplated in
     23 connection with the P Street project that there would be leasing
     24 commissions of 6 percent overall, correct?
     25 A.  That's correct.
2180: 1 Q.  And you didn't care if Douglas Jemal got the money, if
      2 brokers you never heard of got the money, or if the money went
      3 to charity, you in your own head wrote off that 6 percent --
```

```
 4 A.  I didn't care where the money went, as long as it wasn't
 5 any more than 6 percent.
 6 Q.  And when you evaluated the 6 percent number, you took into
 7 account the entire P Street project, correct?
 8 A.  That's correct.
 9 Q.  And is it fair to say that once the MTD commission was
10 disclosed to you, you went back and either you or someone on
11 your behalf actually did the math to see if the leasing
12 commissions that were paid out in connection with the P Street
13 project were more or less than 6 percent.
14 A.  We sure did.
15 Q.  And is it fair to say that they were well short of the 6
16 percent figure that you --
17 A.  I don't know how well short they were, but they did not
18 exceed 6 percent.  I didn't look at it.  I just asked a
19 question, were they more than 6 percent, to my people, and they
20 said they were not.
21 Q.  And as a result, you have concluded that you have not been
22 defrauded out of one penny as a result of the MTD commission,
23 correct?
24 A.  That's correct.
```

Tr. 2179-80 (emphasis added). Obviously there could have been no intended loss of money or property as required by the wire fraud statute if the Defendants were actually entitled to the funds at issue. See, e.g., Regent Office Supply, 421 F.2d at 1181 ("[i]f there is no proof that the defendants expected to get 'something for nothing,' . . . it is difficult to see any intent to injury or to defraud in the defendants' falsehoods").

Similarly, Mr. Black provided undisputed testimony that Morgan Stanley did not lose any money as a result of the commission payment to MTD. See Tr. 1237 ("It is my understanding that Morgan Stanley did not lose any money on this deal."); 1268 (confirming that Morgan Stanley did not "lose one penny as a result of this commission payment to MTD"). Moreover, Mr. Black testified that it would have been impossible for Morgan Stanley to have lost any money as a result of the Defendants' conduct. He testified that if the pools of money that were held back under the loan agreement were not spent, they would go to the borrower,

- 8 -

Cayre Jemal's Gateway, not to Morgan Stanley. Tr. 1268. Mr. Black also testified that Cayre Jemal's Gateway began paying interest on the entire loan amount, including the tenant improvements reserve, when the loan closed. Tr. 1279. Thus, even if Morgan Stanley had refused to pay the leasing commissions at issue based on the invoice submitted by MTD, the total amount paid out by Morgan Stanley under the loan agreement, and the total amount of interest received by Morgan Stanley pursuant to the loan, would have remained the same. Under these circumstances, there is no evidence on which a reasonable jury could find that the Defendants intended to defraud Morgan Stanley of any money.

In sum, because the government has presented absolutely no evidence of injury to the alleged victims of the purported fraud -- or even any possible injury -- there can be no corresponding inference that the Defendants possessed the requisite fraudulent intent.[1] Accordingly, the government has failed to prove one of the essential elements of wire fraud, and the Court should enter a judgment of acquittal on Count Five.

### C. The Government Has Failed To Prove The Materiality Of Any Misrepresentations Made By Defendants

In addition to failing to prove Defendants' fraudulent intent (which alone justifies a judgment of acquittal), the government has also failed to demonstrate that the alleged misrepresentations made by Defendants were material. See Neder v. United States, 527 U.S. 1, 25 (1999) (holding that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes"). In order to be material, a misrepresentation must "ha[ve] 'a

---

[1] Although the prong of the scheme to defraud involving the IRS is addressed separately in Section II(D) below, for the reasons stated therein there is also no evidence of injury to the IRS.

- 9 -

natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Id. at 16 (quoting Kungys v. United States, 485 U.S. 759, 770 (1988)). In this respect, there is an important difference between misrepresentations that amount only to deception and those that rise to the level of fraud punishable by the wire fraud statute. "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." Starr, 816 F.2d at 98. Not only, as discussed above, must "the deceit must be coupled with a contemplated harm to the victim," but "the harm contemplated must affect the very nature of the bargain itself." Id. In other words, it must be material.

