UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES, ) | |
| ) | |
| v. ) | Crim. No. 05-359-1, -2, -3 (RMU) |
| ) | |
| DOUGLAS JEMAL, et al., ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO COUNT FOUR (FRAUD IN THE FIRST DEGREE)

Defendant Blake Esherick ("Defendant"), through counsel, hereby moves this Court, pursuant to Federal Rule of Criminal Procedure 29(a), for a judgment of acquittal on Count Four of the Indictment because the evidence is insufficient to sustain a conviction on those counts. Defendant respectfully requests oral argument on this motion. A proposed Order is attached.

Respectfully submitted,

*/s/ Paul F. Kemp*

Paul F. Kemp (D.C. Bar # 922173)
Carol Elder Bruce (D.C. Bar #202200)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4400

Counsel for Blake Esherick

Dated: October 14, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES, ) | |
| ) | |
| v. ) | Crim. No. 05-0359-1, -2, -3 (RMU) |
| ) | |
| DOUGLAS JEMAL, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL AS TO
<u>COUNT FOUR (FRAUD IN THE FIRST DEGREE)</u>**

Defendant Blake Esherick ("Mr. Esherick"), through counsel, respectfully moves the Court to enter a judgment of acquittal with regard to Count Four (Fraud in the First Degree) of the Indictment pursuant to Federal Rule of Criminal Procedure 29.

**I.   THE RULE 29 STANDARD**

Federal Rule of Criminal Procedure 29(a) provides in relevant part:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

Fed. R. Crim. P. 29(a). In considering a Rule 29 motion, the court must grant relief "when the evidence . . . is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime." <u>United States v. Payton</u>, No. 81-1792, 1982 U.S. App. LEXIS 21154, at *8 (D.C. Cir. Mar. 9, 1982) (citing <u>United States v. Staten</u>, 581 F.2d 878, 882 (D.C. Cir. 1978) (citation omitted)). While the evidence must be viewed in the light most favorable to the government, the Court is required to take a "hard look at the evidence and

accord the government the benefit of only 'legitimate inferences.'" United States v. Recognition Equip., Inc., 725 F. Supp. 587, 588 (D.D.C. 1989) (noting that the court should not "indulge in fanciful speculation or bizarre reconstruction of the evidence" when considering a Rule 29 motion). "'The trial judge should not allow the case to go to the jury if the evidence is such as to permit the jury to merely conjecture or to speculate as to defendant's guilt.'" United States v. Morrow, No. 04-355 (CKK), 2005 U.S. Dist. LEXIS 11753, at *11 (D.D.C. June 13, 2005) (quoting United States v. Bethea, 442 F.2d 790, 792 (D.C. Cir. 1971)).

In resolving this motion, the Court should consider all evidence presented in the government's case-in-chief and on cross-examination of the government's witnesses. United States v. Brodie, 403 F.3d 123, 133-34 (3d Cir. 2005). Defendants contend that the Court should grant this motion immediately due to the lack of sufficient evidence to sustain a conviction. However, if the Court reserves decision on this motion under Rule 29(b), the Court must later resolve this motion solely on the basis of the evidence at the time the ruling was reserved without consideration of any evidence that may be presented in the defense case-in-chief. Fed. R. Crim. P. 29(b); see also United States v. Wahl, 290 F.3d 370, 375 (D.C. Cir. 2002).

For the reasons more fully set forth below, Rule 29 requires this Court to enter a judgment of acquittal on Count Four (Fraud in the First Degree).

## II.     D.C. Code §§ 22-3221(a) and 22-3222(a)(1)

The government charged only Mr. Esherick in Count Four of the Indictment with committing fraud in the first degree in violation of D.C. Code §§ 22-3221(a) and 22-3222(a)(1). D.C. Code § 22-3221(a) states,

> A person commits the offense of fraud in the first degree if that person engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another by means of a

> false or fraudulent pretense, representation, or promise and thereby
> obtains property of another or causes another to lose property.

D.C. Code § 22-3222(a)(1) sets forth the penalties for fraud in the first degree.

Specifically, the government alleged that Mr. Esherick himself created and submitted, or caused to be created and submitted, to the District of Columbia Government, a false and fraudulent invoice seeking payment to Douglas Development Corporation of $38,000 (Government Exhibit 251) related to damage resulting from the move of the District of Columbia Department of Employment Services ("DOES") into 77 P Street in late June 2001 ("the Invoice"). *See* Indictment, Count Four, paragraph II(2).

The Indictment alleges that the invoice is false and fraudulent for two reasons:

> (a) Said invoice set forth a claim for "80 man-hours overtime for staff supervision and engineering during move," when, in truth and in fact, the extent of overtime compensation paid by Douglas Development was to a single employee for 16 hours in the total amount of $288.
> (b) Said invoice set forth a total claim for "D.O.E.S. Relocation Expenses" in the amount of $38,000 when, in truth and in fact, Douglas Development incurred actual expenses of approximately less than $10,000 resulting from move damage.

