UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| v. | ) | Crim. No.  05-359-1, -2, -3 (RMU) |
| | ) | |
| DOUGLAS JEMAL, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS'
RULE 29 MOTION TO DISMISS THE SCHEME TO DEFRAUD THE DC
GOVERNMENT OF MONEY ALLEGED IN COUNT THREE**

Count Three charges two different mail fraud schemes: a scheme to defraud the D.C. Government of money ("the money scheme"), and a scheme to deprive the D.C. Government of Michael Lorusso's honest services ("the honest services scheme"). Defendants moved separately to dismiss the money scheme. The government's opposition proceeds from the faulty legal premise that undisclosed things of value given to Lorusso can be the basis of conviction for a money scheme. The government writes:

> Starting with the very first lease, the 77 P Street lease of April 2001, every other lease, and every other dollar obtained pursuant to those leases, is suspect and tainted. The May 2001 Addison Road lease is infected by the very critical material non-disclosure, namely, that Lorusso was a guest of the defendants at Las Vegas over the weekend prior to the letter of intent being executed. This was made clear by John Koskinen. It is no defense to the charge of fraud that the same result would have occurred honestly (such as the leases for 77 P Street, or even, conceivably, the Addison Road lease), if the evidence shows the defendants took steps to procure the results through dishonest means and through ongoing material non-disclosures. It is no defense to fraud that the city otherwise got a "good deal" or a deal at "market value" if the lease, and the monies that flowed to the defendants therefrom, were otherwise obtained by deception.

Government Opposition at 52-53.

The Supreme Court has expressly rejected the government's argument.  In <u>McNally v. United States</u>, 483 U.S. 350 (1987), the district court instructed the jury that the failure to disclose insurance commissions paid to entities controlled by Kentucky public officials could support conviction under the mail fraud statute.  483 U.S. at 354-55.  The Supreme Count reversed, writing: "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in standards of disclosure and good government for local and state officials, we read section 1341 as limited in scope to the protection of property rights."  483 U.S. at 360.

Because the government's opposition failed to distinguish between the money scheme and the honest services scheme charged in Count Three, it is difficult to discern the government's theory for keeping the money scheme in the case.  The government's opposition did not dispute that there were no false representations in connection with the 77 P Street leases.  The government does not claim that it proved the 77 P Street leases were above market.  The government's opposition does not address Lorusso's testimony that only Blake Esherick purportedly agreed to his fictitious "special projects fund," and that Esherick did so for his own financial benefit and was acting contrary to the interests of Douglas Jemal.  The government does not claim that there were any false representations in connection with payments from the tenant commission pool, and says that Defendants are guilty of a felony for sitting silently after Ken Kauffman requested authority from Lorusso to make payments from the pool, primarily to benefit Kauffman's company, Staubach.  Nor does the government dispute that Medding testified that Esherick always intended to reimburse the District for the commission pool payments.  Tr. 936.

Other than saying that the Jemals knew about things of value given to Lorusso, which cannot support the money scheme, this is what the government says should keep the Jemals in the money scheme alleged in Count Three:

> Furthermore, it is known that Douglas Jemal had particular knowledge of some of the invoices, including the $863,000 and $66,000 invoices (a portion of the proceeds of which he gave to his partner Joe Cayre), and, it is known that Norman Jemal personally gave the directions to prepare the $99,000 invoice (a supporting email was attached to the invoice in the Douglas Development records).

Government Opposition ("Opp'n") at 53. Absent from the government's language, and from the testimony and exhibits at trial, is evidence that the Jemals had knowledge that the invoices were false.

Finally, the government contends that two invoices submitted for work at Addison Road were duplicative, and that the second Addison Road invoice included inappropriate charges. The first Addison Road invoice at issue, submitted in September 2001, included a $100,000 charge for Addison Road work. Computer evidence suggested that a version of that invoice was saved to Blake Esherick's computer folder (which anyone at the Company could save to). The next Addison Road invoice, submitted in February 2002, contained itemized charges for $261,000. The government alleges that the second invoice duplicated the $100,000 charge and billed for brick work and fencing that should have been paid by Douglas Development. However, the government has introduced no evidence that any of the Defendants were involved in preparing the second Addison Road invoice.

