Michael Lorusso                                                    June 21, 2002
                          Washington, DC

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DISTRICT OF COLUMBIA

3      - - -- - - - - - - - - - - - -)

4      SECURITIES AND EXCHANGE          )No. 01cv10637

5      COMMISSION,                      )(PBS)

6                    Plaintiff,         )District of

7                v.                     )Massachusetts

8      ERIC E. RESTEINER, et al.,       )

9                    Defendants.        )

10     - - -- - - - - - - - - - - - -)

11                          Washington, D.C.

12                          Friday, June 21, 2002

13              Deposition of MICHAEL ANTHONY LORUSSO, a

14     witness herein, called for examination by counsel for

15     Plaintiff in the above-entitled matter, pursuant to

16     agreement, the witness being duly sworn by CHERYL A.

17     LORD, a Notary Public in and for the District of

18     Columbia, taken at the offices of the UNITED STATES

19     SECURITIES AND EXCHANGE COMMISSION, 450 5th Street,

20     N.W., Washington, D.C., at 10:09 a.m., Friday, June

21     21, 2002, and the proceedings being taken down by

22     Stenotype by CHERYL A. LORD, RPR, CRR, and

23     transcribed under her direction.

24

25

Michael Lorusso

June 21, 2002

Washington, DC

---

**Page 2**

1  APPEARANCES:
2
3  On behalf of Plaintiff:
4    STEVEN Y. QUINTERO, ESQ.
5    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
6    73 Tremont Street, Suite 600
7    Boston, MA 02108
8    (617) 424-5900
9
10  On behalf of Michael A. Lorusso:
11    PHILIP X. MURRAY, ESQ.
12    655 Summer Street
13    Boston, MA 02210
14    (617) 261-1776
15
16  On behalf of Charles Dyer, Resource F LLC, and Bunker
17  Hill Aviation LLC (via telephone):
18    JONATHAN D. COHEN, ESQ.
19    GREENBERG TRAURIG, LLP
20    1 International Place, 3rd Floor
21    Boston, MA 02110
22    (617) 310-6046
23
24
25

---

**Page 3**

1        CONTENTS
2  WITNESS            EXAMINATION
3            PAGE NO.
4  MICHAEL ANTHONY LORUSSO
5    By Mr. Quintero        6
6    By Mr. Cohen        121
7    By Mr. Quintero        171
8    By Mr. Cohen        180
9
10    Afternoon Session        78
11
12        E X H I B I T S
13  LORUSSO EXHIBIT NO.        PAGE NO.
14    136 Subpoena in a Civil Case        5
15    137 Resume        11
16    138 Deposition of Michael
17      Lorusso, 3-23-01        16
18    139 Private Placement
19      Memorandum, February 1999,
20      Nos. G000003-071        28
21    140 Private Placement
22      Memorandum, February 1999,
23      Nos. D000071-171        28
24    141 Private Placement
25      Memorandum, February 1999        28

---

**Page 4**

1        EXHIBITS CONTINUED
2  LORUSSO EXHIBIT NO.        PAGE NO.
3    142 Resource F, LLC, Member
4      addresses, Nos. D000014-017        51
5    143 Memorandum, 12-27-99,
6      Nos. D001904-922        75
7    144 Chronology Information
8      starting 8-20-98        78
9    145 Memorandum, 7-19-99        87
10    146 Memorandum, 2-25-00,
11      Nos. D000325-326        103
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1        PROCEEDINGS
2
3      (Lorusso Exhibit No. 136
4      was marked for
5      identification.)
6
7  Whereupon,
8      MICHAEL ANTHONY LORUSSO
9  was called as a witness by counsel for Plaintiff,
10  and, having been duly sworn by the Notary Public, was
11  examined and testified as follows:
12
13      MR. QUINTERO: For the record, this is the
14  deposition of Michael Lorusso, being taken in
15  Washington, D.C., on June 21st, 2002. It is
16  approximately 10:05 AM. This is in the case of the
17  SEC v. Eric Resteiner, et al.
18      Would all the attorneys notice their
19  appearances, please.
20      MR. MURRAY: My name is Philip Murray. I
21  represent Mr. Lorusso at this deposition.
22      MR. COHEN: My name is Jonathan Cohen,
23  participating by telephone in Boston, and I represent
24  Charles Dyer, Resource F LLC, and Bunker Hill
25  Aviation LLC.

2 (Pages 2 to 5)

Michael Lorusso                                                                June 21, 2002

Washington, DC

---

Page 6

1    EXAMINATION BY COUNSEL FOR PLAINTIFF
2        BY MR. QUINTERO:
3    Q.  Mr. Lorusso, my name is Steven Quintero,
4    and I represent the U.S. Securities and Exchange
5    Commission. And I'm going to be asking you a number
6    of questions regarding the case. The other attorneys
7    may ask you questions if they wish.
8        If at any time you do not hear my
9    question, please ask me to repeat it. If at any time
10   you do not understand a question, please let me know,
11   and I will attempt to rephrase. If you have answered
12   a question, I will assume that you've heard and
13   understood it.
14       Do you understand this?
15   A.  Yes, I do.
16   Q.  And if you need to stop the deposition at
17   any time, you may do so, and let me know.
18       Your under oath today providing testimony
19   in this deposition is no different from providing
20   testimony in court.
21       Do you understand this?
22   A.  Yes, I do.
23   Q.  Would you please state and spell your full
24   name for the record.
25   A.  Michael Anthony Lorusso. Lorusso is

---

Page 7

1    spelled L-O-R-U-S-S-O.
2    Q.  Mr. Lorusso, I hand you a copy of a
3    subpoena dated May 21st, 2002, which has been marked
4    as Exhibit No. 136.
5        MR. COHEN: Can I interrupt for a second?
6        MR. QUINTERO: Yes.
7        MR. COHEN: Are we operating under the
8    assumption that this is a trial deposition, or are we
9    reserving all objections except as to form until the
10   time of trial?
11       MR. QUINTERO: No. Reserving all
12   objections.
13       MR. COHEN: Okay. That's fine.
14       MR. QUINTERO: Is that agreeable,
15   Mr. Murray?
16       MR. MURRAY: Sure.
17       MR. QUINTERO: Any other stipulations?
18   How about signing?
19       MR. MURRAY: I would like him to read and
20   sign.
21       MR. QUINTERO: Okay. He doesn't need a
22   notary?
23       MR. MURRAY: Right.
24       MR. QUINTERO: Is that all right with you,
25   Jon?

---

Page 8

1        MR. COHEN: That's fine.
2        THE WITNESS: I've completed reading the
3    subpoena.
4        BY MR. QUINTERO:
5    Q.  Okay. Is this a copy of the subpoena that
6    you're appearing pursuant to today?
7    A.  Yes, it is.
8    Q.  Mr. Lorusso, I direct your attention to
9    the second page of the subpoena, which is the
10   attachment which calls for the production of
11   documents.
12       Do you have that in front of you?
13   A.  Yes, I do.
14   Q.  And have you conducted a diligent search
15   for documents responsive to this request?
16   A.  Yes, I have.
17   Q.  And did you produce all responsive
18   documents that were in your possession, custody, or
19   control?
20   A.  Yes, I did.
21   Q.  And did you withhold any documents for any
22   reason?
23   A.  No, I do not.
24   Q.  Now, directing your attention to section
25   roman numeral 2, number 1, which calls for all

---

Page 9

1    documents concerning Resource F LLC, Wall Street
2    South, and Bunker Hill Aviation, did you produce any
3    documents pursuant to this subpoena?
4    A.  I have not produced any new documents. I
5    have not found any new information.
6    Q.  Okay. That's true with respect to request
7    number 2 and 3?
8    A.  Concerning request number 2, I have no
9    knowledge or I'm not familiar with Miles Harbur or
10   Eric E. Resteiner.
11   Q.  You're referring to number 2, which calls
12   for documents concerning Charles Dyer, Voldemar
13   vonStrasdas, Miles Harbur, and Eric Resteiner?
14   A.  That's correct. In the previous
15   deposition, I provided documents and testimony with
16   regards to Charles G. Dyer and Voldemar vonStrasdas.
17   I have never seen nor I'm not familiar with Miles
18   Harbur or Eric Resteiner.
19   Q.  When you say your other deposition, you're
20   referring to the 1 investigative testimony that took
21   place in approximately March of 2001?
22   A.  The 1 in Boston, yes, that's correct.
23   Q.  And with respect to request number 3,
24   which calls for documents concerning investments in
25   Resource F LLC, Wall Street South, and Bunker Hill

---

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                                June 21, 2002
                              Washington, DC

<table>
<tr><td>

Page 10

1  Aviation that have not already been produced in this
2  matter, including but not limited to your investment
3  of 45,000 dollars in the investments of Brian Nelson
4  and Deborah Koepper, are there any -- do you have any
5  responsive documents?
6      A.  No, I have no new documentation.
7      Q.  Have you produced documents responsive to
8  this request in the past?
9      A.  There was in the previous investigative
10  deposition or whatever, the Boston deposition,
11  discussion of the 45,000 dollars, but I have no
12  documentation for Brian Nelson and Deborah Koepper.
13      Q.  Right.  You say that you did receive --
14  concerning the 45,000-dollar investment, did you
15  provide any documents concerning that investment?
16      A.  I don't remember.  At the time I provided
17  a number of documents through my attorney at the
18  request -- at the end of the deposition, which I
19  believe was forwarded to you.  I have not produced
20  any new documents for this deposition.
21      Q.  Okay.  Very good.
22          Mr. Lorusso, could you tell me your home
23  address and home telephone number.
24      A.  It is two thousand six (sic) Columbia
25  Road, number 33, Washington, D.C., two thousand nine

</td><td>

Page 12

1      A.  It was current at the time of -- I'm
2  currently employed by the District of Columbia
3  government.
4      Q.  I see.
5          Directing your attention to the second
6  page of Exhibit 137, where it describes your
7  educational background, is that accurate?
8      A.  Yes.
9      Q.  Anything -- any other education beyond
10  what's listed in your CV, resume in Exhibit 137?
11      A.  There may be, but I don't think it's
12  material.  I mean, there may have been other
13  minor-type course work, but no other degrees or no
14  other major institutional things.
15      Q.  Then directing your attention to first
16  page of Exhibit 137 under, experience.
17          You mentioned that you currently work for
18  the District of Columbia, which is not listed on
19  Exhibit 137, but beyond that, are there any additions
20  or changes that need to be made with respect to the
21  information provided in Exhibit 137?
22      A.  Without reading the remaining -- I'm
23  assuming that you're most concerned with the period
24  1998 to 2000?
25      Q.  I'm talking about all of it, whether it's

</td></tr>
<tr><td>

Page 11

1  (sic).
2      Q.  And your telephone number?
3      A.  202-588-1648.
4      Q.  Do you have any home e-mail addresses?
5      A.  No, I do not.
6      Q.  And your place and date of birth?
7      A.  8-31-65, Norwood, Massachusetts.
8      Q.  And your social security number?
9      A.  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.
10          (Lorusso Exhibit No. 137
11          was marked for
12          identification.)
13      BY MR. QUINTERO:
14      Q.  Mr. Lorusso, I'm going to hand you what's
15  been marked as Exhibit No. 137.  It was previously
16  Exhibit 84 in the investigative testimony.
17          Do you recognize this document?
18      A.  Yes, I do.
19      Q.  What is it?
20      A.  It is my CV or resume.
21      Q.  Did you prepare this?
22      A.  Yes, I did.
23      Q.  And is this CV or resume current?
24      A.  No, it is not.
25      Q.  Describe --

</td><td>

Page 13

1  accurate.
2          I mean, was it accurate at the time you
3  prepared it?
4      A.  It was accurate at the time I prepared it.
5      Q.  Okay.  You see that the last job that's
6  listed here is with Bunker Hill Group LLC between
7  1998 to 2000?
8      A.  Correct.
9      Q.  Can you tell me what happened after you
10  left the employment of Bunker Hill Group?
11      A.  I believe that at the time Mr. Dyer
12  moved -- was going to move his office to his home.
13  He left the office at a place called The Pilot House,
14  and he was then moving to create a home office.
15          And Mr. Dyer laid me off because he had
16  no -- no -- was not going to maintain an office.
17  Then I worked in a self- -- a self-employed capacity
18  doing some real estate activities.
19          I applied for and came to Washington,
20  D.C., for a job in real estate, which is where most
21  if not the majority of my experience is.
22      Q.  And when did you come to D.C.?
23      A.  I believe it was the winter of -- I want
24  to say December '99 --
25      Q.  December '99, but your --

</td></tr>
</table>

4 (Pages 10 to 13)

Michael Lorusso                                                      June 21, 2002
Washington, DC

Page 14

1      A.  -- or December 2000.  I can't -- I've been
2  here for 18 months now.
3      Q.  Seems like that would make it December of
4  2000, then.
5      A.  December of 2000.  I'm sorry.
6      Q.  Okay.  And what did you do when you
7  arrived here in D.C. in December of 2000 as far as
8  work?
9      A.  I had already received an offer for a job
10  working for the District of Columbia government and
11  have maintained that job since then.
12      Q.  And what are your duties and
13  responsibilities in that job?
14      A.  I manage all the real estate on behalf of
15  the mayor of the District of Columbia.
16      Q.  Are you in a supervisory capacity?
17      A.  Yes.
18      Q.  How many people approximately do you
19  supervise?
20      A.  260.
21      Q.  Do you report to anyone in your job?
22      A.  I report to the director of property
23  management.  His name is Timothy Diamond.
24      Q.  And do you have a job title?
25      A.  I'm the deputy director.

Page 15

1      Q.  Have your duties and responsibilities
2  changed since you began working for the district in
3  December of 2000?
4      A.  No.  I've always been the deputy director.
5      Q.  Going back to your experience at Bunker
6  Hill Group LLC, when did you begin working there?
7      A.  I don't remember the exact date.  Mr. Dyer
8  had rented space from my father at 440 Commercial
9  Street, where he had his office prior to The Pilot
10  House, and so I was acquainted with Mr. Dyer.
11      And he kept asking me to become involved
12  with his company particularly due to my real estate
13  experience, as he had a large personal real estate
14  portfolio.
15      Q.  So when did you actually come into his
16  employment?
17      A.  I don't remember the date.
18      Q.  Was it after you obtained your master's
19  degree from the University of Florida?
20      A.  Yes, it was.
21      Q.  And when did you obtain that?
22      A.  I believe in 1999 -- 1998 -- trying to --
23  1998.  I completed the course work in May or June of
24  that year and received my degree in August -- August
25  or -- I think August of that year.

Page 16

1      Q.  Okay.  At that point, did you move to
2  Boston from Florida?
3      A.  I had already been in Boston after June.
4      Q.  Okay.  And did you start with Mr. Dyer
5  right away?
6      A.  No.  I think I started, again, around the
7  January -- excuse me -- December time frame.
8          (Lorusso Exhibit No. 138
9          was marked for
10          identification.)
11      BY MR. QUINTERO:
12      Q.  Mr. Lorusso, I'm going to hand you what's
13  been marked as Exhibit No. 138.  It is the testimony
14  transcript from your investigative testimony dated
15  March 23rd, 2001.
16      A.  M-hm.
17      Q.  Direct your attention, Mr. Lorusso, to
18  page 16, and also to page 17 of Exhibit 138,
19  specifically, your answer to the question:
20  Mr. Lorusso, I believe the question I had for you was
21  whether the date that is contained in Exhibit 84 in
22  your CV for your employment at Bunker Hill Group,
23  which states 1998 to 2000, refreshes your
24  recollection as to the year in which you began.
25      If you would go ahead and read your answer

Page 17

1  to yourself and let me know if that refreshes your
2  memory with respect to when you started with
3  Mr. Dyer.
4      A.  It still doesn't reflect my memory.  It
5  reflects my memory as to what I said.
6      Mr. Dyer used a payroll service.  I never
7  received any 1099-type income.  The best way to find
8  out the exact date I worked was -- would be to check
9  with the payroll service.
10      Q.  Have you read your entire answer?
11      MR. COHEN:  Steve, I'm sorry.  What page
12  are you on?
13      MR. QUINTERO:  Pages 16 and 17.
14      MR. COHEN:  Thanks.
15      A.  I believe -- again, it would be better to
16  check with the payroll service, but I believe that
17  the date that I received my first payroll check from
18  him was June 1999 --
19      BY MR. QUINTERO:
20      Q.  Okay.
21      A.  -- which is correctly stated in the --
22      Q.  -- in the testimony transcript?
23      A.  Right.
24      Q.  Exhibit 138?
25      A.  Correct.

5 (Pages 14 to 17)

Michael Lorusso                                                      June 21, 2002

Washington, DC

Page 18

1    Q.   Okay.  So prior -- did you have some
2    involvement with Mr. Dyer prior to June of 1999?
3    A.   Prior to June of 1999, I was employed in
4    my family business and tried to help Mr. Dyer out on
5    computer-related things.
6    Q.   Okay.  So nothing related directly to
7    Mr. Dyer's real estate business or any other business
8    that he was running?
9    MR. COHEN:  Objection.
10   BY MR. QUINTERO:
11   Q.   You may answer.
12   MR. MURRAY:  You can answer.
13   THE WITNESS:  Okay.
14   A.   At that point in time, I didn't know
15   any -- you know, what Mr. Dyer's business interests
16   were.
17   BY MR. QUINTERO:
18   Q.   Okay.  Let me ask it a different way:
19   What type of computer work were you doing for
20   Mr. Dyer?
21   A.   Very fundamental, like telling him which
22   computer to buy, and physically as stated here --
23   Mr. Dyer was an older gentleman, not particularly
24   computer-savvy.  And even simple things -- I noticed
25   that he was running at the time 286 and 386 computers

Page 19

1    to try to use for Bloomberg and other things, and I
2    suggested, you know, increased capacity, really
3    nothing more than taking them out of the box and plug
4    the peripherals in.
5    Q.   Were you paid for your advice to Mr. Dyer?
6    A.   I believe I was paid later.  I wasn't paid
7    at the time.
8    Q.   Okay.  Approximately -- can you quantify
9    in terms of hours per week what you were doing for
10   Mr. Dyer prior to June of '99?
11   A.   Maybe 5 to 10 hours a week, not a
12   significant -- not even what would be classified as
13   part-time or 20 hours, but just what he sort of -- I
14   was his help desk or the person he could look to for
15   some minor technical advice.
16   Q.   And your testimony is that he wasn't
17   paying you for any of your work during that period?
18   A.   He did not pay me during that period of
19   time, no.
20   Q.   Okay.  Can you explain to me the
21   circumstances that led to your taking a job, a paying
22   job, with Mr. Dyer in June of 1999.
23   A.   Mr. Dyer had spoken of his past
24   involvement with the Eastern Airlines retirement
25   fund, a fund that held 50 percent of their portfolio

Page 20

1    in real estate.  He was very interested in my real
2    estate experience and wanted to start -- he had a
3    number of companies -- and again this is what I found
4    out later but didn't know at the time -- but he was
5    making different investments in different things,
6    including real estate.
7    He also had partnerships and ownership
8    interest of varying degrees in different real estate
9    transactions.  He wanted somebody to help calculate
10   CPI increases, to evaluate what should be sold, what
11   should be bought, scenario analysis for real estate.
12   Q.   So is it fair to say that you came to work
13   for Mr. Dyer in a real estate capacity?
14   A.   Yes.  That was where my interest was, yes.
15   MR. COHEN:  Objection to the last
16   question.
17   BY MR. QUINTERO:
18   Q.   Were there any -- did you have any other
19   duties and responsibilities in your employment with
20   Mr. Dyer?
21   A.   In the beginning, almost exclusively, I
22   reviewed leases and did primarily real estate-type
23   functions.
24   Q.   Did that change over time?
25   A.   He had a person in the office.  I don't

Page 21

1    remember the last name, but the first name was Todd,
2    who handled all of the sort of financial things.
3    Q.   Is that Todd Litton?
4    A.   That's correct, Todd Litton.
5    Q.   Did Mr. Litton at some point leave --
6    A.   Mr. Litton left at some point in time,
7    yes.
8    Q.   Was that before or after you began working
9    for Mr. Dyer on a paying basis?
10   A.   I believe it was right after or very near
11   that time.
12   MR. MURRAY:  Try to let him finish the
13   question, because it gets problematic for Jon.
14   THE WITNESS:  I'm sorry.  Okay.
15   BY MR. QUINTERO:
16   Q.   At the point that Mr. Litton left, did you
17   take over some of Mr. Litton's responsibilities and
18   duties with Mr. Dyer?
19   A.   I didn't know what Mr. Litton's duties and
20   responsibilities were.  He did a lot more pure
21   financial things.  He was looking to go to Harvard
22   business school.  I believe he was an attorney, but I
23   don't remember if he was.
24   So I did not do -- at least in the
25   beginning, I did not do -- I did probably 5 percent

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                    June 21, 2002
Washington, DC

Page 22

1  of the things, and Chuck did the remainder.
2      Q.  What type of things are you talking about?
3      A.  I don't even -- I didn't know, because I
4  wasn't there very long when he was there -- I didn't
5  know what his duties were.  All I know was that Chuck
6  had me do some more things after he had left.  I
7  didn't know whether they were things that Todd had
8  done or new things that Chuck wanted to do.
9      Q.  I'm just concerned now with what you did
10  for Mr. Dyer.
11      A.  Right.
12      Q.  You said with respect to I believe
13  financial things you did about in the beginning 5
14  percent and Chuck did the rest.
15          What is it that you were doing?
16      A.  I was mostly taking -- well, at this point
17  in time, it was nothing, but it was later to take
18  data -- 1 of the things Todd did was, they had a
19  mutual fund at that point in time, and he would
20  download daily data from the stock exchanges, those
21  types of things.
22      Q.  So at some point, you started performing
23  that duty for Mr. Dyer?
24      A.  Yes.
25      Q.  Anything else related to the financial

Page 23

1  side as you termed it?
2      A.  Not that I recollect at that point in
3  time.
4      Q.  What point in time are we talking about?
5      A.  You were talking about the time that Todd
6  Litton and I started to do some more work for
7  Chuck.
8      Q.  Okay.  Now I'm talking about your entire
9  tenure with Mr. Dyer.
10      A.  Okay.
11      Q.  Did those duties and responsibilities that
12  you initially had change over time?
13      A.  Well, as with any employee, the duties
14  changed over time, and I started to do historical --
15  they were all in the same vein.  I would do
16  historical statements if you will for both the stock
17  and bond fund and later, Resource F.
18      Q.  Okay.  What other duties and
19  responsibilities did you have in your employment with
20  Mr. Dyer?
21          MR. COHEN:  Objection.
22      A.  I did not have a set of particular duties.
23  I spent most of my day working on real estate
24  matters.  This was -- these were things that were
25  done once a month that took 10 or 15 minutes.

