UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| UNITED STATES | ) |
| | ) |
| v. | ) Crim. No. 05-0359-1, -3 (RMU) |
| | ) |
| DOUGLAS JEMAL, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ ) | |

**DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT
FOUR OF THE INDICTMENT OR, IN THE ALTERNATIVE, FOR A NEW
TRIAL BECAUSE THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE**

Defendants Douglas Jemal and Blake Esherick ("Defendants"), through counsel,

hereby move this Court, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of

acquittal on Count Four of the Indictment because the evidence is insufficient to sustain a

conviction. Alternatively, Defendants move this Court, pursuant to Federal Rule of Criminal

Procedure 33, for a new trial on Count Four because the verdict is against the weight of the

evidence.

Defendants respectfully request oral argument on this motion. A proposed Order

is attached.

Respectfully submitted,

_____
Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334

Counsel for Douglas Jemal

Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
(202) 344-4400

Counsel for Blake Esherick

Dated:  November 15, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No.  05-359-1, -3 (RMU) |
| | ) | |
| DOUGLAS JEMAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT
FOUR OF THE INDICTMENT OR, IN THE ALTERNATIVE, FOR A NEW
TRIAL BECAUSE THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE

Reid H. Weingarten
Brian M. Heberlig
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
 (202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306

Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
(202) 344-4400

Counsel for Blake Esherick

Christopher B. Mead
London & Mead
1225 19th Street, N.W., Suite 320
Washington, D.C.  20036
(202) 331-3334

Counsel for Douglas Jemal

Dated:  November 15, 2006

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...........................................................................................................1

II.    BACKGROUND ............................................................................................................2

III.   ARGUMENT ..................................................................................................................3

    A.     Rule 29 Legal Standard ........................................................................................3

    B.     Evidence That The MTD Invoice May Have Been False Or Misleading Is
        Not Enough To Sustain Count Four........................................................................4

    C.     The Government Failed To Prove That Defendants Possessed The
        Requisite Fraudulent Intent To Obtain Money To Which They Were Not
        Entitled .................................................................................................................6

        1.     Defendants Did Not Intend To Defraud Joe Cayre......................................7

        2.     Defendants Did Not Intend To Defraud Morgan Stanley..........................11

    D.     The Government Failed To Prove The Materiality Of Any
        Misrepresentations Made By Defendants ...........................................................13

        1.     Nothing About The MTD Invoice Was Material To Mr. Cayre...............14

        2.     The MTD Invoice Contained No Misrepresentations Material To
        Morgan Stanley..........................................................................................15

    E.     In The Alternative, The Court Should Grant Defendants A New Trial On
        Count Four Because The Verdict Is Against The Weight Of The Evidence .........17

IV.    CONCLUSION.............................................................................................................20

## I.      INTRODUCTION

The Court should set aside the verdict and enter a judgment of acquittal on Count Four of the Indictment because the evidence is insufficient to sustain a conviction.  While the government may have established that the MTD Real Estate Services ("MTD") invoice was misleading, the Court instructed the jury, in an agreed-upon instruction that is now law of the case, that mere falsity was insufficient to sustain a wire fraud conviction.  The government was also required to prove that (a) Defendants Douglas Jemal and Blake Esherick ("Defendants") acted with intent to defraud Joseph Cayre or Morgan Stanley Mortgage Capital ("Morgan Stanley") by obtaining money or property that did not belong to them, and (b) the inaccuracies in the MTD invoice were material.

The government failed to prove either element.  First, the government neither established that Defendants intended to harm Mr. Cayre or Morgan Stanley nor proved any tangible injury to those purported "victims" from which the jury could have inferred an intent to defraud.  The direct evidence of intent established that Defendants used MTD to obtain a commission to which they were entitled in order to avoid the historic difficulties they faced in getting Mr. Cayre to pay legitimate fees and commissions.  The government's failure to prove any tangible injury was clear from the undisputed testimony of Mr. Cayre and Morgan Stanley representative Benjamin Black that neither "victim" suffered any loss as a result of the MTD transaction.  Tr. 2180 (Cayre); 1236 (Black).

Second, the government failed to prove that the inaccuracies in the MTD invoice were material.  Mr. Cayre testified that he agreed to pay commissions of 6% on the 77 P Street project and did not care who received the commissions if they were below that threshold -- as the MTD commission was.  Tr. 2179-80.  Mr. Black testified that the Morgan Stanley loan

agreement did not require Douglas Development to disclose its relationship with MTD or even prohibit Douglas Development from being paid from the loan reserve, Tr. 1267, 1272, rendering the use of MTD to obtain the commission instead of Douglas Development completely inconsequential. The Court should enter a judgment of acquittal because the government failed to prove these two critical elements.

