**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 05-359-03 (RMU)** |
| | : | |
| **BLAKE C.  ESHERICK** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, through its attorney, the United States Attorney for the

District of Columbia, respectfully submits this Memorandum in Aid of Sentencing.  It is divided

into two parts:  the first deals with the appropriate guidelines sentence (for Wire Fraud and Tax

Evasion).  The second deals with the consideration and application of non-Guidelines sentencing

factors.

I.  THE GUIDELINES SENTENCE

A.  Overview

The Government commends Probation Officer Renee Moses-Gregory on the preparation

of the Pre-Sentence Report, and has but minor comments on the calculation of the guideline

sentence in this case.  In short, the government submits that the defendant should receive a two-

level enhancement for "sophisticated means," and a two-level enhancement for "vulnerable

victim."  The subsequent Guidelines ranges – presumptively reasonable sentences – would thus

range from 41 to 51 months as found by Ms. Moses-Gregory, to 57 to 71 months if calculated as

suggested by the government.

### B. Determination of the Guidelines for the Wire Fraud Conviction

### 1. The Loss is Over $400,000

The defendant should receive a fourteen-point increase based on the loss amount of approximately $430,000, as recognized in the Pre-Sentence Report. See Report at 9. That loss amount is correct under the facts elicited at trial and pursuant to the application notes to the Sentencing Guidelines. In short, as discussed below, the concept of "intended loss" for purposes of the Guidelines explicitly includes "pecuniary harm that would have been impossible or unlikely to occur." Morgan Stanley sought to avoid "potential pecuniary harm" to its secured loan and in the operation of the Tenant Improvement Construction Reserve by putting in place rigorous procedures associated with distributions from the Reserve, and the defendant's conduct, obtaining money by fraud, threatened the very pecuniary harm Morgan Stanley so rigorously sought to avoid. This conclusion as to the loss arises from the plain reading of the Guidelines.

To start with, the Guidelines state that for purposes of the loss calculation, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, App. Note 2(A). These terms are further defined as follows:

- the Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, App. Note 2(A)(I);

- The Guidelines define "intended loss" as "(I) the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur * * *." Id. App. Note 2(A)(ii) (emphasis added);

-2-

- The Guidelines define "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. App. Note 2(A)(iv) (emphasis added);

- Finally, if the loss cannot reasonably be determined, "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss." Id. App. Note 2(B).

The MTD invoice was intended to obtain $430,000 from Morgan Stanley at a time when the defendants were not entitled to that amount. Morgan Stanley had rigorous procedures for ensuring that funds drawn on the Tenant Improvement Construction Reserve would in fact be spent on tenant improvements. Thus, they insisted on language in the contract to ensure that funds would not go directly to the borrower, which, here, was a partnership between one of the defendants, Douglas Jemal, and Joseph Cayre. Moreover, Morgan Stanley demanded justification from Douglas Development when the company sought to obtain funds directly through the Tenant Improvement Construction Reserve.

The evidence at trial demonstrated that the defendants needed $400,000 immediately to purchase another building, at 111 Massachusetts Avenue; that, at the time of that transaction, Douglas Development was overdrawn on its bank accounts by more than $100,000; and that the MTD fraud provided defendants the keys to the new building on Massachusetts Avenue.

Thus, the defendants intended to obtain $430,000 to which they were not entitled from Morgan Stanley. Their criminal intent and their intended loss is evidenced by the fraudulent MTD invoice and the various iterations of the MTD letterhead; and their decision to have

Michael Rowe—a simple but honest man whom defendants knew would not ask questions—sign relevant MTD-related documents to distance MTD from its true status as an entity connected with Douglas Jemal and Douglas Development.

Defendants have contended that there was no loss intended in this case. Thus, they argued over and over to the jury that they did not commit the offense of wire fraud because they did not intend to cause harm to Morgan Stanley or Joseph Cayre, in that they were entitled to the money in the first place, that they would have gotten the money in the end even without the fraud, that they didn't really need the money because there was cash available at settlement to purchase 111 Massachusetts Avenue, and that Morgan Stanley was never at risk of losing money because the loan was protected by sufficient collateral.

The jury flatly rejected each and every one of those arguments.

Nevertheless, defendants seek to resurrect those arguments at sentencing to avoid the obvious import of submitting a fraudulent $430,000 invoice. But what each one of those arguments has in common is a variant of the following: we can't be responsible for a $430,000 loss because it was "impossible" or "unlikely" for Morgan Stanley or Joseph Cayre to suffer a loss in that amount. But, critically, the Court does not need to accept a defendant's "self-serving assertions at sentencing that he intended no loss * * *." E.g., United States v. Anderson, 68 F.3d 1050, 1054 (8th Cir. 1995). To the contrary, the defendant's conduct inherently put Morgan Stanley at risk that the Tenant Improvement Construction Reserve would be short by $430,000 – this was a "potential result"and no amount of arguments to the contrary alters this conclusion.

Moreover, defendants' argument is foreclosed by the plain, straightforward language of the Guidelines. As described above, the guidelines define "intended loss" to include "pecuniary

harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, App. Note

2(A)(ii) (emphasis added). Thus, defendants are precluded from arguing that the loss was not

$430,000 because, for example, the Cayre-Jemal partnership would have obtained any unspent

Tenant Improvement funds: even if that were true, and even if it meant that an actual loss to

Morgan Stanley was less likely under the circumstances, the Guidelines calculation of $430,000

would still apply. Those are all just arguments to the effect that a loss to Morgan Stanley or

Cayre was unlikely or remote or even, in defendants' minds, impossible. Under the Guidelines,

that position is irrelevant and immaterial to the loss calculation.

