UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                          )
UNITED STATES                             )
                                          )
        v.                                )          Crim. No.  05-0359-1, -3 (RMU)
                                          )
DOUGLAS JEMAL, *et al.*,                  )
                                          )
                    Defendants.           )
———————————————————————)

MEMORANDUM ON SENTENCING ON BEHALF OF
DEFENDANT BLAKE ESHERICK

Defendant, Blake Esherick, hereby submits the following Memorandum in Aid of

Sentencing in the above-captioned case:

I.      Procedural History

As the Court is aware, in September 2005, the United States Attorney's Office indicted

Mr. Douglas Jemal, Mr. Norman Jemal, and Mr. Esherick on four counts relating to bribery of a

government official and one count of wire fraud.  The United States Attorney's Office also

indicted Mr. Douglas Jemal and Mr. Esherick on three counts relating to tax fraud relating to Mr.

Esherick's tax obligations for tax years 2001, 2002, and 2003.

During the year leading up to trial, Mr. Esherick, through counsel, repeatedly offered to

plead guilty to tax evasion for 2001 and 2002.  Specifically, counsel for Mr. Esherick indicated

Mr. Esherick's willingness to plead guilty to tax evasion for years 2001 and 2002 for the

improper mortgage and property tax deductions.  The government refused to consider such a plea

unless either (1) Mr. Douglas Jemal pleaded guilty to certain offenses  (of which he ultimately

was acquitted), or (2) Mr. Esherick enter into a "wired" plea agreement with the government,

wherein both Mr. Jemal and Mr. Esherick would have to plead guilty.  Given that Mr. Esherick

could not control Mr. Douglas Jemal's actions and given that the government was requiring Mr. Esherick to plead to offenses which he believed he had not committed, Mr. Esherick was unable to meet the government's prerequisites for him to plead guilty.  Counsel for Mr. Esherick protested that the government was holding Mr. Esherick "hostage" to the prosecution of Mr. Douglas Jemal, but the government refused to change its position.  (Ultimately, at trial, counsel for Mr. Esherick acknowledged in closing argument that the jury would have to hold Mr. Esherick accountable and responsible for the mortgage and property tax deductions.)

In September 2006, trial commenced before Your Honor.  At the conclusion of the government's case, counsel for Mr. Esherick filed a motion, which the Court granted, dismissing a charge of fraud against Ms. Esherick for lack of evidence pursuant to Rule 29 of the Federal Rules of Criminal Procedure (originally Count Four).

At the conclusion of the trial, the jury acquitted Mr. Douglas Jemal, Mr. Norman Jemal, and Mr. Esherick of Counts One, Two and Three, relating to bribery, gratuities (as a lesser included count of bribery), and fraud.  The jury convicted Mr. Douglas Jemal and Mr. Esherick of amended Count Four, wire fraud.  In addition, the jury convicted only Mr. Esherick of Counts Five and Six (tax evasion for years 2001 and 2002 respectively).  Mr. Esherick was acquitted of Count Seven, relating to tax evasion in the year 2003.  Mr. Jemal, the employer alleged to have paid Mr. Esherick several forms of hidden or "disguised" income, was acquitted of all tax counts (Counts Five, Six and Seven).

On January 12, 2007, Ms. Renee Moses-Gregory completed a draft of the Presentence Investigation Report ("PSIR").  On January 24, 2007, counsel for Mr. Esherick sent a letter to Ms. Moses-Gregory containing several objections to the draft PSIR.  Counsel objected to (1) Ms. Moses-Gregory's description of the facts underlying the conviction for wire fraud; (2) Ms.

Moses-Gregory's description of the offense conduct related to tax evasion; (3) Ms. Moses-Gregory's statement in paragraph 86 that Mr. Esherick's income tax returns (original filed and amended) were the subject of the instant offense; and (4) Ms. Moses-Gregory's conclusion in paragraph 109 that Mr. Esherick is not entitled to an adjustment for acceptance of responsibility. On January 26, 2007, Ms. Moses-Gregory completed the final PSIR.

Counsel for Mr. Esherick now submits this sentencing memorandum. Initially, the issues relating to the now advisory Guidelines are addressed, followed by a discussion of the factors to be considered by the Court pursuant to 18 U.S.C. 3553 (a).

## II.    Sentencing Guidelines Issues

### A.    The Amount of Loss For the Wire Fraud Count is Zero

The Court should decline to enhance the advisory Sentencing Guidelines offense level of Defendant Blake Esherick on the basis of "intended loss." The evidence at trial demonstrated conclusively that there was no actual loss in this case. In testimony largely elicited by the government, alleged victims Joseph Cayre and Morgan Stanley representative Benjamin Black both testified that they did not lose any money in connection with the MTD Real Estate ("MTD") transaction that forms the basis of the wire fraud charge (Count Four). Mr. Cayre further testified that Mr. Douglas Jemal and Mr. Esherick were entitled to the funds at issue under his agreement with Douglas Jemal, indicating that there is also no "intended loss" with respect to Mr. Cayre.

The only issue facing the Court with respect to the loss enhancement, therefore, is whether Defendants intended for Morgan Stanley to lose any money in connection with the MTD transaction. The PSIR, without any analysis, states that Defendants intended a loss of $430,039.08 -- the full amount of the MTD invoice -- and that a 14-level enhancement applies

pursuant to U.S.S.G. § 2B1.1(b)(1)(H).  PSIR at 9 (¶ 34).  However, the PSIR further identifies several factors from which the Court could conclude that there was no intended loss, and that the base offense level should remain at a level six.  Id. at 18-19 (¶ 109).  In other words, the PSIR essentially leaves it for the Court to decide whether any enhancement for "intended loss" applies in this case.

The law and facts of this case leave no doubt that the Court should decline to apply any "intended loss" enhancement.   First, the government simply failed to prove that Defendants intended to cause Morgan Stanley to lose any money in connection with the MTD transaction.  On the contrary, the evidence established that the MTD invoice was focused on Mr. Cayre and submitted to avoid the historical hassling that Mr. Cayre gave Mr. Jemal over fees and commissions.

Second, in cases involving loans obtained by fraud, courts have consistently held that sentencing courts must take into account the value of any collateral provided by the defendant for the loan when determining intended loss under the Guidelines.  Here, even if Defendants' conduct relating to MTD was directed at Morgan Stanley, the Morgan Stanley loan was secured by $30 million in equity in the 77 P Street building, as well as the personal guarantees of Douglas Jemal and Joe Cayre -- individuals worth hundreds of millions of dollars.  This collateral renders the intended loss zero.

Finally, even if the funds paid pursuant to the MTD invoice should have been spent on tenant improvements construction instead of leasing commissions, the intended loss would still be zero because Defendants spent far in excess of the amount of the MTD invoice on tenant improvements construction after the tenant improvements reserve was exhausted and prior to the government's detection of the alleged scheme.  Thus, the $430,000 was effectively returned to

4

the lender before the offense was detected and Mr. Esherick is entitled to a credit against loss of the full amount of the MTD invoice, rendering the applicable loss zero.

In sum, the Court should decline to impose the substantial 14-level intended loss enhancement proposed in the Presentence Investigation Report ("PSIR").  PSIR at 9 (¶ 34). Instead, Mr. Esherick's offense level on the wire fraud offense should remain at a level six.

    i.    Background

Count Four charged Defendants with violating the wire fraud statute, 18 U.S.C. § 1343, by allegedly devising a scheme to defraud relating to a commercial loan obtained from Morgan Stanley by Cayre Jemal's Gateway, the entity that owned the 77 P Street property.  Count Four alleged that the scheme to defraud involved obtaining leasing commissions by way of a false MTD invoice in order to:  (a) obtain partnership funds from Mr. Cayre, and (b) obtain funds from Morgan Stanley out of a tenant improvements reserve that was part of the loan.

