UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No. 05-0359-1, -3 (RMU) |
| | ) | |
| DOUGLAS JEMAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT BLAKE ESHERICK'S REPLY TO GOVERNMENT'S
MEMORANDUM IN AID OF SENTENCING**

Defendant Blake Esherick hereby submits the following Reply to the Government's

Memorandum in Aid of Sentencing ("Government Memorandum"):

**I.      Introduction**

In an extraordinary attempt to persuade the Court by an *ad hominem* attack on Blake

Esherick, government counsel has submitted a vitriolic Sentencing Memorandum which

besmirches the efforts of undersigned counsel, misstates and ignores the evidence, ignores

relevant portions of the Presentence Investigation Report ("PSIR"), and most importantly,

ridicules the verdict of the jury, both as to Mr. Esherick and as to Mr. Jemal.   The government's

unworthy invective comes apart when measured against the factors mandated in 18 U.S.C. §

3553, even calling upon the Court to sentence the Defendant according to Guideline calculations

rejected in the PSIR and not preserved by the government in its letter of objection pursuant to

Fed. R. Crim. P. 32.   In the final analysis, the government's Sentencing Memorandum is a

regurgitation of its opening and rebuttal jury arguments, falsely portraying the Defendant as

guilty of all Counts resoundingly rejected by the jury.   The government's position seeks to have

this Court overlook the hallmark principle of sentencing post–Booker v. United States: that a

Court "shall impose a sentence sufficient, but not greater than necessary" to satisfy the purposes of Section 3553.

In a flurry of inflammatory name-calling devoid of transcript references, government counsel provides the court with his personal opinion that "Mr. Esherick had a callous and dishonest streak" (Government Memorandum at 23), citing the mortgage interest and tax deduction which the government had just conceded five pages earlier in its Memorandum that Mr. Esherick had "not disputed" (Government Memorandum at 18).   In a total evidence-free zone, government counsel restates the very language of its opening statements which drew such a strong admonishment from this court:

> This conduct is simple thievery…and speaks volumes about who Esherick [sic] really is.  The defendant engaged in such conduct because he was greedy, because he believed the United States was an easy victim, because he was selfish, because he had a sense of entitlement, because he had no empathy for those who actually do pay their taxes, and because he could get away with it." (Government Memorandum at 23).

Undersigned counsel was not aware that the Court's Standing Order as to how parties should properly be referenced (by Mr. or Ms.) had been modified or withdrawn.  More critically, how can any lawyer respond to opposing counsel's unprofessional value judgments asserted in a fashion unsupported by any evidentiary or transcript references?  In truth, Mr. Esherick is not a thief; he is not greedy; he is not selfish; and he is not any of the names the government called him.  As numerous people, including Aimee Occhetti, an employee with the Office of Property Management, have written to the Court, Mr. Esherick is "very fair, honest, and extremely trustworthy."  See Letter from Aimee Occhetti, attached hereto as Exhibit 1.

In its nadir, the Government Memorandum at footnote 14 epitomizes how far the government is willing to go in its headlong flight from evidence and the jury verdict:

> Though Esherick [sic] was not convicted of the corruption Counts, the
> evidence demonstrated a series of dishonest encounters with Michael
> Lorusso and Esherick's [sic] preparation of dishonest documents for
> submission to the D.C. Government. (Government Memorandum at 24).

The government's Memorandum is a mean-spirited attack on Mr. Esherick, his family, and his co-workers that suggests nothing less than bitterness over the jury verdict. In a closing indignity, the government seeks to have Mr. Esherick separated from Douglas Jemal and Douglas Development Corporation by order of this Court as a condition of supervised release, which, as will be seen, was specifically rejected by the Court at the close of the verdict and is even more unsupportable at this stage of the proceedings. The Court should reject the government's invective and should only impose a sentence that reflects the verdict reached by the jury after seven weeks of trial and that considers all of the factors relevant to sentencing, including the fact that the loss on the wire fraud count was zero; there should be no adjustments for sophisticated means or vulnerable victim; and the only tax conduct the Court should consider is the taking of improper mortgage deductions, which Mr. Esherick was willing to plead to and to which ultimately he admitted in open court.

## II.    The Court May Not Consider Issues Raised by the Government For the First Time in its Sentencing Memorandum

### A.    The Court Should Not Consider the Government's "Hard Way" of Calculating Tax Loss

The government argues that the amount of unreported income and false deductions amount to over $600,000, with a total tax loss of close to $175,000, for the first time in its sentencing memorandum. See Government Memorandum at 20-21. (The government calls this approach to calculating tax loss the "'hard way.'") See id. at 20. Ms. Moses-Gregory could not utilize or evaluate for the Court this approach to calculating tax loss in the draft PSIR, since the government did not suggest that Ms. Moses-Gregory should use this method of calculating tax

3

loss in its January 24, 2007, letter to Ms. Moses-Gregory, in which it commented on the PSIR. Because the government has not previously raised this approach to calculating tax loss, the government is precluded from doing so for the first time in its Sentencing Memorandum without applying to the Court for permission to do so based on a showing of good cause. See Fed. R. Crim. P. 32 (f), (g) and (i). The government has made no such application or showing.

B. The Court Should Not Consider the Government's Argument that The Possible Sentence of Incarceration Should Range from 41 to 71 Months

For the first time in its sentencing memorandum, the government argues that the range of the possible sentence of incarceration should range be from 41 to 71 months for the first time in its sentencing memorandum. See Government Memorandum at 23-25. In the draft PSIR, Ms. Moses-Gregory recommended a range of imprisonment of 41 to 51 months. The government did not object to or question this range in its January 24, 2007, letter to Ms. Moses-Gregory and therefore is precluded from doing so in its sentencing memorandum without application to the Court showing good cause. See Fed. R. Crim. P. 32 (f), (g) and (i). The government has made no such showing.

C. The Court Should Not Consider the Government's Argument that the Court Should Require Mr. Esherick to Sever Ties with Mr. Douglas Jemal

The government argues that the Court should require that Mr. Esherick should sever ties with Mr. Douglas Jemal as a term of supervised release. See Government Memorandum at 25-29. Ms. Moses-Gregory did not recommend the imposition of such a condition, and the government did not assert this argument in its January 24 letter. The government is precluded from raising this argument now without showing good cause. See Fed. R. Crim. P. 32 (f), (g) and (i). The government has made no such showing.

### III.    Count Four: Wire Fraud

A.    The Government's Arguments For An Intended Loss To Morgan Stanley In The Esherick Sentencing Memorandum Are Without Merit

As Ms. Moses-Gregory noted in the PSIR, the Court "may find the nature and circumstances of the Wire Fraud offense are such that there was no intended loss." (PSIR, Paragraph 109) The Court should so find. The government's claims in its sentencing memorandum related to Mr. Esherick that Defendants intended a loss to Morgan Stanley of approximately $430,000 (the amount of the MTD invoice) are wholly without merit.

The government's argument is premised on the factual assertion that "[t]he MTD invoice was intended to obtain $430,000 from Morgan Stanley at a time when the defendants were not entitled to that amount." Government Memorandum at 3. The government bases that claim, in turn, on the assertion that Morgan Stanley "had rigorous procedures for ensuring that funds drawn on the Tenant Improvement Construction Reserve would in fact be spent on tenant improvements." Id. The government's factual assertions are incorrect.

Morgan Stanley did not require funds drawn on the Tenant Improvement Construction reserve to be spent solely on tenant improvements at 77 P Street. In fact, the first draw request to Morgan Stanley contained invoices for leasing commissions related to a lease transaction between Cayre Jemal's Gateway and the District of Columbia's Department of Transportation and Department of Health. One of the invoices was from the Staubach Company, reflecting the commission related to the Department of Health portion of the transaction, and the other invoice was from MTD, reflecting the commission related to the Department of Transportation portion of the transaction. See GX 411-0002. The government ignores the fact that Morgan Stanley paid the Staubach leasing commission without incident, even though it was for a commission rather than any tenant improvements at the 77 P Street property. (Morgan Stanley representative Ben

Black testified that nothing in the loan agreement prohibited the payment of leasing commissions out of the tenant improvement reserve. Tr. 1267-68. Therefore, contrary to the government's claim, the Morgan Stanley loan agreement undeniably permitted the payment of leasing commissions out of the tenant improvement reserve.