The government has failed to prove that the alleged misrepresentations were material to Mr. Cayre or Morgan Stanley. Mr. Cayre testified that as long as the total commission did not exceed six percent, as in this case, he "didn't care where the money went" -- i.e. he did not care "if Douglas Jemal got the money, if brokers [he] never heard of got the money, or if the money went to charity . . . ." Tr. 2180. In any event, he testified that he believed Douglas Jemal was entitled to that money. Tr. 2151.

Mr. Black testified that no provision in the Morgan Stanley loan agreement required Douglas Development to disclose its relationship with MTD to Morgan Stanley. Tr. 1267. Mr. Black confirmed that "there's absolutely nothing in the loan agreement . . . that prohibited Douglas Development from getting money" from the tenant improvement reserve. Id. He also testified that he did not believe that the request for a commission by MTD violated the terms of the loan agreement. Id. at 1267-68.

In sum, there is no evidence that Mr. Cayre or Morgan Stanley would have altered their conduct or decision-making had they known that MTD was affiliated with Douglas Development. Thus, the government has failed to establish that Defendants' alleged

misrepresentations were material.[2]  See, e.g., Regent Office Supply, 421 F.2d 1182 (noting that "[n]o customer testified that he felt he had been cheated" and finding that "defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception").  Accordingly, the Court should enter a judgment of acquittal on Count Five based on the government's failure to establish any material misrepresentations.

### D. The Government Has Failed To Prove That The Defendants Defrauded The IRS Based On The MTD Transaction

The government has also failed to prove that Defendants defrauded the IRS as a result of the MTD transaction.  Count Five alleges that all three Defendants willfully and knowingly participated in a scheme to defraud the Internal Revenue Service (IRS) by means of false and fraudulent pretenses.  See Indictment at 23 (¶ 11).  The Indictment specifically alleges that the IRS was defrauded because the Defendants, between December 12, 2002 and January 2005, neither filed a tax return with the IRS on behalf of MTD, nor informed the tax preparer for Douglas Development, and Douglas and Norman Jemal, of the receipt by Messrs. Jemal of funds generated through the use of the MTD invoice.  Id. at 27 (¶¶ 20-21).  It is unclear from this vague charge whether the government contends that (a) MTD should have filed a tax return reflecting income tax, or (b) Douglas Development, Douglas Jemal or Norman Jemal (or some

---

[2] In fact, both Mr. Black and Mr. Cayre testified that they wanted to, and in fact did, do more deals with Douglas Development and the Defendants after the 77 P Street loan.  Tr. 1248-49 (Black); 2181-82 (Cayre).

combination thereof) should have declared the funds received as a result of the MTD invoice as income on their tax returns. Under either theory, however, there is no evidence in the record to support the charge that the Defendants defrauded the IRS.

The only evidence presented by the government on this issue was evidence that MTD did not file a corporate tax return. Such evidence might suffice to survive a Rule 29 motion if the government had charged a violation of 26 U.S.C. § 7203 (the traditional failure to file a tax return provision). However, the government charged the Defendants with fraud -- wire fraud (18 U.S.C. § 1343) to be precise -- and a criminal fraud statute requires more. As stated supra, Section 1343 requires proof of a willful scheme to defraud the government of money or property. In a tax fraud scenario, such proof must include evidence that taxes (i.e. the property) were actually owed. See, e.g., Pasquantino v. United States, 544 U.S. 349 (2005) (affirming wire fraud convictions in connection with a scheme to evade Canadian import taxes due and owing from the interstate shipment of liquor).

In Pasquantino, unlike the instant case, the Supreme Court was confronted with evidence that taxes were in fact due and owing to the (Canadian) government:

> Had petitioners complied with this legal obligation [i.e., to pay excise taxes], they would have paid money to Canada. Petitioners' tax evasion deprived Canada of that money, inflicting an economic injury no less than had they embezzled funds from the Canadian treasury. The object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's property.

Id. at 356.

In contrast, the record in the instant case is devoid of any evidence that MTD owed taxes as a result of the MTD transaction. Not one fact witness has testified and not one expert has opined about the tax consequences of the MTD transaction, despite the government

having called <u>three</u> different IRS representatives to the stand (Jeanne Moisa, Charles Jones and Jennifer Abbott). It would be mere supposition, without any basis in the record, for the jury to conclude that there was any scheme to deprive the IRS of any money "legally due" when there has been no evidence of any tax obligation due and owing by MTD. See <u>Pasquantino</u>, 544 U.S. at 356. Such conjecture is what Rule 29 is designed to avoid. See <u>Morrow</u>, 2005 U.S. Dist. LEXIS 11753, at *11.