*See* Indictment, Count Four, paragraphs II(2)(a) and (b).

### III. THE GOVERNMENT FAILED TO PROVE THAT MR. ESHERICK CREATED AND SUBMITTED, OR CAUSED TO BE CREATED AND SUBMITTED, THE INVOICE (CRIMINAL AGENCY)

The government elicited no testimony that Mr. Esherick was the one who created and submitted, or caused to be created and submitted, the Invoice. To the contrary, Susy Hwang, a computer forensic examiner with the Federal Bureau of Investigation and the government's expert on the computer data in this case, testified that the metadata for the Invoice indicates that

the original author of the document was Sabra J. Butler and the last author was also Sabra J. Butler. *See* government exhibit 310; trial transcript ("Tr"). at 1121:6-13.

> Q. And just for reference, Government's No. 310 is what, Ms. Hwang?
> A. It's an invoice to Mr. Mike Lorusso.
> Q. And again, can you tell the jury who the author of that document was and who the last author was as you have defined those terms?
> A. The author is listed as Sabra J. Butler, and the last author is listed as Sabra J. Butler.

Moreover, Sabra Quinn testified that *if* she created the $38,000, either Paul Millstein or Blake Esherick *could have* told her to create it. Tr. 1495:24-1496:4.

> Q. Now, but do you recall who specifically told you to create that document [the $38,000 invoice]?
> THE COURT: If you created that document, who would have told you to create it?
> THE WITNESS: It has a lot of construction language in it. It could have been Paul Millstein or Blake Esherick.

But more importantly, she testified that information for invoices like the $38,000 invoice probably came from Paul Millstein but she saved those documents to Mr. Esherick's computer file. Tr. at 1444:14-23

> Q. You know the three affidavits we were talking about, the $38,000 invoice?
> A. Yes.
> Q. And other items that relate to things like that, who would you get information about those kinds of things from?
> A. Most construction information would probably come from Paul Millstein.
> Q. And when you would prepare those kinds of documents, would you also save those to Blake's work station, his box?
> A. It's quite possible, yes.

There is no evidence in the record to contradict Ms. Quinn's testimony that Paul Millstein probably instructed her to create the Invoice. Thus the government has not established that Mr.

Esherick created the Invoice or caused the Invoice to be created. The only evidence is that Paul Millstein – not Mr. Esherick – probably caused Ms. Quinn to create the Invoice.

## IV. THE GOVERNMENT FAILED TO PROVE THAT MR. ESHERICK ACTED WITH INTENT TO DEFRAUD OR TO OBTAIN PROPERTY OF ANOTHER

The government failed to prove that Mr. Esherick, or whoever created or caused to be created the Invoice, acted with intent to defraud the District of Columbia or obtain the District's property by means of the invoice. The only evidence regarding the timing of the creation of the Invoice established that the Invoice was an estimate that was prepared after 77 P Street suffered damage but before any repair work was performed. Tr. at 1642:10-16:

> Q. And just looking at the face of this document, isn't it obvious that it's simply an estimate of the anticipated move-in expense repair work?...
> THE WITNESS [Kevin Clark]: It would seem that it's an estimate.

As such, there is no evidence that would allow the jury to conclude that whoever created and submitted the invoice intended to defraud the District.

The plethora of evidence that the government elicited about whether Douglas Development Corporation <u>ultimately</u> had to pay for the work done to repair the damage caused by the movers (or whether subcontractors never bothered to charge Douglas Development Corporation for their work) cannot be considered as evidence of the intent of the individual who created and submitted the Invoice to defraud the District of Columbia. Only the intent of the individual who created and submitted the Invoice <u>at the time of the creation and submission</u> can be considered in determing whether that individual intended to defraud the District. <u>See generally</u> <u>United States v. D'Amato</u>, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994) (fraudulent intent must be determined based on intent at the time of the actions and cannot be inferred from subsequent actions). There has been no evidence that the individual who created and submitted

- 5 -

the Invoice intended to defraud the District of Columbia at the time of the creation and submission of the Invoice.

## V. THE GOVERNMENT FAILED TO PROVE THAT THE INVOICE IS FALSE AND FRAUDULENT

The government also failed to prove that Douglas Development incurred actual expenses of less than $10,000 resulting from move damage, as charged in the Indictment. The testimony could not be more clear: the movers hired by the District of Columbia to move the Department of Employment Services into 77 P Street neglected to take proper precautions to protect the building during the move and caused extensive damage throughout 77 P Street. Given the mountain of evidence about the damage at 77 P Street, a reasonable jury must have a reasonable doubt about the fraudulent nature of this invoice.