The only evidence against any of the Defendants related to the second Addison Road was the testimony of Dave Medding related to a conversation with Blake Esherick. The government says that Medding's testimony is enough to establish that Esherick admitted to doubling the second invoice. Opp'n at 53. Instead, it is clear that Esherick was talking about the first

Addison Road invoice, where he had added the $100,000 charge to two months' rent, roughly doubling that invoice. Here is the entirety of Medding's testimony on the subject; it is not enough to prove to anyone beyond a reasonable doubt that Esherick admitted to doubling the second invoice:

```
MEDDING (DIRECT):
892: 7 Q.   And did there come a time when you came to be familiar with
      8 this document?
      9 A.   Yes.
     10 Q.   And tell the jury how it came to be that you came into
     11 contact with this document?
     12 A.   I was asked to -- I was called into Paul's office, Paul
     13 Millstein's.  Blake and Paul were in there.  And they asked me
     14 if I could locate this document.  Checked the lease files and it
     15 was not in there.  I obtained it from Galen Galentine, who said
     16 he had prepared it initially.
     17 Q.   I want to caution you not to talk about conversations with
     18 Mr. Galentine, but did you have a conversation with him?
     19 A.   Yes, I did.
     20 Q.   After you had your conversation with Mr. Galentine, what
     21 did you do?
     22 A.   I took the document to Blake and Paul and relayed the
     23 conversation I had with Galen.
     24 Q.   Okay.  Now that you're in Mr. Esherick's presence, why
     25 don't you tell the jury exactly what you told Mr. Esherick at
 893: 1 that time, including what Mr. Galentine told you, and what
      2 Mr. Esherick said in response.
      3 A.   Galen had told me that there was a small problem with the
      4 support behind the actual invoice, that the amounts didn't add
      5 up to the amount shown on the invoice, and I asked him what was
      6 the difference, and he said that he was told to double the
      7 amounts before preparing the -- in the process of preparing the
      8 invoice.  And when I relayed that to Paul and Blake, Blake
      9 indicated to me that he was the one that instructed Galen to
     10 double the amounts.
     11 Q.   And what exact words did Mr. Esherick use to you?
     12 A.   When I said someone had directed Galen to double them,
     13 Blake replied, that someone was me.
     14 Q.   Do you remember that?
     15 A.   Yes.
     16 Q.   Why do you remember that?
     17 A.   Because my feeling, from the way he conveyed it to me, was
     18 he wanted to make it clear I knew that he was the one that did
     19 it.

MEDDING (CROSS):
 950: 5 Q.   Okay.  Now, the invoice for Addison Road that Mr. Dubester
      6 asked you about today in Exhibit 261, that's the exhibit that
      7 reflects a payment construction cost of about $260,000; is that
      8 right?
      9 A.   Yes.
     10          THE DEPUTY CLERK:  Excuse me, counsel.  This is
     11 Government's Exhibit 261?
     12          MR. KEMP:  261, and I believe it's in evidence,
     13 Mr. Dales.
     14          THE DEPUTY CLERK:  Okay.  It is in evidence.
```

```
    15            MR. KEMP:  Thank you.
    16   BY MR. KEMP:
    17   Q.   There was another invoice for approximately the same amount
    18   of money relating to the same piece of property, Addison Road,
    19   was there not?
    20   A.   I do not recall.
    21   Q.   Well, the first time you ever saw Government's Exhibit 261
    22   was actually when Mr. Dubester showed it to you at a hearing in
    23   this building; is that right?
    24   A.   That's true.
    25   Q.   So you didn't have that piece of paper with you when you
951: 1   were in the room with Mr. Millstein and Mr. Esherick, right?
     2   The first time you saw it, frankly, was in this building, or
     3   U.S. Attorney's Office, right?  You had the support for the
     4   documents that Mr. Galentine had given you; is that right?
     5   A.   Yes.
     6   Q.   And when you referred to some backup, Mr. Esherick said oh,
     7   I doubled that, right?  Something to that effect?
     8   A.   Yes.
     9   Q.   But you didn't show him something and say how about this,
    10   and he said oh, I doubled that, he assumed you were talking
    11   about an invoice relating to Addison Road, am I right?
    12            MR. DUBESTER:  Objection.
    13            THE COURT:  Sustained.
    14   BY MR. KEMP:
    15   Q.   In any event -- well, let me show you 261.  Can we put up
    16   261, Josh?
    17            MR. KEMP:  May I consult at sidebar with Mr. Dubester?
    18            THE COURT:  Yes.
    19       (Defense counsel conferring with government counsel.)
    20            MR. KEMP:  At the risk of breaking all the equipment,
    21   let me try the ELMO.
    22   BY MR. KEMP:
    23   Q.   Do you recognize this document as the same document
    24   Mr. Dubester showed you today -- can you see it on your screen?
    25   A.   No, I cannot.
952: 1   Q.   I'm sorry.  Can you bring that up, Mr. Dales?  There we go.
     2   Thank you.
     3        Do you recognize that document?
     4   A.   Yes.
     5   Q.   All right.  Now, you didn't have this document with you
     6   when you and Mr. Esherick were talking, right?  This is the
     7   document you told Mr. Dubester you're seeing for the first time
     8   when he's questioning you, right?
     9   A.   Yes.
    10   Q.   Am I right?
    11   A.   Yes.
    12   Q.   You had the backup, or at least you had researched the
    13   backup for this document?
    14   A.   The backup, yes.
    15   Q.   Now, Mr. Dubester, in that same proceeding, asked you about
    16   a document that I'll show you that comes out of original
    17   Government's 357, and it's page 3.  You had never seen that
    18   document either; is that correct?
    19   A.   No.
    20   Q.   That document, however, reflects the rent on the Addison
    21   Road property for two months, correct?
    22   A.   Yes, it does.
    23   Q.   And it reflects a build-out reimbursement.  It doesn't say
    24   cost.  It just says build-out reimbursement, round number, a
    25   hundred thousand dollars, right?
953: 1   A.   Yes.
     2   Q.   That comes out to $266,000 and change, right?
```

```
         3  A.   Yes.
         4  Q.   Approximately the same number, right?
         5  A.   Yes.
         6  Q.   When Mr. Esherick said I doubled that, do you know which of
         7  those two invoices he was referring to?
         8  A.   I do not know.

MEDDING (RE-DIRECT):
  963:22  Q.   Mr. Medding, you recall a few minutes ago Mr. Kemp showed
      23  you this page, although it was from a slightly different
      24  collection and had slightly different markings, but this was the
      25  typed page that you were shown as being a $266,375 invoice?
  964: 1  A.   Yes.
       2  Q.   There were words there that say build-out reimbursement for
       3  a hundred thousand dollars?
       4            THE COURT:  For the record, this is 259-0002.
       5            MR. DUBESTER:  That's correct.  I'm sorry, Your Honor.
       6  BY MR. DUBESTER:
       7  Q.   Now, you were previously shown a different Addison Road
       8  construction invoice, which was 271.  I'd like to go to 271.
       9            MR. KEMP:  With the Court's permission, I think it's
      10  261.
      11            MR. DUBESTER:  Sorry.  It's 261.  Thank you, Mr. Kemp.
      12  BY MR. DUBESTER:
      13  Q.   Now, I want you to take your time.  I know this has been a
      14  very, very exhausting period for you, and I think we all want
      15  you to be very careful and you're almost at the end here, but I
      16  want you to look at the contents of 261, and you see it is a
      17  $260,000 invoice.
      18  A.   Yes.
      19  Q.   I want you to go back to the other document, which is 259.
      20  I'm going to ask you if based on your conversations with
      21  Mr. Galentine, if you had any -- if you have -- what degree of
      22  confidence you have that you -- the invoice you were being --
      23  you were talking about with Mr. Esherick was 259 compared to
      24  261.
      25            MR. KEMP:  Objection.
  965: 1            THE COURT:  Overruled.  You may answer.
       2  BY MR. DUBESTER:
       3  Q.   Okay.  There's two in front of you.
       4  A.   The invoice on No. 261 was the one that I had talked to
       5  Mr. Galentine about.
       6  Q.   And then you talked to Mr. Esherick about?
       7  A.   Yeah.  But to make it clear, when I walked into Paul's
       8  office, I handed the information to Mr. Millstein and not to
       9  Mr. Esherick, and relayed the information from Mr. Galentine,
      10  and that's when Blake said that was him.
```