Page 24

1          BY MR. QUINTERO:
2      Q.  Well, did you do anything else for
3  Mr. Dyer in your employment?
4      A.  Get him coffee.
5          I don't -- could you rephrase the question
6  to be more specific?
7      Q.  Well, I'm just trying to get a global
8  sense of all the work that you performed for Mr. Dyer
9  to the best of your memory.
10          MR. MURRAY:  Are you talking about the
11  financial side?
12          MR. QUINTERO:  Not just the financial
13  side.
14          BY MR. QUINTERO:
15      Q.  I'm talking about anything that you do.
16      A.  I drove Mr. Dyer to the bank.  You know, I
17  drove him when his car needed to be picked up from
18  the shop.  I went to Maine where he had an office and
19  closed that office and brought boxes back.  I mean, I
20  did whatever I was told to do.
21      Q.  Now, according to Exhibit 137, which is
22  your CV, resume, you left Bunker Hill in 2000; is
23  that correct?
24      A.  That's correct.
25      Q.  When in 2000 did you leave?

Page 25

1      A.  Chuck left The Pilot House -- I believe it
2  was in the early spring, and supposedly was moving
3  back to his house.  He later set up another office,
4  but I wasn't aware or involved in that.
5      Q.  I believe you testified earlier that he
6  laid you off at that point?
7      A.  That's correct.
8      Q.  So you left involuntarily?
9      A.  As far as I knew, he was closing the
10  company.
11      Q.  Did you leave for any other reasons?
12      A.  No.
13      Q.  I direct your attention, Mr. Lorusso, on
14  Exhibit 139, which is the transcript -- I'm sorry --
15  138 -- excuse me -- to page 121, beginning with the
16  first full question on that page, if you could just
17  read to yourself.
18      A.  M-hm.
19          Yes, I've read that question.
20      Q.  Okay.  Does that refresh your memory as to
21  any other reasons as to why you left Mr. Dyer's
22  employment?
23      A.  It might have been at the time -- the way
24  I recollect it now was what Mr. Dyer did was, he
25  basically moved his office and instructed the payroll

7 (Pages 22 to 25)

Michael Lorusso                                                                  June 21, 2002
                            Washington, DC

**Page 26**

1   company to not pay me anymore.
2      Q.   So when you testified back in March of
3   2001 that 1 of the reasons why you stopped working
4   for Mr. Dyer is that you did not have access to
5   certain records, were you testifying truthfully at
6   that time?
7      A.   I was testifying truthfully. At this
8   time, I don't recollect as clearly why I left. That
9   was upwards of several years ago.
10     Q.   Okay. Directing your attention to page
11  122, your response to the question: Okay, so what
12  was it that you felt uncomfortable in some way.
13         If you could read your answer to yourself
14  and let me know when you're finished.
15     A.   I would agree that we were going in
16  different directions. I wouldn't speak for Mr. Dyer,
17  but the fact that he sort of left the office and set
18  up another office without me probably indicates that
19  that statement was -- showed that we were going in
20  different directions.
21     Q.   Do you see where you testified that: I
22  felt that I could not adequately account for the
23  money that I didn't see because it was offshore?
24     A.   Yes, but that would be true for the entire
25  period of time.

**Page 27**

1      Q.   But did you become uncomfortable with that
2   arrangement at some point in time?
3         MR. COHEN: Objection.
4      A.   I don't know that I would say it was
5   uncomfortable. I would be uncomfortable with any
6   transaction that I wasn't able to see both sides of
7   the parties.
8         BY MR. QUINTERO:
9      Q.   Okay. We'll come back to this a bit
10  later.
11         You mentioned a fund or you mentioned the
12  name Resource F. Describe for me what your
13  understanding of Resource F was during your tenure at
14  Mr. Dyer's employment.
15     A.   I believe that Todd Litton when he started
16  was working on a -- what Chuck described as a hedge
17  fund offering memorandum, which then became the
18  Resource F hedge fund later in my -- about halfway
19  through my tenure. So that's the entity that I
20  described.
21     Q.   What was Mr. Dyer's role with respect to
22  Resource F?
23         MR. COHEN: Objection.
24         BY MR. QUINTERO:
25     Q.   If any.

**Page 28**

1      A.   I don't -- he's listed as the managing
2   member. I don't know what his role -- I don't know
3   what ownership or anything like that.
4      Q.   You said that he was listed as --
5      A.   He's listed in the doc- -- offering
6   document as the managing member.
7         (Lorusso Exhibit Nos. 139-141
8          were marked for
9          identification.)
10         (Recess.)
11         BY MR. QUINTERO:
12     Q.   Mr. Lorusso, I'm going to hand you what's
13  been marked as Exhibit 139. It was formerly Exhibit
14  21 in the investigative testimony.
15     A.   It's a private placement memorandum dated
16  February 1999 for Resource F LLC.
17     Q.   Could you go ahead and just flip through
18  that and tell me if you've seen this before.
19     A.   Without reading every page, I don't know
20  that I've seen this version. I have seen a document
21  titled, private placement memorandum, February 1999,
22  Resource F.
23     Q.   And is this the offering memorandum that
24  you mentioned earlier with respect to the Resource F
25  hedge fund?

**Page 29**

1      A.   That's correct.
2         MR. MURRAY: Just for clarification, do
3   you mean, is this copy what he recognizes as the 1
4   that was previously offered?
5         MR. QUINTERO: Fair enough.
6         THE WITNESS: Right.
7      A.   It appears to be.
8         BY MR. QUINTERO:
9      Q.   Mr. Lorusso, when was Resource F formed?
10         MR. COHEN: Objection.
11     A.   I have no knowledge of when Resource F was
12  formed.
13         BY MR. QUINTERO:
14     Q.   Do you have an understanding as to what
15  the purpose of Resource F was?
16     A.   It was an investment vehicle related to
17  Mr. Dyer not dissimilar to any of his other
18  investment vehicles such as private partnerships,
19  other -- it was an investment vehicle.
20     Q.   And did Resource F have a particular
21  investment focus?
22         MR. COHEN: Objection.
23     A.   Mr. Dyer was very interested in aviation
24  and real estate.
25         BY MR. QUINTERO:

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                      June 21, 2002
Washington, DC

Page 30

1    Q.  Were those the focus -- 2 focuses of
2  Resource F?
3        MR. COHEN:  Objection.
4    A.  Those were the focuses of Mr. Dyer.  I
5  don't know whom else Resource F was or is as a living
6  entity.
7        BY MR. QUINTERO:
8    Q.  Do you know what Resource F as the hedge
9  fund invested in if anything?
10   A.  Mr. Dyer did all of the physical
11  investments.
12   Q.  But I'm asking you your knowledge.
13   A.  No.
14   Q.  So you don't know?
15   A.  No.
16   Q.  Did it invest in the airline business?
17   A.  It bought air ine stocks, and he owned a
18  minor partnership or a portion of an airline that
19  flew from Fort Lauderdale to the Bahamas.
20   Q.  Was that investment subsumed under the
21  Resource F hedge fund?
22   A.  I don't know  Mr. Dyer never delineated
23  to me what vehicle each investment was under.
24   Q.  Is your testimony that Resource F, the
25  hedge fund, did purchase airline stocks?

Page 31

1        MR. COHEN  Objection.
2    A.  I have no knowledge of what entity --
3  Mr. Dyer had several baskets.  I don't know which
4  basket this fell under, but I do know through working
5  through him from a number of years that he held
6  airline stocks, a golf course, some real property,
7  and was very interested in trying to do jet engine
8  leasing and some other things.
9        BY MR. QUINTERO:
10   Q.  Directing your attention to the Bates
11  stamp G 7 page of Exhibit 139.  It's entitled,
12  Resource F LLC, summary of fund terms.
13       MR. MURRAY: G 7 being the Bates number?
14  Is that it?
15       MR. QUINTERO: That's correct.
16       THE WITNESS: Yes.
17   A.  I see that page, summary of fund terms.
18       BY MR. QUINTERO:
19   Q.  Okay.  If you could look under, investment
20  objective, and read that to yourself and let me know
21  when you're done.
22   A.  Okay.
23   Q.  Have you seen this investment objective in
24  the offering memorandum that you may have reviewed
25  during your time at Mr. Dyer's employment?

Page 32

1    A.  If not this exactly, the summary of what
2  this is.
3    Q.  Based upon your understanding of what
4  Resource F did, is this investment objective
5  accurate?
6        MR. COHEN:  Objection.
7    A.  I have no knowledge of what Resource F
8  invested in.  That was not my part of the company.
9        BY MR. QUINTERO:
10   Q.  Was a private placement memorandum dated
11  February 1999 such as the 1 that's Exhibit 139 ever
12  sent out to prospective investors in Resource F?
13   A.  Yes, it was.
14   Q.  How do you know that?
15   A.  The -- I can't remember who the person was
16  on staff, but they would be instructed by Chuck or
17  Mr. vonStrasdas, who would call by telephone, to send
18  an offering memorandum to a particular person.  They
19  were not mass-mailed.  They were always sent to a
20  specific person who they had previously spoken to.
21   Q.  Approximately how many -- I'll say PPMs
22  for short, were sent out from Mr. Dyer's office
23  during the time that you were employed there?
24   A.  Probably 20 or less.
25   Q.  You mentioned a gentleman by the name of

Page 33

1  vonStrasdas.
2        Is that Voldemar vonStrasdas?
3    A.  I believe that's his name.  I don't know
4  what his correct name is, but we referred to him as
5  Von.
6    Q.  Did you ever meet Mr. vonStrasdas?
7    A.  He came into Boston 1 time, and I had
8  lunch with Mr. Dyer and him at a local restaurant,
9  and then they went off and did some business
10  together, so I met him for about a half-hour.
11   Q.  When did that meeting take place?
12   A.  Early in my tenure, probably 2 or 3 months
13  after I had started working there.
14   Q.  So does that put us perhaps the early fall
15  of 1999?
16   A.  Summer.
17   Q.  Summer of 1999?
18   A.  That's correct.
19   Q.  Where did you go for that lunch?
20   A.  It was in the north end -- the place with
21  the open doors on Hanover Street.
22       MR. MURRAY:  Florentine.
23   A.  Florentine -- Florentine Cafe.
24       BY MR. QUINTERO:
25   Q.  And what was discussed at that lunch?

9 (Pages 30 to 33)

Michael Lorusso                                                    June 21, 2002
Washington, DC

**Page 34**

1     A.    No business, just pleasantries. I was new
2  to the company. They had known each other. It was
3  just introducing myself to him.
4     Q.    What understanding if any did you have
5  with respect to Mr. vonStrasdas's relationship with
6  Mr. Dyer?
7     A.    I knew they were -- if not partners, had a
8  relationship with regards to the fund.
9     Q.    When you say, the fund, you're referring
10  to Resource F?
11     A.    That's correct.
12     Q.    Did you at any time learn how long
13  Mr. Dyer and Mr. vonStrasdas had a business
14  relationship?
15     A.    No. I knew that they'd met each other
16  several years previously, but I didn't know how long
17  they'd been acquainted.
18     Q.    How do you know that they had met each
19  other a few years previously?
20     A.    Chuck later shared that with me over some
21  random discussion.
22     Q.    Mr. Dyer described to you how and he
23  Mr. vonStrasdas became acquainted?
24     A.    No, he did not.
25     Q.    What did he tell you about

**Page 35**

1  Mr. vonStrasdas?
2     A.    That he knew he was an investment person
3  and for a number of years.
4     Q.    Was this after the lunch that you attended
5  with Mr. Dyer and Mr. vonStrasdas?
6     A.    Yes, that's correct.
7     Q.    Approximately when?
8     A.    Probably later in my tenure. Probably a
9  year after that.
10     Q.    By that time, you had left the company, if
11  we're now in summer of 2000?
12     A.    Probably December.
13     Q.    Of '99?
14     A.    December of '99.
15     Q.    Okay. Besides the lunch that you've
16  testified about, had you -- have you met
17  Mr. vonStrasdas at any other time?
18     A.    No.
19     Q.    Have you seen him come into Boston at any
20  other point and visit Mr. Dyer?
21     A.    Not to my recollection.
22     Q.    Now, you mentioned that Mr. vonStrasdas
23  had some sort of relationship with Mr. Dyer with
24  respect to the fund.
25     What was that relationship?

**Page 36**

1     MR. COHEN:  Objection.
2     A.    I believe it's stated in the PPM or at
3  least 1 of them that he was a co-managing member or
4  managing member or had some relationship. I don't
5  know where -- what he was from my financial dealings
6  with Chuck.
7     BY MR. QUINTERO:
8     Q.    Besides what may be listed in 1 of the
9  PPMs that you've seen at some point, did you have any
10  other understanding as to what Mr. vonStrasdas's role
11  was?
12     A.    No. Mr. Dyer was very tight-lipped about
13  partnerships. He never had partnership agreements
14  that I was aware of. He may have kept them in
15  another area. I was not aware of any contractual
16  agreement between the 2 with regards to investments.
17     Q.    Mr. Lorusso, I'm going to hand you what's
18  been marked as Exhibit 140, which was the old
19  investigative testimony Exhibit 20. Take a look at
20  it and tell me if you recognize it.
21     A.    Again, it's marked, private placement
22  memorandum, February 1999, Resource F LLC, and it
23  appears to be similar if not the same to the first
24  document you handed me.
25     It appears to be. I haven't had the

**Page 37**

1  benefit of reading it.
2     Q.    Okay. Mr. Lorusso, I'm going to direct
3  your attention to a page that's Bates-stamped D 139,
4  if you'll turn to that, please, in Exhibit 140.
5     A.    Okay.
6     Q.    Do you recognize this page?
7     A.    This page is not part of Mr. Dyer's
8  offering memorandum
9     Q.    How do you know that?
10     A.    Because I was 1 of the people who
11  photocopied and placed offering memorandums in the
12  mail when asked to by Mr. Dyer, and this is not
13  sequentially numbered, has a different letterhead and
14  font, and includes vonStrasdas's Palm Beach address
15  as the letterhead.
16     Q.    When you say, it's not sequentially
17  numbered, you're not referring to the Bates stamp
18  numbers, are you?
19     A.    No. I'm referring to the -- if you go to
20  the prior page, you'll see -- well, 2 pages prior,
21  you have page 20, page 21. Then you have
22  Bates-stamped page D 139. And then you go to the
23  schedule, page 10. It does not fit in the fit-in
24  form of the memorand (sic).
25     Q.    Do you recognize what's on Bates D 139?

Michael Lorusso                                                                June 21, 2002
Washington, DC

Page 38

1    A.   I recognize it only after my employment
2  and through discussions here as something that was
3  probable that Mr. vonStrasdas issued.
4    Q.   So during your time in Mr. Dyer's
5  employment, you never saw a page that's -- that's
6  shown here?
7    MR. COHEN: Objection.
8    MR. MURRAY: Can we just put which Bates
9  number we're talking about?
10   MR. QUINTERO: D 139.
11   A.   If I did, I don't recollect it.
12   BY MR. QUINTERO:
13   Q.   Okay. And I'm not talking about within
14  the offering memo, but even just outside of the
15  offering memorandum.
16   A.   It's not something I was familiar with. I
17  may have seen it once, but not -- I mean, you know,
18  in the type of business Mr. Dyer had, he had
19  thousands and thousands of pages of documents which
20  were not interesing to anyone at the period of time.
21  This is not something I remember. It was certainly
22  not something that was in the client files or bounded
23  (sic) in the offering memorandum.
24   Q.   All right. Just further describing D 139,
25  it states: Resource F LLC investment options, please

Page 39

1  indicate the percentage mix of A and B shares
2  desired.
3    And then it appears to have spaces for
4  someone to check either A shares or B shares.
5    Do you have an understanding -- or did you
6  at the time of your employment with Mr. Dyer have an
7  understanding of what A shares were versus B shares?
8    A.   I knew only that Mr. Dyer was very
9  interested in those previously mentioned investment
10  vehicles, being aviation, real estate, and stocks,
11  and that Mr. vonStrasdas was interested primarily in
12  financial instruments.
13   Q.   That would be the A shares that's listed
14  in D 139?
15   A.   I wouldn't make that conjecture, but I
16  just know that that was the -- you could probably
17  infer that, but I'm not going to make that statement.
18   Q.   But it's true that your understanding is
19  that Mr. Dyer was the managing member for the entire
20  fund, not just a segment of the fund; is that
21  correct?
22   A.   Later, I've seen offering memorandi (sic)
23  I believe in the previous deposition that shows
24  vonStrasdas as co-managing member, or at least there
25  was discussion at some point particularly to the

Page 40

1  clients that were exclusively his.
2    Q.   You say, his?
3    A.   Excuse me. His, meaning vonStrasdas.
4    Q.   Okay.
5    A.   But as far as the legal private placement
6  memorandum that was prepared by Grant Thornton,
7  Mr. Dyer was the sole managing member.
8    Q.   Was there a distinction in clients between
9  Mr. vonStrasdas and possible clients of Mr. Dyer's
10  and Resource F?
11   A.   The distinction was that Mr. Dyer
12  particularly dealt with people that he knew
13  intimately, and so we'll call them his friends, and
14  he was very close-knit about talking to them. We
15  weren't allowed to take phone calls from them.
16     I mean, they were calling him.
17  Mr. vonStrasdas's people, we never met. They were
18  people on the telephone, and they typically did not
19  call.
20   Q.   Mr. Lorusso, I'm going to hand you what's
21  been marked as Exhibit 141. It was old investigative
22  testimony Exhibit 22.
23     Tell me if you recognize this.
24   A.   This again has the same cover page,
25  private placement memorandum, February 1999, Resource

Page 41

1  F LLC. It's otherwise hand-noted as, memorandum
2  number 098, N, dot, Harbur.
3    Q.   Do you recognize the name, N, dot, Harbur?
4    A.   I have a vague recollection that he was
5  possibly Resource F client, and he was a vonStrasdas
6  client.
7    Q.   Direct your attention to the second page
8  of Exhibit 141, which is entitled, executive summary.
9      Could you tell me if you had seen this
10  executive summary or something like it during your
11  time at Mr. Dyer's employment?
12   A.   I have not seen anything -- I have not
13  seen a document that said, executive summary, nor on
14  page --
15   Q.   Why don't we stay with the executive
16  summary for now.
17   A.   Okay. I'm not familiar with this
18  document. It was certainly not -- when clients sent
19  subscriptions to Resource F, they also sent copies of
20  their offering memorandum back. This page was not in
21  the offering memorandum to the best of my knowledge
22  for Nate Harbur from Chuck's files.
23   Q.   Did you make it a practice to look through
24  the offering memorandum when it came back from
25  investors?

11 (Pages 38 to 41)

Michael Lorusso                                                                 June 21, 2002
Washington, DC

Page 42

1    A.   Not particularly to the front part, but
2  just making sure they had signed in the correct
3  place, whether they were an individual or a
4  corporation.
5    Q.   Do you have a specific memory that
6  Mr. Harbur's offering memoranda did not contain this
7  executive summary?
8    A.   I recollect that none of the Dyer client
9  files had this in it.
10     MR. MURRAY:  Just for clarification, do
11  you mean when it was sent out to him, or do you mean
12  when it was returned?
13     THE WITNESS:  Oh, both.  I don't --
14  particularly, it was -- and that -- you know, the
15  question was, from what office.  When things were
16  sent out from the Boston office, they did not include
17  these pages.
18  BY MR. QUINTERO:
19    Q.   When you say, these pages, what pages are
20  you referring to?
21    A.   Unmarked page 1 labeled, executive
22  summary.
23     MR. MURRAY:  Maybe we can mark them, just
24  for clarification of the record.
25     MR. QUINTERO:  Okay.  Why don't we say

Page 43

1  that that's the second page.
2    A.   Second page.
3  BY MR. QUINTERO:
4    Q.   Okay.
5    A.   Page 3, dated May 1999 says, to
6  subscribers of Resource F, January -- at page --
7  January 1999, Resource F, Hawthorne, and an
8  additional page, Resource F, investment options, and
9  another page, Resource F, wiring instructions.
10    Q.   Pages 2 through 6 of Exhibit 141?
11    A.   Correct.  If you look at the next page,
12  it's labeled, page I, which is typically the first
13  page.
14    Q.   Okay.  Mr. Lorusso, was it your testimony
15  that during your tenure with Mr. Dyer, you did not --
16  you have not seen the executive summary?
17    A.   I have not seen it like this.
18    Q.   When you say, like this, what do you mean?
19    A.   I've never seen it on Resource F
20  letterhead in this form.  I've never seen a
21  description of -- it's describing an investment
22  methodology.  I've never seen that description of the
23  investment methodology.
24    Q.   Direct your attention to Exhibit 138,
25  which is the transcript from your earlier testimony,

Page 44

1  specifically, page 65, 66.
2     Almost down on the bottom of page 65,
3  there's a question, says:  Direct your attention,
4  Mr. Lorusso, to the second page of Exhibit 22, which
5  is entitled, executive summary.  I ask you to take a
6  look at that and tell me if you've seen this
7  executive summary before.
8    A.   M-hm.
9    Q.   Go ahead and read your response.
10    A.   I said:  I believe it was a correspondence
11  that vonStrasdas sent to Chuck, because it was from
12  the -- it was labeled from the Palm Beach office, so
13  that's Mr. vonStrasdas's address.
14     And then you asked:  So have you seen this
15  before.  And I said:  I have seen it, I believe,
16  once.
17    Q.   Okay.  Does that refresh your memory as to
18  whether you did in fact see it is during your time of
19  employment with Mr. Dyer?
20    A.   Again, I'm not very familiar with it.  I
21  think I've seen -- I didn't remember seeing it in
22  with the letterhead and the other things, but again,
23  I've probably seen it once.
24    Q.   So do you have a specific memory of this
25  being part of correspondence Mr. vonStrasdas sent to

Page 45

1  Mr. Dyer?
2    A.   Could you rephrase that?
3    Q.   Yes.
4    A.   Regular corresponcence or with regard to
5  private placement memorandums?
6    Q.   No.  I mean, this executive summary, do
7  you remember that specifically coming in from
8  Mr. vonStrasdas to Mr. Dyer?
9    A.   What I recollect is that Mr. Dyer received
10  1, not necessarily from Mr. vonStrasdas, and then
11  questioned Mr. vonStrasdas about it.
12    Q.   Where -- from whom did he receive it?
13    A.   I don't know.
14    Q.   And when -- at what point in time did
15  Mr. Dyer see it in terms of what you're testifying
16  about?
17     MR. COHEN:  Objection.
18     MR. MURRAY:  If you know.
19     THE WITNESS:  I don't.
20    A.   Late in my tenure.
21  BY MR. QUINTERO:
22    Q.   Direct your attention, Mr. Lorusso, to
23  page 72 of Exhibit 138.  Again, that's your
24  investigative testimony, the first question, if you
25  can read down further.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                           June 21, 2002
Washington, DC

Page 46

1    A.    Probably 6 months into my tenure -- the
2  same question, when did you see the executive
3  summary. I said, probably 6 months into my tenure.
4  Let me read my answer: There was an executive
5  summary that Mr. Dyer stated that vonStrasdas
6  produced to the counselors of the fund. I didn't
7  know if that's the 1, and they expressed that they
8  had displeasure. I don't know that that's the 1 that
9  resurfaced, but I don't have any knowledge of that.
10  And he's particularly talking about Dechert Price &
11  Rhoads.
12    Q.    Dechert Price & Rhoads?
13    A.    Dechert Price & Rhoads. I was not
14  involved with either the counselors or the fund or
15  their accountants or their whatever, so any -- I do
16  recollect at that time that Mr. Dyer mentioned to me
17  that somebody was mad about something, but I didn't
18  know -- again, I wasn't involved in those details, so
19  I didn't know what they were meaning.
20    Q.    You were referring to your testimony back
21  in March of 2001 with respect to executive summary?
22    A.    Yes.
23    Q.    Right. Is that the executive summary you
24  saw during your employment with Mr. Dyer -- is that
25  consistent with the executive summary that's before

Page 47

1  you --
2    A.    It was an executive summary. I don't know
3  if it was this. It was an executive summary that
4  described investment philosophy. I don't recollect
5  if it was this 1 on this letterhead.
6    Q.    What if anything did Mr. Dyer say about
7  the executive summary that you're describing back in
8  November of 1999?
9    A.    I don't know that -- if he actually
10  discussed it with me. I may have overheard him
11  talking to the counselors of the fund about it. I
12  don't know that we had an actual discussion.
13    Q.    So the -- let me just understand this --
14  you don't know, then, if you had an actual
15  conversation with Mr. Dyer about it?
16    A.    I knew he had displeasure. I didn't know
17  that -- we didn't sit around and discuss --
18    Q.    How did you know he had displeasure?
19    A.    He was agitated by it, his demeanor, his
20  actions, you know,.
21    Q.    Was he -- what specifically was he
22  agitated about?
23    A.    I don't know. You'd have to ask Mr. Dyer.
24    Q.    Did you gain an understanding as to what
25  he was agitated about?