Alternatively, even if the Court somehow concludes that the evidence is sufficient to sustain the conviction when all inferences are drawn in favor of the government, the Court should grant Defendants a new trial on Count Four because the verdict is against the weight of the evidence and permitting it to stand would result in a miscarriage of justice.

## II.    BACKGROUND

Count Four charged the Defendants with violating the wire fraud statute, 18 U.S.C. § 1343, by allegedly devising a scheme to defraud relating to a commercial loan obtained from Morgan Stanley by Cayre Jemal's Gateway, the entity that owned the 77 P Street property. Count Four alleged that the scheme to defraud involved obtaining leasing commissions by way of a false MTD invoice in order to: (a) obtain partnership funds from Mr. Cayre, and (b) obtain funds from Morgan Stanley out of a tenant improvements reserve that was part of the loan.

The first alleged "victim" to testify for the government was Benjamin Black, Morgan Stanley's relationship manager for Douglas Development Corporation ("Douglas Development"). Mr. Black testified that Morgan Stanley did not lose any money in connection with the payment of the leasing commission to MTD. Tr. 1268. Mr. Black further testified that the Morgan Stanley loan agreement neither prohibited Douglas Development from receiving funds out of the tenant improvements reserve at issue nor obligated Douglas Development to disclose its relationship with MTD to Morgan Stanley. Tr. 1267.

The other alleged "victim" to testify was Joseph Cayre, Mr. Jemal's business partner on the 77 P Street project.  Mr. Cayre similarly testified that he did not lose any money as a result of the MTD transaction.  Tr. 2180.  Mr. Cayre also testified that he repeatedly argued with Mr. Jemal about leasing commissions and other fees, which eventually led to an agreement with Mr. Jemal to pay leasing commissions of 6% of the rents obtained on the entire 77 P Street project.  Tr. 2118, 2179.  Mr. Cayre testified that as long as the commissions were less than 6%, he did not care if the commissions were paid to Douglas Development or a third party broker.  Tr. 2179.  Despite their agreement, Mr. Cayre continued to hassle Mr. Jemal over leasing commissions and fees to which DDC was entitled well into 2003.[1]  Although he did not have contemporaneous knowledge of MTD's affiliation with Douglas Development, Mr. Cayre testified that the commissions on the 77 P Street project were less than 6% and that Douglas Development was entitled to the commission reflected in the MTD invoice.  Tr. 2180, 2144, 2151.

## III.     ARGUMENT

### A.     Rule 29 Legal Standard

Federal Rule of Criminal Procedure 29(a) provides in relevant part:

> [A]fter the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

---

[1] See Tr. 2173 ("Q.  Okay.  So as of September 9, 2003, you two were still fussing about commissions; is that correct?  A.   I guess so, yes."); DX 932 (In a September 9, 2003 letter to Mr. Cayre concerning leasing commissions related to the Woodies project, Douglas Jemal wrote: "However, when we mentioned funding our leasing commissions of $500,000, we were told by Dan to wait, that Glen would not allow it.  Why is it that it is so difficult for us to get paid for what we do?").

Fed. R. Crim. P. 29(a). Rule 29(c)(2) provides: "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). In considering a Rule 29 motion, the court must grant relief "'when the evidence . . . is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime.'" United States v. Payton, No. 81-1792, 1982 U.S. App. LEXIS 21154, at *8 (D.C. Cir. Mar. 9, 1982) (quoting United States v. Staten, 581 F.2d 878, 882 (D.C. Cir. 1978) (citation omitted)). While the evidence must be viewed in the light most favorable to the government, the Court is required to take a "hard look at the evidence and accord the government the benefit of only 'legitimate inferences.'" United States v. Recognition Equip., Inc., 725 F. Supp. 587, 588 (D.D.C. 1989) (noting that the court should not "indulge in fanciful speculation or bizarre reconstruction of the evidence" when considering a Rule 29 motion) (citation omitted). "'The trial judge should not allow the case to go to the jury if the evidence is such as to permit the jury to merely conjecture or to speculate as to defendant's guilt.'" United States v. Morrow, No. 04-355 (CKK), 2005 U.S. Dist. LEXIS 11753, at *11 (D.D.C. June 13, 2005) (quoting United States v. Bethea, 442 F.2d 790, 792 (D.C. Cir. 1971)).

### B.    Evidence That The MTD Invoice May Have Been False Or Misleading Is Not Enough To Sustain Count Four

Right before the government's closing argument, the Court gave the following supplemental jury instruction regarding the "claim of right" issue:

> However, if a defendant knowingly submits an inaccurate or misleading document, honestly believing that the inaccuracies are not material, and that he did not intend to defraud, as I have used that term, he is not guilty of mail or wire fraud.