Indeed, arguments exactly like those raised by the defendants have been rejected outright

as being contrary to the Guidelines. See United States v. Younes, 194 Fed. Appx. 302, 2006 WL

2567481 (6th Cir. Sept. 5, 2006), cert. denied, 127 S. Ct. 699 (2006). In Younes, the defendants

were convicted of, among other things, wire fraud for their activities in running a for-profit

vocational school that received federal financial aid. Thus, the defendant and his coconspirators

> "(1) supplemented student files with fake high school diplomas, GED scores, or
> [other] test scores (even when the students might have possessed proper
> documentation at home), and (2) indicated that students had enrolled in travel and
> computer classes [which were eligible for federal financial aid] when in fact they
> had enrolled in ESL [which was not eligible]. The government also argued * * *
> that [one of the defendants] sent false reports to [the school's] accrediting body
> * * *." Younes, 194 Fed. Appx. at 305.

At sentencing, the government arrived at a loss figure of $866,000 based on spreadsheets

reflecting Education Department disbursements for "(1) students with fraudulent documents in

their files, (2) students enrolled in certain classes ineligible for government aid, and (3) students

whose attendance had been falsified * * *."  Id. at 315.[1]

Raising arguments of the same nature advanced by the defendants here, one of the

defendants in Younes argued that the trial court erred in calculating the loss because

> "some of the students on the spreadsheet were actually eligible for financial aid
> because, for example, some students graduated from high school or had
> equivalent degrees, even though their files at [the defendants' school] were
> supplemented by false documentation.  Those students' eligibility * * * makes it
> impossible for the government to have suffered a loss (since the students could
> have received the money anyway), and that impossibility means the district court
> erred by including those sums in the 'intended loss.'"  Id. 315-16 (emphasis
> added).

In other words, the defendant in Younes was contending, don't calculate the loss amount to

include financial aid given to students who may have been entitled to receive financial aid, even

though false and fraudulent documentation was used to obtain that financial aid.  The Sixth

Circuit affirmed the trial court's rejection of that argument, noting that 2001 amendments to the

Sentencing Guidelines "'clarified that intended loss 'includes intended pecuniary harm that

would have been impossible or unlikely to occur.'"  Id. at 316 (quoting United States v.

Anderson, 353 F.3d 490, 505 n.13 (6th Cir. 2003)).

Here, exactly like in Younes, the defendants submitted false and fraudulent paperwork to

Morgan Stanley to obtain money.  Exactly like in Younes, the defendants here object to including

in the loss calculation the money obtained through false and fraudulent paperwork on the ground

that they were entitled to the money at that time (because of an agreement with Joseph Cayre) or

at a subsequent time (after construction was complete and in the event there were left over

Tenant Improvement funds).  And exactly like the trial court and appeals court in Younes, the

---

[1]     Based on defense arguments, the trial court arrived at a loss figure of $793,325.
Younes, 194 Fed. Appx. at 315.

defendants' similar arguments here should be rejected as contrary to the Guideline provision including "unlikely or impossible" losses as in fact losses.

Finally, pursuant to the Guidelines, if the Court were to determine that, given any uncertainties, the loss cannot be reasonably be determined, it should use the amount of the gain to the defendants as a measure of the loss.  See U.S.S.G. § 2B1.1, App. Note 2(B).  Here, the gain to the defendants was $430,000, based on the amount they were able to obtain from Morgan Stanley through the false and fraudulent MTD invoice seeking reimbursement for "representing" the District of Columbia's Department of Transportation.

## 2.  Sophisticated Means Were Used

The "sophisticated means" adjustment under §2B1.1(b)(8)(C) is required in this case. The defendants committed the following acts to accomplish the fraud and avoid detection:

- creation of a false and misleading memorandum to Cayre informing him of commissions from the TI to "outside brokers;"

- careful creation of false MTD letterhead, crafted to suggest that MTD was a legitimate firm unrelated to Douglas Development or Douglas Jemal so as to avoid questions or scrutiny from Morgan Stanley or Cayre; this letterhead went through several drafts to accomplish maximum deceptive effect;

- creation of a false invoice from MTD to the partnership entity, purportedly for representing the DC Government in securing space at 77 P Street; this document was utterly false and was marked as "approved" by Esherick for payment;

- opening of a MTD bank account at Adams Bank;

- obtaining Michael Rowe's signature on the lien release;

- preparation of a memorandum, purportedly from Rowe to Medding, informing Medding of the Adams Bank MTD account number (when, in truth, Rowe had no idea of the existence of this account);

- preparation of a subsequent lulling letter from Brownell to Cayre, informing Cayre that: "We have accelerated this [buildout] process as if we were the ones receiving all of the buildout funds, when we in fact realize <u>that all of it is going to you</u>;"

- wiring funds directly from the MTD account to the account of a settlement attorney (within 24 hours), so as to further conceal the transaction and the disposition of the funds so acquired.

This course of conduct falls squarely within the contemplation of the "sophisticated means" enhancement. As the Application Notes to the Guidelines provide:

> "'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. * * * Conduct such as <u>hiding assets</u> or transactions, or both, through the use of <u>fictitious entities</u>, <u>corporate shells</u>, or offshore financial accounts also ordinarily indicates sophisticated means."

§2B1.1, App. Note 6(B) (2002 ed.) (emphasis added). Though the examples of the Application Note are illustrative, the example provided in the Guidelines – namely, the use of a sham or shell corporation to accomplish the crime and avoid detection – applies to the fraud in this case. As one District Court has stated:

> "The use of offshore bank accounts implies that the perpetrator has used a means that will protect his or her identity. Similarly, 'transactions through corporate shells' implies conducting business through corporate entities <u>designed to shield the identity of the</u>

> ultimate controlling person(s) or decision maker(s). In both
> instances, the examples describe 'means' that are 'sophisticated' at
> protecting against the discovery of the scheme or the identification
> of the person responsible for or benefitting from the fraudulent
> scheme.

United States v. Lewis, 907 F. Supp 683, 686 (S.D.N.Y 1995) (emphasis supplied).  In this case,

the defendants used the corporate shell of MTD precisely "to shield the identity of the ultimate

controlling person(s) or decision maker(s)" and to "protect[] against the discovery of the scheme

or the identification of the person responsible for or benefitting from the fraudulent scheme."