Mr. Cayre and Mr. Jemal formed the Cayre Jemal's Gateway entity to purchase the property at 77 P Street.  Mr. Jemal's agreement with Mr. Cayre was roughly as follows. Mr. Cayre provided the funds for the purchase of the property and some of the construction costs.  Mr. Jemal was the hands-on manager of the project, providing construction, property management and leasing services through Douglas Development.  When the property made a profit, Mr. Cayre was to be repaid his capital investment plus interest, and Messrs. Jemal and Cayre would split the remaining profits 50-50.  Mr. Cayre would also pay Douglas Development fees and commissions for the services it provided.

Prior to this project, Mr. Cayre had always given Mr. Jemal a hard time paying these types of fees and commissions.  Although they were friends and had a family connection, their

professional relationship was frequently contentious. Especially in the early days, Mr. Cayre repeatedly complained that he was paying too much in fees and commissions and routinely questioned Douglas Development's entitlement to these legitimate fees. After talking it through, Mr. Cayre would typically pay the fees and commissions that he owed Douglas Development, but it was rarely without a hassle. Several letters reflecting these disputes were admitted in evidence at trial. See Defense Exhibits ("DX") 912, 914, 920, 923 & 932. A review of this correspondence indicates that Mr. Cayre appeared to enjoy pushing Mr. Jemal's buttons and hassling him over money to which Douglas Development was entitled.

On the 77 P Street project, after some fighting over these same issues, Messrs. Jemal and Cayre reached an agreement that Mr. Cayre would pay a standard leasing commission on all leases obtained for the building, which was 6% in the industry. Mr. Cayre agreed to pay a 6% commission on the entire 77 P Street project, taking into account all of the rents on all of the leases in the building. Mr. Cayre agreed to pay these commissions to either outside brokers or to Douglas Development. Despite this agreement, Mr. Cayre continued to hassle Mr. Jemal over legitimate commissions that Douglas Development was entitled to. See DX 932 (September 9, 2003 letter from Mr. Jemal to Mr. Cayre, stating with respect to unpaid leasing commissions: "Why is it so difficult for us to get paid for what we do?").

In late-2002, Messrs. Jemal and Cayre refinanced 77 P Street and obtained a $67 million loan from Morgan Stanley. The loan had three components: (a) approximately $41 million was to pay off the existing lender on the property, (b) approximately $19 million was held back by Morgan Stanley to be paid when the building was fully occupied and the construction completed, and (c) approximately $7 million was in a tenant improvements reserve that was to be used to pay the remaining tenant construction costs and related expenses, such as leasing commissions.

In November 2002, Douglas Development personnel submitted several invoices to Morgan Stanley to be paid out of the tenant improvements reserve. Two of the invoices were for leasing commissions related to a lease transaction with the District of Columbia's Department of Transportation and Department of Health. Douglas Development acted as the broker representing the landlord (the Cayre Jemal's Gateway partnership) on these transactions. The Department of Health was represented by the Staubach company in the lease negotiations and one of the invoices was for Staubach's commission. Although the Department of Transportation was not represented by an outside broker, the draw request included an invoice from MTD for a commission relating to the Department of Transportation portion of the lease. Because Mr. Cayre had agreed to pay 6% in commissions on all leasing transactions, Douglas Development claimed the full 6% commission. To avoid the historic hassling that Mr. Cayre had given Mr. Jemal on other legitimate Douglas Development fees and commissions, Douglas Development personnel submitted the invoice on MTD letterhead without disclosing MTD's affiliation with Douglas Development. Morgan Stanley paid the invoice out of the tenant improvements reserve of the loan.

At trial, as set forth in greater detail below, alleged "victims" Joe Cayre and Morgan Stanley representative Benjamin Black both testified that they did not lose any money as a result of the MTD transaction.

ii.    Argument

The government failed to prove that there was any actual or intended loss to either Joe Cayre or Morgan Stanley for purposes of the Guidelines. Accordingly, the Court should not enhance Mr. Esherick's advisory Guidelines range on the basis of loss.

Under U.S.S.G. § 2B1.1(b)(1), a defendant's base offense level may be increased based upon the applicable "loss" amount. Application Note 2(A) to § 2B1.1 provides that "loss is the greater of actual loss or intended loss." Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 (App. Note 2(A)(i)). Intended loss is "the pecuniary harm that was intended to result from the offense." Id. (App. Note 2(A)(II)). The application notes further provide that any loss shall be reduced by: "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." Id. (App. Note 2(E)(ii)).

> 3. The Court Should Require the Government To Establish The
> Applicable Loss Beyond A Reasonable
> Doubt

As an initial matter, the Court should require the government to prove the loss amount beyond a reasonable doubt in light of the enormous impact the loss calculation has on the Guidelines range in this case -- potentially increasing the offense level by 14 levels. Under the reasonable doubt standard, the government cannot establish that Mr. Esherick intended any loss, let alone a loss of $430,000.

Prior to United States v. Booker, 125 S. Ct. 738 (2005), the standard for resolving most factual disputes under the Guidelines was a preponderance of the evidence. United States v. Long, 328 F.3d 655, 670-71 (D.C. Cir. 2003). However, the Supreme Court recognized, without deciding, that there was "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on

clear and convincing evidence." United States v. Watts, 519 U.S. 148, 157 (1997); see also McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) (leaving open the possibility that a higher standard of proof would be required to satisfy Due Process where a sentencing enhancement becomes "a tail which wags the dog of the substantive offense"). The D.C. Circuit recognized that in "extraordinary circumstances a clear and convincing standard may be required," but declined to apply such a standard to a sentencing enhancement involving a six-level increase to the defendant's offense level. United States v. Kwong-Wah, 966 F.2d 682, 688 (D.C. Cir. 1992); see also Long, 328 F.3d at 671 (similarly recognizing that "extraordinary circumstances" may justify a higher standard of proof but declining to apply one in a case involving an eight-level increase).[1]

Post-Booker, the D.C. Circuit reaffirmed its holding that facts triggering enhancements under the Guidelines generally need only be proved by a preponderance of the evidence. United States v. Dorcely, 454 F.3d 366, 373 (D.C. Cir. 2006). However, the court recognized that the Supreme Court has "left open the question whether a higher standard of proof might be necessary if relevant conduct dramatically increased the sentence," an argument the defendant did not advance in Dorcely. Id. at 373 n.2.

---

[1] Numerous other circuits recognized that a higher standard of proof was potentially required when an enhancement or upward departure resulted in a large increase in the Guidelines range. See United States v. Gigante, 94 F.3d 53, 56 (2d Cir. 1996) ("Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate. Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly."); United States v. Kikumura, 918 F.2d 1084, 1100-02 (3d Cir. 1990) (holding there may be cases in which preponderance standard may afford defendant inadequate protection at sentencing); United States v. Trujillo, 959 F.2d 1377, 1382 (7th Cir. 1992) (holding "due process demands increased scrutiny at sentencing" in extreme cases); United States v. Townley, 929 F.2d 365, 369 (8th Cir. 1991) (holding that factor producing a potential 18-level increase in offense level requires higher standard of proof); United States v. Munoz, 233 F.3d 1117, 1127 (9th Cir. 2000) (holding factor producing potential 9-level enhancement requires higher standard of proof); United States v. St. Julian, 922 F.2d 563, 569 n.1 (10th Cir. 1990) (holding the standard of proof may vary when the difference between a departure sentence and a guideline range is great).

A sentencing court that has addressed the issue of loss calculation post-<u>Booker</u> has required the government to prove loss beyond a reasonable doubt. According to the court, "[c]ertain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome. So long as they do, they should be tested by our highest standard of proof." <u>United States v. Pimental</u>, 367 F. Supp. 2d 143, 2005 WL 958245, at *7 (D. Mass. Apr. 21, 2005). The sentencing court rejected the government's suggested loss figure of over half a million dollars, finding that no loss had been established beyond a reasonable doubt, and sentenced the defendant to a non-Guidelines sentence of probation rather than the Guidelines range of 27 to 33 months. <u>Id.</u> at *10-11.

One court in this District noted an alternate approach in which the sentencing court would not apply a higher standard of proof but would depart downward from the advisory Guidelines range where a sentencing enhancement dramatically increases a sentence:

> in those cases where enhancements become unreasonable in relation to the convicted offense, a sentencing court would depart from the advisory Guidelines range pursuant to the provision in 18 U.S.C. § 3553(a) requiring a court to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

<u>United States v. Edwards</u>, 427 F. Supp. 2d 17, 21 n.5 (D.D.C. 2006).