The government also ignores Mr. Cayre's testimony that Mr. Jemal was "entitled" to the leasing commission reflected in the MTD invoice pursuant to their agreement. Tr. 2144. Because the Morgan Stanley loan permitted the payment of leasing commissions out of the tenant improvements reserve, and Mr. Jemal was entitled to the leasing commission at issue pursuant to his agreement with Mr. Cayre, the government is flat wrong in its claim that Defendants intended to obtain funds "to which they were not entitled from Morgan Stanley" by way of the MTD invoice. Government Memorandum at 3. For this reason alone, the Court should reject the government's intended loss argument.[1]

The government's reliance on United States v. Younes, 194 Fed. Appx. 302, 2006 WL 2567481 (6th Cir. Sept. 5, 2006), an unpublished opinion, is similarly misplaced. In that case, the defendants fraudulently obtained federal financial aid for their vocational school by submitting false paperwork regarding students' eligibility for financial aid. Id. at 305. The defendants contended that the loss amount should have been reduced because some of the students would have been eligible for the aid if the correct paperwork had been filed. The court rejected that argument because "to qualify for benefits does not entitle one to them, and the

---

[1] The government's argument relies on a jury instruction that the defendants contend is erroneous. See Defendants' Motion for a New Trial on Count Four of the Indictment. As defendants argued in their Motion for a New Trial, the written "claim of right" instruction relating to Count Four contained an erroneous statement of law that was highly prejudicial and permitted a conviction even if the jury believed Defendants did not intend to harm Joe Cayre or Morgan Stanley in connection with the MTD transaction. Not only was the instruction erroneous and caused an improper conviction, but now the government is using it as a basis to enhance the guidelines sentence.

government was in fact defrauded when it disbursed funds to students whose applications or documentation were deficient." Id. at 316.

Here, however, Morgan Stanley had no discretion to pick and choose among the vendors and contractors providing services related to 77 P Street before paying them out of the tenant improvements reserve. As long as the invoices contained in the draw requests to Morgan Stanley were for tenant improvements or other qualified expenses -- such as the Douglas Development property management fees and the Staubach leasing commission that Morgan Stanley paid out of the tenant improvements reserve -- Morgan Stanley was obligated to pay them. In other words, a vendor or contactor who submitted a qualified expense was entitled to payment from Morgan Stanley. This distinction renders Younes inapposite.

The government also misconstrues the meaning of the Guidelines commentary providing that "intended loss" includes "pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 (App. Note 3(A)(ii)). The government contends that this commentary makes any belief that loss was "unlikely or remote or even, in defendants' minds, impossible . . . irrelevant and immaterial to the loss calculation." Government Memorandum at 5. The government is simply wrong in its interpretation. A belief by the defendant that loss to the alleged victim would be impossible is highly relevant to the intended loss calculation and in fact precludes a finding of intended loss.

At the term "intended loss" suggests, to apply an enhancement for intended loss the possibility of loss "must exist at least in the defendant's mind." United States v. Fearman, 297 F.3d 660, 662 (7th Cir. 2002). The commentary upon which the government relies is intended to cover situations where the defendant intends a loss to his victim, but for reasons unknown to the defendant relating to the victim's status or circumstances (e.g., he is an undercover agent), such a

loss would have been impossible. For example, the Guidelines commentary states that an enhancement for intended loss could be applied in "a government sting operation, or an insurance fraud in which the claim exceeded the insured value." U.S.S.G. § 2B1.1 (App. Note. 3(A)(ii)). However, the "goal" in the intended loss analysis is always "to capture the defendant's intent." Staples, 410 F.3d at 490. The government's claim that a purely theoretical loss that never crossed a defendant's mind could serve as a basis for enhancing a sentence for "intended loss" is incorrect.

Indeed, the government's argument ignores the rationale that courts have used to reduce intended loss in fraudulent loan cases by the amount of any collateral used to secure the loan. In such cases, "the size of the maximum loss that a fraud could have caused is circumstantial evidence of the intended loss . . . [and] the maximum possible loss is the maximum loss that a reasonable person in the defendant's position could have intended." Staples, 410 F.3d at 490. "If a reasonable person intends for the collateral to revert to the defrauded party (or understands that it will), then he or she does not intend to obtain the value of that collateral." Id. This and the other cases cited above demonstrate that the value of collateral is reduced from intended loss in a loan fraud case precisely because a defendant who fraudulently obtains a loan secured by collateral could not possibility intend to cause a loss of the full loan amount where the lender could always mitigate its loss by foreclosing on the collateral.

Even if the Court were to somehow accept the government's intended loss argument, the Court would still be required to give Defendant a full credit against that intended loss because Defendants effectively replaced the so-called fraudulently obtained funds by subsequently spending more than $430,000 on other tenant improvements at 77 P Street after the tenant improvements reserve was exhausted. The government argues that intended loss is greater than

$400,000 because "the defendant's conduct inherently put Morgan Stanley at risk that the Tenant

Improvement Construction Reserve would be short by $430,000 . . . ." Government

Memorandum at 4. Even if true (which Mr. Esherick disputes), any shortfall in the tenant

improvements reserve was more than made up by spending more than $3 million on additional

tenant improvements at 77 P Street after the tenant improvements reserve was exhausted. These

expenditures increased the value of Morgan Stanley's collateral and eliminated any "risk" to

Morgan Stanley caused by the payment of the MTD invoice. Because these expenditures were

made long before the government detected any offense, Mr. Esherick is entitled to a full credit

against loss that renders the intended loss zero. See U.S.S.G. § 2B1.1 (App. Note 2(E)(i));

United States v. Rothwell, 387 F.3d 579 (6th Cir. 2004).

Finally, the government argues that if the loss "cannot be reasonably be [sic] determined,

[the Court] should use the amount of the gain to the defendants as a measure of the loss."

Government Memorandum at 7. Because the loss in this case can reasonably be determined, it is

not necessary to use the amount of gain to defendants as a measure of loss. Moreover, there is

no gain to defendants because the money at issue was a loan; defendants were obligated to repay

the money, and they did so. Further, Mr. Esherick himself was not a recipient of the loan, and

was not a stakeholder in the properties to which the loan was applied, or in any account related to

the loan or its proceeds. No evidence exists as to Mr. Esherick "intending" loss as to this

transaction.

For all these reasons, as well as the reasons set forth in the Sentencing Memorandum on

behalf of Mr. Esherick, the Court should find that there was no intended loss as a result of the

Wire Fraud loss.

B. <u>Mr. Esherick Should Not Receive an Adjustment for Sophisticated Means</u>

The Court should not adjust Mr. Esherick's sentence for "sophisticated means" under §

2B1.1(b)(8)(C). It is axiomatic that, in order to apply such an enhancement, the court must

evaluate Mr. Esherick's specific and subjective conduct. <u>See</u> 2-17 Federal Sentencing for

Business Crimes § 17.04 (2006) (citing <u>United States v. Kraig</u>, 99 F.3d 1361, 1371 (6th Cir.

1996), for the proposition that a defendant involved in a complex or repetitive tax conspiracy is

not automatically given a sophisticated means enhancement if his or her own personal

involvement did not constitute sophisticated means, and <u>United States v. Butler</u>, 297 F.3d 505,

516 (6th Cir. 2002), for the proposition that the sophisticated means enhancement requires the

sentencing court to look at the actions taken by the individual). Mr. Esherick personally must

have engaged in "especially complex or especially intricate offense conduct pertaining to the

execution or concealment of an offense." §2B1.1, Application Note (8)(B). Given the high

standard for enhancing Mr. Esherick's sentence for sophisticated means and the government's

failure, and inability, to detail any acts by Mr. Esherick that would merit a sentencing

enhancement, the Court should not enhance Mr. Esherick's sentence. Ms. Moses-Gregory

agreed with this conclusion in the PSIR, writing "the consummated acts of the defendants does

not appear to meet the standard of sophisticated means." PSIR, Paragraph 20.