Indeed, the only MTD tax-related testimony presented by the government came from Jeanne Moisa of the IRS. The sum and substance of Ms. Moisa's testimony about MTD was that she did not locate a tax return from MTD in the IRS system. Tr. 625 (MTD "did not file any form 1120S, which are U.S. Corporation Income Tax Returns, for the tax years 2000, 2001, 2002 and 2003"). Ms. Moisa further conceded that she is not an expert on tax law but rather a mere custodian of records. Tr. 647. Thus, she did not testify, nor could she testify regarding whether or not MTD actually owed any taxes in those or any other years. No other witness addressed the issue.

There is also no evidence in the record that Douglas Development, Douglas Jemal or Norman Jemal failed to report taxable income from the MTD transaction -- let alone failed to do so with the requisite specific criminal intent. The government failed to introduce any tax returns of Douglas Development, Douglas Jemal or Norman Jemal. Thus, the government has proven nothing whatsoever about the Jemal's and Douglas Development's tax status. Moreover, no fact or expert witness has testified that Douglas Development, Douglas Jemal or Norman Jemal owed taxes from the MTD transaction that were not paid.

Additionally, the government has failed to put on any evidence regarding what the Defendants did or did not advise their tax preparer about MTD. Thus, there has been a complete

- 13 -

failure of proof with respect to the allegation in the Indictment that the Defendants did not inform the tax preparer for Douglas Development and Douglas and Norman Jemal "of the details of this transaction" and "receipt of funds" from MTD.  Indictment at 27 (¶ 21).  The government did not call anyone from the tax preparer firm and did not otherwise elicit such testimony.

The only evidence in the record regarding MTD *vis a vis* the IRS is that MTD:

(1) Filed a Form 8832 (entity classification election) which announces the creation of MTD to the IRS, and provides the IRS with contact information in the name of Blake Esherick and his office address.  Tr. 627-630; DX 681.

(2)  Filed a Form SS-4 (Application For Employer Identification Number) which requests the IRS assign a tax payer identification number to MTD and again provides the name Blake Esherick and his office address.  Tr. 631 - 633; DX 682.

(3)     Received official correspondence from the IRS assigning MTD its taxpayer identification number.  Tr. 633-634; DX 683.

Thus, in stark contrast to the allegation that there was a scheme to defraud the IRS, the evidence demonstrates that the Defendants disclosed MTD to and received official correspondence from the IRS.

Because the record contains <u>no</u> evidence regarding whether or not MTD or the Defendants actually owed any taxes relating to the MTD transaction, a reasonable juror <u>must</u> have a reasonable doubt as to the existence of any fraud on the IRS.  Permitting this prong of Count Five to go to the jury would invite the jury to speculate about matters on which it has heard no evidence.

## III. CONCLUSION

        For the foregoing reasons, the Court should enter a judgment of acquittal on Count Five of the Indictment.

                                          Respectfully submitted,

                                          /s/
                                          Reid H. Weingarten (D.C. Bar #365893)
                                          Brian M. Heberlig (D.C. Bar #455381)
                                          Steptoe & Johnson LLP
                                          1330 Connecticut Avenue, N.W.
                                          Washington, D.C.  20036-1795
                                          (202) 429-3000

                                          Michele A. Roberts
                                          Jeffrey M. King
                                          Akin Gump Strauss Hauer & Feld LLP
                                          1333 New Hampshire Avenue, N.W.
                                          Washington, D.C.  20036
                                          (202) 887-4306

                                          Christopher B. Mead
                                          London & Mead
                                          1225 19th Street, N.W.
                                          Suite 320
                                          Washington, D.C.  20036
                                          (202) 331-3334

                                          Counsel for Douglas Jemal


                                          Stanley M. Brand
                                          Ross Nabatoff
                                          The Brand Law Group
                                          923 Fifteenth Street, N.W.
                                          Washington, D.C.  20005
                                          (202) 662-9700

                                          Counsel for Norman Jemal

                          Paul Kemp
                          Carol Elder Bruce
                          Venable LLP
                          575 7th Street, N.W.
                          Washington, D.C.  20004
                          (202) 344-4400

                          Counsel for Blake Esherick

Dated:  October 14, 2006