The movers were unprofessional, failing to protect the floors of 77 P Street with masonite, failing to protect the elevators and walls with cardboard, and failing to protect the carpet with plastic. Tr. at 1717:20-1718:8:

> Q. And in a normal move with a reputable moving company, does the mover normally protect the flooring in the building – A. Yes, they do. Q. – with something called masonite? A. Masonite mostly. Q. And they also put up cardboard protection along the walls and in the elevators, is that fair? A. Yes, they do. Q. And in a new space like this, they might even put plastic down on the carpet to protect it? A. I've seen that happen. Q. And this moving company did none of those things, or if it did them at all it was willfully [woefully] insufficient? A. That's correct.

1634:2-12:

> A….Good moving companies will put protection in place. They'll put masonite, it's approximately a quarter inch cardboard type material, on the floor. They'll put cardboard around all the door frames and up the walls. They'll put plastic over top of the carpet, things like that, to protect the finishes of a new space….Q: And these movers did not do that, at least adequately. Is that fair to

> say? A. Well, if they had done that, there wouldn't have been a
> lot of move damage.

As a result of the movers' failure to protect the building properly, 77 P Street suffered extensive damage during the move. Government Exhibit 528-0004 (handwritten note from Cheryl Coleman Hall to Joseph Philip, "The movers (Configuration, etc.) <u>really</u> beat up the bldg."); Tr. at 1624:17-19:

> "Q: And is that consistent with your memory that there was
> extensive damage throughout the building [77 P Street] caused by
> the movers?
> A: That's correct.

1624:21-23:

> Q: Now, you recall that the movers who moved DOES into that
> space [the third floor of 77 P Street] caused extensive damage?
> A: That's correct."

3589:16-23:

> Q:…The fact of the matter is the agency that brought this damage,
> move damage to your attention, as you testified in response to Mr.
> Lynch's questions now seven or eight days ago, was the office of
> the mayor. Is that right? You said the mayor's office contacted
> you about this damage. Do you recall your testimony last week?
> A: I believe it was the mayor's office, but the comment came from
> the agency head, Greg Irish….

The movers caused damage to the sprinkler head in the loading dock, the freight elevator, the carpets, the hardwood floors in the lobby, the main elevators, and the three main halls on the third floor, each of which is 400-500 feet long. Tr. at 1725:25-1726:14:

> Q.…Now, you also remember during the move that a moving truck
> operated by the movers backed into a sprinkler head in the loading
> zone area, don't you?
> A. I do….the head was ruptured.

1684:5-21:

      A....I remember that there was an issue with a truck backing into the loading dock area, which hit a piece of sprinkler pipe, causing the pipe to discharge water....
      Q. And you recall that there was water damage, some water had leaked as a result of this sprinkler head being knocked off by the truck?
      A. Yeah, there was water discharge, yes.

1634:23-24:

      Q. Do you have any knowledge of whether they [the freight elevators] went inoperable during the course of this move?
      A. I believe that one of them did go inoperable.

1724:20-23:

      Q. And do you recall as a result of the movers coming through, they tracked in a substantial amount of dirt and other soil in the new carpets? A. Yeah, some, they did.

1723:14-1724:2:

      Q: And the main lobby was hardwood flooring, correct?
      A. Yes, it was....
      Q....you saw major scratches and gouges on the hardwood floor, correct?
      A. That is correct.
      Q. And there is no question in your mind that those gouges and scratches were caused by the movers?
      A. That is correct.

1636:12-14:

      Q. Do you recall whether there was damage to the elevator bucks caused by the movers?
      A. I recall there was discussion about that.

1635:18-21:

      Q. And you also became aware of the fact during these discussions that there had been damage to the elevator bucks around the lobby; is that correct?
      A. That's correct.

1722:6-8:

- 8 -

Q. And the movers banged up, scratched and caused dents to the elevator box, do you remember that?
A. I do remember that.

1725:3-6:

Q: Okay. And do you also recall that the walls of the corridors on the third floor had dings, scratches and chunks out of the new drywall?
A. I do.

1632:5-7:

Q. And the length of the hallway, or the corridors, if you will, would it be about two football fields?
A. That's correct. It's probably 4- or 500 feet long.

## VI. CONCLUSION

Because the evidence adduced by the Government is insufficient, as a matter of law, to sustain a conviction of the Defendant under Count Four, Mr. Esherick respectfully requests that this Court enter a judgment of acquittal with regard to that Count pursuant to Federal Rule of Criminal Procedure 29.

Respectfully submitted,

_____
Paul F. Kemp (D.C. Bar # 922773)
Carol Elder Bruce (D.C. Bar #202200)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4000

Counsel for Blake Esherick

October 14, 2006