The government never asked Galen Galentine about any instructions he received from Mr. Esherick, a telling omission. In any event, Medding never suggested that the Jemals had any knowledge about the doubling of any invoices.

In sum, the government's opposition makes clear that there is no basis for alleging a separate money scheme in Count Three. For the foregoing reasons, the Court should enter a

judgment of acquittal on scheme to defraud the DC Government of money in Count Three of the Indictment.

                                      Respectfully submitted,

                                      _____
                                      Reid H. Weingarten (D.C. Bar #365893)
                                      Brian M. Heberlig (D.C. Bar #455381)
                                      Steptoe & Johnson LLP
                                      1330 Connecticut Avenue, N.W.
                                      Washington, D.C. 20036-1795
                                      (202) 429-3000

                                      Michele A. Roberts
                                      Jeffrey M. King
                                      Akin Gump Strauss Hauer & Feld LLP
                                      1333 New Hampshire Avenue, N.W.
                                      Washington, D.C. 20036
                                      (202) 887-4306

                                      Christopher B. Mead
                                      London & Mead
                                      1225 19th Street, N.W.
                                      Suite 320
                                      Washington, D.C. 20036
                                      (202) 331-3334

                                      Counsel for Douglas Jemal


                                      Stanley M. Brand
                                      Ross Nabatoff
                                      The Brand Law Group
                                      923 Fifteenth Street, N.W.
                                      Washington, D.C. 20005
                                      (202) 662-9700

                                      Counsel for Norman Jemal

-8-

        Paul Kemp
        Carol Elder Bruce
        Venable LLP
        575 7th Street, N.W.
        Washington, D.C. 20004
        (202) 344-4400

        Counsel for Blake Esherick

Dated: October 16, 2006