Page 48

1    A.    No.
2    Q.    Did he tell you?
3    A.    No.
4    Q.    Directing your attention to the executive
5  summary and just page 2 of Exhibit 141, first
6  paragraph, the last sentence reads: The primary U.S.
7  custodians of the fund are Brown Brothers Harriman &
8  Company and Boston Private Bank and Trust. The
9  international custodian for the fund is Barclays
10  Bank. Other double A international custodians may be
11  added on as the need arises.
12    A.    I see those words.
13    Q.    Sure. Did Brown Brothers Harriman and
14  Company act as U.S. custodian for Resource F?
15    A.    I have no idea.
16    Q.    Did Boston Private Bank and Trust act as
17  the U.S. custodian for Resource F?
18    A.    I have no idea.
19    Q.    Did Barclays Bank act as an international
20  custodian for Resource F?
21    A.    I have no idea.
22    Q.    Did Resource F have any relationship
23  whatsoever with Brown Brothers Harriman?
24    A.    That's where I believe Chuck had his stock
25  portfolio.

Page 49

1    Q.    Any other relationship that you're aware
2  of?
3    A.    That was not my area of business.
4    Q.    Is that no?
5    A.    That's, I have no knowledge.
6    Q.    What relationship if any did Resource F
7  have to Boston Private Bank and Trust?
8    A.    That's where Mr. Dyer had bank accounts.
9    Q.    Did Resource F have a bank account at
10  Boston Private?
11    A.    Yes.
12    Q.    How do you know that?
13    A.    I know because they -- we would make
14  deposits to that bank for any customer who sent us a
15  check in the mail.
16    Q.    Did any of Mr. Dyer's entities have a
17  relationship with Barclays Bank?
18    A.    They may have. I'm not aware.
19    Q.    So you're not aware of any bank account
20  that Mr. Dyer controlled with Barclays Bank?
21    A.    He may have when I -- he had a bank
22  account offshore, but I don't know if it was Barclays
23  or not.
24    Q.    Was that bank account in the name of
25  Antietam?

13 (Pages 46 to 49)

Michael Lorusso                                    June 21, 2002

Washington, DC

### Page 50

```
 1      A.  I believe it was.  All the Antietam
 2  information, including the checks and everything,
 3  were sent to the PO box at Manchester by the Sea.
 4      Q.  What significance -- what is Manchester by
 5  the Sea?
 6      A.  That was just -- it was sent to his home.
 7      Q.  Okay.  Did you see any of the banking
 8  documents from the Antietam account?
 9      A.  I occasionally would see a bank statement
10  if he was trying to true up the debits and credits.
11          MR. MURRAY:  Can I take a quick break?
12          MR. QUINTERO:  Sure.  Go off the record.
13      (Recess.)
14          MR. QUINTERO:  Back on the record, please.
15          BY MR. QUINTERO:
16      Q.  Mr. Lorusso, with respect to Boston
17  Private Bank and Trust, did you have any signatory
18  authority?
19          MR. MURRAY:  For whom?
20          MR. QUINTERO:  I'm sorry?
21          MR. MURRAY:  For whom?
22          MR. QUINTERO:  For Mr. Dyer or any of his
23  entities.
24      A.  I believe I did on the bill-paying
25  entities, the ones that paid the light bill and the
```

### Page 51

```
 1  rent.  I did not I believe or recollect have
 2  signatory authority on Resource F.
 3          BY MR. QUINTERO:
 4      Q.  How about with respect to any accounts at
 5  Barclays Bank for Mr. Dyer or any of his entities?
 6      A.  Oh, absolutely not.
 7              (Lorusso Exhibit No. 142
 8              was marked for
 9              identification.)
10          BY MR. QUINTERO:
11      Q.  Okay.  Mr. Lorusso, I'm going to hand you
12  what's been marked as Exhibit 142.  This was also
13  investigative testimony Exhibit 24.  Ask you to take
14  a look at and tell me if you recognize it.
15      A.  It says, Resource F LLC, member addresses.
16      Q.  Do you recognize this document?
17      A.  I don't particularly recognize the
18  document.  I particularly recognize some of the names
19  on the document.
20      Q.  I'm sorry.
21          You do recognize some of the names?
22      A.  I do recognize some of the names.  I don't
23  recognize the particular document?
24          MR. MURRAY:  Just so you know, there's a
25  back page here.
```

### Page 52

```
 1          THE WITNESS:  I'm sorry.  I've never seen
 2  the back page.
 3          BY MR. QUINTERO:
 4      Q.  The back page is entitled, member status,
 5  and appears to be a spreadsheet of some type that has
 6  list of member names along with initial amount
 7  invested, et cetera.
 8          Is that what you're referring to?
 9      A.  Yes.
10      Q.  Bates stamp D 17?
11          Sorry.  You have to answer yes or no.
12      A.  Oh, I've never -- I don't recollect ever
13  seeing that.
14      Q.  With respect to the first page at least of
15  Exhibit 142 that you recognize some of the names --
16      A.  Yes.
17      Q.  -- what are some of the names?
18      A.  Mr. George Hervey-Bathurst from London,
19  England, who is a friend of Chuck's, who called
20  occasionally.
21      Q.  Let me ask you this:  What do the names
22  represent?
23      A.  They represent people who had invested
24  with Chuck.
25      Q.  In Resource F?
```

### Page 53

```
 1      A.  I believe Resource F, although their
 2  investment may not be limited to Resource F.
 3      Q.  Okay.  Does this list include both
 4  Mr. Dyer's clients and also so-called vonStrasdas
 5  clients?
 6      A.  It includes -- well, I can't say with
 7  definity that it includes all of the clients, but
 8  some of the clients here are vonStrasdas clients, and
 9  some of the clients are Dyer clients.
10      Q.  When you say they're Dyer clients or
11  vonStrasdas clients, could you go through here and
12  point out which ones are Dyer clients?
13          MR. MURRAY:  If you know.
14      A.  If I know, I can.
15          BY MR. QUINTERO:
16      Q.  Sure.  Go ahead.
17      A.  George Bathurst.
18          I'm going to just mark out the Dyer
19  clients.
20      Q.  Okay.
21      A.  George Bathurst, Dyer client.  John
22  Billig, Dyer client.
23          MR. COHEN:  I didn't hear that.
24          THE WITNESS:  John Billig.
25          MR. COHEN:  Can you spell it?
```

14 (Pages 50 to 53)

Michael Lorusso                                          June 21, 2002
Washington, DC

Page 54

1    THE WITNESS: B-I-L-L-I-G. It's the top
2  left of page 2, Bates stamp D 15.
3    MR. COHEN: Thanks.
4    A.  2 below that, Donert may be, but I'm not
5  sure. Derek Green. Derek Green again. Then
6  Coastwise Capital.
7    On the second page --
8    MR. MURRAY: What's the Bates number?
9    THE WITNESS: D 16.
10   A.  Just those previously stated.
11   BY MR. QUINTERO:
12   Q.  Okay. Are there any Dyer clients that
13 you're aware of that are not listed on the first 2
14 pages of Exhibit 142?
15   A.  I would have -- if Chuck dealt with them
16 individually, I would have no knowledge of them being
17 a client.
18   Q.  Okay. But my question to you is, are you
19 aware of any --
20   A.  No.
21   Q.  -- Dyer clients that are not listed?
22   A.  Not that I'm aware of.
23   Q.  Okay. What relationship, if any, did
24 Mr. Bathurst have to Mr. Dyer?
25   A.  Mr. Dyer and Mr. Bathurst's father were

Page 55

1  friends, I believe from the time of Eastern Airlines.
2    Q.  What were the circumstances that led to
3  Mr. Bathurst investing in Resource F?
4    A.  I don't know.
5    Q.  Was Mr. Bathurst already a client by the
6  time that you came on at Resource F?
7    A.  I think that he came on during my tenure,
8  but it's my understanding that he had previously
9  invested or anticipated investing in some of Chuck's
10 other endeavors.
11   Q.  What relationship if any did Mr. Dyer have
12 to John Billig?
13   A.  I don't know John Billig. I don't know
14 what relationship he had with him.
15   Q.  How do you know that he is a Dyer client?
16   A.  I just recognize the name in -- from
17 either a subscription memorandum or -- and I also
18 didn't strongly state it. I thought I said I thought
19 he was.
20   MR. COHEN: I'm sorry. I didn't catch the
21 last part of that.
22   THE WITNESS: I was just saying, it was my
23 belief that he was a Chuck client. I don't know how
24 he met him or what the circumstances was.
25   BY MR. QUINTERO:

Page 56

1    Q.  What relationship, if any, did Mr. Donert
2  have to Mr. Dyer?
3    A.  I don't know.
4    Q.  What makes you think that he may be a Dyer
5  client?
6    A.  It was the fact that he's in England. I
7  believe there may have been some relationship with
8  Mr. Bathurst from these people, but I'm not clear.
9    Q.  What relationship if any did Derek Green
10 have to Mr. Dyer?
11   A.  Derek Green was friends or familiar with
12 George Bathurst.
13   Q.  Any other relationship Mr. Dyer had with
14 Mr. Green?
15   A.  Not that I'm aware of.
16   Q.  So it was just through Mr. Bathurst?
17   A.  Yes.
18   Q.  And what relationship if any did Mr. Dyer
19 have with Coastwise Capital?
20   A.  The gentleman from Coastwise Capital ran
21 the payroll service that the firm used.
22   Q.  What is his name?
23   A.  I believe it's Brian Nelson.
24   Q.  Going back to Mr. Bathurst, did Mr. Dyer
25 make any representations to Mr. Bathurst with respect

Page 57

1  to Resource F?
2    MR. COHEN: Objection.
3    A.  You have to be a little more specific to
4  that.
5    BY MR. QUINTERO:
6    Q.  Well, were you -- did Mr. Dyer ever tell
7  you that he made representations to Mr. Bathurst
8  concerning Resource F?
9    A.  You would have to tell me what
10 representations you mean or what you mean by,
11 representations.
12   Q.  What if anything did Mr. Dyer tell you
13 about Mr. Bathurst and Mr. Bathurst's investment in
14 Resource F?
15   A.  He was a general investor just the same as
16 everyone else. There was no specific instructions or
17 discussions of his investment. His money came in,
18 went in the same places, and his statements went to
19 him. He was -- you know, there was no -- nothing
20 more than what's in the offering memorandum.
21   Q.  Did Mr. Dyer meet with Mr. Bathurst to
22 discuss Resource F to your knowledge?
23   A.  Mr. Bathurst frequently called Chuck at
24 the office and at home.
25   Q.  Were you --

15 (Pages 54 to 57)

Michael Lorusso                                                    June 21, 2002
                              Washington, DC

**Page 58**

1         MR. MURRAY:  Please try to answer the
2  question that's asked.
3      A.   That's how they met.
4         BY MR. QUINTERO:
5      Q.   And in those conversations, did they
6  discuss Resource F?
7      A.   I don't know what they discussed.  They
8  were private telephone conversations.
9      Q.   And how do you know that it was
10  Mr. Bathurst calling or on the phone with Mr. Dyer?
11      A.   Mr. Dyer didn't have a direct line.  All
12  the calls went through a switchboard.
13      Q.   Okay.  What discussions if any did
14  Mr. Dyer have with John Billig concerning Resource F?
15      A.   I have no idea.
16      Q.   What discussions if any did Mr. Dyer have
17  with Derek Green concerning Resource F?
18      A.   I know Derek Green called a few times, but
19  I don't know what the -- they discussed.
20      Q.   Mr. Dyer describe to you what he discussed
21  with Mr. Green?
22      A.   No, he did not.
23      Q.   And what discussions if any did Mr. Dyer
24  have with Brian Nelson concerning Resource F?
25      A.   I don't know.

**Page 59**

1      Q.   What discussions if any did you have with
2  Mr. Nelson with respect to Resource F?
3      A.   I introduced Brian to Chuck.
4      Q.   How did you know Mr. Nelson?
5      A.   As stated, he was -- he ran the -- was
6  representing the payroll company that we use.
7      Q.   What was the name of the payroll company?
8      A.   I don't remember off the top of my head.
9      Q.   Was it Coastwise Capital?
10      A.   No, no, no, no.
11         MR. MURRAY:  Hang on a second.
12         (Discussion off the record.)
13      A.   H.R. Logic.
14         BY MR. QUINTERO:
15      Q.   H.R. Logic was the payroll company?
16      A.   I believe.
17      Q.   Okay.  At what point did you introduce
18  Mr. Nelson to Mr. Dyer?
19      A.   Well, I introduced him -- we -- Chuck and
20  I were both introduced to him at the same time when
21  we chose a payroll service.
22         1 of the requirements that I had when I
23  came on with Chuck, that he not pay me in an informal
24  fashion, that he have a service that had insurance
25  and took taxes out and those things.

**Page 60**

1         We interviewed a few companies, and Todd
2  and myself selected H.R. Logic.  Later he would come
3  on sales calls and met Mr. Dyer and spoke to Mr. Dyer
4  about investments.
5      Q.   Were you present at any meetings between
6  Mr. Dyer and Mr. Nelson concerning Resource F?
7      A.   I may have been, but I don't recollect.  I
8  don't know that the meetings were exclusive to
9  Resource F.
10      Q.   No, but were you at any meetings between
11  those 2 gentlemen in which Resource F, the
12  investment, came up as a topic of discussion?
13      A.   I don't recollect that.
14      Q.   Did you have any discussions with
15  Mr. Nelson concerning his investment in Resource F?
16      A.   I -- he was very interested in what we
17  were doing, and I shared with him my enthusiasm for
18  what we were doing.
19      Q.   Can you describe your enthusiasm?
20      A.   Well, no -- just the whole overall makeup
21  of the company, and we were trying to, you know, do
22  the jet engine leasing and had the airline stuff.
23  And I believe at some point we had a guy from Florida
24  who he had brought on to leverage the airline stuff.
25         You know, it was an exciting time in the

**Page 61**

1  financial markets in general, a very -- a lot of high
2  yields due to dot-coms and other things, so he was
3  particularly interested in what we were doing.
4      Q.   So was Mr. Nelson interested in investing
5  in jet engine leasing and the airlines?
6      A.   I don't know specifically to that.  He was
7  interested in investing in Resource F.
8      Q.   And would this have been in the
9  investment-grade financial instruments portion of
10  Resource F?
11      A.   I don't know that -- Chuck never
12  specified -- Chuck -- to Chuck, Resource F was an
13  investment in Resource F in its totality.
14      Q.   What did you tell Mr. Nelson concerning
15  Resource F?
16      A.   I don't recollect.
17         Be more specific.
18      Q.   How many meetings -- or how many separate
19  conversations did you have with Mr. Nelson in which
20  Resource F came up?
21      A.   Probably a couple.  He would come and stop
22  by, and I might be working on a spreadsheet or just
23  talking on the phone, and he would stop by and chat
24  for 5 or 10 minutes, making a sales call.
25      Q.   Did he ever share with you that he was

16 (Pages 58 to 61)

Michael Lorusso                                                    June 21, 2002

Washington, DC

Page 62

1  thinking of investing in Resource F.
2      A.  I knew he was interested, yes.
3      Q.  How did you know that?
4      A.  He stated that.
5      Q.  Was that in 1 of your conversations you
6  had with him?
7      A.  I believe so.  I don't remember the
8  context, but I knew he was interested in investing in
9  Resource F.
10      Q.  Did you make any representations to him
11  concerning what Resource F was about?
12      A.  I don't recollect.
13      Q.  Are you aware of any representations that
14  Mr. Dyer made to Mr. Nelson concerning Resource F?
15      A.  No.
16      Q.  Did anyone in Mr. Dyer's employment or
17  Mr. Dyer himself provide Mr. Nelson with the offering
18  memorandum?
19      A.  I may have or Chuck may have.  I don't
20  remember.  It was customary for me to -- under
21  Chuck's direction to give somebody an offering
22  memorandum.
23      Q.  Okay.  After this conversation in which
24  Mr. Nelson expressed his interest in Resource F and
25  possibly investing, what happened next with respect

Page 63

1  to Mr. Nelson's investment?
2      A.  I believe he consummated the investment.
3  He transferred money into the account -- I think the
4  Resource F account at Boston Private Bank.
5      Q.  During the period in which he was making
6  the decision to invest in Resource F, did he have any
7  conversation was Mr. Dyer concerning his desire to
8  invest?
9      MR. COHEN:  Objection.
10      A.  I'm assuring he did, but I don't know.
11      BY MR. QUINTERO:
12      Q.  You're not aware of any?
13      A.  No, but I also -- I don't make any
14  assumptions.  He often spoke to both of us, so I
15  don't know what conversation he had with anyone.
16      BY MR. QUINTERO:
17      Q.  Did he ask or -- go ahead.
18      A.  Go ahead.  Ask the question.
19      Q.  Well, what were you going to say?
20      A.  No.  I'm fine.
21      Q.  Did you make any representations to
22  Mr. Nelson concerning the rate of return on the
23  investment in Resource F?
24      A.  I showed him the historical rate of return
25  that Chuck and Von's clients had been paid through

Page 64

1  our office for Resource F.
2      Q.  Did you make any representations as to
3  future payments?
4      A.  No.
5      MR. MURRAY:  You have to speak up.
6      THE WITNESS:  I'm sorry.
7      A.  No.
8      BY MR. QUINTERO:
9      Q.  Did Mr. Dyer make any representations as
10  to the rate of return for Resource F investment to
11  Mr. Nelson?
12      A.  I don't know.
13      Q.  Did you describe what the investment in
14  Resource F would entail?
15      A.  No.
16      Q.  Did Mr. Dyer?
17      A.  I don't know.
18      Q.  Are you familiar with the an individual by
19  the name Deborah Koepper?
20      A.  Yes.
21      Q.  Who she?
22      A.  She's a friend of a friend in Palm Beach,
23  Florida.
24      Q.  Did she make an investment in Resource F?
25      A.  Yes.  Through -- directly through

Page 65

1  vonStrasdas.
2      Q.  What were the circumstances leading up to
3  her investment?
4      A.  Mr. Dyer and myself had dinner with her.
5      Q.  Mr. Dyer and you?
6      A.  M-hm.
7      Q.  Okay.  And where was this?
8      A.  In Palm Beach, Florida.
9      Q.  What did you discuss there?
10      A.  Resource F.
11      Q.  Can you be more specific in terms of the
12  substance of the conversation?
13      A.  I introduced Mr. Dyer, and we discussed if
14  she was interested in investing in Resource F.
15      Q.  Did you have some inkling prior to this
16  dinner that she was interested in investing?
17      A.  We had briefly talked about it, yes.  She
18  knew what I was doing and wanted to meet the guy I
19  was working with.
20      Q.  So she contacted you concerning the
21  investment?
22      A.  I don't know who contacted each other, but
23  we -- at that period of time, we had chatted
24  infrequently.
25      Q.  What was the time period?

17 (Pages 62 to 65)

Michael Lorusso                                                          June 21, 2002
                              Washington, DC

Page 66

1        What was the time period?
2    A.   When or how long?
3    Q.   When.
4    A.   It would be early in my tenure with
5    Mr. Dyer.  We had been seeking to open a Palm
6    Beach -- excuse me -- a Fort Lauderdale office, if
7    you look at my CV, you'll see that I'd spent a lot of
8    time in Florida.
9        The back office and rent was starting to
10   get very expensive in the Boston area.  We discussed
11   moving the back office function to Florida.  She was
12   1 of the people that we had meetings with when we
13   went to Florida on that Florida trip.
14   Q.   Who else did you meet with?
15   A.   That was it.
16   Q.   She was the only person you met with?
17   A.   With regards to Resource F.
18   Q.   To a possible investment?
19   A.   Yes.
20   Q.   Okay.  So what did you say to her at this
21   dinner that you had with Mr. Dyer?
22   A.   We just discussed -- and I don't know if
23   that point in time it was a proposed investment.  I
24   don't remember.  I believe it was earlier in the
25   cycle when he was just introducing hedge fund.

Page 67

1        I don't know that -- I don't know how -- I
2    can't remember how long a period it was, whether it
3    was when the hedge fund was new, maybe 1 or 2 months
4    old, or whether it was after 1 year.
5    Q.   What did Mr. Dyer say to Ms. Koepper at
6    this dinner?
7    A.   We just talked about different things.  He
8    talked about airlines and -- I mean, he had a -- not
9    canned, but I mean, he had a real passion for what he
10   was doing.
11   Q.   How long after this dinner did Ms. Koepper
12   make the decision to invest in Resource F?
13   A.   A good while, maybe several months.
14   Q.   Did you have any continuing communications
15   with Ms. Koepper during that time period?
16   A.   Yeah, I occasionally went to Palm Beach,
17   and I would have lunch with her.  I was friendly with
18   her.
19   Q.   Did Mr. Dyer have continuing
20   communications with Ms. Koepper during that period?
21   A.   I don't know.
22   Q.   During your lunches with her during this
23   period, did you discuss Resource F?
24   A.   Probably.
25   Q.   What did you tell her about it?

Page 68

1    A.   I probably gave her the historical return.
2    Q.   She ask if you had invested in it?
3    A.   I don't remember.
4    Q.   Did you discuss any possible future
5    returns on the investment with her?
6    A.   I don't remember.
7    Q.   Did she ask you what Resource F was
8    investing in?
9    A.   I know she had a copy.  Whether at that
10   meeting or we later sent her a copy of the private
11   placement memorandum, it was clearly marked in there.
12   I don't know that we particularly discussed it.
13       Almost throughout all of the discussions
14   with people, the investment philosophy was not
15   something that was their primary concern.
16   Q.   She obtain a copy of the executive summary
17   which was in Exhibit 141 or something similar
18   describing the investment-grade obligation financial
19   instruments?
20   A.   I don't know.
21   Q.   Did you discuss Resource F investments in
22   those type of investment-grade financial instruments?
23   A.   I don't remember.
24   Q.   Did you have an understanding as to what
25   was driving the historical returns on Resource F?