Tr. 4361.  Prior to giving this instruction, the Court confirmed outside the presence of the jury

that the government agreed to this instruction.  Tr. 4356-57.[2]  Thus, the government conceded

that the knowing submission of a false invoice, without more, is insufficient to sustain Count

Four.

        Jury instructions agreed to by the parties are the "'law of the case, and the

evidence must conform to them to support the conviction.'"  United States v. Romero, 136 F.3d

1268, 1272 (10th Cir. 1998) (quoting United States v. Cronic, 900 F.2d 1511, 1515 n.3 (10th Cir.

1990)); see also United States v. Spletzer, 535 F.2d 950, 954 (5th Cir. 1976); United States v.

Staples, 435 F.3d 860, 866 (8th Cir.), cert. denied, 127 S. Ct. 148 (2006); Brooks Transp. Co. v.

McCutcheon, 154 F.2d 841, 843 (D.C. Cir. 1946) (jury instruction "was accepted by both parties

without objection and established the law of the case in this respect.").

        The government's concession did not come until the very end of the case, after

the Court had already resolved the Rule 29 motions filed by Defendants at the conclusion of the

government's case-in-chief.  As a result, the Court has not had an opportunity to review the

sufficiency of the government's evidence in light of the agreed instruction.  See, e.g., Spletzer,

535 F.2d at 954 (judgment of acquittal should have been granted where jury instruction made

specific intent law of the case and there was insufficient evidence of intent); Romero, 136 F.3d at

1271 (conviction overturned because government failed to prove an element of the crime

charged to the jury in agreed-upon jury instruction).

---

[2] Defendants also agreed that the supplemental instruction accurately stated the law on the "claim of right" issue.  Tr. 4356-57.  However, Defendants objected to giving the "claim of right" instruction at all because it was inapplicable in this case, in both a written pleading, filed October 17, 2006, and at the close of the Court's jury instructions.  See Tr. 4345.  For the reasons set forth in detail in Defendants' Rule 33 motion filed herewith, if the Court denies this motion, Defendants are entitled to a new trial because of errors related to the "claim of right" instruction.

The Court's supplemental "claim of right" instruction is fatal to the government's case. There was no real dispute that the MTD invoice and related documents were misleading and concealed Defendants' relationship with MTD.[3]  As this Court instructed the jury, however, this is not enough.  The government had to prove, beyond a reasonable doubt, that Defendants (a) intended to defraud Joe Cayre or Morgan Stanley (i.e. that Defendants "contemplated depriving another of money or property," Tr. 4322), and (b) believed the inaccuracies in the MTD invoice were material.  The law of the case is that if the government did not prove these two elements, then Defendants are "not guilty of mail or wire fraud."  Tr. 4361.  As detailed below, the evidence as to each of these required elements was woefully insufficient.

### C.    The Government Failed To Prove That Defendants Possessed The Requisite Fraudulent Intent To Obtain Money To Which They Were Not Entitled

In order to prove a violation of the wire fraud statute, the government must establish that the defendant engaged in a "scheme or artifice to defraud."  18 U.S.C. § 1343. "[T]he critical element in a 'scheme to defraud' is 'fraudulent intent.'"  United States v. Reid, 533 F.2d 1255, 1264 n.34 (D.C. Cir. 1976) (quoting United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir. 1970)) (quotation marks omitted).  In order to establish that the defendant had the requisite fraudulent intent, the government must show "'that some actual harm

---

[3] Defendant Douglas Jemal contends, however, that the government failed to prove that he participated in the creation of the MTD invoice with knowledge of its falsity.  Dave Medding testified that he received instructions to prepare the MTD lien waiver and wiring instructions for Morgan Stanley from Paul Millstein.  Tr. 868-69.  Kelli McIlwrath and Sabra Quinn, who testified about the circumstances relating to the creation of the MTD letterhead, did not mention any dealings with Douglas Jemal regarding MTD.  Tr. 1155, 1377.  The government introduced no evidence whatsoever that Douglas Jemal had anything to do with the preparation of the MTD invoice or had knowledge of its contents.  This failure of proof is another reason why the Court should enter a judgment of acquittal on Count Four with respect to Mr. Jemal.

or injury was <u>contemplated</u> by the schemer.'" <u>Reid</u>, 533 F.2d at 1264 n.34 (<u>quoting</u> <u>Regent</u> <u>Office Supply</u>, 421 F.2d at 1180); <u>see also</u> <u>United States v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987) (government must, "at a minimum, prove that defendants <u>contemplated</u> some actual harm or injury to their victims").