Moreover, the "sophisticated means" enhancement applies in that the overall fraud

scheme is intricate, even if no particular step were particularly elaborate.  See, e.g., United States

v. Halloran, 415 F.3d 940 (8th Cir. 2006) (affirming enhancement for sophisticated means even

where "certain aspects of [the] scheme were not especially complex or especially intricate,"

because scheme was "sophisticated," involved a "series of fraudulent transactions," used a

"corporate entity [and] numerous fraudulent documents" and forged signatures); United States v.

Jackson, 346 F.3d 22, 25 (2nd Cir. 2003) ("[E]ven if each step in the scheme was not elaborate,

the total scheme was sophisticated in the way all the steps were linked together so that Jackson

could perceive and exploit different vulnerabilities in different systems in a coordinated way.").

Similarly, the defendants in this case used a false corporate entity, numerous fraudulent

documents, and obtained the signature of Michael Rowe – essentially a forgery in that it

represented that Rowe was a principal in MTD –  precisely to "exploit different vulnerabilities"

of Morgan Stanley and Joseph Cayre "in a coordinated way."  The sophistication of the

defendants' conduct thus warrants the two-level adjustment under §2B1.1(8)(C).

3. The "Vulnerable Victim" Enhancement Applies.

The government urges a two-level increase for "vulnerable victim." In this case, Esherick (and Jemal) targeted Michael Rowe to facilitate the crime of conviction. They had Mr. Rowe sign the lien release and used his name on a memo purportedly providing Morgan Stanley with wiring instructions.[2] These documents were required by Morgan Stanley to release the funds it controlled in escrow.[3]

The Court and jury observed Mr. Rowe testify. Mr. Rowe's demeanor was of a very decent, simple, gullible, trusting individual, and, with due respect to Mr. Rowe, it was apparent there were aspects of his personality that would have made it obvious to the defendants that they

---

[2]    The "vulnerable victim" is not required to be the named victim of the offense of conviction. See, e.g., United States v. Bachynsky, 949 F.2d 722, 735 (5th Cir. 1991), cert. denied, 506 U.S. 850 (1992) (in prosecution of physician for submitting false diagnoses to third parties to obtain reimbursement, unknowing patients were vulnerable victims even though insurance companies and the Department of Defense were defrauded); United States v. Echevarria, 33 F.3d 175, 180 (2nd Cir. 1994) (in prosecution of defendant for falsely representing self as doctor and obtaining Medicare reimbursements, exploited patients were vulnerable victims even through economic impact was on the government (following Bachynsky)); United States v. Yount, 960 F.2d 955, 957 (11th Cir. 1992) ("vulnerable victim" enhancement applies in prosecution of bank officer for money laundering of funds stolen from elderly bank account holders even though they were not "victims" of the offense of conviction); United States v. Haggard, 41 F.3d 1320, 1325 (9th Cir. 1994) (in prosecution of prisoner for false statements for claiming to know where a body was buried, family members were vulnerable victims even though the harm caused to them was not an element of the any of the crimes of conviction: "[C]ourts may look beyond the four corners of the charge to the defendant's underlying conduct in determining whether someone is a 'vulnerable victim' under section 3A1.1."); United States v. Cruz, 106 F.3d 1134, 1136 (3rd Cir. 1997) (vulnerable victim enhancement applied with respect to twelve year old passenger in carjacking: "except for the Sixth Circuit, all of the circuits that have considered this issue have held that the vulnerable victim does not have to be the victim of the offense of conviction.").

[3]    Rowe had no knowledge of the significance of the lien release, the existence or use of the bank account, the wiring information, the wiring information memorandum, the purposes to which those documents were to be put, the "operations" of MTD, the funds collected by MTD, or any other aspects of MTD. Tr. 1298-1301.

could easily exploit him and induce him to sign documents, the contents about which Mr. Rowe would have no idea.  In essence, the defendants, in a truly calculated, cynical and callous fashion implicated Mr. Rowe as a participant in their fraud scheme.  It is noteworthy that even the defense counsel described Mr. Rowe as being a "poor man" who had been "hit one too many times" – treating him as an object of scorn if not derision, and clearly of diminished mental stature.

> Mr. Rowe, Mike Rowe.  Mike Rowe, the victim.  I wrote it down to pull out the transcript because I didn't want to get this wrong.  It's the prosecutor's view that they, meaning Douglas Development, specifically meaning Douglas, took advantage of that poor man.  And I think this is one we should spend a couple minutes on, because I think this sort of really catches the different viewpoints here.
>
> Who is Rowe.  We laughed on occasion when Rowe was here.  He said some funny things.  Maybe he was hit one too many times when he was playing with the Colts or doing kickboxing, maybe not.

Trial Tr., October 19, 2006 at 4498-99.

### C.  Guidelines Calculation for the Tax Evasion Convictions

#### 1. Considerations Related to Relevant Conduct

The Guidelines for tax prosecutions are determined on the basis of the "relevant conduct."  Typically, and in this case, that conduct involves a course of actions that spans several years and requires the examination of several years of conduct and tax returns.[4]  The requirement

---

[4]    In each of the following cases, the court has applied the above application note in affirming or determining the sentence of the defendant based on a tax loss for years in addition to the charged years of evasion:

• United States v. Feola, 275 F.3d 216, 218  (2nd Cir. 2001) (defendant's Guidelines calculated based on tax loss for the entirety of conduct from 1996 through 1999,

of considering the relevant conduct is squarely set forth in the Guidelines.  The Sentencing

Guidelines, at § 2T1.1, App. Note 2, requires:

> In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), **all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated**.  The following examples are illustrative of conduct that is part of the same course of conduct of common scheme or plan: (a) there is a continuing pattern of violations of the tax laws by the defendant; (b) the defendant uses a consistent method to evade or camouflage income, e.g., backdating documents or using off-shore accounts; (c) the violations involve the same or a related series of transactions; (d) the violation in each

---

> even though he pleaded guilty to a single count of failure to file a 1998 tax return);