Here, the loss calculation is the most significant factor in determining Mr. Esherick's Guidelines range. In fact, the PSIR recommends that Defendants receive a substantial 14-level enhancement for a loss greater than $400,000, which, if applied, would increase Mr. Esherick's sentence range on the wire fraud charge from probation to several years of incarceration. PSIR at 9 (¶ 34). In light of the overwhelming significance of the loss determination and resulting sentence enhancement in this case, the Court should hold the government to a reasonable doubt standard that recognizes the significance of this important issue and ensures that the resulting

sentence range represents a "just punishment." 18 U.S.C. § 3553(a)(2)(A). Under such a standard, the government cannot establish beyond a reasonable doubt that Mr. Esherick intended a loss greater than $400,000.

### d. Mr. Cayre Suffered No Actual Loss As A Result Of The Offense

The testimony at trial established conclusively that Mr. Cayre suffered no actual loss for purposes of the Guidelines. Mr. Cayre testified that he fought repeatedly with Mr. Jemal about commissions until "we finally made an agreement after some time that there would be a 6 percent commission paid, and I really didn't care who it was paid to. [Douglas Jemal] could either take it all or give it all away . . . ." Tr. 2118. On direct examination, the government asked Mr. Cayre if the $430,000 commission at issue in the MTD invoice was a commission that Douglas Jemal would have been "entitled to" under this agreement. Tr. 2144. Mr. Cayre responded: "Yes. It would have been a leasehold commission. . . . And it was within the 6 percent guideline that he and I worked out." Id.

On cross-examination, Mr. Cayre clarified that this agreement "took into account the entire P Street project" and contemplated Mr. Cayre paying leasing commissions of 6% of the rent negotiated for all of the leases at 77 P Street. Tr. 2179. Mr. Cayre also confirmed that he "didn't care if Douglas Jemal got the money, if brokers [he] never heard of got the money, or if the money went to charity . . .," stating: "I didn't care where the money went, as long as it wasn't any more than 6 percent." Id. Mr. Cayre further testified that he did not pay more than 6% in commissions on the 77 P Street project. Tr. 2180. As a result, Mr. Cayre confirmed that he has "concluded that [he has] not been defrauded out of one penny as a result of the MTD commission." Id. The government offered no other evidence that Mr. Cayre lost money as a result of the MTD transaction, and did not impeach Mr. Cayre's testimony in any way.

11

This testimony establishes conclusively that there was no actual loss to Mr. Cayre.  As set forth above, "actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 (App. Note 2(A)(i)).  "Pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money."  Id. (App. Note. 2(A)(iii)).  Here, Mr. Cayre, the alleged victim of the crime, testified unequivocally that he did not lose any money as a result of the MTD transaction.  Moreover, the government elicited from Mr. Cayre that Douglas Jemal was "entitled to" the commission.  Accordingly, there was no actual loss to Mr. Cayre from the offense.

### 4. Defendants Did Not Intend Any Loss To Mr. Cayre

There was also no intended loss to Mr. Cayre from the offense.  Mr. Cayre testified that he repeatedly argued with Mr. Jemal about leasing commissions and other fees, which eventually led to an agreement with Mr. Jemal to pay leasing commissions of 6% of the rents obtained on the entire 77 P Street project.  See Tr. 2117 (Mr. Cayre testified that he and Mr. Jemal "fought like cats and dogs" over fees and leasing commissions).  Despite their agreement, Mr. Cayre continued to hassle Mr. Jemal over leasing commissions and fees to which Douglas Development was entitled well into 2003.  Tr. 2173.

The evidence at trial established that Defendants submitted the invoice on MTD letterhead to avoid the historic disputes that Mr. Jemal had with Mr. Cayre over leasing commissions; not to obtain funds to which Defendants were not entitled.  During Mr. Cayre's direct examination, the government elicited Douglas Jemal's statement regarding the purpose of MTD:  "[H]e sa[id] the reason that I did it that way is because you always break my balls and call me up and scream and holler, so we did it that way, it was within our 6 percent, so what do you care anyway."  Tr. 2150.  Similarly, the government also elicited from one of its witnesses

the statement of Douglas Development construction vice president Paul Millstein that MTD was used "so that there just wouldn't be the fighting between the two of them, [and] they could collect the commission <u>that they were entitled to</u>."  Tr. 864 (emphasis added).  The evidence establishes that Defendants did not intend to cause any monetary loss to Mr. Cayre.  Accordingly, there is no intended loss to Mr. Cayre for purposes of the Guidelines.

### 5.  <u>Morgan Stanley Suffered No Actual Loss As A Result Of The Offense</u>

Morgan Stanley also suffered no actual loss for purposes of the Guidelines.  Benjamin Black was the only Morgan Stanley witness who testified at trial.  At the end of his direct examination, the government established that Morgan Stanley did not lose any money as a result of the MTD transaction:

> Q.  I just have one more question, Mr. Black.  <u>Just to be absolutely clear for the record</u>, did Morgan Stanley lose any money on this deal?

> A.  It is my understanding that Morgan Stanley did not lose any money on this deal.

Tr. 1236 (emphasis added); <u>see also</u> Tr. 1268 (Mr. Black confirming on cross-examination that Morgan Stanley did not "lose one penny as a result of this commission payment to MTD").  The government did not attempt to impeach this testimony and introduced no other evidence that Morgan Stanley lost any money as a result of the MTD transaction.  Accordingly, the undisputed evidence establishes that Morgan Stanley did not suffer any actual loss for purposes of the Guidelines.

If there was any doubt on this issue, an additional reason why Morgan Stanley suffered no actual loss in connection with the MTD transaction is that Morgan Stanley sold the 77 P Street loan into a loan securitization pool shortly after the closing date.  As a result, Morgan

Stanley was effectively paid off shortly after it made the loan to Cayre Jemal's Gateway.  The 77 P Street loan was the largest loan in a $835 million loan securitization pool issued by Morgan Stanley Dean Witter Capital I Trust 2002-IQ3 ("Capital Trust").  <u>See</u> Exhibit A (excerpts from prospectus).  Morgan Stanley Mortgage Capital sold the 77 P Street loan to Capital Trust in a transaction that closed on December 17, 2002 -- shortly after the MTD transaction took place.  Thus, Morgan Stanley suffered no loss because it sold the loan before there was any default.

### 6.  <u>Mr. Esherick Did Not Intend Any Loss To Morgan Stanley</u>

Mr. Esherick submits that the evidence at trial also failed to establish that he intended to cause Morgan Stanley to suffer any loss.  As set forth above, all direct evidence of intent established solely that Defendants used MTD to avoid their historic disputes with Mr. Cayre over fees and commissions.  There was no evidence that the MTD invoice was intended to cause any loss to Morgan Stanley.

> a.  There Was No Intended Loss To Morgan Stanley Because The Morgan Stanley Loan Was Secured By Collateral Worth Far More Than The $430,000 MTD Invoice

Moreover, there is another consideration that establishes conclusively that there is no intended loss relating to Morgan Stanley for purposes of the Guidelines.  The Morgan Stanley loan was fully secured by collateral that ensured that Morgan Stanley could not suffer any loss.  The value of this collateral must be taken into account in determining any intended loss, which under the facts of this case necessarily means that there was no intended loss.

Several courts have held in cases involving fraud against a lender that the value of any collateral given for the loan must be deducted from intended loss when determining a defendant's sentence.  For instance, in <u>United States v. Weidner</u>, 437 F.3d 1023 (10th Cir. 2006), the defendants, a banker and a borrower of the bank, were charged with defrauding a bank by

increasing the borrower's line of credit by $1.5 million without disclosing that the borrower was

lending the funds at issue to the banker for a private investment. There was no actual loss

because the borrower fully repaid the entire line of credit after the transaction was discovered.