The evidence at trial established that MTD was contemplated and created in anticipation

of starting a legitimate real estate consulting company long before the MTD invoice was

submitted to Morgan Stanley on November 21, 2002. <u>See</u> DX 682 (I.R.S. Form SS-4

(Application for Employer Identification Number) sent to I.R.S. on August 27, 2002, and listing

August 1, 2002 date of MTD incorporation);[2] Tr. 864 (Medding: "Douglas Development was

---

[2] <u>See also</u> DX 681 (Entity Classification Election Form for MTD Real Estate Services, LLC signed on August 29, 2002).

setting up a LLC that would be for a specific purpose for leasing, for handling leasing transactions"); Tr. 3369-70 (Lorusso and Esherick discussed "whether or not it would be wise for DDC people to have a stand-alone operation to fill that role [like that of Staubach or Cushman & Wakefield] for the city"). Therefore, this is not a case that involves "hiding . . . transactions . . . through the use of fictitious entities, or corporate shells . . .," U.S.S.G. § 2B1.1 (App. Note 6(B)), because MTD was not a fictitious entity, but was created to perform legitimate services independent of Douglas Development. At most, this case involves a single transaction in which an existing affiliate of Douglas Development was used to issue one misleading invoice and accompanying documents to obtain a single commission payment to which Mr. Douglas Jemal was entitled, and does not involve the multi-faceted, especially complex or intricate conduct that constitutes "sophisticated means" by Mr. Esherick. See United States v. Sriram, No. 00 CR 0894, 2003 U.S. Dist. LEXIS 20055, at * 24 (N.D. Ill. Nov. 5, 2003) ("[T]he submission of false claims, in and of itself, cannot be said to be complex or intricate offensive conduct.").

Mr. Esherick had no financial role in the transaction. See Tr. at 869:13-870:24; 4078:2-5). Mr. Esherick had no role in the financial arrangements of the transaction. See Tr. at 932:23-933:2 (Dave Medding testified that he opened an account for MTD at Adams Bank). And no evidence suggests that Mr. Esherick ever followed MTD's transactions in the company's books. See Tr. at 846:10-23 (Dave Medding testified that Mr. Esherick never asked to look at DDC's general ledger and that Mr. Medding never saw a copy of the general ledger in Mr. Esherick's possession).

The only evidence in the record is that Mr. Esherick prepared an invoice from a real company that had a real tax identification number (see Tr. at 634:24-635:10), that operated from a real address (see Tr. at 1184:17-24), and that had a real phone number (see Tr. at 1184:25-

1185:7). Further, the government never established what document Mr. Esherick asked Mike Rowe to prepare. See Tr. at 1297:2-22. Accordingly, the Court should not enhance Mr. Esherick's sentence for sophisticated means.

### C. Mr. Esherick Should Not Receive an Adjustment for a Vulnerable Victim

Mr. Esherick should not receive an adjustment for a vulnerable victim. Although the government argues that "Mr. Rowe's demeanor was of a very decent, simple, gullible, trusting individual,"" and asserts that the defendants "could easily exploit him and induce him to sign documents," this is not the standard for applying a vulnerable victim sentencing enhancement.[3]

A vulnerable victim is a victim of the offense of conviction and any relevant conduct who is unusually vulnerable due to mental condition, or who is otherwise particularly susceptible to the criminal conduct. U.S. Sentencing Guidelines Manual § 3A1.1, application n. 2 (2002).

First, Mr. Rowe was not a victim of wire fraud. The government misleadingly cites United States v. Cruz, 106 F.3d 1134, 1136 (3rd Cir. 1997) for the proposition that the Second, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits have held that the vulnerable victim does not have to be the victim of the offense of the conviction, the cases the government cites in which the vulnerable victim is not the named victim of the offense of conviction all can be distinguished from the instant case. Among other cases, the government cites United States v. Young, 960 F.2d 955, 957 (11th Cir. 1992), in which the court applied a vulnerable victim enhancement in the prosecution of a bank officer for money laundering of funds stolen from elderly bank account holders, and United States v. Haggard, 41 F.3d 1320, 1325 (9th Cir. 1994),

---

[3] The government also argues that "the defendants, in a truly calculated, cynical and callous fashion implicated Mr. Rowe as a participant in their fraud scheme" and asserts that defense counsel "treat[ed] [Mr. Rowe] as an object of scorn if not derision, and clearly of diminished mental statute." Government Memorandum at 11. Again, these statements by the government are merely vitriolic rhetoric by the government entirely lacking an evidentiary basis, and intended to inflame this court, instead of providing it with a rational basis for deciding this case. Undersigned counsel re-read his examination of Mr. Rowe, and defies government counsel to justify its insulting characterization of this cross-examination, and the role of undersigned counsel.

in which the court applied a vulnerable victim enhancement in the prosecution of a prisoner for false statements for harm to family members caused by the prisoner's claims that he knew where a body was buried. Both decisions identify a class of persons likely to be targeted or victimized by the conduct of a defendant, even if they are not named as victims in the indictment. Neither these cases nor the other cases cited by the government are analogous to the case at hand. In this case, nothing Mr. Esherick or Mr. Jemal did caused harm to Mr. Rowe, who was not an investor in this transaction or someone likely to use the services of MTD.

Second, Mr. Rowe did not suffer from a mental condition that made him unusually vulnerable, as the government speciously argues. Case law suggests that people such as patients in the District of Columbia's Mental Retardation and Developmentally Disabled Administration (see United States v. Smith, 362 U.S. App. D.C. 415 (D.C. Cir. 2004)); a recent widow who had never previously managed her own finances and who had recently suffered a minor stroke (see United States v. Fox, 1998 U.S. App. LEXIS 9763 (D.C. Cir. 1998)); individuals who are somewhat unfamiliar with the English language and tax enforcement in the United States (see United States v. Shyllon, 304 U.S. App. D.C. 23 (D.C. Cir. 1993)), and special education students who are emotionally troubled students (see United States v. Long, 185 F. Supp. 2d 30, 40 (D.D.C. 2001)) might be considered vulnerable victims. There was no evidence presented at trial that Mr. Rowe suffers from mental retardation, is developmentally disabled, recently suffered a stroke, is unfamiliar with English, is emotionally troubled, or suffers from any other condition that would make him unusually vulnerable. Thus, Mr. Esherick should not receive a sentencing enhancement for vulnerable victim, because as Ms. Moses-Gregory concluded in the PSIR, "[t]here is no argument that Mr. Rowe was an unknowing participant…his traits do not necessarily meet the criteria of an impaired victimized person."

IV.    **Counts Five and Six:  Tax Evasion for 2001 and 2002**

    A.  The Court Should Not Consider Uncharged Conduct for 1999 and 2000

        1.  The Court Should Not Consider Uncharged Conduct Related to Deductions

In its sentencing memorandum, the government argues that pursuant to §2T1.1, App.

Note 2 of the Sentencing Guidelines, the Court should consider uncharged conduct consisting of

improper deductions taken in 1999 and 2000.  The government fails to recognize that the Court

cannot consider any tax conduct from 1999 or 2000 because it has not been proved criminal.

In United States v. Daniel, Ronald Wesley Daniel failed to file federal income tax returns

for 1982-1987.  See United States v. Daniel, 956 F.2d 540, 542 (6th Cir. 1992).  The government

indicted Daniel on three counts of income tax evasion (1985, 1986, and 1987) and the jury

convicted him on these counts.  At sentencing, the district court considered past conduct not

included in the conduct, including Daniel's failure to file income tax returns and tax liabilities for

1982, 1983, and 1984.  Daniel, 956 F.2d at 544.  Daniel challenged this consideration of past

conduct, and the United States Court of Appeals for the Sixth Circuit remanded for resentencing.