Page 69

1    A.   No.
2    Q.   Did you ask Mr. Dyer?
3    A.   No.
4    Q.   Did you ask Mr. vonStrasdas?
5    A.   No.
6    Q.   Did you ask anyone?
7    A.   No.
8    Q.   Did you ever wonder?
9    A.   No.
10   Q.   Why not?
11   A.   Stock market was giving the same type of
12   returns.  I wasn't somebody who was -- who aspired to
13   be a trader -- not trader in the negative -- I mean,
14   a bond trader or a --
15   Q.   Sure.
16   A.   I was not a transaction-oriented person.
17   I've never been -- I've never except for once
18   invested in the stock market.  This is not my area of
19   expertise.  I wouldn't know a fish from a stock.
20   Q.   Now, if Mr. -- how is it that Ms. Koepper
21   when she was invested was not a Dyer client?
22   A.   At that point in time, I think that there
23   was starting to be some disagreements between
24   vonStrasdas and Dyer.
25       MR. MURRAY:  Just for clarification, what

18 (Pages 66 to 69)

Michael Lorusso                                                        June 21, 2002
Washington, DC

---

Page 70

1  point in time are you talking about?
2      THE WITNESS:  Toward the end of my
3  employment.
4      BY MR. QUINTERO:
5      Q.  So sometime around the turn of the year?
6      A.  Turn of the year, yeah.
7      Q.  Okay.
8      A.  And that she wanted to get involved -- you
9  have to understand that whether they're a Von client
10  or a Chuck client, all Chuck did was receive the
11  money from Boston Private and then send it to a
12  secondary company.  So she sent some money to that
13  secondary company directly.
14      Q.  Did Mr. Dyer receive a management fee for
15  Ms. Koepper's investment?
16      A.  No.
17      Q.  Why not?
18      A.  Because it was not a Chuck Dyer client.
19      Q.  Didn't he also receive though a management
20  fee for vonStrasdas's clients, such as we saw on
21  Exhibit -- I believe it was 142, if I'm not mistaken?
22      Yes.  Exhibit 142.
23      I'm asking you, didn't Mr. -- didn't
24  Mr. Dyer receive management fees for vonStrasdas'
25  clients that are contained in Exhibit 142?

---

Page 71

1      A.  Yes, I believe that's correct.
2      Q.  So what's the distinction with
3  Ms. Koepper?
4      A.  I believe that she came on when -- there
5  were -- there was talk of separating the fund, having
6  a Von fund and a Chuck fund, and I believe it was
7  around that time frame.
8      Q.  You say, there was talk.
9      A.  Right.
10      Q.  Who made --
11      A.  Between Chuck and vonStrasdas.
12      Q.  How did you become aware of those
13  conversations?
14      A.  Through discussions with Chuck.
15      Q.  Any discussions with vonStrasdas?
16      A.  I think I talked to him 1 or 2 times on
17  the phone.
18      Q.  When did you talk to vonStrasdas?
19      A.  Throughout -- I mean, I spoke to them when
20  he would call in general, but towards the end of the
21  tenure, he just suggested that we send the stuff
22  directly to his account instead of coming through the
23  Boston account.
24      Q.  Was Mr. Dyer aware of that arrangement?
25      A.  Not for this particular transaction, I

---

Page 72

1  don't believe.
2      Q.  Was he aware of it with respect to other
3  transactions when --
4      A.  Yes, because all of the Von clients always
5  sent their money -- I shouldn't say "always" -- the
6  majority of Von clients sent their money directly to
7  Von anyways.
8      Q.  Okay.
9      A.  So it was not uncommon.
10      Q.  Were there any clients besides Ms. Koepper
11  for which Mr. Dyer did not receive credit so to speak
12  to receive management fees?
13      A.  I don't know.  I don't know the universe
14  of the funds.
15      Q.  No, I understand that.
16      I'm asking if you're aware of anything
17  else.
18      A.  No.
19      Q.  All right.  Going back to the talk that
20  you mention between Mr. Dyer and Mr. vonStrasdas on
21  separating the funds, what did Mr. Dyer tell you
22  about?
23      A.  He just said that historically, Von was
24  much more interested in what you were talking about,
25  which is a higher-yield product, or a different way

---

Page 73

1  to say it was, Von was not interested in aviation.
2      Q.  Anything else that Mr. Dyer told you?
3      A.  Not that I can recollect.
4      Q.  And what did Mr. vonStrasdas tell you
5  about splitting the funds?
6      A.  We didn't talk about that.
7      Q.  What did you talk about?
8      A.  You really didn't talk to Von.  He just
9  sort of gave you orders.
10      He would call up and say, send this here,
11  do this, do that.  And so he just said, send it to --
12  send it directly there due to the time frame of
13  something closing.  He always specified, you know, a
14  window of opportunity, meaning that he had a cutoff
15  period for when funds would be considered in the
16  fund, and so in order to achieve that time frame, he
17  instructed that investment go directly to the same
18  place that the Chuck ones went in the second step.
19      Q.  Did you receive any compensation for
20  Ms. Koepper's investments?
21      A.  No.
22      Q.  Did not receive a finder's fee?
23      A.  No.
24      Q.  Receive any management fees?
25      A.  No.

---

19 (Pages 70 to 73)

Michael Lorusso                                                          June 21, 2002
Washington, DC

Page 74

1    Q.   Or any share in the profits?
2    A.   No.
3    Q.   Did you ask Mr. vonStrasdas about that,
4    about receiving compensation for Ms. Koepper's
5    investment?
6    A.   We discussed it.  I never received
7    anything.
8    Q.   What were the discussions?
9    A.   The possibility of such things.
10   Q.   What did Mr. vonStrasdas tell you about
11   that?
12   A.   He thought that it was a good idea, but it
13   never came to fruition.
14   Q.   Did you talk about a specific percentage
15   that you would get for Ms. Koepper's investment?
16   A.   No.
17   Q.   Besides Ms. Koepper, was there anyone else
18   that you discussed the investment with?
19   A.   No.
20   Q.   Why only Ms. Koepper?
21   A.   I had met her previously, and she had
22   indicated an interest in the type of stuff we were
23   doing.
24   Q.   She tell you how she heard about what you
25   were doing?

Page 75

1    A.   No.
2    Q.   Did you ask?
3    A.   No.
4              (Lorusso Exhibit No. 143
5               was marked for
6               identification.)
7         BY MR. QUINTERO:
8    Q.   Did you invest in Resource F?
9    A.   No.
10   Q.   Did you invest in some sort of trading
11   program involving Mr. vonStrasdas?
12   A.   No.
13   Q.   Did you invest 45,000 dollars in or about
14   January of 2000?
15   A.   No.  I believe that was the person -- we
16   should get the spelling later -- I think it's
17   Koeppler, but I don't know the --
18   Q.   Okay.  You believe it's Koeppler as
19   opposed to Koepper?
20   A.   Deborah -- Koepper is fine.  Deb from Palm
21   Beach, Florida.
22   Q.   Okay.  So that 45,000 dollars which you
23   did testify about back in March of 2001, it was not
24   actually your money.
25             It was Ms. Koepper's money?

Page 76

1    A.   It was money that Ms. Koepper sent, I
2    believe, half of the money to me, because we were
3    going to put it through the Boston office.
4    Q.   Okay.
5    A.   And she had self-directed the investment
6    to go into Resource F.  For some reason, I don't
7    remember the particular instance, we chose not to
8    send it through Chuck.
9              I sent the part that I had to vonStrasdas,
10   and she sent I believe 55,000 dollars to make up the
11   hundred thousand-dollar normal subscription.  She
12   wired it from her bank in Palm Beach directly to
13   vonStrasdas.
14   Q.   Okay.  So her total investment was a
15   hundred thousand?
16   A.   Yes, in Resource F, yes.
17   Q.   Is there a particular reason why you
18   failed to testify about this when asked back in March
19   of 2001?
20   A.   I wasn't that -- I didn't recollect the
21   exact circumstances of the transaction, and after
22   reflecting on the testimony and further reflection, I
23   now remember that's what it was.
24   Q.   So back in March of 2001, you just forgot
25   that it was someone else's money that you were

Page 77

1    testifying about?
2         MR. MURRAY:  Objection.
3         MR. QUINTERO:  Let's take a short break.
4    Off the record, please.
5              (Whereupon, at 12:04 p.m., the deposition
6    in the above-entitled matter was recessed, to
7    reconvene at 1:14 p.m., this same day.)

20 (Pages 74 to 77)

Michael Lorusso                                          June 21, 2002
Washington, DC

---

Page 78

1          AFTERNOON SESSION
2              (1:14 p.m.)
3   Whereupon,
4       MICHAEL ANTHONY LORUSSO,
5   the witness testifying at the time of recess, having
6   been previously duly sworn, was further examined and
7   testified further as follows:
8              (Lorusso Exhibit No. 144
9               was marked for
10              identification.)
11      MR. QUINTERO: Back on the record.
12      MR. MURRAY: Does this memorandum to
13  Charles Dyer have a new number?
14      MR. QUINTERO: It does. It's Exhibit 143.
15  It's actually what I was just about to hand to
16  Mr. Lorusso.
17      MR. MURRAY: Oh, sorry.
18      MR. QUINTERO: That's fine.
19  EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
20      BY MR. QUINTERO:
21      Q. Mr. Lorusso, I hand you what's been marked
22  as Exhibit 143. It's the old investigative testimony
23  Exhibit 85. Take a look at it and tell me if you
24  recognize it.
25      A. Yes. These are the --

---

Page 79

1      MR. MURRAY: Just --
2      A. Yes, I do.
3      BY MR. QUINTERO:
4      Q. What is it?
5      A. Appears to be the -- marked,
6   distributions, states that these were compiled by
7   Mr. vonStrasdas.
8      Q. Were they sent to Mr. Dyer's office?
9      A. Yes.
10     Q. Did you have any role with respect to
11  Exhibit 143?
12     A. No.
13     MR. MURRAY: These are all different
14  documents. They were all the same, but different
15  dates.
16     MR. QUINTERO: That's right. Appears to
17  be --
18     MR. MURRAY: It may be good if you can
19  focus on -- if you have a particular question, you
20  can focus on.
21     MR. QUINTERO: Sure.
22     BY MR. QUINTERO:
23     Q. Why don't we just go with the first 2
24  pages of Exhibit 143, which is dated December 27,
25  1999.

---

Page 80

1      A. Marked 1904, 1905 on the Bates stamps.
2      Q. Exactly.
3      A. Yes.
4      Q. This was during your tenure with Mr. Dyer;
5   is that correct?
6      A. That's correct.
7      Q. Okay. And directing your attention to the
8   text or the body, which after, dear Chuck, it says:
9   Please verify our calculations for disbursements for
10  immediate executions.
11         Who if anyone verified these calculations?
12     A. The calculations really was the math
13  between .0456 times 300,000.
14     Q. So you're pointing to Mr. Richard Ellison?
15     A. Richard Ellison. It was, please verify
16  the math, as opposed to, please cross-reference the
17  file.
18     Q. Okay. It's your testimony this was
19  prepared by Mr. vonStrasdas?
20     A. Correct.
21     Q. Who made the decision as to the numbers we
22  see saying the total gains received by the fund -- it
23  says, .059 times 8.840 MM.
24         Does the 8.840 refer to 8.84 million?
25     A. That's correct. That would be the balance

---

Page 81

1   of money in the fund at that time.
2      Q. And what does the .059 signify?
3      A. According to the statement -- the
4   sentence, total gains for the fund, so I would assume
5   it would be .059 percent.
6      Q. .059 percent, or would it then be 5.9
7   percent?
8      A. Excuse me. 5.9 percent. I'm sorry.
9      Q. Who made the decision as to what -- or who
10  calculated what the gain would be for the fund for
11  the given month for example in this?
12     MR. MURRAY: Objection. If you know.
13     A. I don't. But we received this as a total
14  package from Mr. vonStrasdas.
15     BY MR. QUINTERO:
16     Q. Did anyone in Mr. Dyer's office in Boston
17  come up with the figure?
18     A. No.
19     Q. And that's true for all these
20  disbursements throughout your tenure?
21     A. That's correct.
22     Q. It was always -- it always came in the
23  form of something like the first 2 pages of Exhibit
24  143?
25     A. That's correct.

---

21 (Pages 78 to 81)

Michael Lorusso

June 21, 2002

Washington, DC

Page 82

1  Q.  Okay.  Moving on to where it says,
2  Resource F administration fee, 1.5 percent divided by
3  12 times 8.940 million.
4      What does the 1.5 percent signify?
5  A.  I believe it's the administrative fee that
6  Resource F charged to administer the fund, which is
7  stated in the private placement memorandum.
8  Q.  It's divided by 12 because --
9  A.  -- 12 months in a year.
10  Q.  I see.  Okay.
11      Where it says, Bunker Hill Aviation
12  Company, manager performance fee, tell me what that
13  is.
14  A.  I believe it was -- in the private
15  placement memorandum, it -- I believe it has a
16  percentage of share of the return that the managing
17  members or the -- that the hedge fund itself
18  participates.
19  Q.  So it's a certain percentage of the total
20  gain?
21  A.  Correct, which is described I believe in
22  here as a performance fee.
23  Q.  Okay.  Did you -- were you the person in
24  Mr. Dyer's office who made sure that the math was
25  correct on sheets such as the first 2 pages of

Page 83

1  Exhibit 143?
2  A.  Sometimes I was, yes.
3  Q.  Who else?
4  A.  Mr. Dyer or any of the administrative
5  staff, depending on who was there.  Again, we were
6  just -- it says, view the calculation, so it's really
7  just taking a calculator out and verifying the
8  arithmetic.
9  Q.  Now, under, client distributions, which is
10  in the body of the first page of Exhibit 143, appears
11  to have dollar amounts attached to individual
12  clients; is that correct?
13  A.  That's correct.
14  Q.  What, if anything, did Mr. Dyer's office
15  do with this information?
16  A.  Depending on if he was to pay that client,
17  that was the amount that the client was distributed.
18  Q.  Did Mr. Dyer's office pay clients these
19  amounts that are found for example on the first 2
20  pages of Exhibit 143?
21  A.  Yes.  He typically prepared a wire sheet
22  depending on the bank, sent it away for distribution
23  to these named people.
24  Q.  Okay.  And where did the money that went
25  out to clients -- where did that money come from?

Page 84

1  A.  Before it went out to people?
2  Q.  Yes.
3  A.  It was deposited in that account.  I don't
4  know where.
5  Q.  What account are you referring to?
6  A.  I'm talking about the Resource F account
7  at Boston Private Bank.
8  Q.  Okay.  So money was deposited in the
9  Boston Private Bank account, and in turn, that money
10  was then wired to clients based on the information
11  such as in Exhibit 143?
12  A.  Correct.  You could define the Resource F
13  account as a distributions account.  It may have gone
14  to different banks before it reached there.  I don't
15  know.  But it ended up there as a lump sum, and then
16  it was distributed to the clients.
17  Q.  Who placed the moneys in the Boston
18  Private account for distribution?
19  A.  They were wired.  I don't know where they
20  were wired from.
21  Q.  Do you know who was responsible for doing
22  the wiring?
23  A.  No, I do not.
24  Q.  So I understand how the transaction worked
25  on the other end, I think you -- I believe you

Page 85

1  testified about this, but let me just go over it with
2  you again.
3      When someone such as Mr. Ellison or any of
4  these clients that are listed here in Exhibit 143
5  made their initial investment, how did that happen?
6  MR. COHEN:  Objection.
7  A.  The client would either send money
8  directly to the Resource F account, or send it --
9  I'll assume to go another place, because then they
10  would show up as a client.
11  BY MR. QUINTERO:
12  Q.  Okay.
13  A.  They were -- it was sent either to a place
14  that we controlled or a place we didn't control.
15  Q.  I see.
16      When it was sent to a place that you
17  controlled, meaning Mr. Dyer's entities, was that
18  initially Boston Private Bank?
19  A.  It was typically Boston Private, yes.
20  Q.  What other accounts?
21  A.  I don't know.  I can't say that it was
22  solely Boston Private.
23  Q.  From there, where would it go?
24  A.  It was wired to an account offshore whose
25  name I don't remember.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                                June 21, 2002

Washington, DC

Page 86

1    Q.  Was that account under Mr. Dyer's control?
2    A.  I think it was 1, but I couldn't testify
3  to that.
4    Q.  Why do you think so?
5    A.  I know 1 I ad 1 offshore.
6    Q.  What makes you believe that money was
7  wired to that account offshore?
8    A.  It was bundled and sent somewhere
9  offshore.  I don't know where.
10    Q.  Okay.  And from there, was it sent
11  someplace else?
12    A.  The only account that I had knowledge of
13  or received statements or seen statements on was the
14  Resource F account at Boston Private, so after that,
15  I have no knowledge of where something may or may not
16  have been directed to.
17    Q.  Did any of the clients receive statements
18  that described how much money they were getting on a
19  monthly or quarterly basis?
20    A.  Yes.
21    Q.  Who prepared those?
22    A.  The Boston office prepared them based on
23  this.  They were typically quarterly statements.
24    Q.  What role if any did you have in preparing
25  those statements?

Page 87

1    A.  I sometimes prepared the statements.
2    Q.  Who else prepared them?
3    A.  I believe Todd Litton did in the
4  beginning.  And then Chuck may have, depending on --
5  again, I don't know the whole world of the client
6  base.  I prepared some for some of the clients.  And
7  then after I left, I don't know who prepared any of
8  them.
9    Q.  Do you know if Mr. Dyer did in fact
10  prepare some client statements?
11    A.  No, I don't know that he did or did not.
12            (Lorusso Exhibit No. 145
13             was marked for
14             identification.)
15    BY MR. QUINTERO:
16    Q.  Mr. Lorusso, I'm going to hand you what's
17  been marked as Exhibit 145.  It is a document dated
18  July 19th, 1999.  It's a memo, friends of Resource F
19  shares, subject, Resource F A shares, year-to-date
20  performance.  This is old investigative testimony
21  Exhibit No. 41.
22    MR. COHEN:  Was there an Exhibit -- what's
23  the current document being marked as?
24    MR. QUINTERO:  145.
25    MR. COHEN:  Was there a 144?

Page 88

1    MR. QUINTERO:  There's a 144, but I
2  haven't introduced it yet.  I had it premarked.
3    MR. COHEN:  Oh, sorry about that.
4    MR. QUINTERO:  No.  It's a natural
5  question.
6    A.  It's a cover letter with a number of
7  graphs and charts.
8    BY MR. QUINTERO:
9    Q.  Okay.  What role if any did you have in
10  preparing the cover letter that's Exhibit 145?
11    A.  No role in preparing the cover letter.
12    Q.  What role if any did you play in preparing
13  the charts and graphs that are attached to the cover
14  letter in Exhibit 145?
15    A.  I typically prepared charts and graphs of
16  this nature.  I don't know that I prepared these
17  charts or graphs.
18    Q.  Would you look through there and tell me
19  if there's anything that you do not believe that you
20  prepared.
21    A.  It's consistent with work that I would
22  have done.
23    Q.  Okay.  When you did prepare graphs in
24  connection with Resource F, at whose direction did
25  you prepare them?

Page 89

1    A.  It was part of the performance return
2  package.  Chuck sent letters to his clients.  We sent
3  the information to the Florida office where I believe
4  Mr. vonStrasdas distributed them to his clients, so
5  it was just something we did on a monthly basis.
6    Q.  So you prepared charts and graphs such as
7  part of Exhibit 145 on a monthly basis?
8    A.  That's correct.  We would not
9  distribute -- we would distribute on a quarterly
10  basis as required in the offering memorandum, but we
11  would prepare them on a monthly basis.
12    Q.  And when you prepared the quarterly
13  statements for distribution, were they for so-called
14  vonStrasdas's clients as well as Mr. Dyer's clients?
15    A.  There was no delineation.
16    Q.  So it was for basically all the clients?
17    A.  All Resource F clients.
18    Q.  Okay.  And those went out of the Boston
19  office?
20    A.  Yes, but not with this -- not with the
21  front page of 145.
22    Q.  Where did you receive the data that backed
23  up the charts and graphs that are contained in
24  Exhibit 145?
25    A.  Do you mean, historic market data?