The harm that the government must prove the defendant intended is "harm to the <u>property rights</u> of their victims." <u>United States v. Stouffer</u>, 986 F.2d 916, 922 (5th Cir. 1993) (emphasis added). "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." <u>Starr</u>, 816 F.2d at 98. Instead, the statute requires "evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful." <u>Regent Office Supply</u>, 421 F.2d at 1182. Whether any injury resulted from the fraud goes to the defendant's fraudulent intent, or lack thereof. <u>See</u> <u>Reid</u>, 533 F.2d at 1264 n.34 ("'proof that someone was actually victimized by the fraud is good evidence of the schemer's intent'") (quoting <u>Regent Office Supply</u>, 421 F.2d at 1181). In this case, there was no evidence that Defendants contemplated any pecuniary harm to Mr. Cayre or Morgan Stanley arising out of the MTD transaction.

## 1.    Defendants Did Not Intend To Defraud Joe Cayre

The government failed to prove that Defendants submitted the MTD invoice with intent to harm Mr. Cayre, deprive him of any money, or otherwise cheat him out of the bargain he had reached with Douglas Jemal with respect to leasing commissions. In this respect, the evidence established at trial was similar to the evidence in <u>United States v. Starr</u>, 816 F.2d 94 (2d Cir. 1987), where the Second Circuit reversed a mail fraud conviction for insufficient evidence that the defendants intended to defraud the alleged victim. In <u>Starr</u>, the defendants were charged

with engaging in a scheme to defraud bulk mailing customers by charging them higher postal rates than the defendants actually paid because defendants "buried" higher rate mailings in lower rate bulk mailings. The defendants charged their customers the correct postage and delivered their mailings as promised, but failed to disclose that they were cheating the Postal Service and did not refund the excess funds to their customers. Id. at 95-97. The court held that while the defendants may have deceived the alleged victims, they did not intend to harm them. Noting that "the harm contemplated must affect the very nature of the bargain itself," the court held that the alleged victims received what they paid for. Id. at 98-99. Because "no evidence of tangible injury was shown from which the jury could infer an intent to defraud," the court reversed the convictions. Id. at 101; see also United States v. Novak, 443 F.3d 150, 159 (2d Cir. 2006) (mail fraud convictions reversed where "contractors received all they bargained for" in connection with the payment of wages to union members, despite defendant union leader's undisclosed receipt of a portion of those wages in kickbacks, because defendant's "conduct did not affect an essential element of those bargains.").

Likewise, in United States v. Jain, 93 F.3d 436 (8th Cir. 1996), the Eighth Circuit reversed the mail fraud convictions of a physician accused of receiving kickbacks in exchange for referring patients to a specific hospital. Although the government alleged that the referred patients were the victims of the fraudulent referral fees scheme, none of the patients received unnecessary or inadequate care and there was no evidence that any patient suffered tangible harm. Id. at 441. The court held that, while actual harm suffered by the victims was not necessary to violate the mail fraud statute, "'the government must show that some actual harm or injury was contemplated by the schemer.'" Id. (quoting United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994)). "When there has been no actual harm, 'the government must

produce evidence independent of the alleged scheme to show the defendant's fraudulent intent.'" Id. at 442 (quoting D'Amato, 39 F.3d at 1257). Because there was no evidence that the defendant intended to harm his patients in any way or that the defendant's patients would have considered the referral fees material given that they did not affect the quality of their medical care, the court reversed the mail fraud convictions. Id.

Similarly, there was no evidence that Mr. Cayre was cheated out of the bargain he reached with Douglas Jemal over leasing commissions, or otherwise deprived of money, from which the jury could have inferred that Defendants intended to defraud Mr. Cayre. The only direct evidence of intent established that Defendants submitted the MTD invoice to avoid the historic disputes that Mr. Jemal had with Mr. Cayre over leasing commissions;[4] not to harm Mr. Cayre or obtain funds to which Defendants were not entitled. During Mr. Cayre's direct examination, the government elicited Douglas Jemal's statement regarding the purpose of MTD: "[H]e sa[id] the reason that I did it that way is because you always break my balls and call me up and scream and holler, so we did it that way, it was within our 6 percent, so what do you care anyway." Tr. 2150. The only other direct evidence of intent was Douglas Development construction vice president Paul Millstein's statement, which the government elicited during the direct examination of David Medding, that MTD was used "so that there just wouldn't be the fighting between the two of them, [and] they could collect the commission that they were entitled to." Tr. 864 (emphasis added). Thus, the direct evidence of intent was utterly inconsistent with any intent to obtain money from Mr. Cayre to which Defendants were not entitled.

---

[4] Mr. Cayre testified that he and Douglas Jemal "fought like cats and dogs" over fees and leasing commissions. Tr. 2117.