- United States v. Codner, 2000 WL 373791 (10th Cir., April 12, 2000) at *4  (tax loss determined on the basis of uncharged conduct from 1992 through 1996 in addition to the charged conduct from 1988 through 1991);

- United States v. Bove, 155 F.3d 44, 46-48  (2nd Cir. 1998) (tax loss determined by including uncharged year (1992), in addition to charged year (1993));

- United States v. Babcock, 1995 WL 437936 (8th Cir.) (July 7, 1995) at *1 (tax loss included uncharged tax year 1991 in addition to charged tax years 1992 and 1993);

- United States v. Pierce, 17 F.3d 146, 150 (6th Cir. 1994) (tax loss included conduct from 1981 through 1990, even though the tax evasion charges in the indictment went from 1985-1987);

- United States v. Meek, 998 F.2d 776, 778-79 (10th Cir. 1993)  (tax loss included uncharged tax years 1984-1986 and 1989-1991, in addition to charged tax years 1987 and 1988, for which the defendant was convicted);

- United States v. Hollier, 321 F. Supp. 2d 601, 602 (S.D. N.Y. 2004) (tax loss included uncharged tax years 1993, 1994 and 1995 in addition to the three years for which defendant was indicted (1996-1998));

- United States v. Rabin, 986 F. Supp. 887, 890 (D.N.J. 1997) (tax loss determined on the basis of entire conspiracy, spanning 1981 through 1993, rather than charged years of 1990 through 1993).

-12-

instance involves a false or inflated claim of a similar deduction or credit; and (e) the violation in each instance involves a failure to report or an understatement of a specific source of income, e.g., interest from savings accounts or income from a particular business activity.  These examples are not intended to be exhaustive.

Esherick's Guidelines must thus be determined based on relevant conduct that spans from 1999 through 2004.  This includes uncharged conduct (for calendar years 1999, 2000, and 2004) and acquitted conduct (for calendar year 2003).[5]

> 2.  The Nature of the Conduct in the Tax Years from 1999 through 2004

There are two aspects of the relevant conduct: first, the false deductions for mortgage interest and state taxes, and second, unreported income.  The amounts of false deductions and the amounts of unreported income are easily determined, and have been appropriately determined by Ms. Moses-Gregory.

> a.  The False Mortgage and State Property Tax  Deductions

For calendar years 1999 and 2000 (as well as 2001 and 2002, the years of conviction), Esherick claimed false deductions for mortgage interest and property taxes.[6]  In 1999, he

---

[5]        The Court must make a determination as to relevant conduct.  A sentence is otherwise subject to being reversed. See United States v. Hayes, 322 F.3d 792 801-02 (4th Cir. 2003) (sentence reversed where Court failed to consider government's contention that tax loss was in excess of $274,000 (based on non-convicted conduct) where court relied solely on the tax loss of $75,814 based on the counts of conviction); United States v. Ross, 2005 WL 2185543 (11th Cir., Sept. 12 2005) (sentence of tax preparer for preparation of false returns reversed where Court failed to take into account evidence of defendant's tax fraud in relation to non charged events, and limited sentence solely to the tax loss attributable to two counts of the indictment to which the defendant pleaded guilty).

[6]        Attached to this pleading are pertinent pages of the following  Esherick's returns for 1999 (GX 22), 2000 (GX 24), 2001 (GX 26), 2002 (GX 28), 2003 (GX 30), and 2004 (GX 34) – these are attached as Exhibit 1 –  as well as the amended returns for 2001 (GX 33) and 2002 (GX 32) (attached as Exhibit 2).  The returns for 1999 through 2002 were introduced into evidence.  The returns for 2003, 2004 and the amended returns, all filed in 2005, were not.

claimed over $26,800, Exh. 1, GX 22-0003, and in 2000 he claimed over $30,000. Exh. 1, GX

24-0003. In addition, Esherick claimed comparable false deductions for the years of conviction.

There is no contention that Esherick was entitled to the itemized mortgage interest and real estate

tax deductions. These false deductions, for each of the years 1999, 2000, 20001 and 2002 were

bald acts of fraud, designed to steal from the people of the United States. Notably, when in 2005

Esherick filed amended returns for 2001 and 2002 – to be discussed – he did not at that time

correct the false deductions but continued to claim false deductions and thereby perpetuate his

fraud on the United States.

b.  The Unreported Income

For calendar years 2000, 2003 and 2004 (as well as 2001 and 2002, the years of

conviction), Esherick received as income: a) housing, b) direct payments from his employer

(Douglas Development Corporation (DDC)) to his ex-wife, c) the provision of or payments

toward personal automobiles, and d) checks directly payable from DDC to Esherick personally,

recorded on DDC's books as loans.

There is no question that the bulk of these payments were in fact income to the defendant,

and the defendant has admitted as much in his amended tax returns. Thus:

• Calendar year 2001 Esherick filed an amended return in 2005 reporting an

increase in his 2001 adjusted gross income of **over $66,000** – from $66,000 to

over $132,000 – and an increased tax that he owed of over $18,569. Exh. 2,

GX 33-1, -2. As part of the return, Esherick stated: "The original return failed to

This Court will recall that for 2002, for example, Esherick claimed taxable income, after
deductions, of $305 and a tax due and owing of $0.

include <u>imputed income for value of housing</u> provided to the taxpayer, for vehicle allowances, <u>for child support payments made on behalf of the taxpayer</u>, and for the imputed value of a below market loan." Exh. 2, GX 33-7 (emphasis supplied).

- <u>Calendar year 2002.</u> Esherick filed an amended return in 2005 reporting an increase in his 2002 adjusted gross income of **over $55,000** – from $66,000 to over $121,000 – and an additional tax that owed of over $15,000. Exh. 2, GX 32-001,-002. As part of the return, Esherick again stated: "The original return failed to include imputed income for value of housing provided to the taxpayer, for vehicle allowances, for the imputed value of a below market loan ... and for unreported company reimbursements." Exh. 2, GX 32-0008.