437 F.3d at 1030. The district court concluded that the intended loss was $1.5 million, the entire

amount of the increased loan balance. Id. at 1047-48. On appeal, the Tenth Circuit held that the

district court erred by not considering the value of the collateral that the borrower had pledged to

secure the line of credit in determining the amount of intended loss. Id. at 1048. The court

further noted that a district court is only justified in ignoring collateral in determining intended

loss if it determines that the defendant intended to deprive the lender of the collateral. Id. In a

subsequent appeal in the same case, the Tenth Circuit held that the intended loss was zero

because the loan was fully secured by collateral and there was "no evidence that [the borrower]

intended the Bank to lose any money on its loan to him." United States v. Wittig, No. 06-3166,

2006 WL 3378451, at *6 (10th Cir. Nov. 22, 2006).

Similarly, in United States v. Staples, 410 F.3d 484 (8th Cir. 2005), the defendant was

charged with defrauding a bank by purchasing a house with a counterfeit check. The seller of the

house was a participant in the fraud. The counterfeit check was approximately $250,000, the

outstanding mortgage on the property was approximately $170,000, and the seller's equity was

approximately $76,000. The district court concluded that the intended loss was the full amount

of the $250,000 counterfeit check. 410 F.3d at 491. The Eighth Circuit reversed, holding that

the house essentially served as collateral for the purchase, which the district court should have

taken into account in determining the intended loss. Id. at 490. The court stated: "If a

reasonable person intends for the collateral to revert to the defrauded party (or understands that it

will), then he or she does not intend to obtain the value of that collateral." Id. In other words,

"the existence of collateral could indicate that the defendant intended to cause a smaller loss than would have occurred absent the collateral.  Thus, sentencing courts should subtract the value of the collateral from the intended loss amount when facts warrant it."  Id. at 491.  Since a reasonable person would not have believed that he would have been able to dispose of the house or otherwise keep the bank from foreclosing on it to reduce its loss on the transaction, the court held that the value of the house needed to be subtracted from the amount of the purchase price to determine intended loss.  Id.

Likewise, in United States v. Calkins, No. 05-5902, 2006 WL 2430999 (6th Cir. Aug. 22, 2006), the defendant was charged with defrauding a lender by delaying repayment of construction loans and instead diverting funds for his personal use.  The full amount of the delayed repayment was approximately $4.9 million, which the district court used as the intended loss.  Id. at *2.  However, the lender had obtained a first security interest in the properties underlying the construction loans, and a pledge of all of the defendant's business and personal assets, which the defendant contended would reduce the loss to approximately $330,000 if liquidated.  Id.  The Sixth Circuit held that "[t]he district court erred in concluding that the defendant's intended loss, i.e., his intent not to pay off the construction loans, would eliminate an offset for pledged collateral. . . .  [T]he banks were never in any danger of losing the underlying collateral, which was secured by the condominium units."  Id. at *3.  Accordingly, the court remanded for resentencing with instructions that the district court should reduce the intended loss amount by the value of the collateral, including the value of the underlying condominium units and any assets of the defendant that were pledged as collateral.  Id. at *5.

Several other courts have similarly concluded that the value of collateral must be taken into account when determining intended loss in a case involving fraud against a lender.  See

United States v. Nichols, 229 F.3d 975, 980 (10th Cir. 2000) (In reversing with instructions to reduce intended loss determination by value of collateral, the court stated:  "The security of the loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss."); United States v. Quigley, 382 F.3d 617, 622-23 (6th Cir. 2004) (holding that in cases where a defendant obtains a loan under false pretenses, a district court must reduce the amount of loss by the value of any collateral used to secure the loan); United States v. Radziszewski, -- F.3d --, 2007 WL 162836, at *5 (7th Cir. Jan. 24, 2007) (approving district court's calculation of intended loss figure by deducting value of collateral from amount of fraudulently obtained loan).

At worst, Defendants' conduct in this case resulted in loan proceeds being obtained by false pretenses.  Mr. Esherick did not steal any money outright.  The funds were borrowed from Morgan Stanley.  There was no evidence that Cayre Jemal's Gateway defaulted on the Morgan Stanley loan, failed to make a payment, or otherwise failed to repay Morgan Stanley.

Accordingly, as in other cases involving lenders, the value of Morgan Stanley's collateral securing the loan at 77 P Street must be taken into account in determining the intended loss. Because Morgan Stanley's collateral in the 77 P Street loan far exceeded the $430,000 MTD invoice, it could not possibly have lost money on the transaction and Defendants could not have intended any loss.  Specifically, the amount of the Morgan Stanley loan was approximately $67 million.  Tr. 1210.  As part of the loan, Morgan Stanley obtained a perfected security interest in the entire property at 77 P Street, as well as assignments of all leases, rents and contracts associated with the property.  See Government Exhibit ("GX") 113-0167 (Section 3.1.7 of the Morgan Stanley loan); GX 248-285 (Fee and Leasehold Deed of Trust And Security Interest executed as part of the loan).  The government introduced evidence that the appraisal

commissioned by Morgan Stanley in connection with this loan valued 77 P Street at $96 million. GX 356 (the appraisal); Tr. 3711 (testimony of Don Morris). Even assuming that Mr. Esherick intended to obtain the $430,000 in loan proceeds from Morgan Stanley by fraud, which Mr. Esherick disputes, he could not possibly have intended to cause Morgan Stanley to suffer a loss because he knew that Morgan Stanley had a security interest in 77 P Street -- which was valued at approximately $29 million more than the loan balance -- and that there was no way he could conceal or deprive Morgan Stanley of this collateral.

In addition to its collateral in the equity in 77 P Street, Morgan Stanley obtained a personal guaranty from Douglas Jemal to further secure the loan. See GX 113 (pp. 332-346). Mr. Jemal has a net worth of several hundred million dollars. Therefore, even if somehow the $29 million in equity at 77 P Street was insufficient to protect Morgan Stanley from a loss associated with the $430,000 MTD invoice, Morgan Stanley had additional protection against loss from Mr. Jemal's personal guaranty. Accordingly, the intended loss amount in this case is zero.

> b. Even If There Was An Intended Loss, Mr. Esherick Is Entitled
> To A Credit That Reduces Any Loss To Zero

There is also yet another basis for the Court to conclude that the applicable loss amount relating to Morgan Stanley is zero. Even if Defendants were prohibited by the loan terms from receiving the MTD leasing commission from the tenant improvements reserve (which Mr. Esherick disputes), and the $430,000 at issue should have been spent instead on tenant improvements at 77 P Street, Defendants effectively replaced those funds by spending more than $430,000 in additional tenant improvements at 77 P Street after the tenant improvements reserve was exhausted. By so doing, Defendants fully protected Morgan Stanley's interest in the

property even if the $430,000 should not have gone to pay the MTD commission. Mr. Esherick

is therefore entitled to a full credit against any intended loss amount that reduces the loss to zero.

Application Note 2(E)(i) to U.S.S.G. § 2B1.1, entitled "Credits Against Loss," provides

that loss shall be reduced by:

> The money returned, and the fair market value of the property
> returned and the services rendered, by the defendant or other
> persons acting jointly with the defendant, to the victim before the
> offense was detected. The time of detection of the offense is the
> earlier of (I) the time the offense was discovered by a victim or
> government agency; or (II) the time the defendant knew or
> reasonably should have known that the offense was detected or
> about to be detected by a victim or government agency

U.S.S.G. § 2B1.1 (App. Note 2(E)(i)).

In United States v. Rothwell, 387 F.3d 579 (6th Cir. 2004), the Sixth Circuit applied this

Guidelines policy statement in a case with strikingly similar facts to those at issue here to

conclude that the defendant was entitled to a full credit against loss that rendered the loss

enhancement inapplicable. In Rothwell, the defendant was convicted of mail fraud based on the

submission of false draw requests for progress payments on a Small Business Administration

(SBA) loan. The draw requests included invoices and certifications that falsely represented that

the costs for which the loan proceeds were sought had been incurred constructing a building to

which the loan related, when in fact the defendant had spent the funds constructing another

building. 387 F.3d at 581. In reliance upon these false draw requests, the SBA advanced

approximately $103,370 to the defendant. Id. However, the defendant ultimately spent more

than the total loan amount to construct the building covered by the loan, thereby effectively

replenishing the amount obtained by fraud prior to the government's discovery of the scheme.