In doing so, the Sixth Circuit found that "'all conduct violating the tax laws' must refer to *all*

*relevant criminal conduct underlying the charged offense*."  Daniel, 956 F.2d at 544.  Because

Daniel's liability for tax years 1982-1984 was a *civil* tax liability not part of the underlying

criminal conviction, and because Daniel was not able to disprove the civil liability alleged by the

government in the pre-sentence report, the district court should not have included any liability

for tax years 1982-1984 in its calculation of tax loss.

As in Daniel, this Court should not consider any alleged liability of Mr. Esherick in tax

years 1999 and 2000.  Any tax liability for those years is a civil liability that was not part of the

criminal conviction, and Mr. Esherick has not had an opportunity to challenge that alleged civil

14

liability. Former counsel to Mr. Esherick has confirmed in a letter to Ms. Moses-Gregory that although Mr. Esherick filed amended tax returns for 1999 and 2000, no criminal indictment had been filed against Mr. Esherick in relation to those years. Rather, the filing of the amended returns was "a good faith effort to resolve any tax-related issues with the government, and was not intended to be an admission of civil tax deficiency or guilt on criminal tax-evasion charges." *See* Letter from David C. Tobin to Paul F. Kemp, Jan. 24, 2007, attached hereto as Exhibit 2.[4]

   2. The Court Should Not Consider Uncharged Conduct Related to Income

   The government also argues that the Court should include in its calculation of tax loss monies that it alleges are unreported income for 2000-2004. None of the government's arguments for why the Court should include these monies in its calculation are persuasive.

   First, the government argues that by filing amended tax returns, Mr. Esherick has admitted that he received income in the form of housing, direct payments from Douglas Development Corporation ("DDC") to his ex-wife, the provision of payments toward personal automobiles, and loans from DDC. <u>See</u> Government Memorandum at 14. Mr. Esherick has done no such thing. The filing of amended tax returns – prior to indictment – was not intended to be an admission of civil tax deficiency or guilt on criminal tax evasion charges. Rather, Mr. Esherick filed amended returns in a good-faith effort prior to the indictment in this matter to resolve any tax-related issues regardless of the merits of those claims, and on the advice of counsel. The hope of prior counsel was that, by the payment of any arguable tax liability which the Government might postulate as to Mr. Esherick, he could avoid indictment. The Court should not now use this effort at a pre-indictment resolution of the case – the preparation of these amended tax returns - against Mr. Esherick in determining loss for purposes of sentencing. As

---

[4] To the extent that the amended returns for 2001 and 2002 did not correct the improper deductions, that was an error by the return preparer that former counsel for Mr. Esherick accidentally failed to correct.

the Second Circuit has noted, the filing of an amended tax return is "not an admission of fraud" and is encouraged by the taxing authorities.  United States v. Dyer, 922 F.2d 105, 108 (2d Cir. 1990).  Mr. Esherick should not be penalized for having filed these amended returns, and their contents should not be deemed admissions by Mr. Esherick.  That is precisely the tack of the government, and it should be rejected by the court for the very reason that such an argument discourages taxpayers from attempting to resolve, without necessity of formal tax charges or criminal charges, any attendant tax liability.

Moreover, in briefing in the related case of United States v. Brownell, the government seems to concede that Mr. Esherick was acquitted of receiving "disguised income" from Mr. Jemal in the form of loans, use of company vehicles, payment of child support, and free housing. In a motion filed in Brownell, the government distinguished loans to Mr. Brownell from loans to Mr. Esherick, noting that loans to Mr. Esherick were recorded on the Douglas Development books in the loans receivable account, "suggesting that as far as DDC was concerned, Esherick owed DDC the amounts of the loans."  See Government's Response to Defendant Brownell's Motion In Limine To Preclude Expert Testimony on Ultimate Issue of Status of Payments of Loans at 2.  This position by the government is inconsistent with an argument by the government that the loans on the Douglas Development books actually were "disguised income" to Mr. Esherick.

Second, the government argues that "there is little question the things of value provided to Esherick from his employer...were intended to constitute compensation at the time."  Gov't's Sentencing Memorandum at 16.  It is not true that "there is little question" about this issue.  The truth is that the jury found that these things of value were not intended to constitute compensation.  The jury rebuffed the government's theory that Mr. Douglas Jemal and Mr.

Esherick committed tax evasion by having Mr. Douglas Jemal compensate Mr. Esherick with

"disguised income," thereby helping Mr. Esherick evade his obligation to pay tax on that

income. If the categories of payments identified by the government had been proved by the

government to be income to Mr. Esherick, then presumably Mr. Jemal would have been

convicted in Counts 5, 6 and 7. He was not. The jury acquitted Mr. Douglas Jemal on all three

of the tax counts against him.

Further, if the jury had accepted the government's strained theory of criminal tax

liability, Mr. Esherick would have been convicted in Count 7, representing tax year 2003. He

was not, despite having received more so-called "disguised income" in that year than in any

other year charged in the indictment or about which the jury heard evidence. (The court

admitted evidence as to its disguised income theory for several other years besides the years of

indictment, a fact which did not sway the jury to the very argument that the government now

makes to the court.). Moreover, the jurors' comments after the verdict indicated that their

convictions for Counts Five and Six were based only on the improper mortgage and real estate

tax deductions, and not the "disguised income" categories argued by the Government.

Third, the government argues that the monies it deems unreported income should be

considered by the Court in calculating tax loss because they are relevant conduct. See

Government Memorandum at 18. As to the categories of disguised income upon which the

government relies, there is no reason to believe that the defendant would have been convicted in

other tax years if he was acquitted for 2001 through 2003, as was Mr. Jemal. Importantly, Mr.

Esherick had no role to play in the preparation of any loan or child support checks, and no

testimony was elicited concerning which cars were used in earlier or later years than those

charged in the indictment. Mr. Esherick had no role, according to the testimony of Dave

Medding, in the booking of any of these payments to the company ledger, or any other financial aspect of these payments, including the preparation of his Form W-2 for tax reporting purposes. Moreover, all loan and child support payments were openly booked to Mr. Esherick, not hidden or obfuscated in any fashion.

The unit of prosecution for any tax offense is necessarily year by year. The government elected to include evidence from 2001 through 2003, and to introduce evidence from 1999 and 2000 in support of its obviously flawed case. The court allowed the government wide latitude at trial in the introduction of evidence on these points, and the jury rejected the government's arguments. The court should exercise its discretion to preclude the government from trivializing the efforts of our jury in its attempt to "convict" Mr. Esherick by a preponderance of the evidence.

Fourth, as argued in Mr. Esherick's Memorandum on Sentencing, the Court should not consider any alleged tax loss pursuant to the government's "disguised income" theory because the conduct relating to the government's "disguised income" theory is clearly unrelated to the conduct relating to the improper deductions. See Memorandum on Sentencing at 25.

B. The Court Should Not Consider Acquitted Conduct

In a footnote, the government argues that the Court should consider the 2003 tax year as part of its determination of relevant conduct, even though Mr. Esherick was acquitted of Count Seven. In support of its position, the government cites United States v. Dorcely, 454 F.3d 366, 372-73 (D.C. Cir. 2006) and United States v. Watts, 519 U.S. 148 (1997). See Gov't's Sentencing Memorandum at n. 7.[5] The government ignores the recent ruling by the United

---

[5] The government also cites United States v. Boney, 977 F.2d 624, 635 (D.C. Cir. 1992) for the proposition that in imposing a sentence, the court could consider the 12.72 grams of cocaine for which the defendant was acquitted of possession and could impose a range of 63 to 78 months, which was far greater than the 10 to 16 month range that was proper given the amount of cocaine for which the defendant was convicted of distributing. See

States District Court for the District of Columbia that consideration of acquitted conduct is not mandatory, but instead is wholly within the trial court's discretion. *See* United States v. Safavian, 2006 U.S. Dist. LEXIS 83170 at *21 (D.D.C. Nov. 16, 2006). In Safavian, the Court noted that the holding in Dorcely does not mandate consideration of acquitted conduct. Safavian, 2006 U.S. Dist. LEXIS 83170 at *21. The Court further stated that it believes that the "consideration of acquitted conduct "trivializes 'legal guilt' or 'legal innocence,' which is what a jury decides." Id. at *22 (citing United States v. Pimental, 367 F. Supp. 2d 143, 152 (D. Mass. 2005)). As in Safavian, the Court in this case should not consider the 2003 tax year (Count Seven) as part of its determination of relevant conduct. To do so would be to undermine and trivialize the jury's verdict on Count Seven.