23 (Pages 86 to 89)

Michael Lorusso                                                           June 21, 2002
                              Washington, DC

Page 90

1    Q.  No.  I'm talking about the Resource F
2   data.
3    A.  It was compiled by the actual transactions
4   that we made, so if we made a distribution to a
5   person, we would note that distribution, and that
6   would be the basis of the return analysis.
7    Q.  Okay.  And that original information was
8   the information that came from Mr. vonStrasdas, such
9   as in Exhibit 143?
10    A.  Correct.
11    Q.  Okay.  Were you able to -- did you attempt
12   to verify -- strike that.
13      Are you familiar with something called a
14   Resource F alpha fund?
15    A.  I've heard the name before, but I'm not
16   familiar with what that terminology means.
17    Q.  At what point did you hear the name?
18    A.  Halfway through my tenure.
19    Q.  What did you hear about it?
20    A.  There was a lot of talk of, again,
21   splitting the fund, the Von clients versus the Chuck
22   clients.  And I understand it to be discussions that
23   they were having with whoever the fund's counselors
24   were to create, quote-unquote, a second fund or a
25   subfund to differentiate between investment

Page 91

1   philosophy.
2    Q.  Was that Dechert Price & Rhoads?
3    A.  It might have been at that time, yes.
4    Q.  What was the focus of the investment going
5   to be in the alpha fund?
6    A.  I wasn't involved in the discussions with
7   Dechert Price & Rhoads.
8    Q.  Did you have any discussions with either
9   Mr. vonStrasdas or Mr. Dyer on that subject?
10    A.  No.
11    Q.  Were you able to derive any understanding
12   of what the alpha fund was going to do?
13    A.  No.  I -- again, I know that they were
14   trying to go in 2 different directions.
15    Q.  Did Dechert Price & Rhoads or any other
16   attorneys prepare any documents such as an offering
17   memorandum with respect to the alpha fund?
18    A.  A new offering memorandum was prepared,
19   and I don't know if it was prepared by Dechert Price
20   & Rhoads.
21      There was also a firm in Texas which
22   Mr. Dyer had been acquainted with before that had a
23   second proposed offering memorandum, but through my
24   entire tenure, the only offering memorandum that was
25   on the street was the 1999 Resource F LLC offering

Page 92

1   memorandum.
2    Q.  Was the firm Haynes & Boone?
3    A.  Yes, the firm was Haynes & Boone.
4    Q.  Okay.  Did you ever see the offering
5   memorandum for alpha fund?
6    A.  I may have seen it once.  I wasn't
7   involved in the discussions with the people from
8   Haynes & Boone or DPR.  I don't know who.
9    Q.  Did the offering memorandum for the alpha
10   fund, a draft alpha fund offering memorandum differ
11   in investment focus from the offering memorandum such
12   as we saw in Exhibits 140, 141, and 139?
13    MR. MURRAY:  Objection.
14    Go ahead.
15    A.  Don't know.
16    BY MR. QUINTERO:
17    Q.  What was the investment focus in the alpha
18   fund?
19    A.  I don't know.
20    Q.  Were there any differences between the
21   Resource F offering memoranda and the alpha fund
22   memoranda that you saw?
23    A.  It was created by 2 different firms.
24   There were a lot of differences, but it was never --
25   it was never put out in the street.  It was always in

Page 93

1   draft form.  We just didn't -- it wasn't something we
2   studied every day.
3    Q.  What differences do you remember there
4   being?
5    A.  Just the look and the feel of it.  I mean,
6   2 different firms do 2 different things.  I mean, it
7   wasn't a mirror copy of the other 1.
8    Q.  Is it your testimony now that it was
9   Haynes & Boone that prepared the alpha fund
10   memorandum?
11    A.  Dechert Price & Rhoads prepared 1.  Haynes
12   & Boone also prepared 1.
13    Q.  Oh, I see.  Okay.
14      So if I understand correctly -- so they
15   both prepared an alpha fund offering memorandum?
16    A.  They both prepared a replacement
17   substitute, different version, proposed different
18   version.
19    Q.  Taking the Dechert 1 first, what
20   differences do you remember from the Dechert version
21   versus the Resource F?
22    A.  I wasn't involved in the discussion or
23   negotiations with them with regards to it, so I
24   don't.
25    Q.  I'm asking based on your observation of

24 (Pages 90 to 93)

Michael Lorusso                                                    June 21, 2002

Washington, DC

Page 94

1  the replacement PPM.
2      A.  I probably looked at it 1 or 2 times.
3  Again, the feel was very similar to the first 1 from
4  Dechert Price & Rhoads.  In the Haynes & Boone 1, it
5  just had different fonts, different feel, but I
6  didn't study it with regards to the particulars.
7          It was really to change the managing
8  members and do those types of things that we paid
9  attention to as opposed to the investment philosophy.
10     Q.  Was Mr. Dyer going to remain a managing
11 member in the replacement PPM?
12     A.  It was my understanding that they would
13 either be co-managing members or each person would
14 have their own separate fund.
15     Q.  Okay.  Were there any substantive
16 differences that you remember between the 2
17 replacement PPMs and the original Resource F PPM?
18     A.  No, not that came through Chuck's office,
19 not to say that there aren't.
20     Q.  Are you aware of any other ones that did
21 not come through Chuck's office?
22     A.  No.  It's just that the PPMs that you
23 showed me have pages inserted from Mr. vonStrasdas,
24 so had they left the Boston office and had additional
25 pages, I wouldn't be aware of them.

Page 95

1      Q.  Directing your attention back to Exhibit
2  141, the executive summary which is page 2 of that
3  exhibit.
4      A.  Okay.
5      Q.  Did either of the replacement PPMs contain
6  a discussion of the type of investment that's
7  described in the executive summary?
8      A.  No.
9      Q.  How do you know that?
10     A.  I just know it.  My belief was that the
11 substantive work or the replacement offering
12 memorandums were due to changes in the investment
13 manager, not changes in the investment philosophy.
14     Q.  Did Resource F have an auditor, an
15 independent auditor for the fund?
16     A.  They engaged I believe it was Grant
17 Thornton.
18     Q.  What role if any did you play in the
19 relationship between Resource F and Grant Thornton?
20     A.  Some of the items that they wanted were
21 the historical returns, and I provided them to the
22 people at Grant Thornton.
23     Q.  Who did you deal with at Grant Thornton?
24     A.  I don't remember.
25     Q.  A gentleman by the name of Mr. Vaccaro?

Page 96

1      A.  There were 2 Italian gentlemen that I
2  dealt with.  1 was there for a little bit, and the
3  other 1, I don't -- the name Vaccaro was familiar.
4      Q.  Are you familiar with the type of work
5  that Grant Thornton was doing for Resource F?
6      A.  They were doing a compilation on it.
7      Q.  What is your understanding of what a
8  compilation is?
9      A.  It's far less than a Big 4- or 6- -- I
10 don't know how many are left -- type-audit.  It
11 basically is far less than even verifying the
12 transactions.  It's just almost saying, these things
13 are -- probably could have happened as opposed to
14 saying with certainty that these are things that
15 certifiably have happened.
16     Q.  And did you pass on to them the numbers
17 that they used for their compilation?
18     A.  Yes.
19     Q.  And where did you derive those financial
20 numbers?
21     A.  Those numbers were deriven (sic) from the
22 stack -- Exhibit --
23     Q.  -- Exhibit 143?
24     A.  -- 148, but it was also cross-referenced
25 by the fact that we -- by the actual distributions to

Page 97

1  the clients.  We provided to Grant Thornton
2  photocopies of the bank statements showing the checks
3  or wires to the individual clients.
4      Q.  Okay.  Going back now to Resource F as
5  opposed to the possible replacement fund.
6          Did Mr. Dyer invest his own money into
7  Resource F?
8      A.  I don't know what Mr. Dyer's investment
9  was.  I believe he contributed stock, but I'm not
10 fully aware of what his monetary contribution was.
11     Q.  Are you aware of any monetary
12 contribution?
13     A.  I'm not aware of any.
14     Q.  And how do you know that he contributed
15 stock into Resource F?
16     A.  He had several times stated to people that
17 that's what he had contributed.
18     Q.  Who did he state that to?
19     A.  Some of his client base.
20     Q.  Who specifically?
21     A.  George Bathurst.
22     Q.  Anyone else?
23     A.  I believe Derek Green.
24     Q.  Anyone else?
25     A.  Not that I'm aware of.

25 (Pages 94 to 97)

Michael Lorusso                                                                June 21, 2002

Washington, DC

Page 98

1    Q.   Did Mr. Dyer ever make any statements that
2    Resource F -- or what Mr. vonStrasdas was doing could
3    be a Ponzi scheme or a pyramid scheme or a prime bank
4    scheme?
5    A.   No.
6    Q.   Did Mr. Dyer ever express an opinion that
7    what Mr. vonStrasdas was doing may not be a
8    legitimate trading program?
9        MR. COHEN:  Objection.
10   A.   No, he did not.
11       BY MR. QUINTERO:
12   Q.   Did you ever question him on the
13   investment returns' legitimacy?
14   A.   No.
15       Again, this was a time with a robust stock
16   market.  All the money was being wired to our
17   account.  We were distributing actual dollars to the
18   clients.  There was no need for me at this time to
19   question the validity of the investment.
20   Q.   Did you ever have any discussions with
21   Mr. Dyer as to why all the money was going to
22   offshore accounts?
23   A.   No.
24   Q.   Did he ever discuss that with you?
25   A.   No.

Page 99

1    Q.   Did Mr. Dyer ever solicit investors to
2    Resource F?
3        MR. COHEN:  Objection.
4    A.   I know he contacted a number of his
5    friends who were high-net-worth individuals or
6    people -- he had a very close circle, people that he
7    went to Harvard business school with.  Most of them
8    are in the financial community.  And he tended to do
9    a lot of business with them.
10       BY MR. QUINTERO:
11   Q.   Did any of those individuals invest in
12   Resource F?
13   A.   Only the people on the stated sheet
14   invested to my knowledge.
15   Q.   Are you aware of any solicitations that
16   Mr. Dyer made to Bain Capital?
17   A.   No.
18   Q.   Are you aware of solicitations that
19   Mr. Dyer made to the Christian Science Church in
20   Boston?
21   A.   No.
22   Q.   Are you aware of any solicitations that
23   Mr. Dyer made to the an individual by the name of
24   Richard Ellison?
25   A.   No.

Page 100

1    Q.   Are you familiar with an individual by the
2    name Eric Resteiner?
3    A.   No.
4    Q.   Have you ever heard the name before?
5    A.   I heard the name after I left the
6    employment of Mr. Dyer.
7    Q.   In what context did you hear the name?
8    A.   It was a negative context.  They said he
9    was related to some of the investments, related to
10   Von, but I had no -- I didn't know how the puzzle fit
11   together.
12   Q.   When you say "they," who is "they"?
13   A.   Different people Chuck, other people who
14   worked in the office.
15   Q.   Worked in the office, Chuck's office after
16   he left?
17   A.   Yes.
18   Q.   David Stockard?
19   A.   David Stockard, and there was a secretary,
20   a young lady that's escapes me.
21   Q.   They all mentioned Mr. Resteiner?
22   A.   They might not all have, but I believe
23   that Chuck and the other gentleman you mentioned did.
24   Q.   Mr. Stockard?
25   A.   Right, because they said they were going

Page 101

1    after this gentleman, quote-unquote, and I didn't
2    know who that gentleman was.
3    Q.   What else did they say about him?
4    A.   They said that he was the ultimate
5    investor or the investment vehicle or where the money
6    ended up.  And again, it is was after my tenure.  I
7    only had several very brief discussions with Chuck
8    and them.
9        I would bring them their mail and maybe
10   have lunch with them once.  And I'd say, hey, what's
11   going on with the fund.  And they'd say, we're
12   seeking money from these people, and this is the guy
13   that we're going after.
14   Q.   Did anyone tell you how it was that -- or
15   did Mr. Dyer ever tell you how it is he came to learn
16   Mr. Resteiner was involved?
17   A.   No.
18   Q.   Did you ask him?
19   A.   No.
20   Q.   Did you have any discussions with
21   Mr. Stockard on that issue?
22   A.   No.  I didn't know Mr. Stockard very well.
23   Q.   Have you heard of any entities -- an
24   entity called Osaka (phonetic) Limited or Osaka
25   (phonetic)?

26 (Pages 98 to 101)

Michael Lorusso                                                    June 21, 2002
Washington, DC

**Page 102**

1    A.   No.
2    Q.   Have you heard of an entity called Telogy,
3  T-E-L-O-G-Y, Network?
4    A.   No.
5    Q.   Have you heard of an entity called Swiss
6  Asset Management?
7    A.   No.
8    Q.   Have you heard of an entity called
9  Eurasia?
10   A.   I've heard the term Eurasia, but it might
11  be from historical context of the word.
12   Q.   As opposed to any investment vehicle?
13   A.   Correct. The term for unified continents
14  were Eurasia and Gondwanaland.
15   Q.   Learned something new.
16   A.   Plate tectonics.
17   Q.   Have you ever heard of an entity called
18  Seabreeze?
19   A.   No.
20   Q.   Euro-Caribbean?
21   A.   No.
22   Q.   Did Mr. Dyer have a financial relationship
23  with Mr. Bathurst outside of Resource F?
24        MR. COHEN: Objection.
25   A.   I don't know. He had a personal

**Page 103**

1  relationship with him.
2        BY MR. QUINTERO:
3    Q.   Did Mr. Bathurst --
4        MR. MURRAY: Can I have a second?
5        MR. QUINTERO: Sure.
6        (Recess.)
7        (Lorusso Exhibit No. 146
8           was marked for
9           identification.)
10       MR. QUINTERO: Jon, just to let you know,
11  I was going to refer to Exhibit 75.
12       MR. COHEN: What is it, Steve?
13       MR. QUINTERO: Exhibit 75.
14       MR. COHEN: I'm sorry -- what's -- let me
15  get it.
16       MR. QUINTERO: It's a letter from George
17  Bathurst to Chuck Dyer.
18       MR. COHEN: Okay. I'm not sure I have it,
19  but go ahead.
20       BY MR. QUINTERO:
21   Q.   Mr. Lorusso, I'm going to hand you what's
22  been marked as Exhibit 146, appears to be a letter
23  from George Hervey-Bathurst, dated February 25th,
24  2000, to Chuck Dyer.
25   A.   Yes.

**Page 104**

1    Q.   Have you seen this document before?
2    A.   No, I don't know that I've seen this.
3    Q.   Okay. I direct your attention to the
4  second paragraph of the letter, if you could just
5  read that to yourself.
6    A.   Okay.
7    Q.   Does that refresh your memory as to
8  whether Mr. Bathurst had a business or financial
9  relationship with Mr. Dyer outside of Resource F?
10   A.   No, it doesn't, because the money sent was
11  sent to Resource F.
12   Q.   Are you referring to the 550,000 dollars
13  that's referred to in the letter?
14   A.   Correct.
15   Q.   Was sent to Resource F?
16   A.   I believe it was.
17   Q.   And did Mr. Bathurst receive returns on
18  that investment?
19   A.   I don't know.
20   Q.   Did you ever have any conversations with
21  Mr. Bathurst concerning the return of that 550,000
22  dollars?
23   A.   Mr. Dyer was very interested that the
24  people who are his clients only speak to him about
25  matters of financial interest.

**Page 105**

1    Q.   Right. But did you have any
2  communications with Mr. Bathurst about this issue?
3    A.   He may have called once or twice,
4  mentioned the issue, and I mentioned it to Chuck.
5    Q.   The issue being that Mr. Bathurst wanted
6  the 550,000 dollars back?
7    A.   Yes.
8    Q.   Was there also -- was Mr. Dyer also
9  holding moneys from Brian West?
10   A.   I'm not familiar with the name Brian West,
11  and he doesn't appear on the client sheet, so I'm not
12  familiar with that name.
13   Q.   Okay. I'm going to hand you what's been
14  marked as Exhibit 144.
15   A.   M-hm.
16   Q.   These appear to be wiring instructions
17  concerning Barclays Bank, et cetera.
18        Directing your attention specifically to
19  page 4 of Exhibit 144.
20   A.   Yes.
21   Q.   To the second -- the second wire transfer
22  dated January 27, 2000.
23        Do you see that?
24   A.   Yes, I do.
25   Q.   Do you see that it appears to be -- leave

27 (Pages 102 to 105)

Michael Lorusso                                               June 21, 2002

Washington, DC

**Page 106**

1  a debit from the account of -- or, no -- maybe a
2  credit -- for 45,000 dollars into the Barclays Bank
3  account?
4      A.   It's a withdrawal from the account of
5  Michael Lorusso to the favor of the Wall Street South
6  account.
7      Q.   Okay.  And that Mike Lorusso referred
8  here, is that you?
9      A.   That's me.
10     Q.   And it refers to a bank account I believe
11  at Fleet Bank?
12     A.   Yes.
13     Q.   Is that your personal account?
14     A.   It was my personal account at the time
15  when I lived in the Boston area.
16     Q.   Okay.  Was it your testimony earlier that
17  this 45,000 dollars was actually moneys from
18  Ms. Deborah Koepper of Palm Beach?
19     A.   That's correct.
20     Q.   Is it also your testimony that her total
21  investment was 100,000 dollars in Resource F?
22     A.   That's my --
23         MR. MURRAY:  Objection.
24         BY MR. QUINTERO:
25     Q.   I'm sorry?

**Page 107**

1      A.   That is my understanding, but I don't have
2  any empirical data.  I didn't witness or have any --
3  I don't have a receipt of the transaction.
4      Q.   All right.  How much money did she give
5  you?
6      A.   45,000.
7      Q.   And did you wire all of the moneys that
8  she gave you to Wall Street South?
9      A.   Yes.
10     Q.   Did you retain any moneys from Ms. Koepper
11  whatsoever in connection with her investment?
12     A.   No.
13     Q.   When you testified earlier that you split
14  up -- your understanding was that she split her
15  investment in the sense she gave you 45,000 and she
16  wired approximately 55,000 directly to
17  Mr. vonStrasdas's control?
18     A.   That's my understanding.  The minimum
19  contribution as stated on the PPM is a hundred
20  thousand dollars.  Almost universally except for a
21  few exceptions, a hundred thousand dollars was the
22  minimum required for the fund.
23     Q.   And why was the transaction done in this
24  way, splitting it up, I mean?
25     A.   I don't particularly recall at this point

**Page 108**

1  in time.  I believe that I was going to send it
2  through the Boston account, and for some reason, we
3  didn't, and I sent it directly to Wall Street South
4  or vonStrasdas.  I don't recollect the rationale at
5  this point in time.
6      Q.   Okay.  Back when you testified in Boston
7  in March of 2001 -- first of all, do you recall
8  testifying?
9      A.   Yes.
10     Q.   And were you under oath in that testimony?
11     A.   Yes, I was.
12     Q.   Directing your attention to Exhibit 138,
13  which is the testimony transcript from your -- from
14  that testimony.
15     A.   What page?
16     Q.   Page 160 of Exhibit 138.
17     A.   Okay.
18     Q.   You want to actually look at page 159 just
19  to give yourself the context of the questions that
20  come on page 160.
21     A.   Okay.
22     Q.   The middle of the page where I ask you:
23  Turning your attention back to Exhibit 93,
24  Mr. Lorusso, in the fourth page of that exhibit,
25  specifically the second transaction from the top

**Page 109**

1  which is dated 27 January 2000, which is a wire
2  transfer of 45,000 dollars originating with you,
3  Mr. Lorusso, to a Wall Street South account, it
4  appears to be at Barclays Bank.
5          Then I go on to ask you:  Did you in fact
6  make that wire transaction, so forth.
7      A.   Right.  And as I remember, we had -- there
8  were a number of questions with regards to that.  My
9  overall answer was, I needed -- again, line 8, again,
10  without the benefit of my information, I can't -- I
11  don't want to speculate.
12     Q.   Yes.
13     A.   Since that time, I've been able to discern
14  that it was not in fact my personal money, but it was
15  money given to me by Deb Koepper.
16     Q.   You see where I ask you on page 160,
17  that's fine, was this your own personal money, how
18  you did answer?
19     A.   I said, yes, and --
20     Q.   How do you explain that?
21     A.   That was my belief at the time.
22         Again, 2 lines below, I say -- or
23  repeatedly, I say that I need time to review my
24  records.
25     Q.   So your testimony is that at the time back

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                          June 21, 2002

Washington, DC

---

Page 110

1  in March of 2001, you didn't remember whether it was
2  your money or someone else's money?
3      A.   Not that I didn't remember. It was the
4  end of the day of a long thing. I asked repeatedly
5  to have the benefit to look at my records to state
6  what that was. I think that my original testimony
7  was clear on that.
8      Q.   Did you mention Ms. Koepper's name at all
9  in connection with the testimony back in March of
10 2001?
11     A.   No, I did not.
12     Q.   Did you indicate at all that the 45,000
13 dollars was not your money at any point?
14     A.   No, I didn't. I just asked repeatedly to
15 be able to review my records.
16     Q.   And did you in fact actually testify that
17 it was your personal money?
18     A.   I believe -- at the time I believed,
19 again, without the benefit of my records, it was my
20 personal money.
21     Q.   What type of investments do you have --
22 did you have at that time, Mr. Lorusso?
23     A.   I don't have any investments.
24     Q.   So a 45,000-dollar investment would have
25 been somewhat unusual for you; is that correct?

---

Page 111

1      A.   Yes.
2      Q.   And it's your testimony that you were
3  unsure as to whether this 45,000 dollars was yours --
4  was your investment at a point at which you had no
5  investments?
6      A.   I had money in the account. I didn't -- I
7  wasn't unsure about -- I was just unsure about the
8  particular transaction, because that's what I was
9  asked about.
10         I was not asked about Ms. Koepper. I was
11 asked about a particular wire transfer, and I said
12 that I needed time to review my information to speak
13 about that wire transfer.
14     Q.   I understand that.
15         But I'm not asking about the
16 particulars -- well, I did ask you at the time, I
17 believe, about who you were dealing with respect to
18 that transaction.
19     A.   Correct.
20     Q.   However, on the fundamental point of who
21 the money belonged to, is it your testimony that you
22 would have had to have looked at your records to
23 figure out if it was you who put 45,000 dollars out
24 of your pocket and wired it to Wall Street South?
25     A.   Yes.

---

Page 112

1      Q.   So you just float -- well, was anyone else
2  involved in the Wall Street South account investment
3  beyond Mr. vonStrasdas?
4      A.   You need to be more specific.
5      MR. MURRAY:  Objection.
6      You mean that he knew about?
7      MR. QUINTERO:  Yes, that he knew about.
8      A.   Which --
9      BY MR. QUINTERO:
10     Q.   Well, back -- directing your attention
11 back to the transcript, on page 160, my question was:
12 Was Mr. vonStrasdas involved with the fund. And your
13 answer: I'd have to review my records to look at
14 that. I know it was involved with the Wall Street
15 South Corporation, and there's another group, but
16 again, I don't want to speculate.
17     A.   Yes. And I did -- and since this time, I
18 have gone back and reviewed my records, and it was
19 indeed directed towards Wall Street South, which was
20 I believe at the time, and I don't know who, solely
21 or part of it, but it was part of vonStrasdas.
22     Q.   Anyone else that you --
23     A.   Not that --
24     Q.   -- dealt with at all?
25     A.   No. I've never spoken to anyone else but

---

Page 113

1  vonStrasdas.
2      Q.   Despite the fact that you testified on
3  page 161 in response to a question, did you speak,
4  well, I meant in connection with your decision to
5  invest. Your answer, yes, but I don't have that
6  information in front of me who that was. Question,
7  was it more than 1 individual. Answer, I believe it
8  was, yes. Question, was it any of the individuals
9  that we've talked about today. Answer, no, it was
10 not.
11     A.   Again, I've been able to go back and
12 refresh my memory. The only person that was involved
13 in the 45,000-dollar transfer, again being specific,
14 was myself and vonStrasdas. I've never spoken to --
15 you said a number of names and a number of company
16 names. I've never spoken to those people, nor do I
17 know who those people are.
18     Q.   And is it your testimony today that you
19 did not speak to anyone other than Mr. vonStrasdas in
20 connection with the 45,000-dollar wire on
21 Exhibit --
22     A.   Yes, after reviewing my records, yes,
23 that's correct.
24     Q.   What records did you review?
25     A.   The records that I provided to you before.

---

29 (Pages 110 to 113)

Michael Lorusso                                                      June 21, 2002
Washington, DC

Page 114

1    Q.   What records were they?
2    A.   Bank records.
3    Q.   Anything else?
4    A.   I don't remember.  That was the --
5    Q.   When did you --
6    A.   It was after the prior deposition.
7    Q.   Directing your attention to pages 134 and
8    135 of Exhibit No. 138.  To set the context, in the
9    middle of page 134, the question to you was posed,
10   did you send moneys to an account named Wall Street
11   South.  Answer, maybe, trying to think.
12          Going on to page 135, question to you was,
13   what was the amount of the transfer.  Answer, I think
14   it was a couple thousand dollars.
15          Is there a particular reason why you were
16   so far off?
17   A.   No.  And I'm trying to -- I see on a line
18   here, it says:  I don't know, but this is a maybe.
19   I'm not sure.  I'd like to review my records.
20          You know, after reviewing my records and
21   in discussions of the -- in the prior deposition, it
22   was 45,000 dollars, not several thousand dollars.
23   Q.   At the time of the deposition in March of
24   2001, had you forgotten about Deborah Koepper?
25   A.   Define, forgot.