In addition, as in <u>Starr</u>, the government introduced "no evidence of tangible injury" to Mr. Cayre "from which the jury could infer an intent to defraud." 816 F.2d at 101; <u>see also</u> <u>Jain</u>, 93 F.3d at 441 (no evidence of actual harm requires independent evidence of intent to defraud). Mr. Cayre testified that he fought repeatedly with Mr. Jemal about commissions until "we finally made an agreement after some time that there would be a 6 percent commission paid, and I really didn't care who it was paid to. [Douglas Jemal] could either take it all or give it all away . . . ." Tr. 2118; <u>see also</u> Tr. 2179 (Cayre: "I didn't care where the money went, as long as it wasn't any more than 6 percent.). Mr. Cayre made clear that this agreement "took into account the entire P Street project" and contemplated Mr. Cayre paying leasing commissions of 6% of the rent negotiated for all of the leases at 77 P Street. Tr. 2179. Mr. Cayre further testified that (a) he did not pay more than 6% in commissions on the 77 P Street project, Tr. 2180; (b) the commission in the MTD invoice "was within the 6 percent guideline that [Jemal and Cayre] worked out," Tr. 2144; and (c) he has not lost "one penny" as a result of the MTD transaction that forms the basis of Count Four. Tr. 2180. This evidence was uncontested and largely elicited by the government during its direct examination of Mr. Cayre. The government offered no other evidence that Mr. Cayre lost money as a result of the MTD transaction.

Mr. Cayre testified that while he was "disappointed" that Defendants used MTD to obtain the commission, Mr. Jemal was nonetheless "entitled to it based upon the 6 percent" agreement and he "[had] no problem with that." Tr. 2151. Thus, any claim by the government that Mr. Cayre would not have paid the commission had he known that MTD was affiliated with Douglas Development is contradicted by the evidence. Even absent that evidence, such a claim would be sheer speculation that is insufficient to support a finding of fraudulent intent. <u>See</u> <u>Novak</u>, 443 F.3d at 159 ("Although the Government insists that the contractors would not have

- 10 -

paid for the no-show hours [to union members] had they been aware that [defendant union leader] would receive a portion of the money, that hypothetical contention is inadequate to support a finding of fraudulent intent.").

In sum, the government failed to prove that Defendants intended to defraud Mr. Cayre, a critical element of the wire fraud offense.

### 2.    Defendants Did Not Intend To Defraud Morgan Stanley

The government also failed to prove that Defendants intended to harm Morgan Stanley or deprive it of money or property.  Again, as in Starr, the government introduced "no evidence of tangible injury" to Morgan Stanley "from which the jury could infer an intent to defraud."  816 F.2d at 101; see also Jain, 93 F.3d at 441 (no evidence of actual harm requires independent evidence of intent to defraud).  Most importantly, "to be absolutely clear for the record," the government elicited from Mr. Black that "Morgan Stanley did not lose any money on this deal."  Tr. 1236; see also Tr. 1268 (Mr. Black confirming on cross-examination that Morgan Stanley did not "lose one penny as a result of this commission payment to MTD").  This direct, undisputed evidence that Morgan Stanley suffered no harm as a result of the MTD transaction is a powerful indication that Defendants did not intend to defraud Morgan Stanley.  No witness testified that Defendants intended to harm Morgan Stanley in any way.

Moreover, the evidence established that there was no way Morgan Stanley could have been defrauded and lost its own money as a result of the MTD invoice, which further demonstrates that the government failed to prove that Defendants acted with intent to defraud Morgan Stanley.  First, the MTD invoice was submitted to obtain money that had already been borrowed from Morgan Stanley by Cayre Jemal's Gateway.  Therefore, Defendants' actions

- 11 -

could not have harmed Morgan Stanley's property interests or obtained Morgan Stanley's money.

Second, there can be no claim that Morgan Stanley would have kept more money at the end of the loan term if Defendants had not obtained the funds through the MTD invoice. Mr. Black testified that if the tenant improvements reserve from which Defendants obtained the MTD commission had not been not spent, those funds would have gone to the borrower, Cayre Jemal's Gateway, not to Morgan Stanley. Tr. 1268. Therefore, Defendants did not obtain funds that would have reverted to Morgan Stanley had they not been spent.

Third, there can be no claim that Defendants obtained the "time value of money" from Morgan Stanley by obtaining the MTD commission earlier than they might have otherwise.[5]  On the contrary, Mr. Black testified that Cayre Jemal's Gateway began paying interest on the entire loan amount, including the tenant improvements reserve, as soon as the loan closed. Tr. 1279. Therefore, Morgan Stanley earned the same interest on the funds that made up the tenant improvements reserve no matter when they were paid.