- <u>Calendar year 2003.</u> In 2005, Esherick filed a (late) 2003 return. Esherick reported an increase in his reported compensation of **over $36,000** above the amount previously reported on the original W-2 submitted to the IRS. The return included an amended W-2, which reported Esherick's income as $102,220.15 instead of the $66,000 originally reported to the IRS. Exh. 1, GX 30-0003.[7]

- <u>Calendar year 2004.</u> Esherick filed his 2004 return, in which he reported an

---

[7]     Because decisions as to the application of the sentencing guidelines are based on a "preponderance" standard and not the "beyond a reasonable doubt" standard, the court may appropriately consider the 2003 tax year as part of its determination of relevant conduct, even though Esherick was acquitted on that particular count. <u>United States v. Dorcely</u>, 454 F.3d 366, 372-73 (D.C. Cir. 2006) (sentence based on acquitted conduct). <u>See also</u>, <u>United States v. Watts,</u> 519 U.S. 148 (1997) (affirming sentencing enhancement for possession of firearm despite acquittal on firearms charges); <u>United States v. Boney</u>, 977 F.2d 624, 635 (D.C. Cir. 1992) (drug sentence based on .199 grams of cocaine for which the defendant was convicted of distributing, as well as 12.72 grams for which the defendant was acquitted of possessing with intent to distribute; defendant sentenced in 63 to 78 month range instead of 10 to 16 month range).

increase in his reported compensation of **over $53,000** above the amounts

previously reported on the W-2 submitted to the IRS.  The return included an

amended W-2, which reported Esherick's income as $120,984 instead of the

$67,269.19 originally reported.  Exh 1, GX 34-003, -004. [8]

Furthermore, there is little question the things of value provided to Esherick from his

employer – housing, vehicles, payments to his ex-wife – were intended to constitute

compensation at the time.  First, he has admitted they were income.  Moreover:

- From 1998 through 2004, Esherick, the second highest official at Douglas Development, received $70,200 per year without receiving salary increases; this amount was far below the market value of his services; it has no relationship whatsoever to Esherick's value to the company and Douglas Jemal, and it belies credibility that he would work seven years without so much as a dollar increase or bonus.

- On the books, Esherick was paid barely more than the DDC employee who took care of DDC's vehicle fleet, and far less than individuals at DDC (like David Medding) who Esherick far outranked.

- During this period of time, despite reporting his income to the IRS as $66,000 per

---

[8]    Defense counsel, in open Court, argued that certain of the income items may have been gifts, when the defendant, on documents signed under penalties of perjury and submitted to the IRS, has acknowledged these items of value to be income.  For ease of trial management and to avoid attorney-client issues, this fiction was endured at trial, even though it was profoundly exploited by the defense counsel, but at sentencing it is necessary to deal with reality, and in this case, the defendant's admission that he received income, even though disputed at trial, is dispositive and ends the inquiry.

year, Esherick represented his income to other institutions as follows:[9]

| Date | Institution/Purpose | Reported Income |
|------|---------------------|-----------------|
| 2000 | Bank of America/Credit Card Application | $115,000 |
| 2001 | Bank of America/Credit Card Application | $150,000 |
| 2003 | Montgomery County Maryland Court | $150,000 |
| 2004 | Bank of America/Credit Application | $200,000 |
| 2004 | Bank of America/Credit Card Application | $150,000 |

• In addition, Esherick is a skilled accountant. He had worked for a large accounting firm and had worked in senior accounting positions. He well knew how to keep track of his income, and well knew what his income was.

• After Esherick was put on notice he was under investigation – in late 2004 – his salary was increased to $300,000 effective January 1, 2005 – providing true indication of his value to his employer and providing evidence of his true prior compensation. His salary was subsequently increased to $350,000.[10] Esherick's total income for 2005 was in excess of $700,000. Similarly, in June 2005, Esherick received a one-time payment of approximately $245,000 (net), 2005. Upon his receipt of these funds, he issued a check back to Douglas Development

_____

[9]      The various documents are attached to this pleading as "Exhibit 3 ."

[10]      A documents obtained from DDC by subpoena reflecting this increase is attached as "Exhibit 4."

of that same amount, thus "repaying" outstanding "loans" of that amount.[11]

This unreported **income** (as conceded by the defendant in his amended returns) and the false deductions (as easily proved and not disputed) satisfy not just one but nearly each of the five criteria set forth for consideration of such conduct as "relevant conduct" as contemplated by the Guidelines.  These actions  (a) are of  "a continuing pattern," (b) reflect "consistent method(s)," and (c) involve "a related series of transactions."  In addition, for 1999 through 2002, the violations in each instance (d) "involve[d] a false or inflated claim of a similar deduction or credit (false mortgage interest and state tax deductions), and (e) "involve[d] a failure to report *** a specific source of income," e.g., housing, purported loans, payments to Esherick's ex-wife, and automobiles.

### 3.  The Tax Loss is Easily Greater that $80,000

Thus, using simply the dollar figures that come straight from Esherick's returns – the approach of Ms. Moses-Gregory – the tax loss in this case is from $80,000 through $200,000, or Guideline Level 16 (21 to 27 months).[12]

### a.  The "Easy Way" of Demonstrating a Tax Loss in Excess of $80,000

There are several ways of arriving at the overall tax loss.  The first, and easiest, is simply to use Esherick's own representations as to his additional income that he included in the returns he filed in 2005, and add the false deductions as to mortgage interest and state property taxes.  This is the approach properly used by Ms. Moses-Gregory.  If so, the tax loss would be calculated

---

[11]    Documents reflecting this transaction are attached as "Exhibit 5."