The defendant contended that his false draw request to the SBA "'can only be seen to have

caused a portion of the total loan to be advanced prematurely. As to those funds, he replaced

them voluntarily.'" Id. at 582 (quoting Appellant's Brief).  The defendant conceded that the intended loss was $103,370, but argued that the district court should have reduced the loss amount to zero because the construction costs on the project ultimately exceeded the loan amount.  Id. at 584.

The Rothwell court, relying upon Application Note 2(E)(i) to U.S.S.G. § 2B1.1, agreed with the defendant and concluded that "[b]ecause the expenditures on the project exceeded the amount envisioned under the loan agreement, [the defendant] returned or replaced the money he improperly obtained before the offense was detected and is this entitled to a credit equal to the amount of the replaced funds."  387 F.3d at 585.  Accordingly, the Sixth Circuit ordered the district court to re-sentence the defendant with a loss amount of zero.

Here, even if the Court somehow concludes that the approximately $430,000 MTD invoice represents the intended loss to Morgan Stanley, Mr. Esherick is entitled to a full credit against loss because more than $430,000 was spent on subsequent tenant improvements at 77 P Street after the $7 million tenant improvements reserve was fully depleted.  Specifically, as demonstrated in documentation submitted with this memorandum, more than $10 million total was spent on tenant improvements at 77 P Street (or more than $3 million in excess of the tenant improvements reserve in the Morgan Stanley loan).  The 2003 77 P Street Tenant Lease Construction Costs Ledger, an accounting document maintained by Douglas Development, identifies $5,842,319.26 in total expenditures for tenant improvements construction at 77 P Street that were paid out of the tenant improvements reserve in the Morgan Stanley loan.  See Exhibit B (relevant expenses highlighted in yellow on page one).  An additional $651,815.08 was drawn from the tenant improvements reserve to pay leasing commissions related to 77 P Street, including the $430,000 MTD commission at issue.  See Exhibit C (77 P Street Tenant

Lease Commission Costs Ledger; relevant expenses highlighted in yellow). The total of these amounts -- $6,494,134.34 -- effectively exhausted the tenant improvements reserve in the Morgan Stanley loan.[2]

Thereafter, roughly $3.7 million in additional tenant improvements construction at 77 P Street was spent in 2003. See Exhibit B. The bulk of these additional tenant improvements construction costs -- $2,490,337.00 -- were paid to Davis Construction Corp. in April and July 2003. See Exhibit B (payments to Davis highlighted in orange on pages two and four). Attached as Exhibit E is backup documentation from Davis Construction Corp. confirming that these expenses related to tenant improvements construction at 77 P Street.

Therefore, just as in Rothwell, Defendants effectively replaced the $430,000 obtained from the tenant improvements reserve pursuant to the MTD invoice by subsequently spending an amount far in excess of the $430,000 on other tenant improvements at 77 P Street after the tenant improvements reserve was exhausted. There is no question that these expenditures took place "before the offense was detected" for purposes of Application Note 2(E)(i) to U.S.S.G. § 2B1.1. The approximately $2.5 million in Davis Construction invoices alone were paid in April and July 2003. See Exhibits B & E. The government did not issue the first grand jury subpoena to Douglas Development until August 2004. The government did not issue any grand jury subpoena seeking records related to MTD until December 27, 2004. Accordingly, even if the $430,000 could be deemed an intended loss to Morgan Stanley, that intended loss would be fully offset by the amount of tenant improvements spent on the 77 P Street property after the tenant

---

[2] While the Morgan Stanley loan documentation originally included a $7 million tenant improvements reserve, the amount of the tenant improvements reserve was later reduced to $6.5 million. See GX 411-2 (attached as Exhibit D) (showing a $6,505,192.83 "Beginning Deposit Balance" in the first application for tenant improvements funds sent to Morgan Stanley).

improvements reserve was depleted.[3]  This credit against loss renders the applicable loss amount

zero and eliminates any loss enhancement under U.S.S.G. § 2B1.1(b)(1).

In sum, the Court should decline to impose any enhancement for "loss" pursuant to

U.S.S.G. § 2B1.1(b)(1).  There is no actual or intended loss in this case and the Court should not

apply the loss enhancement when calculating Mr. Esherick's sentence.  Uniformly, the testimony

deals only with Mr. Douglas Jemal's intent in the use of these funds, and Mr. Esherick is simply

not involved, and could have had no benefit from the use of these funds.   To find "intended

loss" as to Mr. Esherick flies free of the facts and the record.

B.     Michael Rowe is Not a Vulnerable Victim

In its objections to the PSIR, the government argues that Michael Rowe, the individual

who signed the memorandum to Morgan Stanley containing wiring instructions and the lien

release, was a vulnerable victim in the wire fraud offense and that consequently, a two level

enhancement is warranted pursuant to U.S. Sentencing Guidelines Manual § 3A1.1.  Ms. Moses-

Gregory did not accept the government's argument, nor should she.  As Ms. Moses-Gregory

indicated in the PSIR, "[t]here is no argument that Mr. Rowe was an unknowing participant…his

traits do not necessarily meet the criteria of an impaired victimized person."

A vulnerable victim is a victim of the offense of conviction and any relevant conduct who

is unusually vulnerable due to mental condition, or who is otherwise particularly susceptible to

the criminal conduct. U.S. Sentencing Guidelines Manual § 3A1.1, application n. 2 (2002).  First,

Mr. Rowe was not a victim of wire fraud.  There was no allegation in the indictment or at trial –

---

[3]  Moreover, although the court in <u>Rothwell</u> did not address this issue, there also can be no claim that
Morgan Stanley lost the time value of money by paying the MTD invoice sooner than it might have paid for these
other tenant improvements because Morgan Stanley earned interest on the entire loan amount -- including the tenant
improvements reserve -- from the day of the loan closing.  Tr. 1279.

nor could there be – that Mr. Rowe was defrauded by the use of the wires. Second, Mr. Rowe was not unusually vulnerable due to mental condition. The federal cases in the District of Columbia dealing with enhancements for vulnerable victims suggest that people such as patients in the District of Columbia's Mental Retardation and Developmentally Disabled Administration (*see* United States v. Smith, 362 U.S. App. D.C. 415 (D.C. Cir. 2004)); a recent widow who had never previously managed her own finances and who had recently suffered a minor stroke (*see* United States v. Fox, 1998 U.S. App. LEXIS 9763 (D.C. Cir. 1998)); individuals who are somewhat unfamiliar with the English language and tax enforcement in the United States (*see* United States v. Shyllon, 304 U.S. App. D.C. 23 (D.C. Cir. 1993)), and special education students who are emotionally troubled students (*see* United States v. Long, 185 F. Supp. 2d 30, 40 (D.D.C. 2001)) should be considered vulnerable victims. There was no evidence presented at trial that Mr. Rowe suffers from mental retardation, is developmentally disabled, recently suffered a stroke, is unfamiliar with English, is emotionally troubled, or suffers from any other condition that would make him unusually vulnerable.

C.    The Court Should Not Consider Acquitted and Relevant Tax Conduct

The calculation of tax loss in the PSIR is incorrect and should be disregarded. In the PSIR, Ms. Moses-Gregory calculates tax loss based on actions taken in years other than 2001 and 2002, the only years for which Mr. Esherick was convicted of tax evasion. As the United States Supreme Court has made clear, a judge cannot impose a sentence outside the sentencing range established by the verdict rendered by the jury even in a period when the Sentencing Guidelines are advisory rather than mandatory. *See* United States v. Booker, 543 U.S. 220, 233 (2005) ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required the selection of particular sentences in response to differing

23

sets of facts, their use would not implicate the Sixth Amendment.  We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence *within a statutory range*") (emphasis added) (citations omitted); Id. at 244 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt").  Thus, the Court can only sentence Mr. Esherick to a sentence within the range established by the jury's finding that Mr. Esherick was guilty of tax evasion in 2001 and 2002 (Counts Five and Six).