Further, to the extent that consideration of acquitted conduct for the year 2003 would raise the category of sentencing from a level 12 to level 16 under §2T4.1, consideration of that conduct would violate Mr. Esherick's right to a jury trial. See Cunningham v. California, 549 U.S. __ (Jan. 22, 2007) ("This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.").

---

Gov't Sentencing Memorandum at n. 7. The government's citation of Boney simply ignores the seminal holding in Booker that a judge cannot impose a sentence outside the sentencing range established by the verdict rendered by the jury even in a period when the Sentencing Guidelines are advisory rather than mandatory. See United States v. Booker, 543 U.S. 220, 233 (2005) ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence *within a statutory range*") (emphasis added) (citations omitted); Id. at 244 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt"), recently affirmed by the Supreme Court in Cunningham v. California, 549 U.S. __ at 8 (Jan. 22, 2007).

## V.     An Appropriate Sentence After <u>Booker</u>

A.  The Court May Impose a Guidelines or Non-Guidelines Sentence

As the Court is aware, the Supreme Court fundamentally altered the federal sentencing

landscape in <u>United States v. Booker</u>, 543 U.S. 220 (2005), by holding that mandatory

application of the Sentencing Guidelines violated a defendant's Sixth Amendment right to a jury

trial.  With this decision, the Court freed sentencing courts from the rigid, formalistic framework

that existed under the Guidelines, replacing it with a system that provides judges the discretion to

consider any relevant characteristic of an offense or of the particular defendant.  As the Supreme

Court recently confirmed, courts are "no longer . . . tied to the sentencing range indicated in the

Guidelines." <u>Cunningham v. California</u>, 127 S.Ct. 856, 867 (p. 14) (2007).  Instead, courts are

"obliged to 'take account of' that range along with the sentencing goals Congress enumerated in

the [Sentencing Reform Act] at 18 U.S.C. § 3553(a)." <u>Id.</u> (quoting <u>Booker</u>, 543 U.S. at 259,

264); <u>see also</u> <u>United States v. Pickett</u>, -- F.3d --, 207 WL 445937, at *4 (D.C. Cir. Feb. 13,

2007) ("The Court's remedial opinion [in <u>Booker</u>] required the district court to treat the

Guidelines as advisory only and as simply one factor to be considered in sentencing.").

"One, but only one, of the factors sentencing court must also consider is the sentencing

range under the Guidelines." <u>Pickett</u>, 207 WL 445937, at *4.  Several courts have held that the

Guidelines are entitled to no greater weight than any of the other factors.  <u>See</u> <u>United States v.</u>

<u>Biheiri</u>, 356 F. Supp. 2d 589, 594 n.6 (E.D. Va. 2005) ("No individual factor is singled out as

having greater weight; instead, the richness of factual diversity in cases calls on sentencing

judges to consider all of the factors and to accord each factor the weight it deserves under the

circumstances."); <u>United States v. Simon</u>, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) ("[T]he

Guidelines are advisory and entitled to the same weight accorded to each other factor that the

Court is instructed to consider by § 3553(a).”); United States v. Ranum, 353 F. Supp. 2d 984, 986-987 (E.D. Wis. 2005) (giving equal weight to each factor listed in § 3553(a)).

The D.C. Circuit recently held that “A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence. To do so would be to take a large step in the direction of returning to the pre-Booker regime. Another approach, the correct one in our view, is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a).” Pickett, 2007 WL 445937, at *5 (footnote and citations omitted; emphasis added).[6]

“‘If Booker’s rendering the Guidelines discretionary means anything,’ it must give district court judges greater latitude in assessing potentially mitigating factors than they had under the Sentencing Guidelines.” United States v. Brown, 449 F.3d 154, 169 (D.C. Cir. 2006) (quoting United States v. Gomez, 431 F.3d 818, 825 (D.C. Cir. 2005)). The D.C. Circuit has also recognized that mitigating evidence that is not relevant to the Guidelines calculation may well be relevant to the district court’s analysis of the Section 3553(a) factors. United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005) It is through the consideration of all of these relevant sentencing factors that courts ensure they reach a “just punishment” as required by 18 U.S.C. § 3553(a). After the Court considers the Guidelines and Section 3553(a) factors, the court has the authority “(i) to impose the sentence that would have been imposed under the Guidelines,

---

[6] The D.C. Circuit has held that a sentence within a properly calculated Guidelines range is “entitled to a rebuttable presumption of reasonableness” on appeal. Dorcely, 454 F.3d at 376. However, the Supreme Court subsequently granted certiorari in a case to resolve the question of whether affording a presumption of reasonableness is consistent with Booker. See Rita v. United States, 127 S. Ct. 551 (2006) (granting certiorari on, among other things, issue of whether it is “consistent with United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), to accord a presumption of reasonableness to within-Guidelines sentences?”); see also Claiborne v. United States, 127 S. Ct. 551 (2006) (granting certiorari on related issue of whether it is “consistent with United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), to require that a sentence which constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances?”). We respectfully submit that affording a Guidelines sentence a presumption of reasonableness is fundamentally inconsistent with the Booker decision, and expect the Supreme Court to reach that conclusion in the near future.

*i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence." Crosby, 397 F.3d at 113.

    B.  Section 3553 Factors the Court Should and Should Not Consider

        1.  The Government's Rhetoric is not a Basis for a Lengthy Term of Incarceration

The government's overblown, *ad hominem* rhetoric is a bald-faced attempt at inflaming the court, not a proper basis for seeking a sentence of incarceration. The government's argument that Mr. Esherick should be incarcerated for 41 to 71 months is rife with vitriol, and deserves to be rejected. See Government Memorandum at 23-25; see section II B above for the argument that the government's recommendation of 71 months as the high end of the range, not preserved in its letter to the PSIR writer, is improper. As noted, the government argues that the "Court heard evidence demonstrating [sic] that when it came to matters of money, Mr. Esherick had a callous and calculating dishonest streak." Government Memorandum at 23. In truth, neither the Court nor the jury heard such evidence.

The government also fumes without evidentiary basis, "The defendant engaged in [taking improper deductions] because he was greedy, because he believed the United States of America was an easy victim, because he was selfish, because he had a sense of entitlement, because he had no empathy for those who actually do pay their taxes, and because he believed he could get away with it." Id. There is no evidence in the record to support this accusation by the government, and nothing could be further from the truth. The government's bitter rant misstates evidence known to it, though not presented to the jury at trial. To the extent that Mr. Esherick took improper deductions, he did so during the darkest days of his life. Mr. Esherick was going through a divorce that forced him to move out of his house and temporarily away from his children. Lacking funds and wanting to be able to spend more money on his children, Mr.