Page 115

1    Q.   Did you forget that you invested 45,000
2    dollars on her behalf?
3    A.   No.  I just had to look at my records.
4    Q.   So you hadn't forgotten at that point that
5    you had invested on her behalf?
6    MR. MURRAY:  Objection.  He's already
7    testified.
8    A.   If you could rephrase the question.
9    BY MR. QUINTERO:
10   Q.   Sure.
11          Is it your testimony that in March of 2001
12   it's your testimony that you did remember that you
13   had wired moneys on behalf of Ms. Koepper?
14   A.   I cannot tell you today what I remembered
15   in March of -- whatever the date was.  I can tell you
16   what I remember now.
17   Q.   Okay.  At the time that you were reviewing
18   your records after the testimony --
19   A.   Yes.
20   Q.   -- did you have a eureka moment when you
21   said, oh, I guess I did wire money on behalf of
22   Deborah Koepper?
23   MR. MURRAY:  Objection.
24   A.   I don't know that there was a eureka
25   moment.  In discussions prior to this, I remembered

Page 116

1    that it was Deborah Koepper's money.
2    BY MR. QUINTERO:
3    Q.   If you could just tell me again, why
4    didn't you say so back in March of 2001 in your
5    testimony?
6    A.   All -- all -- I cannot tell you why -- why
7    or what I said.  The -- the feeling for why or what I
8    said back then, only that I repeatedly asked to
9    review my records and was denied.
10          I can state today to clarify the record
11   that I now believe it was Deborah Koepper's money.
12   Q.   Did you have to review your records in
13   order to remember that it was Deborah Koepper's
14   money?
15   A.   Yes.
16   Q.   You did.
17          So it's your testimony that without your
18   records, you would not have known that it was Deborah
19   Koepper's money?
20   MR. MURRAY:  Objection.
21   A.   Say it a different way:  It was the end of
22   a long deposition.  There was many discussions where
23   I asked for time to relax and think about this.  I
24   was denied the ability to look at my records, which
25   were not there.  I have subsequently recalled that

Page 117

1    that is Deborah Koepper's money.
2    BY MR. QUINTERO:
3    Q.   Directing your attention to page 158,
4    towards the bottom of that page, again, Exhibit 138,
5    you say that -- there was a recess at 4:12 PM, and
6    examination resumed at 4:37, meaning that there was a
7    25-minute break for you just prior to your testimony
8    on page 160.
9    A.   And again, the spirit of my testimony
10   through the 4 or 5 pages was the ability to look at
11   my records, which I didn't have the ability at the
12   deposition to do.
13   Q.   And what I'm just trying -- and I
14   apologize for going back over this -- I'm trying to
15   get from you is:  Is it your testimony that you
16   needed your records to remember that the money
17   belonged to Deborah Koepper?
18   A.   At the time of the deposition, I felt that
19   I needed my records to answer the questions asked of
20   you (sic).
21   Q.   Did you need them to answer the question
22   that I posed to you, was this your own personal
23   money?
24   A.   Yes.
25   Q.   Because you weren't sure?

30 (Pages 114 to 117)

Michael Lorusso                                                      June 21, 2002
Washington, DC

Page 118

1     A.   Because I wasn't sure, that's correct.
2     Q.   You thought that you might have invested
3   45,000 dollars?
4         MR. MURRAY: Objection.
5         BY MR. QUINTERO:
6     Q.   Is that your testimony?
7         MR. QUINTERO: Objection.
8     A.   I had just repeatedly asked for the
9   ability to review --
10        MR. QUINTERO:
11    Q.   If you wouldn't mind, please -- I
12  understand that.
13        Would you mind answering my question.
14        Did you need those records to answer -- or
15  to remember whether you had invested 45,000 dollars
16  of your own money?
17        MR. MURRAY: Asked and answered.
18    A.   Asked and answered.
19        I felt -- I felt at the time that it was
20  necessary.
21        BY MR. QUINTERO:
22    Q.   It was necessary to remember --
23    A.   Yes.
24    Q.   -- whether you had invested 45,000
25  dollars?

Page 119

1     A.   Correct.
2         MR. QUINTERO: Let's take -- go off the
3   record.
4         (Recess.)
5         MR. QUINTERO: Back on the record.
6         BY MR. QUINTERO:
7     Q.   Mr. Lorusso, how did Ms. Koepper give you
8   the 45,000 dollars?
9     A.   I don't have the bank statement in front
10  of me. She gave me some in cash, I believe some in
11  checks.
12    Q.   Do you still have the bank statements in
13  your possession?
14    A.   I may. I'll have to go back and look.
15    Q.   If you could, I believe that falls under
16  the subpoena with respect to investments by Deborah
17  Koepper, so if you could look and let me know through
18  Mr. Murray, I'd appreciate that.
19    A.   Sure.
20        MR. MURRAY: Bank statements from Fleet?
21        THE WITNESS: Yes.
22        MR. MURRAY: Relative to that wire
23  transfer, is that correct, and any other information
24  on deposits?
25        MR. QUINTERO: Right, canceled checks,

Page 120

1   whatever.
2         BY MR. QUINTERO:
3     Q.   And you obtained that from her in person
4   down in Palm Beach?
5     A.   In a meeting in Palm Beach, yes.
6     Q.   When did that meeting occur?
7     A.   Probably right before that. It wasn't --
8   I don't know the exact date, but there wasn't a large
9   delay between that time and the wire transfer.
10    Q.   Okay. When was the last time you had a
11  communication with Mr. Dyer?
12    A.   Mr. Dyer called me 4 or 5 weeks ago. My
13  father passed away 2 or 3 months ago. And he called
14  to offer his condolences and to say that he was sorry
15  he couldn't go to the wake and funeral.
16    Q.   When was the last communication you had
17  with Mr. Dyer in which anything concerning Resource F
18  was discussed?
19    A.   At least a year.
20    Q.   Was it after your prior testimony?
21    A.   I believe so.
22    Q.   And on how many occasions did you discuss
23  Resource F after your last testimony?
24    A.   Probably -- I've probably only talked to
25  him 1 or 2 times after the last testimony.

Page 121

1     Q.   Okay. In the communication that you had
2   with him in which Resource F came up, what was said?
3     A.   I don't know that Resource F in particular
4   came up. He was again talking about going after
5   those guys, using that terminology, "those guys"
6   meaning vonStrasdas, et al., and trying to get
7   everyone's money back, and he may have talked a
8   little bit about the golf course.
9     Q.   That's Falcon Road golf course down in
10  Georgia?
11    A.   Yeah, saying that he thought he had a
12  buyer for it or something like that, but at that
13  particular time I wasn't too interested in
14  chitchatting.
15    Q.   Okay. Did you ever -- I may have asked
16  you this: Did you ever invest any of your own money
17  into Resource F or any like investment?
18    A.   No.
19        MR. QUINTERO: All right. I think those
20  are all the questions that I have right now.
21        Jon?
22        EXAMINATION BY COUNSEL FOR
23  CHARLES DYER, RESOURCE F LLC, and BUNKER HILL
24        AVIATION LLC
25        BY MR. COHEN:

31 (Pages 118 to 121)

Michael Lorusso
Washington, DC

June 21, 2002

Page 122

1    Q.   Mr. Lorusso, I'm Jonathan Cohen. 1
2  represent Chuck Dyer, Resource F LLC, and Bunker Hill
3  Aviation LLC in this action. I'll be asking you
4  questions about some of the topics that you've
5  already discussed with Mr. Quintero this morning and
6  this afternoon.
7        And I know we're doing this by phone, and
8  if I get cut off at any time, please let me know.
9  I'll be happy to repeat the question. And I
10  apologize beforehand for any interference that we
11  have in the communication.
12       THE WITNESS:  Can I just ask a clarifying
13  question?
14       Am I required to answer his questions as I
15  am your questions?
16       MR. QUINTERO:  Yes.
17       Would you agree, Jon?
18       BY MR. COHEN:
19    Q.   You're required to answer my questions as
20  you were required to answer Mr. Quintero's questions.
21  You're here pursuant to a subpoena from
22  Mr. Quintero's office, and I have a right of
23  cross-examination about the topics that you've
24  already testified about today.
25    A.   Thank you.

Page 123

1        I was just asking for clarification.
2    Q.   Going back to that conversation that you
3  were just talking about, your conversation with Chuck
4  Dyer.
5        He was pretty upset at Mr. vonStrasdas,
6  wasn't he?
7    A.   Absolutely.
8    Q.   He felt that he'd been duped by
9  Mr. vonStrasdas?
10    A.   I don't speak for Chuck, but I believe
11  that Chuck believed he'd been duped.
12    Q.   He conveyed to you that he was upset?
13    A.   Yes.
14    Q.   He was upset about Eric Resteiner as well;
15  isn't that right?
16    A.   We didn't speak a lot about Eric
17  Resteiner. His name only came up after I had left
18  Mr. Dyer's employ.
19    Q.   When did you leave Mr. Dyer's employment?
20    A.   When he moved to --
21       THE WITNESS:  Peabody?
22       MR. MURRAY:  Danvers.
23    A.   Danvers. When the involvement of the
24  other gentleman started.
25       BY MR. COHEN:

Page 124

1    Q.   Looking more for the time frame.
2        Was it spring of 2000?
3    A.   I believe that's true.
4    Q.   So April, May of 2000, roughly?
5    A.   Yeah. I know he moved in the spring.
6    Q.   It was around that time that you first
7  heard the name Eric Resteiner?
8    A.   Once Chuck's new associate came on, he
9  used that term, that gentleman's name.
10    Q.   David Stockard?
11    A.   Yes.
12    Q.   That was after you had already left
13  Chuck's employment?
14    A.   I believe, yes. David Stockard arose
15  after I left Chuck's employment.
16    Q.   And I know you've already described it
17  today, but at that time, what was said about
18  Mr. Resteiner?
19    A.   Characterization, bad guy, really bad guy,
20  part of the problem, the ultimate person where the
21  money went to. Those were the types of things.
22    Q.   Was that Chuck that said that, or -- was
23  it Mr. Dyer that said that, or was it Mr. Stockard?
24    A.   I think both. Mr. Stockard was the 1 I
25  believe who introduced me to the name Eric Resteiner,

Page 125

1  but certainly afterwards, Mr. Dyer and I spoke of
2  him.
3    Q.   You said that Mr. Dyer told George
4  Bathurst at some point that he had invested in
5  Resource F; is that right?
6    A.   Could you rephrase the question?
7    Q.   Did Chuck Dyer -- is it your understanding
8  that Mr. Dyer told George Bathurst that he had
9  invested his money, his own money, in Resource F?
10    A.   Again, are you saying Chuck's money or
11  George's money.
12    Q.   Chuck's money.
13    A.   Okay. It's my belief that Chuck stated he
14  had either put in through stock or something else
15  equity in Resource F
16    Q.   What's the basis of your belief?
17    A.   I think from a discussion that I overheard
18  between the 2 of them, but that's -- that's just my
19  belief.
20    Q.   Was this discussion over the phone?
21    A.   I believe it was over the phone.
22    Q.   Do you remember when it occurred?
23    A.   No.
24    Q.   Was it in the year 2000?
25    A.   Probably in the year 2000.

32 (Pages 122 to 125)

Michael Lorusso                                                                June 21, 2002
                              Washington, DC

Page 126

1    Q.   You also said that he had -- Mr. Dyer had
2  a similar conversation with Derek Green; is that
3  right?
4    A.   I believe, yes, he -- people always wanted
5  to know what Chuck's at-risk was or what -- and I
6  believe that he would always speak very globally
7  about certain things, but again, he would always say
8  and he would -- and not only to them, but to me, that
9  he had -- that his equity was the stock and other
10  things that he put in the company, and to clarify,
11  the startup fees and the intellectual capital and
12  those other things.
13    Q.   What is the specific basis of your belief
14  that Mr. Dyer told Derek Green that he invested his
15  own money in Resource F?
16    A.   I never stated that Chuck stated to Derek
17  Green that he invested his own money.
18    Q.   Okay.  What did Mr. Dyer say to Derek
19  Green?
20    A.   I believe I said he contributed capital or
21  assets to Resource F.
22    Q.   Do you know what he meant by, contributing
23  capital or assets to Resource F?
24    A.   No, I do not.
25    Q.   Do you know when that conversation took

Page 127

1  place?
2    A.   Over the summer of 2000.
3    Q.   Over the summer of 2000, so that was after
4  you left Resource F?
5    Yes?
6    A.   The summer that I was there.  The summer
7  that we were in The Pilot House.
8    Q.   The summer of 1999?
9    A.   I think it was the summer of 2000.  It
10  was -- Chuck called him from his office in The Pilot
11  House.
12    Q.   I thought you just told me, Mr. Lorusso,
13  that you left Mr. Dyer's employment in the spring of
14  2000, and that he left The Pilot House during that
15  time.
16    A.   It was -- then it was in the spring of
17  2000 and not the summer of 2000, but it was from The
18  Pilot House.
19    Q.   You say it was the spring of 2000?
20    A.   Yes.  I'm not clear on the time.  I know
21  the location.
22    Q.   And you overheard that conversation with
23  Derek Green?
24    A.   Yes.
25    Q.   It was on the telephone?

Page 128

1    A.   Yes.
2    Q.   How do you know Derek Green was on the
3  other end of the telephone conversation?
4    A.   Mr. Dyer never took any of his calls
5  directly.
6    Q.   So did the telephone call from Mr. Green
7  go to you first?
8    A.   It went to either myself or whoever was
9  the receptionist at the time.
10    Q.   You don't know for a fact whether it went
11  to you first.
12    A.   It could have gone to somebody else.
13    Q.   How would you know if it went to somebody
14  else that it was Derek Green calling?
15    A.   Because we announce on the intercom who is
16  on the phone.
17    Q.   But you don't know whether or not you
18  actually talked to Derek Green?
19    A.   Whether I talked to Derek Green?
20    Q.   Right.  You don't know for a fact that
21  this call came through you first?
22    A.   No, I do not.
23    Q.   Go back to the transaction involving
24  Deborah Koepper.
25    A.   Yes.

Page 129

1    Q.   When was that initial dinner with Mr. Dyer
2  and Ms. Koepper and you in Florida when you discussed
3  the possible investment in Resource F?
4    A.   I don't know the exact date.  The date was
5  when Chuck and I were in there to look for leased
6  property.  You could check the records for the
7  airline tickets, and Chuck paid for the dinner.  And
8  it was in a restaurant in the same building where Deb
9  has an office.
10    Q.   Palm Beach, Florida, you said?
11    A.   Yes.
12    Q.   But it was some months prior to her actual
13  investment in Resource F with Mr. vonStrasdas; is
14  that right?
15    A.   That is my recollection, yes.
16    Q.   Her investment as we already discussed
17  today was in January of 2000; is that right?
18    THE WITNESS:  Do you have a copy of the
19  wire?
20    A.   The wire was sent in January of 2000.
21    BY MR. COHEN:
22    Q.   But it's your recollection that's when
23  Ms. Koepper's hundred thousand-dollar investment was
24  made with Mr. vonStrasdas?
25    A.   No.  That's the date of the wire.

33 (Pages 126 to 129)

Michael Lorusso                                                                      June 21, 2002
                        Washington, DC

Page 130

1      MR. QUINTERO: Just for your information,
2  Jon, he's looking at the exhibit that contains the
3  wire information.
4      MR. COHEN: What exhibit number is that?
5      MR. QUINTERO: 144.
6      MR. MURRAY: 144, page 4 of 144.
7      BY MR. COHEN:
8   Q.  Your testimony is it was sent directly to
9  Mr. vonStrasdas; is that right?
10  A.  Correct.
11  Q.  You sent 45,000 dollars of it, and she
12 sent 55,000 dollars; is that right?
13  A.  I can stipulate to how much I sent. I
14 believe that she sent 55,000.
15  Q.  You testified before that Ms. Koepper was
16 not a, quote, Dyer client. Right?
17  A.  That's correct.
18  Q.  She was vonStrasdas's client?
19  A.  Yes.
20  Q.  What was the distinction in your mind
21 between Dyer client and vonStrasdas's client?
22  A.  Just like any investment house, if you're
23 a stockbroker, your clients are the ones you bring to
24 the table. So Chuck and Von -- and Chuck's clients
25 were typically people who were known to him.

Page 131

1      There is a demarcation. Chuck only took
2  calls from his clients. Mr. vonStrasdas was very
3  protective of his clients. It was similar to a
4  brokerage-type arrangement.
5   Q.  Would you describe for me what was
6  Mr. Dyer's role in connection with Mr. Koepper's
7  ultimate investment with Mr. vonStrasdas?
8   A.  I don't know. Besides the initial
9  meeting, I don't know.
10  Q.  You don't know whether he had any role at
11 all; is that right?
12  A.  No, I don't.
13  Q.  Unlike other clients, he didn't even wire
14 the investment down to Mr. vonStrasdas; is that
15 right?
16  A.  There was -- there was no prototypical
17 methodology. Chuck's clients sometimes wired money
18 directly to Mr. vonStrasdas and sometimes sent the
19 money directly to Resource F.
20  Q.  Between the time of that first dinner in
21 Florida and the investment in January of 2000, how
22 many conversations did you have with Ms. Koeppper
23 regarding a possible investment in Resource F?
24  A.  Probably 3 or 4.
25  Q.  3 or 4 over the course of 6 or 7 months?

Page 132

1   A.  That's correct.
2   Q.  Would you say that Ms. Koepper's decision
3  to invest in Resource F was based on her
4  conversations with you?
5   A.  I can't say speak for Mrs. Koepper's
6  intentions.
7   Q.  How many conversations did you have with
8  Mr. vonStrasdas during that same 6- or 7-month
9  period?
10  A.  Be more specific.
11  Q.  Any conversations at all?
12      How many -- how frequently would you speak
13 to Mr. vonStrasdas during that period?
14  A.  Once every 2 weeks, once a month.
15  Q.  On average you spoke to Mr. vonStrasdas 1
16 or 2 times a month?
17  A.  Yes.
18  Q.  Mr. vonStrasdas was impressed with what
19 you were doing in connection with Resource F, wasn't
20 he?
21  A.  Yes. He liked the graphs and charts that
22 were being produced.
23  Q.  Did you have -- were you also impressed
24 with Mr. vonStrasdas?
25  A.  Yes. Like many people who made the

Page 133

1  investment, I was initially or during the period that
2  I worked for Chuck impressed with Mr. vonStrasdas.
3   Q.  Did there come a time when you stopped
4  being impressed with Mr. vonStrasdas?
5   A.  After my employment with Chuck and through
6  the knowledge that I now have, yes.
7   Q.  Not until spring of 2000 did you become
8  concerned about Mr. vonStrasdas?
9   A.  That's correct.
10  Q.  As of January -- certainly -- strike that.
11      If you were -- had any concern about
12 Mr. vonStrasdas in January of 2000, you certainly
13 would have conveyed those feelings to Ms. Koepper;
14 isn't that right?
15  A.  That's correct.
16  Q.  Friend of yours?
17  A.  She was a friend of a friend. We were
18 friendly.
19  Q.  Not until -- I want to be clear about
20 this -- not until you left Mr. Dyer's employment did
21 you begin to have any suspicions regarding
22 Mr. vonStrasdas?
23  A.  I don't know that -- I can't classify it
24 that directly, but certainly I was much more
25 comfortable during the period of time that I was with

34 (Pages 130 to 133)

Michael Lorusso                                                    June 21, 2002
Washington, DC

Page 134

1  Chuck. I was comfortable with the investment.
2      Q.  You were comfortable and encouraging
3  Ms. Koepper to invest with Mr. vonStrasdas?
4      A.  Correct.
5      Q.  Did you have an understanding of the
6  investment that Mr. vonStrasdas was going to make on
7  behalf of Ms. Koepper?
8      A.  It was the same -- my understanding, there
9  was no differentiation between her investment and any
10 of the other people's investments, nor would the
11 return be different.
12     Q.  Can you describe that investment for me?
13     A.  I didn't -- I did not handle the
14 investment.
15     Q.  What was your understanding of the
16 investment that Mr. vonStrasdas was going to make on
17 behalf of Ms. Koepper and that he made on behalf of
18 others?
19     A.  Just that it had a similar yield.
20     Q.  You had no idea about the specifics of the
21 investment?
22     A.  No, I did not.
23     Q.  Never mentioned anything about
24 investment-grade financial obligations?
25     A.  There was -- I have the private placement

Page 135

1  memorandum in front of me.
2      Q.  Okay.
3      A.  And there was a page that described -- may
4  or may not be in this 1 -- the permitted investments.
5  I knew that the investment was 1 of the permitted
6  investments.
7          And again, it wasn't so much of my
8  understanding of what the investment was, but the
9  fact that I had actually seen the money coming in and
10 distributed to people, so nobody showed me a graph or
11 a chart. I had the knowledge that these people
12 actually were paid these amounts of money.
13     Q.  Up in Boston you actually saw the money
14 that was going -- that was being distributed to the
15 investors; isn't that right?
16     A.  Absolutely.
17     Q.  You can verify that information?
18     A.  Correct.
19     Q.  And you kept -- and the office in Boston
20 kept records of that information; isn't that right?
21     A.  That's correct.
22     Q.  There was no reason to doubt -- there was
23 no reason to believe that the yield on Ms. Koepper's
24 investment was going to be less than the yield on the
25 prior investment; isn't that right?