Fourth, Morgan Stanley could not possibly have lost money as a result of the MTD invoice because the Morgan Stanley loan was secured by a perfected security interest in

---

[5] In his rebuttal closing argument, while conceding that there was no actual loss in this case, the prosecutor made this very argument, stating:

> Well, there was no loss caused in this case.  Ultimately, ultimately there was no loss.  But at the time those acts were done the defendants were getting money to which they were not entitled.
>
> At that particular moment in time Mr. Cayre was deprived of his money and Morgan Stanley was deprived of its money.  Maybe it was for a week or two weeks or four weeks or eight weeks.  And we submit that that is a loss, it is a loss to them of the control of their money.

Tr. 4803.

the 77 P Street building.  <u>See</u> GX 113 (the loan agreement).  The total amount of the Morgan

Stanley loan was $67 million, Tr. 1210, and the appraised value of the 77 P Street building that

served as collateral for the loan was approximately $97 million.  Tr. 1283.  Thus, Morgan

Stanley had a $30 million cushion between the loan amount and its collateral, which protected

Morgan Stanley from any loss associated with the loan.

        Finally, even if despite all of the foregoing the MTD invoice somehow could have

led to a default of the Morgan Stanley loan that was not covered by Morgan Stanley's perfected

security interest in 77 P Street, Morgan Stanley had a final layer of protection to avoid any loss

as a result of the transaction.  Douglas Jemal and Joe Cayre personally guaranteed the Morgan

Stanley loan.  Tr. 1259; <u>see also</u> GX 113 (pp. 331-46).  Therefore, if all else failed, Morgan

Stanley could have sought recourse from Douglas Jemal or Joe Cayre -- whose net worth was

$350 million at the time of these events, Tr. 2156 -- to prevent itself from suffering any loss

related to this transaction.  Indeed, in light of Douglas Jemal's personal guarantee, the

government's entire theory of prosecution related to Morgan Stanley makes no sense because it

essentially required a nonsensical finding that Mr. Jemal intended to steal from himself.

        In sum, because the government has presented absolutely no evidence of injury to

the alleged victims of the purported fraud -- or even any possible injury -- there can be no

corresponding inference that the Defendants possessed the requisite fraudulent intent.

    **D.    The Government Failed To Prove The Materiality Of Any
            Misrepresentations Made By Defendants**

        The government also failed to demonstrate that any misrepresentations in the

MTD invoice were material.  <u>See</u> <u>Neder v. United States</u>, 527 U.S. 1, 25 (1999) (holding that

"materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud

statutes"). In order to be material, a misrepresentation must "ha[ve] 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Id. at 16 (citation omitted). In this respect, there is an important difference between misrepresentations that amount only to deception and those that rise to the level of fraud punishable by the wire fraud statute. "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." Starr, 816 F.2d at 98. Not only, as discussed above, must "the deceit must be coupled with a contemplated harm to the victim," but "the harm contemplated must affect the very nature of the bargain itself." Id. In other words, it must be material.

### 1.    Nothing About The MTD Invoice Was Material To Mr. Cayre

The government failed to prove that any misrepresentations in the MTD invoice were material to Mr. Cayre. In Jain, 93 F.3d at 442, a similar failure of proof led the Eighth Circuit to reverse the defendant's mail fraud convictions. As discussed above, the defendant physician in Jain received kickbacks from a psychiatric hospital for patients he referred, which he failed to disclose to his patients. Id. However, there was no evidence that the patients were harmed or received inferior care, and the court concluded that "[t]here [was] simply no evidence that any patient would have considered Dr. Jain's relationship with [the hospital] material if it did not affect the quality or cost of his services to that patient." Id.

Similarly, there was no evidence that the inaccuracies in the MTD invoice, had they been known to him, would have caused Mr. Cayre to refuse to pay the commission that otherwise fell within the agreement that Mr. Cayre had reached with Douglas Jemal. To the contrary, Mr. Cayre testified explicitly that he simply did not care who received commissions on the 77 P Street project: "we finally made an agreement that there would be a 6 percent

- 14 -

commission paid, and I really didn't care who it was paid to.  [Douglas Jemal] could either take it all or give it all away . . . ."  Tr. 2118.  On cross-examination, Mr. Cayre made clear this six percent agreement took into account the entire 77 P Street project -- i.e. he agreed to pay a commission of six percent of the entire rents negotiated at 77 P Street.  Tr. 2179.  Mr. Cayre also confirmed that as long as the total commission did not exceed six percent he "didn't care where the money went" -- i.e. he did not care "if Douglas Jemal got the money, if brokers [he] never heard of got the money, or if the money went to charity . . . ."  Tr. 2180.