[12]    This guideline range corresponds to unreported income or false deductions amounting from about $286,000 to $714,000.  See § 2T1.1(c) Notes (A) and (B) (tax loss computed at 28% of the unreported deduction of value of false deduction).

as follows:

| Year | False Deduction/Declared Additional Income | Amount (False Deductions) | Amount (Unreported Income) |
|---|---|---|---|
| 1999 | False Mortgage Interest and State Real Estate Tax Deductions (GX 22-003) | $31,812 | |
| 2000 | False Mortgage Interest and State Real Estate Tax Deductions (GX 24-003) | $31,057 | |
| 2001 | False Mortgage Interest and State Real Estate Tax Deductions (GX 26-003) | $30,952 | |
| | Additional Reported Income per amended W-2 (GX 33-02) | | $66,363 |
| 2002 | False Mortgage Interest and State Real Estate Tax Deductions (GX 28-003) | $30,467 | |
| | Additional Reported Income per amended W-2 (GX 32-001) | | $55,398 |
| 2003 | Additional Reported Income per amended W-2 (GX 30-003) | | $36,220 |
| 2004 | Additional Reported Income per amended W-2 (GX 34-003) | | $53,715 |
| | TOTALS | $124,288 | $211,696 |
| TOTAL FALSE DEDUCTION AND ADDITIONAL REPORTED INCOME | | | $335,984 |
| **TAX LOSS  PER GUIDELINES:** **$335,984 x .28** | | | **$94,075** |

This way of calculating the sentencing guidelines relies <u>solely</u> on <u>Esherick's own</u>

admissions plus the clearly false mortgage interest and state property tax deductions for 1999

through 2002.  In addition, there is certainly "state tax loss" that should properly be included in

the above analysis as relevant conduct.   This yields a tax loss in excess of $80,000, for a

guidelines level of 16.   This is how Probation Officer Moses-Gregory determined the tax loss in

this case, and it is a straight-forward method that involves virtually no fact-finding by the Court.

### 2. The "Hard Way"

The government maintains that the true tax loss is far greater, and consists of all the funds

that were provided to Esherick by DDC, or payments on his behalf or for his benefit, including

payments directly to Esherick that were claimed at trial to be loans.  The government maintains

that the amount of unreported income and false deductions amounts to over $600,000, with a

total tax loss of close to $175,000.  Thus, the government calculates Esherick's unreported

income and false deductions as follows:[13]

| Year | False Tax Deductions | Unreported Income | Total |
|------|------|------|------|
| 1999 | $26,812 | | |
| 2000 | $31,057 | $55,240 | $86,297.00 |
| 2001 | $30,952 | $82,011.50 | $112,963.50 |
| 2002 | $30,467 | $100,388 | $130,855.00 |
| 2003 | | $112,214.23 | $112,214.23 |
| 2004 | | $157,560 | $157,560.00 |
| | $119,288 | $507,413.73 | $626,701.73 |
| **TAX LOSS COMPUTATION:** | | | |
| **$626,701 x .28 = $175,476** | | | |

The supporting documentation for these calculations is found in the appendices attached to this pleading.  Even at a tax loss of $175,476, however, the guideline range remains at Level 16.

### D.  Conclusion

The Government hereby sets forth the various Guidelines calculations consistent with the arguments set forth above.

---

[13]    The supporting schedules are attached to this pleading as Exhibit 6.  The schedules are necessarily approximate in certain aspects, but the approximations are not in any way material to the overall conclusion.  For example, in 2004, Esherick's employer purchased a Mercedes station wagon for Esherick's personal use.  There can be no serious claim this involved the business use of an automobile.  This is not included as income.

1.  If the Court finds "Sophisticated Means" and "Vulnerable Victim"

1)  Sentence for Wire Fraud (COUNT FOUR)
      2B1.1  Fraud
              (a)(2)Base Offense Level          6
              (b)(1)(H) Loss in excess of $400,000    14
              (b)(8)(C) Sophisticated Means      2
      3A1.1(b)    Vulnerable Victim        2
      Total                                    24

2)  Sentence for Tax Evasion (COUNTS FIVE AND SIX)
      2T4.1 (F) Excess of $80,000 Tax Loss    16
      Total                                    16

Grouping Rules.  Under § 3D1.4 "one unit" is assigned to the wire fraud conviction (the offense with the highest level), and ½ unit to the tax evasion offense (five to eight offense levels less than wire fraud).  This yields 1½ units, and results in an increase of one guideline levels to the group with the highest level (wire fraud), for a total offense level of **25** (57-71 months).

2.  "Sophisticated Means" and No "Vulnerable Victim"

1)  Sentence for Wire Fraud
      2B1.1  Fraud
              (a)(2)Base Offense Level          6
              (b)(1)(H) Loss in excess of $400,000    14
              (b)(8)(C) Sophisticated Means      2
      Total                                    22

2)  Sentence for Tax Evasion
      2T4.1 (F) Excess of $80,000 Tax Loss    16
      Total                                    16

Grouping Rules.   Under § 3D1.4 "one unit" is assigned to the wire fraud conviction (the offense with the highest level), and ½ unit to the tax evasion offense (five to eight offense levels less than wire fraud).   This yields 1½ units, and results in an increase of one guideline levels to the group with the highest level (wire fraud), for a total offense level of **23** (48-57 months).

3.  Neither "Sophisticated Means" nor "Vulnerable Victim"

Finally, if the Court were to adopt the recommendation of the Probation Officer, and not

find either "sophisticated means" or "vulnerable victim," then the Guidelines would be calculated as set forth by Ms. Moses-Gregory, at level **22** (41-51 months).

Thus, the Guidelines for Wire Fraud is either level 20 – at a minimum – as found by Ms. Moses-Gregory, or level 22 (plus Sophisticated Means) or level 24 (plus Vulnerable Victim) as urged by the Government. The Guidelines for Tax Evasion is level 16 – as found by Ms. Moses-Gregory. Under the Grouping Rules, therefore, the resulting sentencing is either level 22 as found by Ms. Moses-Gregory, level 23 (if the Court finds sophisticated means) or level 25 (if the Court finds sophisticated means and vulnerable victim).

II.  FACTORS UNDER 18 U.S.C. 3553 RELATED TO THE IMPOSITION OF SENTENCE, FACTORS RELATED TO THE IMPOSITION OF TERMS OF SUPERVISED RELEASE AND CONSIDERATION OF GROUNDS FOR UPWARD DEPARTURE

A.  Term of Incarceration

The possible sentences discussed above, in the range of 41 months (at the lowest end of the lowest range found by the Probation Officer)  to 71 months (at the highest end of the highest range argued by the government) are absolutely proper in this case.