Moreover, although Booker allows the Court to consider acquitted or relevant conduct in determining a sentence within the range established by the jury verdict, the United States District Court for the District of Columbia has made clear that the Court *need not* consider such conduct in issuing a sentence.  *See* United States v. Safavian, 2006 U.S. Dist. LEXIS 83170 at *21 (D.D.C. Nov. 16, 2006) (stating that consideration of acquitted conduct is not mandatory).  In this case, the Court should not consider acquitted or relevant conduct in determining a sentence within the range established by the jury verdict because the jury verdict made clear that the jury did not convict Mr. Esherick on the government's "disguised income" theory.  Under the government's theory, Mr. Douglas Jemal committed tax evasion by compensating Mr. Esherick with "disguised income" in 2001, 2002, and 2003, thereby helping him to evade his obligation to pay tax on that income.  The jury rebuffed the government's argument, acquitting Mr. Douglas Jemal on all three of the tax counts and acquitting Mr. Esherick on Count Seven (the only count in which Mr. Esherick did not claim deductions for mortgage interest and real estate property tax).  Moreover, the jurors' comments after the verdict indicated that their convictions for Counts

Five and Six were based only on the improper mortgage and real estate tax deductions, and not the "disguised income" categories argued by the Government.

It also is improper to consider any alleged loss pursuant to the government's "disguised income" theory in determining Mr. Esherick's sentence.  Application Note 2 to §2T1.1 of the Sentencing Guidelines Manual specifies that in determining tax loss, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan *unless the evidence demonstrates that the conduct is clearly unrelated*."  *See* Sentencing Guidelines Manual, §2T1.1, Application Note 2 (emphasis added).  In this case, Mr. Esherick clearly admitted responsibility for false mortgage and property tax deductions,[4] and the jury clearly convicted Mr. Esherick of taking these deductions improperly.  Mr. Esherick did not, admit that he received "disguised income" and, as discussed above, we submit that the jury did not convict Mr. Esherick of receiving "disguised income."  Moreover, given that taking improper deductions is clearly unrelated to receiving disguised income, the Court should not consider any conduct relating to the government's "disguised income" theory in determining Mr. Esherick's sentence.

The Court also should not consider any conduct of Mr. Esherick in 1999 and 2000 because such conduct has not been proved criminal.  In United States v. Daniel, Ronald Wesley Daniel failed to file federal income tax returns for 1982-1987.  *See* United States v. Daniel, 956 F.2d 540, 542 (6th Cir. 1992).  The government indicted Daniel on three counts of income tax evasion (1985, 1986, and 1987) and the jury convicted him on these counts.  At sentencing, the district court considered past conduct not included in the conduct, including Daniel's failure to

---

[4] *See* closing argument by counsel for Mr. Esherick at Tr. 4677:11-13 ("Does [Mr. Esherick] have to stand accountable on the matter that we talked about before with respect to the mortgage interest deduction?  Clearly, he does.  There's no question about that.").

file income tax returns and tax liabilities for 1982, 1983, and 1984. *Daniel*, 956 F.2d at 544.

Daniel challenged this consideration of past conduct, and the United States Court of Appeals for

the Sixth Circuit remanded for resentencing. In doing so, the Sixth Circuit found that "'all

conduct violating the tax laws' must refer to *all relevant criminal conduct underlying the*

*charged offense*." *Daniel*, 956 F.2d at 544. Because Daniel's liability for tax years 1982-1984

was a *civil* tax liability not part of the underlying criminal conviction, and because Daniel was

not able to disprove the civil liability alleged by the government in the pre-sentence report, the

district court should not have included any liability for tax years 1982-1984 in its calculation of

tax loss. As in Daniel, this Court should not consider any alleged liability of Mr. Esherick in tax

years 1999 and 2000. Any tax liability for those years is a civil liability that was not part of the

criminal conviction, and Mr. Esherick has not had an opportunity to challenge that alleged

liability. Former counsel to Mr. Esherick has confirmed in a letter to Ms. Moses-Gregory that

although Mr. Esherick filed amended tax returns for 1999 and 2000, no criminal indictment had

been filed against Mr. Esherick in relation to those years. Rather, the filing of the amended

returns was "a good faith effort to resolve any tax-related issues with the government, and was

not intended to be an admission of civil tax deficiency or guilt on criminal tax-evasion charges."

*See* Letter from David C. Tobin to Paul F. Kemp, Jan. 24, 2007, attached hereto as Exhibit F.

The Court also should not consider any tax liability of Mr. Esherick in 2003 because the

jury acquitted Mr. Esherick of Count Seven. *See* United States v. Gordon, 71 F. Supp. 2d 129,

137 (E.D. N.Y. 1999) (declining to consider additional tax due and owing for 1990 and 1991 for

purposes of determining tax loss because Gordon was acquitted of the charge of filing a false

individual income tax return for 1991). Similarly, in the Safavian case, the United States District

Court for the District of Columbia declined to exercise its discretion under the advisory

Guidelines to consider acquitted conduct, because of the belief that "consideration of acquitted conduct 'trivializes 'legal guilt' or 'legal innocence,' which is what a jury decides.'" <u>United States v. Safavian</u>, 2006 U.S. Dist. LEXIS 83170 at *22 (D.D.C Nov. 16, 2004) (citing <u>United States v. Pimental</u>, 367 F. Supp. 2d 143, 152 (D. Mass. 2005)).

For all of the reasons identified above, the Court should limit the calculation of tax loss caused by Mr. Esherick to the tax loss that resulted from his taking improper deductions in 2001 and 2002.  The chart below indicates the amount of this loss:

| 2001 | | |
|---|---|---|
| **Description of Deduction** | **Amount of Deduction** | **Tax loss pursuant to Note (B) to § 2T1.1** |
| Home mortgage interest and points<br><br>*See* Blake Esherick's 1040 for 2001, Schedule A, line 10 | $26,996 | $7,558.88 |
| Real estate taxes<br><br>*See* Blake Esherick's 1040 for 2001, Schedule A, line 6 | $3,956 | $1,107.68 |

| 2002 | | |
|---|---|---|
| **Description of Deduction** | **Amount of Deduction** | **Tax loss pursuant to Note (B) to § 2T1.1** |
| Home mortgage interest and points<br><br>*See* Blake Esherick's 1040 for 2002, Schedule A, line | $26,078 | $7,301.84 |

| 10 | | |
|---|---|---|
| Real estate taxes<br><br>*See* Blake Esherick's 1040 for 2002, Schedule A, line 6 | $4,389 | $1,228.92 |

Thus, the total tax loss for 2001 and 2002 is $17,197.32.

## III.    Acceptance of Responsibility

If the Court rules that a new trial on the wire fraud count should be granted, the

Defendant seeks an adjustment under the United States Sentencing Guidelines for Acceptance of

Responsibility (U.S.S.G. § 3E1.1).   Mr. Esherick's continual efforts, right up to the eve of trial,

to accept responsibility for improper real estate tax deductions in 2001 and 2002 entitles him to

this adjustment.  In United States v. Dozier, 162 F.3d 120 (D.C. Cir. 1998), the Court set forth

standards for determining acceptance of responsibility in a situation where a defendant goes to

trial. In Dozier, the defendant offered to plead guilty to drug charges but not to weapons charges.

The government refused to accept the defendant's plea offer unless he also pled guilty to drug

charges.  Accordingly, trial ensued.  At trial, the defendant contested his guilt on both the

weapons charges and the drug charges.  The United States Court of Appeals for the D.C. Circuit

suggested that, had the defendant gone to trial, but admitted responsibility for the gun and

ammunition charges at issue, he would have been eligible for a downward departure.  See

Dozier, 162 F.3d at 127 ("Nothing prevented Dozier from going to trial to contest his guilt on the

drug charges, while admitting ownership of the gun and ammunition.  Had he done so, he would

not now be ineligible for the downward adjustment he seeks.")  Mr. Esherick went to trial in this

case only because the government refused his offer to plead guilty solely to the tax evasion

charges for tax years 2001 and 2002, based on a theory of taking the improper real estate deductions specified above. At trial, Mr. Esherick fully accepted before the jury responsibility for these tax evasion charges, based only on improper deductions. As the court held in <u>Dozier</u>, Mr. Esherick is entitled to a downward departure.