Esherick took improper deductions. He did not do so because he was greedy or selfish or had a sense of entitlement, and no witness suggested such motive. The government's slander of Mr. Esherick's character demeans the supposedly impartial role to be taken by the United States at every stage of a criminal proceeding, and could not be farther from the truth. He was desperately searching for funds that would enable him to better provide for his children. The Court should ignore the government's invective as that of a prosecutor disappointed in a jury verdict of acquittal on the counts that were the mainstay of his case – the bribery and gratuity counts, and the disguised income tax counts as to Mr. Jemal and Mr. Esherick. The government now resorts to unfounded armchair psychology to demonize Mr. Esherick. The court should sentence Mr. Esherick solely according to the counts on which he was convicted and the loss, if any, that was sustained. As the Defendant has argued, the loss on count Four is zero, and the tax loss is 28 % of the improper deductions to which Mr. Esherick admitted before the jury in closing argument.

Moreover, rather than enhance Mr. Esherick's sentence based on the government's extreme rhetoric, the Court should consider the true impact of any sentence in determining "a sentence sufficient, but not greater than necessary," as commanded by 18 U.S.C. 3553 (a). Mr. Esherick is a devoted son, husband, father, and uncle. Mr. Esherick has taken on enormous responsibility in caring for his mother, a widow, and visits her more frequently than any of his other siblings do. He is a devoted father who is very involved in his children's lives and who coaches his son's football team. And he is a popular uncle to his nieces and nephews. Mr. Esherick's wife, Stefanie, has provided poignant and reliable portrayal of the role he plays in his children's lives. See Letter from Stefanie Esherick, attached hereto as Exhibit 3. Mr. Esherick enjoys a tremendous bond with each of his children. See id. He has heart-to-heart conversations with his 13-year-old daughter, he coached his son's football team, and he takes his 4-year-old

daughter to gymnastics every week.  See id.  And numerous friends and other family members

have all heaped praise on Mr. Esherick as a family man.  See additional letters of support,

including letter from M. Bane and M. Imbroscio, attached hereto as Exhibit 4 and stating in part,

"Unlike many busy working fathers, Blake has always taken time to attend the school's events

with his daughter, and both Blake and Stefanie frequently volunteer to chaperone field trips and

participate in other school events.  It becomes readily apparent after only the most cursory

exposure to Blake that greed and selfishness simply are not in his repertoire;" letter from J.

Cassidy, attached hereto as Exhibit 5 and stating in part, "I have always been impressed by [Mr.

Esherick's] devotion to his family and friends.  In spite of the huge demands on his time, Blake

is first and foremost a family man.  One only has to spend five minutes with him to understand

what is most important to him – his wife Stephanie and his children Douglas, Taylor, and

Grayson;" letter from P. and P. Greif, attached hereto as Exhibit 6 and stating in part, "[Mr.

Esherick] is a loving husband and father.  His three children are his pride and joy.  He adores

Stephanie and they love spending time together as a family;" letter from K. Zanelotti, attached

hereto as Exhibit 7 and stating in part, "[Mr. Esherick's] children are at the center of his attention

at all times and I have seen first hand how he instills good values and a work ethic in them.  In

addition, Blake still maintains a healthy relationship with his elderly mother and takes the time to

visit her frequently in Florida."

    In addition to being a dedicated son, husband, father, and uncle, Mr. Esherick is a

devoted member of the District of Columbia community.  As James Cassidy wrote, "Washington

is a far better place because of the work of Blake Esherick...."" see Exhibit 5; as William Collins

wrote, "At Douglas Development[, Mr. Esherick] with others helped shape the cities [sic] new

vitality and luster and along the way has given not only money but inspiration and support to

causes that help others reach their goals." <u>see</u> Exhibit 8; as Jud Ryan wrote, "It has been amazing

with Blake and the rest of his team have been able to do to the Washington, DC area in terms of

revitalization. He is quite the visionary and a prime example of this is the Gallery Place

neighborhood next to the Verizon Center. What once was an unsafe place to be around is now

bustling 24 hours a day and is one of the more popular tourist destinations during the evening.

This is just one example of many, but what Blake has done for the community and area is mind-

blowing." <u>See</u> Exhibit 9.

Contrary to the government's baseless and desperate argument that Mr. Esherick should

be incarcerated for a term <u>20 months longer than even the highest term calculated according to

the PSIR's figuring of the Guidelines,</u> removing Mr. Esherick from his family and from the

Washington community for any amount of time will only cause serious harm to his family and

the community. Mr. Esherick's mother, wife, and children depend on him, and his daily

activities benefit the greater District of Columbia community. There is no benefit gained from

incarcerating him for any longer than the Court deems absolutely necessary, and the

government's invitation to do so runs blatantly afoul of the cardinal principle in § 3553 (a).

    2.  There is No Basis For The Court to Sever Ties Between Mr. Esherick and
        <u>Douglas Jemal</u>

As argued above, the Court should not re-consider the government's argument that the

Court require Mr. Esherick to sever ties with Mr. Douglas Jemal as a term of supervised release.

The government already has asked the Court to require Mr. Esherick to sever ties with

Mr. Douglas Jemal, and the Court already has denied the request. Tr. at 4880:16-19 (…"we

would ask that Mr. Esherick be ordered at this point, as somebody who's convicted of three

felonies now, that he be ordered at this point to just cease his association with Douglas

Jemal…"). The only justification that the government offered for its request was its assertion

that "Mr. Esherick was Mr. Jemal's trusted lieutenant" and that it would be "for the good of the community" that the two men not be permitted to associate with each other. Tr. at 4880:20-21; 4881:7-10. The Court rejected the government's request, observing "I don't see any interest to be served by, certainly none that the government has articulated persuasively that would serve the public's interest by requiring that Mr. Esherick should not associate further with Mr. Norman [Douglas] Jemal." Tr. at 4882:23-4883:1.

In its Sentencing Memorandum, the government adds only two arguments to those that the Court already has rejected. The government argues (1) that the severance of ties between Mr. Esherick and Mr. Douglas Jemal "is essential for the rehabilitation of Esherick" (Gov't's Sentencing Memorandum at 27) and (2) that "[i]t would undermine respect for the law" if Mr. Esherick were permitted to continue his relationship with Douglas Jemal (id. at 29). Apart from the utter illogic of how this measure would add to the "rehabilitation" of Mr. Esherick, or promote respect for the law, neither new argument is a proper basis for requiring Mr. Esherick to sever his ties with Mr. Douglas Jemal.

In fact, to the extent Mr. Esherick needed to be "rehabilitated," he has been so rehabilitated. As Mr. Esherick's wife, Stefanie, wrote, "Blake recognizes that he has made some mistakes with regard to his mortgage deductions and I know he has learned from those mistakes. He realizes that the way he handled his tax situation put his family in jeopardy and the trial was an experience that will forever influence his future decisions." See Exhibit 3.

Moreover, significant incarceration is not required to "promote respect for the law." Rather, the Court should consider the serious consequences of incarcerating Mr. Esherick, including the harm that would result to his family, including his wife and three children. Mr.

Esherick is the sole provider for his wife Stefanie and their daughter Grayson, and he supports

his two children from his marriage to Barbara Gill.

Respectfully submitted,

Paul F. Kemp (D.C. Bar # 922773)
Carol Elder Bruce (D.C. Bar #202200)
Venable LLP
One Church Street
Fifth Floor
Rockville, Maryland  20850
(301) 217-5600

Counsel for Blake Esherick

February 20, 2007

The Honorable Ricardo M. Urbina
United States District Court for the
District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Urbina:

I am pleased to write a letter of strong support on behalf of Blake Esherick, whom I have known for about six years and worked closely with for four years. I work for the District government in the Office of Property Management (so I am well aware of all the Court proceedings). My role in my current position is largely negotiating leases on behalf of the District government.

I have negotiated several deals with Douglas Development, on most occasions dealing with Blake directly. I have a great relationship with Blake. I enjoy working with him more than most of the brokers in D.C. I find him to be very fair, honest, and extremely trustworthy.

Douglas Development, on the whole, has contributed substantially to real estate development in the District. It is difficult to be as successful as Douglas Development has been without having a good reputation in real estate. Both Douglas Development and Blake have only good intentions in their commitment to the development of the District. They believe in developing the entire city, not just the middle to upper class areas; this has benefited the residents of the District.