Page 136

1      A.  I made no differentiation between the 2
2  investments.
3      Q.  You felt comfortable in encouraging her to
4  invest with Mr. vonStrasdas based purely on what you
5  expected the yield to be; isn't that right?
6          MR. MURRAY:  Objection.
7          BY MR. COHEN:
8      Q.  Sorry?
9      A.  Not based solely on what I thought the
10 yield would be.
11     Q.  Explain for me, what other reasons did you
12 encourage Ms. Koepper to invest with Mr. vonStrasdas?
13     A.  Well, based on the historical yield, not
14 on what it would be, but based on the historical
15 yield.
16     Q.  Okay.  But anything else other than the
17 historical yield and what you expected the yield to
18 be?
19     A.  I would agree with the first part.  I
20 would strike out what I expected it to be.
21     Q.  Okay.  So just based on the historical
22 yield, you felt comfortable encouraging her to invest
23 with Mr. vonStrasdas?
24     A.  That's correct.
25     Q.  When was the last time that you spoke with

Page 137

1  Ms. Koepper regarding her investment in Resource F --
2  I'm sorry -- regarding her investment with
3  Mr. vonStrasdas?
4      A.  I haven't spoken to her in over 2 years.
5  She has to my knowledge not sent any correspondence.
6  I still maintain the office which Resource F had.
7  It's a building that my family owns.  I still
8  maintain the same telephone number and the same
9  address.  I have never received any written
10 correspondence that I have been aware of, and my
11 mother mails me my mail every 2 weeks, from
12 Ms. Koepper.
13     Q.  You know whether Ms. Koepper ever received
14 any returns on her investment with Mr. vonStrasdas?
15     A.  I don't have that information in front of
16 me. I don't know that she received -- she received
17 returns directly from vonStrasdas, no.
18     Q.  Do you feel, Mr. Lorusso, like you were
19 duped by Mr. vonStrasdas?
20     A.  Yes.
21     Q.  Why is that?
22     A.  I think that a lot of people were duped by
23 Mr. vonStrasdas.
24     Q.  How were they duped?
25     A.  Because of the way that the transaction

35 (Pages 134 to 137)

Michael Lorusso                                                    June 21, 2002
                              Washington, DC

Page 138

1    occurred. In other words, there were real,
2    quantifiable, tangible, touchable returns that then
3    faded away.
4        Q.   When did they begin to fade away?
5        A.   I believe it was February or March.
6        MR. MURRAY: Of what year?
7        THE WITNESS: Oh, I'm sorry.
8        A.   Oh, oh --
9        BY MR. COHEN:
10       Q.   February or March of 2000 returns stopped
11   being as high as they were previously?
12       A.   Correct. That's my recollection. I don't
13   have any data. I know it was February of a year,
14   February or March.
15       Q.   Okay. At that point, did you begin
16   becoming concerned about how Mr. vonStrasdas was
17   investing the money?
18       A.   I was -- I was more concerned, but he made
19   excuses, and, you know, claims that this was common,
20   and the overall annual return will be as great as
21   last year's overall annual return, we're just going
22   to skip a month, those types of things. Again based
23   on the previous track record, I had no reason to sort
24   of doubt his word.
25       He had -- he was a strange guy, but when

Page 139

1    he said he was going to do something, he always did
2    it, or would send -- whether it was send a fax or a
3    wire or a check.
4        Q.   But prior to that period, you had no
5    reason to doubt that Mr. vonStrasdas was doing
6    anything other than what he said he was doing?
7        A.   And I didn't know what that was, but that
8    the return -- prior to that period, I didn't know
9    that there was any problems with the investment.
10       Q.   I want to make sure I get this right:
11   Prior to that period, February or March of 2000, did
12   you have any reason to believe Mr. vonStrasdas was
13   doing anything other than what he said he was doing
14   in connection with Resource F investment?
15       A.   It is -- because you're being so emphatic,
16   it is my recollection at this time that during that
17   period of time I had no issues with regards to
18   Mr. vonStrasdas. When the money came in, there were
19   no questions.
20       Q.   If you could just turn your attention to
21   what's been marked as Exhibit 142, the list of
22   Resource F members.
23       A.   Yes, I have that in my hand.
24       Q.   Previously, you went through those pages,
25   and you picked out what you considered to be Dyer

Page 140

1    clients; is that right?
2        A.   Correct. That was -- it would only be my
3    opinion if they were Dyer clients or not.
4        Q.   I understand that.
5        It was your understanding of the Dyer
6    clients?
7        A.   Correct.
8        Q.   Was Mr. Bathurst --
9        A.   Yes. 1 of the clients was George
10   Hervey-Bathurst.
11       Q.   1 of the clients was also Mr. Billig?
12       A.   Yes, I believe 1 of the clients was
13   Mr. Billig. I'm certain about Derek Green and George
14   Hervey-Bathurst.
15       Q.   And 1 of those other clients that you
16   identified was Mr. Derek Green?
17       A.   Yes, that's correct.
18       Q.   I believe the only remaining client that
19   you identified as a Dyer client was Coastwise
20   Capital; is that right?
21       A.   Correct.
22       Q.   So by process of elimination that would
23   leave all of the other names as vonStrasdas clients;
24   is that right?
25       A.   That's correct.

Page 141

1        Q.   Those were people, Mr. Lorusso, that
2    Mr. vonStrasdas convinced to invest in Resource F; is
3    that right?
4        A.   That's correct.
5        Q.   Mr. vonStrasdas is a member of Christian
6    Science Church; is that right?
7        A.   I come to know that now. I didn't at the
8    time.
9        Q.   You didn't know that at the time?
10       Do you have an understanding as to whether
11   all of the vonStrasdas clients listed in Exhibit 142
12   were also members of the Christian Science Church?
13       A.   We never had any discussions with them,
14   so, no, I wasn't aware of that.
15       Q.   Okay. But all of those members that you
16   identified as vonStrasdas clients were people who
17   were convinced to invest in Resource F by
18   Mr. vonStrasdas, not Mr. Dyer; is that right?
19       A.   That's correct.
20       Q.   I want to talk a little bit about your
21   responsibilities at Resource F -- I'm sorry -- your
22   responsibilities during the time that you were
23   employed by Mr. Dyer.
24       Prior to your employment with Mr. Dyer,
25   did you ever tell him that your long-term goal was to

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                    June 21, 2002
                          Washington, DC

---

Page 142

1   be a money manager?
2       A.   No.
3       Q.   Did you ever have any interest in becoming
4   a money manager?
5       A.   No.
6       Q.   Do you have any interest in working on a
7   hedge fund?
8       A.   I thought that it was interesting because
9   that was -- and I wasn't employed by the hedge fund.
10  I was employed by some management company, but that
11  part was interesting.
12      Q.   That was 1 of the reasons why you came to
13  work for Mr. Dyer?
14      A.   Well, Mr. Dyer was a dynamic person. He
15  was well connected, well thought of.
16      Q.   You were impressed with his intelligence
17  and his resume?
18      A.   Yes. He was also personally known to me
19  because he was a client -- a tenant -- excuse me --
20  of my father in the building. And he had been so for
21  5 years.
22      Q.   Had you been -- had you had a personal --
23  I'm sorry. Strike that.
24           Other than being a tenant of your father,
25  did you have a business relationship with Mr. Dyer?

---

Page 143

1       A.   Prior to coming to his employment?
2       Q.   Yes.
3       A.   No.
4       Q.   Why did Mr. Dyer tell you that he wanted
5   you to come on board?
6       A.   We ran into each other. I just finished
7   graduate school. I talked to him a few times. He
8   had moved to a different part of the building. And
9   we talked a couple times.
10      Q.   Was he looking for an individual to
11  perform certain responsibilities?
12      A.   You'd have to ask him that question.
13      Q.   Did he convey that to you prior to the
14  time that you became employed?
15      A.   He was looking for somebody who had
16  greater computer technical skills, those types of
17  things.
18      Q.   Anything else?
19      A.   I don't know.
20      Q.   He didn't convey anything else to you as
21  to the reasons why he was asking you to come on
22  board?
23      A.   As previously stated, almost -- Todd
24  Litton was employed at this point in time. Almost
25  solely, the discussions were about managing and

---

Page 144

1   benefiting his real estate portfolio.
2       Q.   Did he tell you that he wanted somebody to
3   perform the responsibilities that Todd Litton had
4   been performing?
5       A.   Todd Litton was still employed with him at
6   that time.
7       Q.   Was Todd Litton considering going to
8   graduate school at that point?
9       A.   Yes, he was. He had applied to graduate
10  school.
11      Q.   He was going to leave in the near future?
12      A.   He left I think 6, 7 months after I came,
13  or several months, but Todd was an attorney, and Todd
14  was somebody who wanted to get involved in Wall
15  Street. That wasn't me.
16      Q.   Was Todd involved in the preparation of
17  the private placement memorandum with Dechert Price &
18  Rhoads?
19      A.   That happened prior to my arrival.
20      Q.   But don't you have any understanding 1 way
21  or the other?
22      A.   I believe that that was 1 of the things
23  Todd was working on.
24      Q.   Do you know what else Mr. Litton was
25  working on?

---

Page 145

1       A.   Again, he did -- he downloaded historical
2   stock data. At the time they had a bond fund, a
3   mutual fund. They had a stock portfolio run out of
4   the state of Maine, run by David Connery.
5       Q.   And he was working on all of those things?
6       A.   Yes.
7       Q.   If you could do your best -- I know this
8   was some time ago -- describe for me all of your
9   responsibilities in connection with Resource F during
10  the time that you were employed by Mr. Dyer.
11      A.   I opened the mail. I, you know, would
12  drive him to the bank.
13           Later, I received check-signing authority,
14  not on Resource F, but some of the other accounts to
15  pay the bills to pay for the office where Resource F
16  was. I found him substitute office space. And I did
17  financial spreadsheets for the -- using the
18  historical data and sending them to the clients.
19      Q.   Anything else that you can remember?
20      A.   No. I mean, some of the things that Todd
21  did included making stock trades, doing things like
22  that. I never did any of those things.
23      Q.   Would you characterize your
24  responsibilities as being organizational or
25  administrative?

---

37 (Pages 142 to 145)

Michael Lorusso                                                                June 21, 2002
                                    Washington, DC

Page 146

1    A.  I would say that as opposed to saying
2  financial.  I was effectively the office manager.
3    Q.  Mr. Dyer look to you to organize his
4  files?
5    A.  Mr. Dyer kept his own files.
6    Q.  He didn't ever ask you to keep any files
7  regarding Resource F?
8    A.  The original files were all kept by Todd,
9  and then they were later kept by the young lady whose
10  name escapes me.  There was not a lot of -- with
11  regard to Resource F, there was not a lot of filing.
12    Q.  During the time that you worked with --
13  for Mr. Dyer, how much time per month did you
14  dedicate to responsibilities in connection with
15  Resource F?
16    A.  5 hours a week or less.  It was typically
17  month -- it was probably 5 to 10 hours a month.
18    Q.  Did that ever change?
19    A.  That was at the height.  The only thing,
20  you know, that -- the data would come in from
21  vonStrasdas, we would prepare the wires.  Chuck had
22  to sign them.  We'd send it to the bank, and we'd
23  mail out statements quarterly.
24       Again, there's not a huge list of clients.
25  It did not take a lot of time.

Page 147

1    Q.  You mailed out quarterly statements to
2  Resource F members; is that right?
3    A.  That's correct.
4    Q.  What information did you rely on to
5  prepare those quarterly statements?
6    A.  I relied on Exhibit 143, things like
7  Exhibit 143 that were given to us monthly.
8    Q.  Let's take a look at Exhibit 143 for a
9  minute.
10    A.  M-hm.
11    Q.  Recognize the handwriting in the right
12  hand margin?
13       MR. MURRAY:  Which page?
14    A.  Which page?
15       BY MR. COHEN:
16    Q.  Very first page.
17    A.  I'd say it's Chuck's, but, you know, if
18  you've ever seen my handwriting, you can't read it,
19  so it's not mine.  Let me see if there's any marks by
20  me.
21    Q.  It's okay.
22       It's not yours; is that right?
23    A.  That's correct.
24    Q.  I just want to make sure about this.
25       The information under, client

Page 148

1  distribution, you were able to verify because you
2  knew the amounts that were actually being sent out to
3  investors; is that right?
4    A.  That's correct.  I crossed -- I would -- I
5  didn't emphatically do this as a job, but I was able
6  to cross-reference what we received and what went out
7  based on the wires.
8    Q.  And you said you were concerned or
9  suspicious about -- well, strike that.
10       Weren't you suspicious about the high
11  yield that was being distributed to investors?
12    A.  No.  At the time -- it was during the
13  beginning of the Wall Street high-tech boom.  High
14  yields were the spirit of the day.
15    Q.  In looking at the first few pages -- this
16  was in December of 1999?
17    A.  Yes.
18    Q.  Was there any other information that you
19  relied upon, Mr. Lorusso, to prepare the quarterly
20  statements?
21    A.  With regards to the Resource F portion or
22  with regards to market data?
23    Q.  With regard to the quarterly statements
24  that were sent to Resource F members?
25    A.  I used -- on Bloomberg and other things, I

Page 149

1  downloaded -- I downloaded indices --
2    Q.  Are you looking at a document to refresh
3  your recollection?
4    A.  Yeah.  I'm looking at 145, not --
5  exclusive of page 1.
6    Q.  Okay.
7    A.  Page 1 is not me.
8    Q.  The other information that you relied upon
9  was it Resource F exclusive information?
10    A.  No.  It was market-derived information.
11    Q.  Publicly available information?
12    A.  Correct.
13       But with regards to your question on
14  yields, you would see that even the market indices
15  had a similar up-tick yield at that time.
16    Q.  There was no reason to be suspicious about
17  the yield that was being distributed to Resource F
18  members; isn't that right?
19    A.  That's correct.
20    Q.  The Boston office also prepared monthly
21  reports in connection with Resource F; is that right?
22    A.  The offering memorandum called for
23  quarterly reports.  Sometimes we -- we prepared
24  monthly performance data.  I'm not sure that we sent
25  out monthly reports.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                                    June 21, 2002
Washington, DC

Page 150

1  Q.  Would that be used for your own internal
2  purposes?
3  A.  Yes.
4  Q.  In what way were those monthly statements
5  used?
6  A.  Well, it was just -- when the historical
7  market data was available, we would download it
8  rather than waiting the 3 months to do the
9  quarterlies. So at that time, we would also enter
10  whatever months' data we had.
11  Q.  Were those monthly reports also based on
12  the distributions that were being made to Resource F
13  members?
14  A.  Yes. The reports were solely based on the
15  actual distributions made to Resource F members.
16  Q.  During your tenure at Resource F,
17  Mr. Lorusso, you testified that the money stopped
18  coming in at some point; is that right?
19  A.  Yes.
20  Q.  Stopped coming from Mr. vonStrasdas in
21  particular; is that right?
22  A.  That's correct.
23  Q.  And I think you testified earlier that 1
24  of the reasons you left is because you didn't have
25  access to information; is that right?

Page 151

1  A.  Well, in order to prepare what I did, I
2  needed the data from Mr. vonStrasdas as well as
3  the -- to report or money, you need money to come in.
4  There was no need for me to do any of my reporting
5  data if there was no money.
6  Q.  Exactly. The data that you're referring
7  to is really the money that had been coming in from
8  Mr. vonStrasdas; is that right?
9  A.  Correct.
10  Q.  You couldn't -- you could no longer
11  perform your functions because no money was coming
12  in?
13  A.  There was no need for my function.
14  Q.  So that's 1 of the reasons you left.
15  Right?
16  A.  Yes.
17  Q.  I know it sounds obvious, but you couldn't
18  perform your functions because no money was coming
19  in, so you left; is that right?
20  A.  There were a number of things. Let's
21  characterize it as a dwindling pool of money to pay
22  employees also, because -- but based on the drop in
23  the money from GMAG.
24  Q.  And obviously, when the money stopped
25  coming in, you couldn't do the monthly and quarterly

Page 152

1  statements; is that right?
2  A.  Well, initially, we did, showing the zero
3  returns, or the -- I believe there was 1 month that
4  it was a lower return.
5  Q.  But at some point when the money stopped
6  coming in entirely, there was no need to do
7  statements; isn't that right?
8  A.  The only need was the legal requirement in
9  the PPM.
10  Q.  Other than that?
11  A.  Yes. Correct. Let's say that it didn't
12  take a lot of time to do the statements.
13  Q.  Okay. Did the Boston office receive
14  information other than the wiring information from
15  investors?
16  A.  That was where they were supposed to send
17  the signed copies of the memorandi (sic).
18  Q.  So the information was sent back, signed
19  copies of the private placement memo?
20  A.  Yes.
21  Q.  And so the private placement memoranda
22  were placed in the file for each member?
23  A.  Yes. There was a unique file for each
24  member. It consisted of the private placement
25  memorandum and copies of the wire sheets for their

Page 153

1  distribution.
2  Q.  Were you responsible for putting together
3  those files?
4  A.  Initially, it was Todd Litton. I did some
5  of the work. And the administrative person also did
6  some of the work.
7  Q.  Mr. Dyer do any of that work?
8  A.  Not that I'm aware of.
9  Q.  Did he look to you and Mr. Litton and the
10  administrative assistant to do that work?
11  A.  Yes, he looked for staff to do that work.
12  Q.  Boston office also sent out investor
13  questionnaires to prospective members?
14  A.  I believe what you stated is bundled in
15  the exhibit of the private placement memorandum. For
16  example, 139, I believe in the back has the
17  questionnaire.
18  Q.  Okay. So as part of the private placement
19  memo --
20  A.  They were sent at the same time.
21  Q.  -- the investor questionnaire was sent
22  out --
23  A.  Yes.
24  Q.  -- is that right?
25  A.  Yes.

39 (Pages 150 to 153)

Michael Lorusso                                                        June 21, 2002
                        Washington, DC

Page 154

1    Q.   Did Mr. Dyer -- strike that.
2        During the time that you worked for
3    Mr. Dyer, did you have any understanding regarding
4    Mr. vonStrasdas's background?
5    A.   No.
6    Q.   You didn't know where he had worked
7    previously?
8    A.   No.
9    Q.   But during the time that you worked there
10   and communicated with Mr. vonStrasdas, you were
11   impressed with him?
12   A.   I was impressed with his candor, his
13   demeanor, his -- the way he carried himself.
14   Q.   If you could just turn, Mr. Lorusso, to
15   Exhibit 140.
16   A.   I have it, private placement memorandum,
17   February 1999.
18   Q.   Is it your understanding that this version
19   of the private placement memorandum was the 1 that
20   was prepared by Dechert Price & Rhoads?
21   A.   I believe that's true.
22   Q.   Is this the 1 that the Boston office sent
23   out to prospective investors?
24   A.   It is, but before I say that, I'd have to
25   check each page, but it appears to be the 1 that they

Page 155

1    sent out.
2    Q.   Okay.  I think you testified earlier that
3    none of the individuals who received private
4    placement memorandums from the Boston office actually
5    invested in Resource F; is that right?
6    A.   I don't know that I testified to that.  I
7    think I said that we sent out 20.  I believe that
8    Mr. Bathurst and others received them.
9    Q.   Of the 20 that you sent out, how many of
10   the individuals who received them do you know
11   invested with Resource F?
12   A.   Maybe 1 or 2.  I know for example they
13   sent 1 to Derek Green because of the discussion of
14   how much postage it takes to get to Monaco.  And I
15   know he sent 1 to George Bathurst.
16       I wasn't there all the time.  My duties
17   were not solely for the hedge fund.  So other people
18   may have sent some to other people, but he sent
19   probably a total of 20 out.
20   Q.   But other than Mr. Bathurst and Mr. Green,
21   you don't know of any other individuals who received
22   private placement memorandums from the Boston office
23   who invested in Resource F?
24   A.   Not that I can recollect.
25   Q.   And the private placement memorandum to

Page 156

1    the best of your knowledge that was sent out by the
2    Boston office did not contain the executive summaries
3    which we -- which you discussed earlier today?
4    A.   The thing I could emphatically state
5    because I was very surprised in the first deposition
6    is that the private placement memorandum prepared
7    from -- by Dechert Price & Rhoads did not contain
8    that executive summary.
9    Q.   Mr. Dyer had no involvement in the
10   preparation of that executive summary; isn't that
11   right?
12   A.   That is my recollection.
13   Q.   Did you know during your employment at
14   Resource F whether that executive summary was in fact
15   sent to investors?
16   A.   It was not sent to any of the Chuck
17   investors, and we had very limited contact with any
18   of the vonStrasdas -- people would typically call him
19   directly.  They wouldn't call us if they had
20   questions.
21   Q.   You don't know 1 way or the other whether
22   the executive summary was sent to the, quote,
23   vonStrasdas clients?
24   A.   No, I do not.
25   Q.   If you could just turn to Bates-stamped

Page 157

1    page 82 of Exhibit 140.
2    A.   Okay.
3    Q.   If you could just go to the bottom of the
4    page, I'll ask you to read to yourself that paragraph
5    that goes on for page 1 to page 2 of the document
6    under, investment objective, and let me know when
7    you're done reading it
8    A.   I've completed it.
9    Q.   Now, on page -- at the bottom of page 1
10   and the top of page 2 with Bates-stamped pages 82 and
11   83, it says:  The fund will seek to generate growth
12   of capital through -- and under roman numeral 2, it
13   says, investment-grade financial obligations.
14       Do you see that?
15   A.   Yes, the beginning -- starting the fourth
16   word on page Bates-stamped 83.
17   Q.   But is it your understanding, Mr. Lorusso,
18   that the investments in investment-grade financial
19   obligations were being made by Mr. vonStrasdas?
20   A.   I had no real understanding of what he was
21   doing.  My knowledge was it was 1 of the permissible
22   investments.
23   Q.   That was in the private placement
24   memorandum sent by the Boston office which was
25   prepared by Dechert Price & Rhoads; is that right?

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                         June 21, 2002
                              Washington, DC

Page 158

1    A.   That's correct.
2    Q.   If you could just turn to Bates-stamped
3    page 139.
4    A.   M-hm. I'm there.
5    Q.   I think it was your testimony that this
6    page was not sent out as part of the private
7    placement memorandum sent out by the Boston office;
8    is that right?
9    A.   That's correct. These were questions I
10   answered in the first deposition. I also provided --
11   all of the offering memorandums that Chuck had were
12   all bound. And I gave -- I gave the SEC a copy of 1
13   of the bound Dechert Price & Rhoads offering
14   memorandi (sic) showing that it did not include this
15   page.
16   Q.   Okay. Are you familiar with the page that
17   is Bates-stamped D 000139?
18   A.   I've seen it before, but mostly in the
19   context of these proceedings.
20   Q.   You don't remember seeing it when you
21   worked for Mr. Dyer?
22   A.   I may have, but it was not in any of the
23   Dyer clients' files, and most of the vonStrasdas
24   client files were not as complete as we would have
25   liked.