In light of this testimony, misrepresentations in the MTD invoice that concealed the affiliation between MTD and Douglas Development were necessarily immaterial to Mr. Cayre.  Mr. Cayre made it absolutely clear that he did not care if the leasing commissions went to Douglas Jemal or to brokers he had never heard of.  Tr. 2180.  All that mattered to Mr. Cayre was that the commission remain below the six percent threshold.  See Tr. 2118 ("He could either take it all or give it all away, but if it was ever more than the standard 6 percent, . . . I wouldn't pay it and he'd have to pay it out of his own pocket.").  And Mr. Cayre confirmed that the MTD invoice did not result in Defendants obtaining more than the six percent commission to which Mr. Cayre had agreed.  Tr. 2180.  Accordingly, the government failed to prove that any misrepresentations in the MTD invoice were material to Mr. Cayre.

### 2. The MTD Invoice Contained No Misrepresentations Material To Morgan Stanley

The government also failed to prove that any misrepresentations in the MTD invoice were material to Morgan Stanley.  The government asked Mr. Black whether there was anything about the MTD invoice that suggested that the money would be going to a bank account controlled by Mr. Jemal.  Tr. 1227.  However, the government never asked Mr. Black whether it

- 15 -

would have made a difference to him or Morgan Stanley if he knew that MTD was affiliated with Douglas Development or Mr. Jemal -- the critical question regarding materiality.

    Moreover, Mr. Black's testimony on cross-examination established conclusively that MTD's relationship to Douglas Development was not material to Morgan Stanley and would not have influenced Morgan Stanley's decision to pay the invoice. Mr. Black testified that no provision in the Morgan Stanley loan agreement required Douglas Development to disclose its relationship with MTD to Morgan Stanley. Tr. 1267. Mr. Black also confirmed that "there's absolutely nothing in the loan agreement . . . that prohibited Douglas Development from getting money" from the tenant improvements reserve. Id.; see also Tr. 1272 ("Q. So Douglas Development could have, if they were going to themselves do the work that MTD actually did, they could have submitted a bill for the work that MTD did if they had done it, is that correct? A. Yes, I believe that they could have, yes. I mean, yes."). In fact, Mr. Black also testified that he did not even believe that the request for a commission by MTD violated the terms of the loan agreement. Tr. 1267-68. On this record, there is simply insufficient evidence that Morgan Stanley would have altered its conduct or decision-making had it known that MTD was affiliated with Douglas Development.[6]

---

  [6] In its opposition to Defendants' Rule 29 motion at the close of the government's case-in-chief, the government claimed that the misrepresentations in the MTD invoice were material because Defendants needed the money to purchase 111 Massachusetts Avenue. See Government's Opposition To Defendants' Motions For Judgment Of Acquittal at 61-62. The government appears to have confused motive evidence with the concept of materiality. At most, the government's argument suggested that it was important to Defendants to get the MTD invoice paid. But the wire fraud statute requires materiality to be measured by the recipient of the alleged misrepresentation -- i.e. the alleged victim -- not the defendant. See Neder, 527 U.S. at 16. In any event, as the testimony of Jan Peterson made clear, the fact that Defendants had a $450,000 credit available to use at the 111 Massachusetts Avenue closing completely refuted the government's overblown theory of motive by demonstrating that Defendants did not even need the money to purchase that building. Tr. 4191-94.

**E.    In The Alternative, The Court Should Grant Defendants A New Trial On Count Four Because The Verdict Is Against The Weight Of The Evidence**

Even if the Court finds that a judgment of acquittal is not warranted on Count Four, the Court should nonetheless order a new trial because the weight of the evidence does not support the jury's verdict.  Pursuant to Federal Rule of Criminal Procedure 33, the trial court may grant a motion for a new trial when "the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Setting aside a jury's guilty verdict in the interests of justice may be appropriate under circumstances where the evidence brought forth at trial may tangentially support a guilty verdict, but in actuality, 'preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred.'"  United States v. Tarango, 396 F.3d 666, 672 (5th Cir. 2005) (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).  In other words, "[w]here . . . the 'evidence weighs heavily against the verdict,' a new trial may well be warranted."  United States v. Kinard, 788 F. Supp. 36, 38 (D.D.C. 1992) (quoting United States v. Edmonds, 765 F. Supp. 1112, 1118 (D.D.C. 1991)).

In considering a motion for a new trial under Rule 33, "the power of the Court is much broader" than that exercised in connection with a Rule 29 motion.  United States v. Robinson, 71 F. Supp. 9, 10 (D.D.C. 1947); see also United States v. Ruiz, 105 F.3d 1492, 1501 (1st Cir. 1997) ("A district court's power to order a new trial is greater than its power to grant a motion for acquittal."); United States v. A. Lanoy Alston, D.M.D., P.C., 974 F.2d 1206, 1211 (9th Cir. 1992) ("A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal.").  In particular, when considering whether the verdict is against the weight of the evidence, "the Court need not accept the evidence in the light most favorable to the government, [but] may weigh the testimony and may consider the credibility of the witnesses."  United States v. Edmonds, 765 F. Supp. 1112, 1118 (D.D.C. 1991);

United States v. Davis, 103 F.3d 660, 668 (8th Cir. 1996) (in evaluating motion based on the weight of the evidence "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred").