This Court heard evidence tdemonstrating that when it came to matters of money, Mr. Esherick had a callous and calculating dishonest streak. This is typified most clearly by his tax returns, where he falsely claimed tax deductions for mortgage interest and state taxes. This conduct is simple thievery – perpetrated year after year –  and speaks volumes about who Esherick really is. The defendant engaged in such conduct because he was greedy, because he believed the United States of America was an easy victim, because he was selfish, because he had a sense of entitlement, because he had no empathy for those who actually do pay their taxes, and because he believed he could get away with it.

Similarly, the MTD invoice reflected weeks of dishonest planning and offers a window into how his mind operated, as he directed the preparation of a series of drafts of the false MTD invoice and related documents. This document was carefully designed to deceive both Morgan Stanley and Jemal's partner, and to minimize the risks of detection. Finally, this Court well knows that Esherick prepared a series of dishonest invoices that were submitted to the D.C. Government. Though these did not result in criminal convictions, they were in fact dishonest, and were designed to enrich Douglas Jemal and to ingratiate himself with Douglas Jemal.

Applying the factors listed in 18 U.S.C. §3553, therefore, the sentence suggested above, and derived from the guidelines, is appropriate, and, more important, it is reasonable.

Under 18 U.S.C. §3553(a)(1), such a sentence appropriately takes into consideration "the nature and circumstances of the offense," namely, the numerous calculated and dishonest efforts to perpetrate a $430,000 fraud and annual tax crimes. The Wire Fraud scheme required numerous steps, careful coordination, and the recruitment of Michael Rowe. It was not a crime of impulse or opportunity. Such a sentence likewise takes in to account the annual tax frauds on the U.S. Government.

Similarly, under 18 U.S.C. §3553(a)(1), such a sentence also appropriately takes into account "the history and characteristics of the defendant." In this regard, Esherick committed a series of dishonest acts, designed to enrich himself and others. The crimes are hardly those of a "first offender," rather, they are the crimes of an individual who has finally been prosecuted.[14]

For the same reasons, under 18 U.S.C. § 3553((a)(2), such a sentence appropriately

---

[14]     Though Esherick was not convicted of the corruption counts, the evidence demonstrated a series of dishonest encounters with Michael Lorusso and Esherick's preparation of dishonest documents for submission to the D.C. Government.

reflects "the seriousness of the offense, promote[s] respect for the law, and [] provide[s] just punishment." It would not fairly characterize the seriousness of the defendant's conduct, his penchant for fraud, and the crimes of conviction to sentence him other than to a meaningful term of incarceration. Indeed, it would invite disrespect for the law if, having been convicted of three serious felonies, the defendant did not receive meaningful punishment.

Accordingly, the government maintains that a sentence of incarceration within the Guidelines ranges discussed above is reasonable and reflects an appropriate consideration of the requirements of 18 U.S.C. §3553.[15]

## B. Supervised Release

The Government urges the Court to impose standard conditions of supervised release designed to sever the ties between Esherick and convicted felon Douglas Jemal.

The evidence has demonstrated that for numerous reasons, defendant Esherick has knowingly and intentionally placed himself in a position of utter dependence on and abject and uncritical loyalty to Douglas Jemal.

The financial dependence is obvious: Esherick left a marriage in 1998 with nothing. As of 2005, after 7 years of (purportedly) making $70,000 per year, by 2005, after the tax scheme was uncovered, Jemal commenced paying him over $350,000 per annum. (His W-2 for 2005 was in excess of $700,000.) Jemal provided Esherick not only monies when needed, but a car (in 2004, it was a Mercedes station wagon) and a million dollar house in Chevy Chase. Let there be

---

[15] Similarly, though the government insists that the guidelines as calculated are appropriate, the government further believes that a "no loss" finding on the Wire Fraud and any subsequent guideline calculation would tremendously and drastically understate the true culpability of Esherick. If so, the Court would be just in departing "upward" into the 41 to 71 month range urged by the government

no question:  that house was purchased by Jemal for Esherick.  In 2004, for example, Esherick made substantial payments to renovate and improve the property, and he made these payments by "borrowing" monies from Douglas Development.  In real life, tenants do not "borrow" from their landlords to make improvements on a property owned by the landlord.  Even now, Esherick reported to the Pre-Sentence Report writer that he has home improvement obligations.[16]

Moreover, Esherick has clearly embraced the role of being the number two man to Douglas Jemal and reflecting in that aura.  And, to earn his keep and his boss's approval, he willingly does the dirty work for him.  Whether it is dealing dishonestly with Michael Lorusso in connection with District of Columbia Government leases, preparing the false invoice for MTD, or accepting compensation in ways that were not reported to the IRS, Esherick has discarded basic standards of honesty and lost all perspective and sense of right and wrong, and he has done so to please Douglas Jemal.  For reasons that are unclear, but, certainly involve financial incentives, Esherick has found a comfort zone working for Jemal.

Even though Douglas Jemal has been instrumental in Esherick's downfall, and brings out the worst of the Esherick's dishonest impulses, Esherick continues to crave a continued financial relationship with Jemal  To this day, Esherick remains tethered – by finances if for no other reason – to Jemal.  This must come to an end.

In imposing terms of supervised release under 18 U. S. C. §3583(d), this Court should consider "the nature and circumstance of the offense and the history and characteristics of the defendant," the "need for the sentence imposed *** to provide respect for the law" and to

---

[16]    Jemal had paid for the construction of a home of another Douglas Development official.  It appears he was affording the same employee benefit to Esherick.

"protect the public from further crimes of the defendant."[17]  It is thus a standard condition of supervised release that a convicted felon (Esherick) not be permitted to associate with other known felons.  As set forth in the Guidelines, §5D1.3(c)(9), it is a standard condition of supervised release that "the defendant shall not associate with any person *** convicted of a felony unless granted permission to do so by the probation officer[]."  As written, this standard condition requires that there be no such contacts without approval of the probation officer.  We request that this condition be modified so that there be no such contact without permission of the Court.