As noted above (see footnote 1), undersigned counsel explicitly exhorted the jury they should hold Mr. Esherick accountable on these improper deductions (Transcript 4677: 11-13). Mr. Esherick never challenged his guilt for the improper deductions charged in Counts 5 and 6 at any point in the trial, either in opening statement, during the elicitation of evidence from any witness, or in closing argument. To the contrary, the defense focused on the "disguised income theory" of unreported income unsuccessfully advanced by the government and ultimately rejected by the jury.

If these categories of payments had been proved by the government as income, then presumably Mr. Jemal would have been convicted in Counts 5, 6 and 7. He was not. The jury returned verdicts of not guilty on all of those counts.

If the jury had accepted the government's strained theory of criminal tax liability, Mr. Esherick would have been convicted in Count 7, representing tax year 2003. He was not, despite having received more so-called "disguised income" in that year than in any other year charged in the indictment or about which we heard evidence. (The court admitted evidence as to its disguised income theory for several other years).

Instead, the only convictions returned by the jury relate to 2001 and 2002, in which Mr. Esherick filed returns taking the improper deductions. Defense counsel openly admitted this to the jury and the jury embraced that admission of guilt by Mr. Esherick.

Critically, counsel had attempted to plead guilty to tax evasion for tax years 2001 and 2002. This offer was made prior to the indictment, as early as September 2005, and again repeatedly throughout the intervening period of time up until July 2006. At the last meeting between undersigned counsel and government counsel, concerning a plea proposal, the government would not consider a plea to tax evasion only from Mr. Esherick, insisting on a plea to bribery counts as well. Undersigned counsel's protestations that Mr. Esherick was being "held hostage" by the government's efforts to prosecute the co-defendants fell upon deaf ears, and Mr. Esherick was forced to go to trial on those counts wherein he contended he was not guilty. Fortunately, the jury agreed, resulting in the acquittal of all counts relating to briberies, gratuities, a fraud count involving 77 P Street (original Count 4), and the one tax count in which no false real estate deduction was claimed (amended Count 7).

Dozier sets forth in clear terms the circumstances under which acceptance of responsibility can be claimed. Mr. Esherick has met those conditions and is entitled to this adjustment.

## IV.     Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

Two years ago, the United States Supreme Court in United States v. Booker, 543 US 220 (2005) held that the United States Sentencing Guidelines are no longer mandatory. Instead, the Guidelines are to be applied as just that: guidelines that District Courts consider as only one factor among others set forth generally in 18 U.S.C. § 3553(a). See id. at 239-240. Courts must consider the Sentencing Guidelines, but also "tailor the sentence in light of other statutory concerns, See 18 U.S.C. § 3553(a)." Booker, 543 U.S. at 220.

Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary" to comply with several goals of sentencing. 18 U.S.C. § 3553(a). The Court must

consider both the "history and character of the defendant" and the "nature and circumstances of the offense" including the "seriousness of the offense". Further, Section 3553(a) mandates that the Court impose a sentence that:

A.    Promotes respect for the law;

B.    Provides just punishment;

C.    Protects the public from further crimes of the defendant;

D.    Provides to the defendant necessary educational, medical or other correctional treatment in the most effective manner;

E.    Avoids unwanted disparities between similarly situated defendants;

F.    Allows for restitution to any victims of the offense.

As part of this analysis, the Supreme Court has directed that a sentencing judge is obligated to weigh all of the above factors in determining the overall "reasonable" sentence. Accordingly, where warranted, the Court may deviate from the advisory guideline range to effect proper punishment.

### (A) The History and Character of the Defendant

Mr. Esherick comes before this Court free of any criminal history whatsoever. He is married, and is the father of three minor children. The Defendant's father was an attorney with the Justice Department who recently died at the age of 75. The defendant's mother resides in Florida, following her retirement from the staff at the Department of Justice. The Defendant is the youngest of five children. His brother, Douglas Esherick, died at the early age of 26, he is the brother, for whom the Defendant's oldest son is named.

Mr. Esherick's marriage to Barbara Gill resulted in divorce. As the Court will recall, Ms. Gill testified at trial. Mr. Esherick has shared custody of his two children, Taylor and Douglas.

He visits with them religiously, every week, and has fought to maintain and indeed increase his level of contact with his children.

Mr. Esherick married Stefanie Esherick, in November 2004. Their daughter, Grayson, age 4, lives with the Defendant and Stefanie full time.

The Defendant has presented a host of impressive testimonials from various persons who know him. Primarily, the letters come from individuals working in the commercial real estate field, either as brokers or as tenants of Mr. Esherick and Douglas Development Corporation. All of the letters are strong proof of Mr. Esherick's honesty and integrity, his devotion to his family and children, and his devotion to the District of Columbia as a vibrant and growing community.

John Alexander speaks glowingly of Mr. Esherick in the Washington commercial real estate world. Mr. Alexander is the President of AMR Commercial, LLC, a Bethesda real estate brokerage. See Exhibit G.

William Collins is a long time developer and broker within the District of Columbia. He notes the way Mr. Esherick has helped shape the "new vitality and luster" of the District of Columbia. Mr. Collins is able to cite specific projects in which Mr. Esherick has been instrumental in charitable contributions to the District. See Exhibit H.

Victor D'Imbrosia is a Partner at TSC Realty Services. He has known Mr. Esherick for over seven years. He speaks of Mr. Esherick as "a man of his word" and pays tribute to his honesty and integrity. See Exhibit I.

Chuck Driesell is a long-time friend of Mr. Esherick, whom he considers a person of the highest standard. Mr. Driesell speaks to Mr. Esherick's love of the District of Columbia, in both the growth and development of the city. See Exhibit J.

James Elliott from Ourisman Automotive knows Mr. Esherick more as a friend than a business acquaintance.  He is familiar with Mr. Esherick's care for the homeless in the District of Columbia.  Mr. Elliott considers Mr. Esherick to be one of the finest people he has ever met.  <u>See</u> Exhibit K.

Jolie Figueroa is a secretary at Douglas Development.   Mr. Esherick has trained her in the leasing field.  She notes Mr. Esherick's generosity, that he is a family man, and is completely dedicated to his work.  She remarks on Mr. Esherick's thoughtfulness.  <u>See</u> Exhibit L.

Earl Goodman is a Partner at Divaris Real Estate Development Company.  Mr. Goodman regards Mr. Esherick as very ethical and notes the great degree to which Mr. Esherick is respected in the brokerage community.  <u>See</u> Exhibit M.

John M. Kane is a well-known figure in D.C. development efforts and is the President of Kane Office Moving and Storage Company.  He notes the vital role that Mr. Esherick has played in the redevelopment of downtown Washington, and his importance to jobs throughout Washington, D.C.  <u>See</u> Exhibit N.

Both Senior Pastor William McKenney and current Pastor Robert Knight of the Mariner Church in Annapolis Maryland provide glowing recommendations for Mr. Esherick who afforded the church very favorable terms for a lease in the Whitehall section of Annapolis.  They regard him as "a model of integrity" and note that it is a blessing to have Mr. Esherick as their real estate broker.  <u>See</u> Exhibit O.

 Attorney Richard Levin speaks in detail of Mr. Esherick's participation with the Battered Women and Children's Center of the District of Columbia, and notes his honest and forthright character.   <u>See</u> Exhibit P.

Deborah Menkart, the Executive Director of Teaching for Change, has been a tenant of Mr. Esherick for seven years at 1328 Florida Avenue, N.W. Her organization is a non- profit devoted to improvement of city schools and educational efforts. She talks of the crucial role Mr. Esherick played in allowing Teaching for Change to remain at its location at 1328 Florida Avenue and notes the accommodations Mr. Esherick has made on behalf of Douglas Development to allow Teaching for Change to remain in the center city. See Exhibit Q.