I enjoy working with Blake and hope to continue this relationship over the years. I believe that Blake is strongly committed to the District. We should all remember the accomplishments that have occurred over the years, thanks to Douglas Development and Blake Esherick.

Sincerely,

Aimee Occhetti, Esq.

Exhibit 1

# Tobin
# O'Connor
# Ewing &
# Richard

**Attorneys at Law**
*A Partnership of Professional Corporations*

*Practicality in Practice*

David C. Tobin
Direct Dial (202) 362-5903
dctobin@tobinoconnor.com

January 24, 2007

Mr. Paul F. Kemp
One Church Street
Fifth Floor
Rockville, MD  20850

RE:    <u>United States v. Blake C. Esherick, Docket No. CR-05-359-03</u>

Dear Mr. Kemp:

This firm previously represented Blake C. Esherick in connection with the above-referenced matter.

As you may be aware, during the course of that representation, and in connection therewith, I advised Mr. Esherick to file amended tax returns, Form 502X's, for a number of years that were the subject of the government's investigation.  Based on my advice, Mr. Esherick did so.

At the time those returns were filed, we included a notice with each return that identified the subject area of the amendments, so that the government would have full disclosure of the nature of the amendments.  This was done in an effort to address any civil claims that might have arisen against Mr. Esherick, regardless of the merits of those claims.  The filing of these amended returns was a good faith effort to resolve any tax-related issues with the government, and was not intended to be an admission of civil tax deficiency or guilt on criminal tax-evasion charges.

If my memory serves me correctly, no indictment had been returned at the time the amended returns were filed.  Indeed, on or about August 15, 2005, I sent a letter to Ms. Rosemary E. Paguni, Esq., Chief of the Northern Division Criminal Enforcement Section, Tax Division, U.S. Department of Justice, requesting a conference with that office _before_ any decision to bring any tax charges against Mr. Esherick was reached.  By letter dated August 18, 2005, the Tax Division denied my request, and referred me back to the United States Attorney for the District of Columbia.  I will be happy to provide you with copies of these letters if you wish.

5335 Wisconsin Avenue, NW
Suite 700
Washington, DC 20015

Phone  202-362-5900
Fax  202-362-5901
www.tobinoconnor.com

*Exhibit 2*

Mr. Paul F. Kemp
January 24, 2007
Page 2


Needless to say, in light of the Tax Division's refusal to confer, I never had the opportunity to discuss the merits <u>vel non</u> of any particular item on Mr. Esherick's returns. Nor for that matter do I recall ever discussing the factual or legal merits of any item on Mr. Esherick's returns during informal discussions with Mr. Dubester, the Assistant United States Attorney who was the lead prosecutor on the case.

Please let me know if I can be of any further assistance.

Sincerely,

David C. Tobin

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

My name is Stefanie Esherick, my husband is Blake Esherick. I am writing this
letter on his behalf for your consideration at his sentencing on March 15, 2007. I am not
quite certain how to put my feelings and thoughts onto paper in a way that would make
sense to anyone, and I have been working on this letter for some time now. I begin to cry
thinking about the uncertainty of our future.

I met Blake in 1999. He was working for Douglas Development and living in
Bethesda with his co-worker. Once we began dating, I learned on a deeper level what a
wonderful man he is. One night, we were walking to dinner and passed a homeless man
that others ignored. As we were finishing our meal, Blake ordered the man a prime rib
dinner and delivered it to the homeless man. He told me that the man "deserved to eat as
well as I do." He still often gives food to homeless men and women. When his oldest
daughter's school needed help transporting students, most parents did not offer to help.
Blake rented a bus to provide the transportation for the school. When it snows, he
shovels some of the older neighbors' sidewalks. He has donated both his time and his
money to various charities. He patronizes merchants and restaurants in the city that he
shared a vision and was instrumental in helping to revitalize, and make it the great city it
is today.

Blake is also an exceptional father. He works as hard and long as he does for his
family and still cooks us all breakfast every weekend. He has heart-to-heart talks with his
thirteen year old daughter about the trials and tribulations of adolescence. He
volunteered to coach his son's football team and takes his 4 year old daughter to
gymnastics every Saturday morning. Blake makes the time to foster an independent
relationship with each child, doing various things whether it is playing one-on-one in
basketball, or "date night" (taking one of the girls to dinner). His shares a tremendous
bond with his children and I would hate for him to be absent from their lives for even a
day.

Blake is my life. He is my best friend. He is the one who knows all my secrets.
He has seen me at my worst and makes me want to be a better person. He makes me
want to get up in the morning and do it all over again tomorrow.

EXHIBIT 3

Of course, I am aware of the conviction that my husband is facing. I survived an FBI raid on my home, including being searched by agents and having everything we own handled by strangers. I attended the nearly eight-week trial daily. Blake recognizes that he has made some mistakes with regard to his mortgage deductions and I know he has learned from those mistakes. He realizes that the way he handled his tax situation put his family in jeopardy and the trial was an experience that will forever influence his future decisions. It was difficult for all involved, but being a husband and a father trying to protect his family while trying to defend himself was extremely hard on Blake. I ask that you consider everyone involved when sentencing my husband.

Sincerely,

Stefanie Esherick

## Michael X. Imbroscio & Marcie L. Bane
7211 16th Street N.W.
Washington, DC 20012
(202) 291-0230

February 7, 2007

Honorable Ricardo M. Urbina,
United States District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington, DC 20001

Dear Judge Urbina,

We are writing to offer our strongest support of Blake Esherick, whom we understand is scheduled to be sentenced by your Honor on March 15, 2007. Blake is a caring, unselfish, dedicated father and friend, and we respectfully ask that you take our views into consideration as you determine an appropriate sentence for Blake next month.

We have gotten to know Blake and his family over the past two years as our children have attended nursery school together at the Chevy Chase Presbyterian Church here in Washington. Even in this relatively short period of time, Blake's character and generosity have become immediately evident to us.

In the first instance, Blake, along with his wife Stefanie, has repeatedly demonstrated extraordinary support to the school community. This support is often financial -- the Esherisk's are first in line to provide needed monetary assistance to the class and staff -- but more frequently it is intangible. Unlike many busy working fathers, Blake has always taken time to attend the school's events with his daughter, and both Blake and Stefanie frequently volunteer to chaperone field trips and participate in other school events. It becomes readily apparent after only the most cursory exposure to Blake that greed and selfishness are simply not in his repertoire.

We have been the personal beneficiaries of Blake and Stefanie's giving and selflessness. As the parent's of two young sons and a third on the way, we have on countless unpredictable occasions found ourselves in need of help -- whether it be watching our younger son during an unexpected medical appointment or taking our older son after school when Marcie was too exhausted and just needed a break. They have never once turned us away. Not only do Blake and Stefanie care for our children as if they were their own, but they truly enjoy them. They treat our boys like family. They do all of this without the slightest expectation of anything in return -- the truest sign of unconditional friendship.

*Exhibit 4*

Hon. Ricardo M. Urbina
February 7, 2007
Page 2

Perhaps the greatest indication of Blake's character is his unqualified devotion to his daughter. It is easy to see that she is the light of his life, and he in turn is her heart and soul. The bond that they share serves as a tremendous model for our own relationship with our children, and we sincerely hope that it will be possible that they will not have to be separated during this important time in her development.

We hope you find this letter of some help in appreciating who Blake is as a person and the positive impact he has made on so many people in his life.

Sincerely,

Marcie L. Bane                          Michael X. Imbroscio

# CASSIDY & PINKARD

**COLLIERS**
INTERNATIONAL

February 5, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.
20001

Dear Judge Urbina:

I am writing you today in support of my friend Blake Esherick. I know he will be standing before you in short order to receive a sentence for his recent convictions.