Page 159

1    Q.   Do you know whether investors sent this
2    form document to your office to Mr. vonStrasdas
3    indicating whether -- indicating that they wanted
4    their investments in A or B shares?
5    A.   The private placement memorandum makes no
6    reference to A or B shares. I may have seen this,
7    but I don't -- I didn't pay it much heed.
8    Q.   I guess that wasn't my question.
9    My question was whether or not -- do you
10   know whether -- strike that.
11   Do you know whether Resource F investors
12   sent this document back to your office or to
13   Mr. vonStrasdas's office indicating that they wanted
14   investments in A or B shares?
15   A.   I'm only aware of the things that happened
16   in Mr. Dyer's office. And I believe that none of
17   Mr. Dyer's clients sent this back. I cannot speak
18   for what was sent to Mr. vonStrasdas's office, having
19   never been there.
20   Q.   These forms sent by vonStrasdas clients to
21   the Boston office?
22   A.   I don't remember whether they were or not.
23   Q.   Do you remember seeing this document in
24   connection with the vonStrasdas clients?
25   A.   I don't. I know I've seen it. I think

Page 160

1    it's mostly in the context of these proceedings.
2    That does not mean that I haven't seen it. I haven't
3    looked at those files in, what, 2 and a half years
4    now.
5    Q.   Would you look at Exhibit 138, which is
6    your hearing testimony in March of 2001.
7    A.   Sure.
8    Q.   And I want you to read to yourself
9    beginning in the middle of page 61 all the way
10   through page 63. Let me know when you're done
11   reading that.
12   (Pause.)
13   A.   We referred to this earlier. And I said I
14   thought I'd seen it maybe once before. But it was
15   something never sent either with or back with the
16   private placement memorandum.
17   BY MR. COHEN:
18   Q.   Direct your attention to page 63 of your
19   prior testimony in March of 2001, and Mr. Quintero
20   asked you when you've seen this document, and you
21   said, I've seen it typically with regards to
22   vonStrasdas's clients.
23   Does that help refresh your recollection
24   as to when you saw this document?
25   A.   I see that. I was reading down before --

Page 161

1    on panel 65.
2    Q.   I want you to go to panel 63.
3    A.   I'm sorry.
4    Q.   You say you saw it typically with regard
5    to vonStrasdas's clients.
6    A.   Again, I haven't seen these for a number
7    years, and that probably clarifies my recollection.
8    Q.   How does it clarify your recollection?
9    A.   I knew I never saw it with regards to Dyer
10   clients. That was my recollection. By reviewing the
11   testimony, I stated before and I don't remember now,
12   but I may have been -- my previous -- I'll stand on
13   my previous testimony.
14   Q.   You remember testifying that you typically
15   saw it in connection Mr. vonStrasdas's clients?
16   A.   Yes.
17   Q.   Was it your understanding that
18   Mr. vonStrasdas's clients invested in the A shares?
19   A.   When I had seen this form, it was always
20   marked with A shares.
21   Q.   Boston office kept files with these forms
22   in it?
23   A.   This form existed in some of the files in
24   the Boston office. We had very incomplete files on
25   the vonStrasdas clients, though. So it was probably

41 (Pages 158 to 161)

Michael Lorusso

June 21, 2002

Washington, DC

**Page 162**

1 only 1 or 2 of them.
2 Q. Sorry to make you repeat this.
3 I want to make sure I'm clear in my mind:
4 When money from investors was wired from the Boston
5 Private Bank account, do you know where it was wired
6 to?
7 A. Only Chuck had signature on that. I
8 helped fill in the monetary data. I don't recall off
9 the top of my head.
10 Q. Do you know whether or not it was an
11 account controlled by Mr. vonStrasdas?
12 A. It's my belief it was an account
13 controlled by Mr. vonStrasdas, yes.
14 Q. What's the basis of that belief?
15 A. That that was the mechanics of how the
16 investment vehicle worked.
17 Q. You don't know what Mr. vonStrasdas did
18 with the money once he received it into that account,
19 do you?
20 A. No, nor would I know what Morgan Stanley
21 does with the money that they get.
22 Q. I just want to go back to that form on
23 page 139 of Exhibit 140.
24 A. Yes.
25 Q. Is it your understanding, Mr. Lorusso,

**Page 163**

1 that investors had the ability to just designate that
2 they wanted to invest solely in the A shares?
3 A. The private placement memorandum makes no
4 reference to A shares or B shares.
5 Q. That's not my question.
6 Do you have -- did you have an
7 understanding that investors could designate that
8 they wanted all of their money invested in A shares?
9 A. I don't know what investors knew or
10 thought because that was not part of my rationale.
11 Q. You knew about the existence of that form,
12 didn't you?
13 A. I knew about the existence of the form.
14 All of the investment money went to the same place.
15 Q. Do you know that there were investors that
16 designated that they wanted all of their money
17 invested in the A shares?
18 I'm sorry?
19 A. I think I previously answered that, but --
20 Q. Can you just answer it again?
21 A. That there were no -- there is no -- there
22 are no A shares or B shares or Q shares.
23 Q. Well, other than the few clients you
24 identified as Dyer clients, Mr. Lorusso, you
25 identified all the others as vonStrasdas clients; is

**Page 164**

1 that right?
2 A. Right. And if you want to state it this
3 way, they're all A share clients.
4 Q. All the vonStrasdas clients were A share
5 clients; isn't that right?
6 A. Correct.
7 Q. A (phonetic) invested in Resource F for
8 the express purpose of investing with
9 Mr. vonStrasdas; isn't that right?
10 A. Correct.
11 Q. Mr. vonStrasdas had a personal
12 relationship with all of those individuals you've
13 identified as vonStrasdas clients; is that right?
14 A. I'm not aware of that relationship. But I
15 can't speak for Mr. vonStrasdas.
16 Q. Mr. Dyer didn't have a relationship with
17 any of those people, did he?
18 A. Mr. Dyer did not have a relationship with
19 those people to the best of my knowledge.
20 MR. COHEN: Give me 5 minutes, I can try
21 to organize myself, and I shouldn't have too much
22 more.
23 MR. QUINTERO: Okay.
24 (Recess.)
25 MR. COHEN: Back on the record.

**Page 165**

1 BY MR. COHEN:
2 Q. Just turn your attention, Mr. Lorusso, to
3 what's been marked as today as Exhibit 143.
4 A. Yes, I have it.
5 Q. Okay. Would you please identify this
6 document for me again?
7 A. That is the -- what we used to call the
8 distribution sheet that was sent by Mr. vonStrasdas
9 to Chuck, always sent by facsimile from Florida to
10 Boston.
11 Q. If you could just describe for me the
12 information contained on the very first page of the
13 document.
14 A. It includes the return data that the fund
15 generated, and administrative fees and other things
16 in the front, and then on the top -- excuse me -- and
17 then a list of distributions to the client base.
18 Q. Would you direct your attention to where
19 it says, total gains received by fund, and then
20 there's a parenthetical?
21 A. Yes.
22 Q. It says, .059.
23 Could you just explain for us again what
24 that number represents?
25 A. That would be 5.9 percent for the period.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Michael Lorusso                                                June 21, 2002
Washington, DC

**Page 166**

1    Q.   There's a rate of return of 5.9 percent
2    for the period?
3    A.   Yes, rate of return.
4    Q.   Did Mr. Dyer play any role in determining
5    the rate of return?
6    A.   No.
7    Q.   And so if you go down to the information
8    contained under, client distributions?
9    A.   Yes.
10   Q.   You take the first name, Richard Ellison
11   it says, .0456 times 300 M, which I assume is
12   300,000?
13   A.   Yes.
14   Q.   What's that .0456 number represent?
15   A.   That's the return to them minus the fees
16   and other distributions.
17   Q.   But it's 5.9 percent minus the fees and
18   other distributions?
19   A.   Yeah, that are marked in the PPM -- I'm
20   switching to government-speak now -- in --
21   Q.   -- the private placement memorandum?
22   A.   Yeah.
23   Q.   I'm sorry.
24        The private placement memorandum?
25   A.   That's correct.

**Page 167**

1    Q.   And you said all of this information was
2    provided by Mr. vonStrasdas?
3    A.   Correct.
4    Q.   I just want to ask you a few questions
5    about the investment made by Mr. Nelson.
6    A.   Okay.
7    Q.   What was his first name again?
8    A.   Brian.
9    Q.   Brian Nelson.
10        He worked for H.R. Logic?
11   A.   That's correct.
12   Q.   Do you remember when he made his visit?
13   A.   He's on this list, so I'm trying to see
14   when he's not on this list.
15        Where is this?
16        It would be probably in November of 1999.
17   He's not on the -- he's not on the November list, but
18   he's on the December list.
19   Q.   Which document are you looking at?
20   A.   The same, 143.
21        MR. MURRAY:  What page number?
22        THE WITNESS:  I'm sorry.
23   A.   1905.  Brian Nelson never invested in his
24   name.  The name of the company was Coastwise Capital
25   LLC.  It's on the bottom of Bates stamp 1905.

**Page 168**

1        BY MR. COHEN:
2    Q.   Did you identify Coastwise Capital as a
3    Dyer client?
4    A.   Yes.
5    Q.   Why was that?
6    A.   He sent money to Resource F.  He was known
7    to Chuck.  Chuck made the -- Chuck included him in
8    his commission pool.
9    Q.   You also had conversations with Mr. Nelson
10   about a prospective investment in Resource F; isn't
11   that right?
12   A.   Yes, I did.
13   Q.   You provided him -- I believe you said
14   historical rates of return?
15   A.   That's correct.
16   Q.   And did you prepare charts that were
17   provided to him?
18   A.   I prepared the charts that were provided
19   to several prospective clients.
20   Q.   You prepared charts that were provided to
21   Mr. Nelson in particular?
22   A.   That's probably true.
23   Q.   Probably true or it is true?
24   A.   I don't necessarily remember handing them
25   to him, and I don't know exactly what graphs or

**Page 169**

1    charts you are referencing, but I did prepare on a
2    monthly basis graphs and charts that Chuck and myself
3    and others shared with prospective clients.
4    Q.   I'm not referencing anything, Mr. Lorusso.
5        I believe you said that you provided
6    Mr. Nelson data indicating Resource F's historical
7    rate of return?
8    A.   Yes.  I don't know that it was graph or
9    chart.  It might have been a spreadsheet.
10   Q.   Okay.  But you provided him some
11   information?
12   A.   Yes.
13   Q.   And do you know whether he relied on that
14   information to make his investment in Resource F?
15   A.   I'm assuming he did.
16   Q.   How many conversations that you know of
17   did Mr. Dyer have with Mr. Nelson regarding
18   prospective investment in Resource F?
19   A.   Several, but not numerous.
20   Q.   Were you involved in those conversations
21   as well?
22   A.   Sometimes.
23   Q.   How many conversations were you involved
24   with?
25   A.   Probably 1 or 2, and then Chuck talked to

43 (Pages 166 to 169)

Michael Lorusso

June 21, 2002

Washington, DC

Page 170

1 me about it, was happy that he would be involved in
2 the transaction.
3    Q.   Did you encourage Mr. Nelson to invest in
4 Resource F?
5    MR. MURRAY: Objection.
6    A.   Encouraged -- I made him aware of the
7 investment.
8    BY MR. COHEN:
9    Q.   Did you tell Mr. Nelson that you thought
10 it was a good idea for him to invest in Resource F?
11    A.   At the time I thought it was a good idea,
12 so he may have -- I don't know that I used that
13 terminology.
14    Q.   Did you use favorable terminology in
15 connection with a prospective investment in Resource
16 F by Mr. Nelson?
17    A.   Yes.
18    Q.   You had no reason -- based on the
19 historical data, you had no reason to believe that an
20 investment by Mr. Nelson would be anything other than
21 profitable?
22    A.   That's correct.
23    Q.   That was in November or December of 1999?
24    A.   Yes.  According to the distribution -- I'm
25 relying on the limited information I have here.  His

Page 171

1 name doesn't appear on the November distribution
2 sheets, so that means that he was not paid for that
3 period of time, so his money was received sometime
4 prior to December of '99.
5    MR. COHEN: I think that's all I have.
6    MR. QUINTERO: Okay. I just have a few
7 followups, Jon.
8    MR. COHEN: Okay.
9 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
10    BY MR. QUINTERO:
11    Q.   Direct your attention, Mr. Lorusso, to
12 Exhibit 142, which is the Resource F LLC list of
13 members.
14    A.   M-hm, yes.
15    Q.   I believe you identified both for me and
16 for Mr. Cohen the so-called Chuck Dyer clients on
17 this list?
18    A.   M-hm.
19    Q.   You have to answer yes or no.
20    MR. MURRAY: Answer yes or no.
21    BY MR. QUINTERO:
22    Q.   You identified Chuck Dyer clients on this
23 list?
24    A.   Yes.
25    Q.   Do you know for a fact that those -- that

Page 172

1 you did not identify as Chuck Dyer clients -- well,
2 strike that.
3    Do you know for a fact whether Mr. Dyer
4 spoke to any of the other clients on the list which
5 is Exhibit 142?
6    A.   Mr. Dyer and sometimes myself spoke to
7 some of the people. It was more after there was no
8 return coming in that they called and said, you know,
9 Von told to us call you, where is our money.
10    Q.   You took some of those calls?
11    A.   Well, you could imagine the people who
12 hadn't called before would be very interested to know
13 where their money was, so, yeah, I mean, we had a
14 central switchboard, so I took some of those calls.
15    Q.   My question to you is, do you know for a
16 fact whether Mr. Dyer -- whether or not Mr. Dyer
17 spoke to any of these clients prior to that point?
18    A.   I know Mr. Dyer spoke to several of these
19 clients. I don't know which of these clients were
20 the ones that called.
21    Q.   Okay. I'm talking about prior to any
22 issues coming up with --
23    A.   No.
24    Q.   -- no money returns?
25    A.   I have no knowledge.

Page 173

1    MR. MURRAY: Wait till he finishes.
2    BY MR. QUINTERO:
3    Q.   So you don't know whether Mr. Dyer spoke
4 to them or not?
5    A.   No.
6    Q.   Do you know whether or not for a fact it
7 was this Von who convinced these folks to invest in
8 Resource F?
9    A.   No, I don't.
10    Q.   You mentioned I think with respect to
11 conversations you had with both Ms. Koepper or
12 Mr. Nelson that you talked about the historical
13 yield --
14    A.   Yes.
15    Q.   -- for Resource F?
16    Did either 1 of them ask either you or
17 Mr. Dyer whether he expected that historical yield to
18 continue into the future?
19    A.   I don't know that they asked that
20 particular question. As we were basing it on past
21 performance, we had no reason to believe that it
22 would not continue into the future.
23    Q.   Did you convey that belief to either
24 Ms. Koepper or Mr. Nelson?
25    A.   We may have or I may have. I don't know.

44 (Pages 170 to 173)

Michael Lorusso                                                           June 21, 2002
Washington, DC

Page 174

1  I don't recollect.
2      Q.  Why do you believe that you or Mr. Dyer
3  may have conveyed your belief that the returns would
4  continue to the future?
5      A.  Because we had no reason to believe that
6  they would not.  We were very bullish on the
7  investment.
8      Q.  Did you know what the investment was?
9      A.  No.  We were -- I should strike that and
10  say, we were very bullish on the return.
11     Q.  Mr. Dyer know what the investment was?
12     A.  I don't know.
13     Q.  Did you ask him?
14     A.  No.
15     Q.  I believe you testified in response to
16  Mr. Cohen's questions that you were very comfortable
17  with Mr. vonStasdas during the tenure with Mr. Dyer,
18  when the money was coming in; is that right?
19     A.  Yes.
20     Q.  And with these monthly returns that we've
21  seen in Exhibit 143, is there any particular reason
22  why you decided not to invest your own money?
23     A.  No, no particular reason.
24     Q.  Did you have money to invest?
25     A.  M-hm.

Page 175

1      Q.  Sorry.  Yes or no?
2      A.  Yes.
3      Q.  Why didn't you invest in something that
4  was getting returns of 60 percent a year?
5          MR. MURRAY:  Objection.
6      A.  I don't know.
7          BY MR. QUINTERO:
8      Q.  Did you think about investing?
9      A.  Yes.
10     Q.  And what was -- if you can explain for me
11  your decision-making process for -- that made you
12  arrive at the point where you decided not to do it.
13     A.  Right now, I work for the government.  I
14  don't engage in any -- I don't buy stocks or
15  anything, something that would be a conflict of
16  interest.  I didn't know if my investing in it would
17  be more of a conflict of interest as opposed to a
18  legitimate investment.
19     Q.  So when you were employed by Mr. Dyer, you
20  were concerned about a conflict of interest if you
21  invested in Resource F?
22     A.  Yes.
23     Q.  Did you speak -- did you discuss that
24  concern with anybody?
25     A.  No.  There was -- there were some SEC

Page 176

1  requirements and some other things about disclosure,
2  so I chose not -- at the period of time that I worked
3  for a financial company, I chose not to own any
4  stock, bond, publicly traded, anything, including
5  shares in the hedge fund.
6      Q.  Where did you derive your understanding of
7  these disclosure requirements?
8      A.  Chuck told me that there were -- because
9  of the bond fund and the mutual fund that we had to
10  disclose yearly to the S- -- or whatever -- I don't
11  know the term -- either annually to the SEC, the
12  transactions that we had made.  He made Todd Litton
13  do that.  I was not interested in having that done.
14     Q.  So it was because of this potential
15  conflict of interest or these disclosure requirements
16  that it's your testimony that's why you decided not
17  to invest?
18     A.  Primarily, yes.
19     Q.  What were other reasons?
20     A.  Just -- you know, I had them at the time.
21  I don't know what they are now.
22     Q.  Did you talk to any friends or family
23  about investing in Resource F?
24     A.  I talked to some people.  I gave a friend
25  the offering memorandum.  They went through it, and

Page 177

1  they were not interested in participating.
2      Q.  Did you get --
3          MR. MURRAY:  I don't think that was his
4  question.  Answer the question.
5          I thought the focus of your question was,
6  did he talk with anyone about his investing.
7          MR. QUINTERO:  No.  If you can read it
8  back.
9          (The reporter read the next-to-last
10         question.)
11         BY MR. QUINTERO:
12     Q.  Did you talk to any of your friends or
13  family about investing in Resource F?
14     A.  Yes.
15     Q.  Who?
16     A.  My girlfriend, Adrea Foster, F-O-S-T-E-R.
17         THE COURT REPORTER:  And her first name?
18         THE WITNESS:  A-D-R-E-A.
19         BY MR. QUINTERO:
20     Q.  Anyone else?
21     A.  Not that I recall.
22     Q.  Was she the person that you gave the
23  offering memorandum to?
24     A.  Yes.  She marked it up to me and then
25  returned it to me and indicated that she wasn't

45 (Pages 174 to 177)

Michael Lorusso

Washington, DC

June 21, 2002

**Page 178**

1 interested.
2   Q.   During the time that you were working for
3 Mr. Dyer, did you have any -- to that point, did you
4 have any investment experience?
5   A.   Very limited.
6   Q.   What was it?
7   A.   I had owned a few publicly traded stocks,
8 but nothing more than that. Most of my experience --
9 financial experience is with real property.
10   Q.   Did you have any money management
11 experience?
12   A.   No.
13   Q.   You wouldn't describe yourself as a
14 sophisticated investor?
15   A.   No.
16   Q.   Did you attempt to evaluate the quality of
17 the Resource F investment other than -- by other
18 means besides the historical yield?
19   A.   No.
20   Q.   Did Mr. Dyer receive any commissions in
21 connection with Resource F?
22   A.   Exhibit -- the 1 we just had.
23   Q.   143?
24       MR. MURRAY:  Right here.
25   A.   Exhibit 143 shows that Bunker Hill

**Page 179**

1 Aviation on the first page Bates-stamped 1904
2 received 51,051 dollars for the period of December
3 1999.
4       BY MR. QUINTERO:
5   Q.   Right. That's for the performance fee,
6 was it not?
7   A.   Yes.
8   Q.   And that was the fee that was being split
9 between the 2 co-managers?
10   A.   Right. It's -- let me see --
11       (Pause.)
12   A.   It was my understanding that he received a
13 fee, but I thought it was incorporated in here. It's
14 another document.
15       BY MR. QUINTERO:
16   Q.   So what type of fee are we talking about
17 just so we're clear?
18   A.   A commission or a fee on bringing in new
19 accounts.
20   Q.   A finder's fee?
21   A.   Finder's fee.
22   Q.   You believe that he did receive?
23   A.   It's my understanding that he did receive.
24   Q.   How did you derive that understanding?
25   A.   I've seen documents describing the

**Page 180**

1 transaction.
2   Q.   Which clients -- for which clients did he
3 receive the finder's fee?
4   A.   Without the documentation, I'm not clear,
5 but I believe it's those stated clients.
6   Q.   The ones that you refer to as the Dyer
7 clients --
8   A.   Right.
9   Q.   -- on Exhibit 142, I believe?
10   A.   That's correct.
11   Q.   Okay. Did you ever receive any
12 commissions in connection with Resource F?
13   A.   No.
14       MR. QUINTERO:  I think that's all the
15 questions I have.
16       MR. COHEN:  A few short followup.
17       FURTHER EXAMINATION BY COUNSEL FOR
18 CHARLES DYER, RESOURCE F LLC, and BUNKER HILL
19       AVIATION LLC
20       BY MR. COHEN:
21   Q.   Look at your resume, please, Mr. Lorusso,
22 Exhibit 137.
23   A.   Got it.
24   Q.   The end of the first paragraph under
25 profile, it says:  Ability to manage a large load of

**Page 181**

1 diverse, simultaneous, and mission-critical
2 responsibility. Do you see that?
3   A.   Yes, I do.
4   Q.   As of December 1998 did you have those
5 capabilities?
6   A.   I put them in there in 2000, so I probably
7 had them in 1998, but again, that -- the previous
8 paragraph is talking about real estate -- real estate
9 portfolio-type management, but I would say that I
10 have that, yes.
11   Q.   Had those capabilities as of December of
12 1998; isn't that right?
13   A.   That's true.
14   Q.   And you graduated from business school in
15 1998; is that right?
16   A.   That's correct.
17   Q.   It looks like you got a 3.9 GPA?
18   A.   That's correct.
19   Q.   Graduated with highest honors?
20   A.   I did all right.
21   Q.   You graduated with honors?
22   A.   I don't know what they called it, but that
23 was my GPA.
24   Q.   Is that on a 4.0 scale?
25   A.   Yes.

46 (Pages 178 to 181)

Michael Lorusso                                                      June 21, 2002
Washington, DC

Page 182

1      Q.   Looking at your experience under Boston
2   Industrial Group for 1989 to 1998 --
3      A.   M-hm.
4      Q.   -- I think you had significant
5   responsibilities there; isn't that right?
6      A.   Yes.
7      Q.   Real estate -- you were responsible for
8   handling large real estate portfolios; is that right?
9      A.   That's correct.
10     Q.   Have people who reported to you during
11  your time at Boston Industrial Group?
12     A.   M-m-m? Repeat the question.
13     Q.   Did you have people who reported to you
14  while you -- during the time that you worked at
15  Boston Industrial Group?
16     A.   Yes.
17     Q.   How many people reported to you during
18  that time?
19     A.   Probably 5 or 10.
20     Q.   You were responsible for 5 or 10 people?
21     A.   Yes.
22     MR. COHEN:  That's all I have.
23     MR. QUINTERO:  I don't have anything else.
24     MR. MURRAY:  And I don't have any
25  questions.

Page 183

1      MR. COHEN:  Thank you very much.  I
2   appreciate everyone's indulgence for letting me do
3   this by phone.
4      MR. QUINTERO:  No problem.
5      We're off the record.
6      (Whereupon, at 3:46 p.m., the taking of
7   the instant deposition ceased.)
8
9
10     _____
11        Signature of the Witness
12  SUBSCRIBED AND SWORN to before me this _____ day of
13  _____, 20_____.
14
15     _____
16        Notary Public
17  My Commission Expires:_____
18
19
20
21
22
23
24
25

Page 184

1         CERTIFICATE OF COURT REPORTER
2   UNITED STATES OF AMERICA    )
3   DISTRICT OF COLUMBIA        )
4      I, CHERYL A. LORD, the reporter before
5   whom the foregoing deposition was taken, do hereby
6   certify that the witness whose testimony appears in
7   the foregoing deposition was sworn by me; that the
8   testimony of said witness was taken by me in machine
9   shorthand and thereafter transcribed by
10  computer-aided transcription; that said deposition is
11  a true record of the testimony given by said witness;
12  that I am neither counsel for, related to, nor
13  employed by any of the parties to the action in which
14  this deposition was taken; and, further, that I am
15  not a relative or employee of any attorney or counsel
16  employed by the parties hereto, or financially or
17  otherwise interested in the outcome of this action.
18
19         CHERYL A. LORD
20         Notary Public in and for the
21         District of Columbia
22  My Commission expires April 30, 2006
23
24
25

47 (Pages 182 to 184)