Some courts have characterized their role in deciding a motion for a new trial on the weight of the evidence as that of a "'thirteenth juror,'" who is free to disagree with the jury's evaluation of the evidence and testimony presented at trial.  See Tibbs v. Florida, 457 U.S. 31, 42 (1982) (reversal based on weight of the evidence occurs when "court sits as a 'thirteenth juror' and disagrees the jury's resolution of the conflicting testimony"); Brodie v. United States, 295 F.2d 157, 160 (D.C. Cir. 1961) ("on a motion for a new trial . . . 'the court sits as a thirteenth juror,' and the trial court has broader powers") (citation omitted); United States v. Solorio, 337 F.3d 580, 589 n.6 (6th Cir. 2003) ("'[i]t has often been said that [the trial judge] sits as a thirteenth juror'" in evaluating a Rule 33 motion based on the weight of the evidence) (citation omitted).  Thus, after conducting its own evaluation of the evidence, "[i]f the Court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted." United States v. Robinson, 71 F. Supp. 9, 10 (D.D.C. 1947) (granting new trial); see also United States v. Kelly, 119 F. Supp. 217, 222 (D.D.C. 1954) (same).

If the Court somehow concludes that the evidence, taken in the light most favorable to the government, tangentially supports the jury's verdict on Count Four, the Court should nonetheless order a new trial because the verdict is against the weight of the evidence and would result in a miscarriage of justice if permitted to stand.  The same arguments set forth above in support of Defendants' motion for a judgment of acquittal strongly support a finding that the verdict was against the weight of the evidence.  Most significantly, no one was harmed

- 18 -

by the MTD transaction at issue in Count Four.  The lack of any victims weighs heavily in favor of a determination that there was no crime at all, and thus that the verdict was against the weight of the evidence.  Moreover, there was no evidence that any misrepresentations in the MTD invoice influenced or were capable of influencing the decision-making of Mr. Cayre or Morgan Stanley, rendering any misstatements immaterial.

       The evidence further demonstrated that the purported "victims" in Count Four were eager to do additional business with Defendants despite having full knowledge of the government's allegations in Count Four.  The Court should take this evidence into account when fulfilling its role as a "thirteenth juror" and evaluating whether the verdict was against the weight of the evidence.  Mr. Cayre testified that notwithstanding his knowledge of the criminal charges, he would "probably jump" to do business with Mr. Jemal in the future.  Tr. 2181.  He also testified that he would trust Mr. Jemal to be his partner, Tr. 2181, and that he would be willing to loan Mr. Jemal money in the future without documentation or collateral.  Tr. 2182.  Similarly, Mr. Black testified that he left Morgan Stanley to work for UBS shortly before the trial started. Tr. 1202.  Despite his obvious knowledge of the criminal charges in Count Four and the claim that Defendants defrauded his prior employer in connection with a loan he negotiated, Mr. Black testified that during his first month on the job he engaged in preliminary discussions with Douglas Development about doing new deals with UBS.  Tr. 1268-69.

       Defendants respectfully submit that when the Court weighs all of the evidence without having to draw all plausible inferences in favor of the government, it can only conclude that the verdict is against the weight of the evidence.  Accordingly, the Court should grant Defendants a new trial on Count Four to prevent a miscarriage of justice.

IV.     **CONCLUSION**

        For the foregoing reasons, the Court should set aside the verdict on Count Four of

the Indictment and enter a judgment of acquittal or, alternatively, grant Defendants a new trial.

        Respectfully submitted,

        _____
        Reid H. Weingarten (D.C. Bar #365893)
        Brian M. Heberlig (D.C. Bar #455381)
        Steptoe & Johnson LLP
        1330 Connecticut Avenue, N.W.
        Washington, D.C.  20036-1795
        (202) 429-3000

        Michele A. Roberts
        Jeffrey M. King
        Akin Gump Strauss Hauer & Feld LLP
        1333 New Hampshire Avenue, N.W.
        Washington, D.C.  20036
        (202) 887-4306

        Christopher B. Mead
        London & Mead
        1225 19th Street, N.W.
        Suite 320
        Washington, D.C.  20036
        (202) 331-3334

        Counsel for Douglas Jemal

        Paul Kemp
        Carol Elder Bruce
        Venable LLP
        575 7th Street, N.W.
        Washington, D.C.  20004
        (202) 344-4400

        Counsel for Blake Esherick

Dated:  November 15, 2006

- 20 -