The imposition of this standard term of supervised release, and its rigorous enforcement, is essential for the rehabilitation of Esherick.  He must be removed from Jemal's orbit, the financial influences that Jemal intuitively and astutely brings to that relationship, and the power of Jemal over his conduct.  It is also essential to protect the community at large, for when Esherick operates under the influence of Jemal, Esherick loses judgement, perspective and the ability to distinguish right from wrong.  Moreover, such terms, as noted, are common, and have particular applicability when the crime at issue stems from the unique relationship between the two individuals.  See, e.g., United States v. Bortels, 1993 WL 101445 (6th Cir., Apr. 6, 1993) at *1 (defendant convicted of harboring a fugitive prohibited, under the terms of supervised release, from having contact with know felons including that same fugitive).[18]

---

[17]     18 U.S.C. § 3684 cross-references, in particular, the factors of 18 U.S.C. §3553(a) related to the imposition of sentence.  The factors cited include 18 U.S.C. § 3553(a)(1) and 2(A) and (C).

[18]     See, e.g., United States v. Sharp, 931 F.2d 1310, 1311 (8th Cir. 1991) (approving term of supervised release subjecting defendant to warrantless searches for drugs and alcohol: "the district court may order conditions of supervised release which are 'reasonably related to

The government does not seek to impoverish Mr. Esherick.  However, there is stunningly little information as to the contemplated financial relationship between the two men.  We do not know if Jemal intends on paying Esherick $400,000 per year even if Esherick were incarcerated, how long Jemal will continue to pay Esherick that amount, if Jemal intends on providing Esherick "free" use of the million dollar house on Nevada Avenue, or whether there is a million dollar (or even more) bonus or piece of the business that awaits Esherick (or that Esherick believe or hopes awaits him) if and when Esherick serves his sentence.  Esherick did not report having any expectation of continued remuneration from Jemal while he was incarcerated, and Jemal did not report such expected liabilities.[19]

Even though there is no easy way to navigate the issue of their financial entanglements, there is no reason to hesitate in requiring that the financial ties between the two men be severed.  In this regard, the government notes the following:  in case after case, persons come before this Court with little in the way of advantages in life.  They come from broken homes, frequently without both parents.  They do not finish high school. They are exposed to criminal elements and bad influences as children.  They have little in the way of support systems, or families that can take care of their children if they are incarcerated.  They are barely hanging on, and a criminal conviction can push such defendants over the edge from which there is no real hope of financial

---

*** the nature and circumstances of the offense and the history and characteristics of the defendant, and *** to protect the public from further crimes of the defendant.'" U.S.S.G. § 5D1.3(b); see also 18 U.S.C. § 3583(d)."); United States v. Phaneuf, 91 F.3d 255, 262-63 & n. 10  (affirming terms of supervised release  limiting defendant's power to make purchases over $100 and obtain credit (citing cases)).

[19]    Even the concept of a fine is somewhat illusory, as it will almost certainly be paid by Jemal.

recovery.

In contrast, Mr. Esherick came from a good home with both parents and supportive siblings; his father was a Department of Justice attorney; Esherick graduated from high school in Montgomery County; he graduated with an accounting degree from James Madison University; he worked at a Big Eight accounting firm; he has an ex-wife who can take care of two children, a supporting wife, family and friends. Esherick is a smart man with skills that will permit him to rebound. It may be tough, but he is no pushover. He can sell real estate, do accounting, or accept other related employment. However, he is not entitled to resume a million dollar a year lifestyle financed by his codefendant. It would undermine respect for the law if he were permitted to resume that relationship and that position in Jemal's company as if nothing ever happened, and it is not harsh to bring his financial relationship and dependence on Douglas Jemal to an end.[20]  The Government thus requests that there be no more financial dealings between the two men, even involving the Nevada Avenue house, within one year of the imposition of sentence, and that all financial dealings between the two men prior to that time occur through counsel and be reported to the government and the Court.

Fine

The issue of the amount of a fine is directly related to the concerns discussed above. So long as Douglas Jemal will pay for all Esherick's obligations, a fine of Esherick is meaningless. Nonetheless, in that it appears that Esherick's wealth is boundless (because Jemal takes care of

---

[20]     In United States v. Mills, 959 F.2d 516 (5th Cir. 1992), a defendant convicted of odometer tampering was forbidden under the terms of supervised release to go into the used car business. Here, the government is simply requiring that the defendant not work for one specific company.

him, and Jemal has deep pockets), and that Esherick can tap Jemal for what he needs, there is no reason to hesitate at this time in the imposition of a substantial fine, even assuming that a fine will be passed through to Jemal.  Accordingly, the government submits that the maximum fine is in order.

WHEREFORE, the Government requests the Court consider this Memorandum in sentencing the defendant, to wit, 1) that the Court find the sentencing guidelines at either level 22 (as suggested by the Pre-Sentence Report Writer) or level 24 (finding sophisticated means) or level 25 (finding sophisticated means and vulnerable victim), and 2) that the Court impose the maximum permissible fine;  3) that the Court modify the standard conditions of supervised release to require a) that the defendant have no contact with convicted felons, to include Douglas Jemal, without permission of the Court, b) that any and all direct or indirect financial transactions within a year of the imposition of sentence between the defendant and Douglas Jemal be handled through counsel and reported to the government and the Court, and c) that after one year, the

defendant have no further financial contact (direct or indirect) with Douglas Jemal during the
period of supervised release.

                                                 Respectfully submitted,

                                                 JEFFREY A. TAYLOR
                                                 UNITED STATES ATTORNEY

By:                  /s/
                                                 Mark H. Dubester, D.C. Bar No. 339655
                                                 Timothy G. Lynch, D.C. Bar No. 456506
                                                 Assistant United States Attorneys
                                                 555 4th Street, NW,
                                                 Washington, D.C. 20530
                                                 (202) 514-7986