Edward Pinkard is the Executive Director of the Booker T. Washington Charter School, located at 1346 Florida Avenue, also a non-profit group. He notes Mr. Esherick's "love for the school and devotion to the District of Columbia." See Exhibit R; see also Exhibits S-for a letter from Heather Waters, the Defendant's sister-in-law, Exhibit T for a letter from Kurt L. Zanelotti, the President of Contract Carpet Systems on behalf of Mr. Esherick, and Exhibit U for a letter from Stefanie Esherick, the Defendant's wife.

The common theme, running through these letters and other testimonials that will be presented to the Court at sentencing, is that Mr. Esherick deals with his tenants as individual human ingredients in a vibrant city life. He shares his personal life with his tenants and becomes friends with his business acquaintances, a strength which makes him unusual in the commercial real estate community, to say the least.

Douglas Development Corporation is an unusual company. The trial testimony was replete with instances of the informal and good- natured atmosphere and characteristics of DDC. Mr. Esherick was an integral part of that, having responsibility for many of the commercial leases negotiated and maintained by DDC.

Despite the agony of being under investigation and then having to undergo trial over a period beginning in May 2003 through and including the present, Mr. Esherick has maintained

his honesty and professionalism in his dealings at Douglas Development Corporation. Although by nature a private person, he and his family have been the subject of intense media scrutiny throughout this torturous path to the present stage of this case.

Thus, the history and character of this defendant weigh strongly in his favor, and support a sentence of probation.

### (B) The Nature and Circumstances of the Offense

As to Count 4 (Wire Fraud), the testimony clearly demonstrates that Mr. Esherick had no financial stake in the transaction in question. We have written at length above concerning the fact that there was no actual loss to either Mr. Cayre or Morgan Stanley and will not go over this material again, other than to note that, at its worst and accepting everything the government says, this loan was collateralized by property owned by Mr. Jemal (or one of his subsidiary entities) and thus, no possible loss could ever have been occasioned to either Mr. Cayre or to Morgan Stanley. The PSIR's discussion in Paragraph 109 notes that MTD, under the umbrella of DDC, "was an entitled recipient of the funds requested on the invoice."   Mr. Esherick himself had no pecuniary interest with respect to this transaction, let alone an intent to harm or defraud anybody with respect to the nature of DDC's loan.  All parties believed that MTD was to be a genuine real estate commercial brokerage arm of Douglas Development Corporation, once it got started. Dave Medding testified to this as did Sabra Gould, both of whom were important witnesses for the government in this case.  The address eventually settled on as the invoice address for the MTD property was owned by Douglas Development Corporation, and the phone number rang on the desk of Ms. Gould.  In the final analysis, the money received by Norman and Douglas Jemal was money to which they were ultimately entitled.  Mr. Esherick had no financial role or part to play in this transaction whatsoever.

35

As to the tax counts, as noted in Section III, above, Mr. Esherick has always admitted to improperly claiming a mortgage interest real estate deduction and real property tax deduction. But the tax loss associated with them (28% of the improperly claimed deductions) under the Guidelines amounts to a Level 12 offense (more than $12,500 and less than $30,000). It is questionable whether Mr. Esherick would ever have been criminally charged in this case, were it not for the government's zealous prosecution Douglas Jemal in the bribery and fraud counts embodied in Counts 1 through 3 of the indictment, for which both he and Mr. Esherick were acquitted.

Importantly, in 2005, Mr. Esherick paid the full amount of taxes that could conceivably have been owed for the tax years in question and all other tax years, in an attempt to satisfy the IRS for any civil penalties and interest. Now the government takes Mr. Esherick to task, using the efforts of prior counsel to pay restitution prior to indictment as an admission of criminal tax liability, and ignoring the distinction between civil and criminal tax liability recognized in U.S. v. Daniel. The Application Note to United States Sentencing Guideline 3E1.1, Application Note 1(c) recommend acceptance of responsibility upon "voluntary payment of restitution prior to adjudication of guilt," among other factors.

In sum, the nature of the offenses of conviction in this case do not call for a sentence of incarceration, necessitating a removal of Mr. Esherick from his wife, his children, his career, and his work within the District of Columbia. A proper assessment of these factors weighs heavily in favor of a probationary sentence. No sentence of incarceration is necessary to promote proper respect for the law, to reflect the seriousness of the offense, to provide just punishment, to provide adequate general deterrence, or to protect the public.

36

**(C) Other Factors in § 3553**

Section 3553 also calls upon the Court to impose a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As noted above, in Section III (Acceptance of Responsibility) and Section IV (the Nature and Circumstances of the Offense), Mr. Esherick has recognized from the outset that he should not have taken the mortgage interest deduction for a home he did not own. All sums due and owing to the IRS and to the Office of the Comptroller of the State of Maryland or of the District of Columbia have been paid in full. Mr. Esherick's early admission, through counsel, of this limited aspect of his criminal tax liability mitigates the seriousness of the offense. His payment of restitution further weighs against the seriousness of the offense. In fact, Mr. Esherick has gone to extraordinary lengths to make sure that any money conceivably due and owing be paid. For this minimal level of tax lost, undersigned counsel urges that a sentence of probation more than adequately reflects the seriousness of the offense under these circumstances.

**(D)     General Deterrence and Specific Deterrence**

Section 3553(a) requires the Court to consider a sentence that will "afford adequate deterrence to criminal conduct (general deterrence)" and protect the public from further crimes of the Defendant. (specific deterrence)   There is no demonstrable interest in special or specific deterrence as to Mr. Esherick in order to protect the public from further crimes. This is not the type of offense, in the first instance, where special deterrence is normally regarded as a valid sentencing.

As to general deterrence, as noted above, where Mr. Esherick has been willing to admit his guilty to the offense of conviction since the outset of this investigation and has cured any financial or tax loss due and owing well before the issuance of an indictment, the need for

general deterrence is greatly reduced. In this regard, undersigned counsel points to the very first sentence of Section 3553(a), requiring that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Paragraph 2 of this subsection". The sentencing recommendations set forth hereinafter will fully satisfy the statutory sentencing interests, while ensuring that the sentence is not greater than necessary.

## V.        Sentencing Recommendation

Mr. Esherick's primary role in this case, from the Government's standpoint, was to provide a tangible link between Douglas Development and the wrongdoing of Michael Lorusso. But for his friendship with Mr. Lorusso, the government would not have targeted Mr. Esherick in this matter. Ultimately, the jury rejected the government's attempted characterization of the relationship between Mr. Esherick and Mr. Lorusso and acquitted all defendants of the charges alleged in Counts One, Two and Three.

As an employee of DDC, Mr. Esherick has worked hard and honorably. The former Director of the D.C. Office of Property Management testified – as a witness for the government – that Mr. Esherick always dealt fairly and honestly with the D.C. Government. Mr. Esherick's reputation for integrity in the commercial real estate market is superb.

Mr. Esherick's conviction in the Wire Fraud Count (assuming that the Court declines to order a new trial for Count Four) involves a stand-alone count where the supposed victims have stated that they suffered no loss – intended or actual. Mr. Esherick's conviction for tax years 2001 and 2002 was invited by undersigned counsel, and would have resulted in a guilty plea one year ago but for the government's trial strategy considerations.

A sentence sufficient but not greater than necessary to satisfy the goals of § 3553 is probation, with lengthy community service, and an appropriate fine. Such a sentence would

recognize Mr. Esherick's status as a first offender and would grant him credit for his substantial contributions to the community while allowing him to continue to so contribute. Moreover, this sentence would recognize that Mr. Esherick dealt with any conceivable tax liability prior to being indicted, and over a year before his conviction.

The government prosecuted this case by attempting to make it into something not borne out by the facts. It is seeking a sentence of incarceration by making the trial and verdict into something they were not, and, in Judge Friedman's words, trivializing that trial and verdict. Mr. Esherick should be sentenced for that for which he was convicted, which happens to be what he admitted to long before indictment and trial. He is a talented and decent family man who is an asset to this community. Mr. Esherick should be sentenced accordingly.

Respectfully submitted,


_____/s/_____
Paul F. Kemp (D.C. Bar # 922773)
Carol Elder Bruce (D.C. Bar #202200)
Mara Zusman
Venable LLP
One Church Street
Fifth Floor
Rockville, Maryland  20850
(301) 217-5600

Counsel for Blake Esherick