I met Blake in 2001 when we sat on opposite sides of the table during a lease negotiation. Since that time, I have had numerous opportunities to work with him on several leases. Though each time we represented competing interests, I found that he conducted himself in a professional manner and my clients were pleased with their tenure as a Douglas Development Corporation's tenants

Since 2001, Blake and I have been both colleagues and friends. He consistently takes the time to say hello or have the occasional meal and his warmth and enthusiasm are infectious. I have always been impressed by his devotion to his family and friends. In spite of his the huge demands on his time, Blake is first and foremost a family man. One only has to spend five minutes with him to understand what is most important to him - his wife Stephanie and his children Douglas, Taylor, and Grayson.

As a native Washingtonian and lifelong follower of the real estate market I have often marveled at what Douglas Development has been able to accomplish. As a company they have reshaped the East-end of the city from a blighted area to a bustling downtown. Blake Esherick has been a key figure in this effort. As a leasing broker for Douglas Development, his determination and moxie have lured tenants back to this area of the city. Washington is a far better place because of the work of Blake Esherick and it is my sincere hope, as a fellow real estate professional and a friend, that he is allowed to continue both his role as a vital member of our business community and as a husband and father. I appreciate your time and consideration.

Sincerely,

James P. Cassidy
Vice President

*Exhibit 5*

*Real Results In Real Estate®*

**Commercial Real Estate**    2001 Pennsylvania Avenue, NW   Suite 800   Washington, DC 20006   Tel. 202.463.2100   Fax: 202.223.2989
www.cassidypinkard.com

Paul and Paula Greif
720 Chestertown Street
Gaithersburg, Maryland 20878

February 8, 2007

The Honorable Ricardo M. Urbina
United States District Court
District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

**RE: Mr. Blake Esherick**

Dear Judge Urbina:

This is a Letter of Support for Blake Esherick. While we understand that Blake was convicted by a jury of his peers, we find it completely inconsistent with Blake's character.

We have known Blake for over three years. We first met Blake when he volunteered to coach our seven year old son's flag football team. I recall that the league was having difficulty finding a volunteer to coach the boys. Numerous calls and requests were made to the parents. I was called, but said I did not have enough time. However, when Blake was called, he said yes, and he volunteered to be the football coach of our son and 15 other boys.

He was an outstanding coach and mentor to the boys and my son still refers to him as "Coach Blake." He taught the boys about hard work, character, persistence, and playing football. He was a great role model. He emphasized discipline, team work, and having fun. Blake did not need to preach these qualities to the boys because these qualities are embodied in who he is and it was obvious to the boys. We could not have asked for a better coach and mentor for our son's flag football team and I am sure all the parents feel the same way.

Since our meeting, we have become close friends with Blake and his wife, Stephanie. Our families have spent time together and we have gotten to know Blake very well. He is a loving husband and father. His three children are his pride and joy. He adores Stephanie and they love spending time together as a family.

In closing, we offer this Letter of Support for Blake because we know he is a man of character, honesty and integrity. He is the type of guy who would give you the shirt off his back if you needed it. He is a good friend, husband, father, and last, but not least, a good coach and mentor.

Thank you for allowing us to present his Letter of Support for Blake Esherick.

Respectfully,

Paul and Paula Greif

*Exhibit 6*



10212 Southard Drive
Beltsville, Maryland 20705
Tel: 301.937.0030, Fax: 301.937.3676

February 1, 2007

The Honorable Ricardo M Urbina
United States District Court for
The District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20005

Re: Blake Esherick

Dear Judge Urbina:

Soon you will be deciding the final outcome of the future of Blake Esherick as his trial and
sentencing comes to a close. It is my hope, and that of my family and associates, that you take
into consideration Blake's many virtues and true character.

In the mid 1960's I first met Blake's family through our community church, Saint John the
Baptist Catholic Church in Silver Spring, Maryland. Throughout the next fifteen years I
became best friends with Blake's older brother Doug, who subsequently died an unexpected
death in 1983. Because of this relationship with his brother, I was able to watch a young
Blake develop through his formidable years. He became a very good athlete in junior high,
high school, and then college. As the youngest of five children, it was rewarding to watch him
become successful in his athletics, his studies and then in his professional career, especially
after losing both his brother and father in such a short period of time.

I have also witnessed Blake's growth as family man. While his first marriage ended in
divorce, I was able to observe him in what was, for a long time, a successful marriage. He
became a devoted father and husband. In his second marriage to Stephanie, and in the
subsequent birth of his third child, Blake has again been a good family man while maintaining
the responsibilities to his older children. His children are at the center of his attention at all
times and I have seen first hand how he instills good values and a work ethic in them. In
addition, Blake still maintains a healthy relationship with his elderly mother and takes the time
to visit her frequently in Florida. She is a dear woman and I know that the past year has been
very troubling to her.

*Exhibit 7*

Honorable Judge Urbina

Page 2

In his work with Douglas Development, Blake has proven to be a hard working associate who has put in the long hours that are required to help build and maintain the diverse property portfolio that has been their hallmark. There are many times when I have called him well into the night to find him still working on projects that require his attention and expertise. I would be very happy to find just one person with his work ethic to work in my business.

In closing, I would ask that you find leniency and an understanding of Blake's true character prior to making the decision on his sentencing. He is truly a good father, husband, and businessman who I know will come out of this situation a better person for having been through it.

Sincerely,

Kurt L. Zanelotti
President
Contract Carpet Systems, Inc.

February 4, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.,
Washington, D. C. 20001

Dear Judge Urbina,

I am writing this letter to you in connection with the recent conviction of Blake Esherick. I have known Blake for over 10 years and know him as an honest and giving individual. I met Blake when he was getting started in the real estate business. Blake has always treated the people he has come in contact with respect and fairness. Blake has also looked for ways to reach out to the community and help others less fortunate then himself. At Douglas Development he with others helped shaped the cities new vitality and luster and along the way has given not only money but inspiration and support to causes that help others reach their goals. A few examples of those efforts are the rebuilding of a Synagogue on 6th Street or giving time to the Salvation Army during the holidays. The list of individuals and groups he has helped is long and broad. His foundation is set in the belief that the greatest gift of all is in giving people hope. In closing, the District is a better place because of Blake. I only hope is that he is given a chance to remain in the community with his wife and children to continue to make it a better place to live and work. Thank you for taking the time to listen to my thoughts.

Sincerely,

William M. Collins
2001 Pennsylvania Ave, NW
Washington, DC  20006

Exhibit 8

**CASSIDY & PINKARD**  COLLIERS INTERNATIONAL

February 9, 2007

The Honorable Ricarodo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Mr. Urbina:

My name is Jud Ryan and I've been in the Washington, DC real estate market since graduating college in 2000. Since that time, our firm (Cassidy & Pinkard) and myself have had the pleasure of working with Blake Esherick on numerous occasions. I was deeply saddened and surprised when I heard of the charges being brought on Blake and felt the least I could do was to write this letter.

Blake is such a genuinely nice man and as one of the more junior people on our team, I more than many respect this above anything. The amount of time he is willing to spend answering questions, ensuring information is received timely and switching from day-to-day tasks to help the transactional process along has been tremendous. Though Blake's size may be intimidating to some, I've learned that his heart is larger than any exterior attributes. I would be honored to work for or with him in any capacity.

It has been amazing what Blake and the rest of his team have been able to do to the Washington, DC area in terms of revitalization. He is quite the visionary and a prime example of this is the Gallery Place neighborhood next to the Verizon Center. What once was an unsafe place to be around, is now bustling 24 hours a day and is one of the more popular tourist destinations during the evening. This is just one example of many, but what Blake has done for the community and area is mind-blowing.

Again, not sure what impact this letter can have in the whole process, but I certainly feel that it is important to hear what a commendable person and respectable man Blake Esherick is.

Sincerely,

Jud Ryan

*Exhibit 9*

*Real Results In Real Estate*®

**Commercial Real Estate**  2001 Pennsylvania Avenue, N.W  Suite 800  Washington, DC 20006  Tel: 202.463.2100  Fax: 202.223.2989
www.cassidypinkard.com