UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA           :
                                   :
        v.                         :        **Crim. No. 05-359-03 (RMU)**
                                   :
**BLAKE C. ESHERICK**              :

GOVERNMENT'S RESPONSE TO
MEMORANDUM ON SENTENCING ON BEHALF
OF DEFENDANT BLAKE ESHERICK

The United States of America, through its attorney, the United States Attorney for the

District of Columbia, respectfully submits this Response to Defendant Esherick's Sentencing

Memorandum.

I.  THE DEFENDANT IS NOT ENTITLED TO CREDIT FOR
ACCEPTANCE OF RESPONSIBILITY

The defendant did not plead guilty nor did he admit guilt during trial.  Rather, he put the

government to its evidence.  The law is clear that a defendant who puts the government through

its proof is not entitled any "acceptance of responsibility" credit except in "rare circumstances"

such as the preservation of a constitutional issue for appeal.  See, e.g., In re: Sealed Case, 350

F.3d 113, 117, 119 & n. 3 (D.C. Cir. 2003) (citing cases); United States v. Dozier, 162 F.3d 120,

126-28 (D.C.Cir.1998) (affirming trial court's decision to deny acceptance of responsibility

credit to defendant who twice offered to plead guilty to weapons charges (of which he was

subsequently convicted) but refused to plead to drug charges (of which he was acquitted)).[1]

---

[1]    At a minimum, Mr. Esherick could have pleaded guilty to tax years 2001 and
2002, informed the Court, like Mr. Brownell, that there was a sufficient basis for the plea, and
left the "loss" issue for sentencing.

The defendant relies almost entirely on a misleading characterization of plea discussions and his claim that he was held hostage. Not only is this argument improper, it has no relation to fact. Thus, the defendant claims that he is entitled to acceptance of responsibility because he offered, pre-trial, to plead guilty to a minimal tax violation (and thus receive probation) in exchange for the dismissal of all counts – including the corruption counts and the wire fraud count on which he was convicted. This offer was hardly meaningful; there was no way it would be accepted by the government, and it was properly rejected.[2]

Counsel's characterization of the trial record is likewise inaccurate. Although he claims that he "explicitly exhorted the jury [that it] should hold Mr. Esherick accountable on these improper deductions," in reality counsel argued for acquittal and asked the jury, in essence, to disregard the evidence of guilt of the false deductions. Thus counsel argued:

"Does he have to stand accountable on the matter that we talked about before with respect to the mortgage interest deduction? Clearly, he does. There's no question about that. But the things that the Court's instructed you on, what this case is all about in these three [tax] counts is the four categories of income that the Court has instructed you on."

Tr. at 4676. And, at the conclusion, counsel for Mr. Esherick argued:

"You are deciding the fate of our clients. Under the state of the evidence before

---

[2]     Indeed, in one of the cases cited by the defendant, the defendant prior to trial pleaded guilty to two of the offenses and went to trial on the remaining counts. United States v. Weidner, 437 F.3d 1023, 1031 (10th Cir. 2006). Presumably the defendant in Weidner pleaded because he was guilty of the counts to which he pleaded, and truly wanted to be in a position of "accepting responsibility" for that conduct if he were acquitted of the other counts. Blake Esehrick has demonstrated nothing of that nature in this case.

you in this case, I implore you to do what our constitution requires, what the

Court's instructions require, and that is to find these people not guilty of these

charges."

Tr. at 4714. Thus, the defendant urged the jury to minimize and disregard the clear evidence of

his guilt as to the false deductions, to focus on "what this case is all about," namely, the income,

and to acquit on all counts. Counsel's tactical decision not to dispute the indisputable but to

minimize the significance of the false deductions is an understandable trial strategy to preserve

credibility with the jury on other counts. However, it certainly does not reflect his client's

"acceptance of responsibility."

Finally, we note a truly stunning fact that completely belies the defendant's claim that he

has accepted responsibility: when the defendant filed his amended returns in 2005 – supposedly

to clean up his tax status and ward off indictment – he did not in fact correct the false deductions

that as to which he claims he has "accepted responsibility." He did not correct them for 2001, or

2002, let alone 1999 or 2000 (and he continues to argue the Court should not consider the 1999

or 2000 conduct in fashioning sentence). To the government's knowledge, he <u>never</u>, to this date

(let alone pre-trial) filed amended returns acknowledging the false deductions for mortgage

interest and state taxes.

The defendant weaves his assertion that he has accepted responsibility into page after

page of his pleading. It is repeated so often as to suggest that it must be true, and it forms the

centerpiece of his conclusion. This claim is meritless and does not gain strength upon repetition.

## II. THE PRE-SENTENCE REPORT PROPERLY FOUND THE LOSS FOR GUIDELINES PURPOSES AS OVER $400,000

### A. Defendant's Guideline Loss Was $430,000.

The defendant, through myriad and necessarily complicated arguments, tries to get away from the simple facts in this case: the defendants intended to deprive others of $430,000 that defendants were not entitled to by obtaining that money through a fraudulent MTD invoice hiding the relationship between MTD and Douglas Jemal and Douglas Development and falsely claiming entitlement to a lease commission for representing the District of Columbia. Defendants were not entitled to receive $430,000 from Morgan Stanley for (not) representing the District of Columbia; they wanted that money immediately to purchase another building (on Massachusetts Avenue); they obtained that money through a fraudulent invoice; and they never wrote a check to Morgan Stanley returning the money.

Defendants' arguments to the contrary all boil down to one overarching theme: we have so many assets in collateral, personal guarantees, and tenant improvement expenditures (even if Douglas Development was overdrawn by more than $100,000 at the time of the MTD-400 Mass. Ave. transaction), that we should be allowed to engage in fraud to obtain several hundred thousand dollars in the short run because we (ultimately) probably could have covered the fraud loss (unless the market went into a downturn).[3]  The Court should soundly reject such arguments.

---

[3]     According to the defendants' logic, their conduct in obtaining $430,000 was less serious than that of a bank teller who embezzles $5,001. Indeed, taken to its logical conclusion, defendants are really arguing that it would not matter if the amount obtained by fraud was $430,000, $1 million, or $10 million; that it is nearly impossible for Douglas Jemal to ever commit bank fraud in connection with a loan, because no matter if he obtains $400,00, $1 million or $10 million, the bank can always sue to recover fraudulently obtained funds. Indeed, the defendants' interpretation of the Guidelines would carve out a "wealthy defendant" exception in applying the Guidelines to fraud prosecutions – the wealthier the defendant, the greater the

Fraud is fraud; and Douglas Jemal and Blake Esherick had other, more legitimate ways to finance the purchase of 400 Massachusetts Avenue (such as by obtaining a loan backed by their other assets) than the vast majority of other people who are tempted to commit fraud because of pressing financial need but who lack the resources and advantages of these defendants. To "promote respect for the law," see 18 U.S.C. § 3553(a)(2)(A), in particular the principle that we are all equal under the law—high and low, rich and poor, rough and plain—defendants should not be given more favorable treatment because they had vast resources at their disposal but chose the easy, criminal way instead to obtain $430,000.

    B.  Defendant Is Not Entitled To A Credit Against Loss.

        1.  There Is No Credit Based On Collateral Here.

Defendants are not entitled to a credit under Application Note 2(E)(ii) based on the collateral pledged to obtain the Morgan Stanley loan in the first place. The fraudulent $430,000 MTD invoice was not a fraud to obtain the $67 million Morgan Stanley loan ab initio; it was a fraud to obtain money (from the Tenant Improvement fund) to which the defendants were not entitled, but which defendants needed immediately to purchase another building (not to renovate 77 P Street). Thus, all the cases on which defendants rely on are wholly inapposite. In those cases, the initial loan was obtained under false pretenses or through a false application, and the defendant's collateral backing up the loan was used as a credit against loss. Here, however, the $430,000 invoice paid to MTD was not a loan to MTD obtained under false pretenses; it was reimbursement for MTD's purported representation of the District of Columbia's Department of

---

amount of funds that could be obtained by fraud without "intending loss" as the defendants would interpret those terms. This is the precise opposite of the purposes of the Sentencing Guidelines, and would distort the purposes of sentencing.

Transportation. MTD, unlike the defendants in the cases on which defendants rely, was not

obtaining a loan and it was never planning on paying Morgan Stanley back on such a non-loan.

Thus, defendants' lengthy discussion of these cases, see Sentencing Memo. at 14-18, has no

bearing whatsoever on the analysis of the application of the Guidelines in this case.

2. Defendants Did Not Return Money To the Victim.

Nor are defendants entitled to a credit for amounts spent on renovating 77 P Street under

Application Note 2(E)(i).[4]  First, the Application Note presumes a consciousness of guilt on the

part of a defendant.  That is, it is based on the notion that a defendant, realizing that he has done

wrong, decides—before he has been caught—that he should attempt to make his victim whole by

returning his unlawful proceeds.  When a defendant reaches such a moral realization, and acts

accordingly (even before he is being prosecuted), it is typically right and fitting that the loss

amount—and therefore the presumptive sentence—be reduced.

Understood in those terms, Application Note 2(E)(I) has no bearing whatsoever here.

The defendants have argued repeatedly—at trial, in the post-trial motions, and in their sentencing

letters and memoranda—that they never intended to harm Morgan Stanley or Joseph Cayre, and,

more generally, that no loss was inflicted or intended.  If, as they have consistently argued, they

did no wrong, they could not have knowingly and intentionally "returned" money to Morgan

Stanley or Joseph Cayre; for they would have had no reason to have done so.[5]  In other words, if

---

[4]      Application Note 2(E)(i) provides, in part:

"The money returned * * * by the defendant or other persons acting jointly with
the defendant[ ] to the victim before the offense was detected."

[5]      United States v. Rothwell, 387 F.3d 579 (6th Cir. 2004), a non-binding opinion, is
consistent with this point.  In Rothwell, the defendant pleading guilty for having made a false,

they were truly blameless, as they have maintained, they would not, as rational and sophisticated businessmen, have "returned" money to an entity they never intended to harm.

Second, and even more importantly, Application Note 2(E)(i) has no bearing here because there is no proof the $430,000 was actually returned to the victim. Defendants conspicuously do not argue that they cut a check in the amount of $430,000 and sent it to Morgan Stanley before the MTD fraud was discovered. But that is the only way defendants would have been entitled to a credit under Application Note 2(E)(i). See United States v. Radtke, 415 F.3d 826, 842 (8th Cir. 2005) ("The commentary to the guidelines provides that the court should apply a credit where the defendant returns the very money or property taken as part of the fraud."). Money the defendants chose to spend on tenant improvements thereafter does not count as "money * * * returned to the victim," because it is impossible to determine whether expenditures not approved by Morgan Stanley benefitted Morgan Stanley or primarily benefitted the Cayre-Jemal partnership.

Morgan Stanley had a right to review and approve draws from the Tenant Improvement fund. Morgan Stanley in fact exercised this review thoroughly, going so far as to challenge Douglas Development's request for a commission. Thus, assuming defendant is correct that the Cayre-Jemal partnership spent money on renovating 77 P Street above and beyond the entire amount set aside in the Tenant Improvement fund allocated under the loan agreement, that does not mean that the excess funds were returned to the victim.

---

fictitious, and fraudulent material statement in connection with a loan from the Small Business Administration. In other words, that defendant admitted that his conduct was improper, and that there thus was a victim. Under the circumstances there, but not here, it could make sense that he would repay a victim, because he was actually admitting there was a victim.

To take an example of how the interests of property owners and lenders are not necessarily the same, if the Cayre-Jemal partnership determined that, over the long term, the value of the property to the partnership would be increased if $1 million was spent on the lobby of 77 P Street, but Morgan Stanley's interests in the loan would have been sufficiently protected by a lobby that cost $250,000, it cannot be fairly stated that the defendants "returned" $750,000 to Morgan Stanley by spending $1 million.

Likewise, if the Cayre-Jemal partnership determined that it could save money over the long term by installing windows and lighting fixtures that saved energy, even though such features were more expensive to purchase initially, should the additional expenditures be counted as having been returned to Morgan Stanley if they are included in tenant improvement costs?

More generally, an owner of a building could decide to make certain tenant improvements that were so costly that they placed other, more important but less visible, improvements in jeopardy for lack of funding. Under such circumstances, the lender would not be seen to have benefitted or having received the return of money with respect to such expenditures.

Put simply, the defendants obtained the $430,000 from Morgan Stanley at the end of 2002, and they never specifically and unequivocally returned that money to the victim so that Morgan Stanley (not Blake Esherick, Douglas Jemal, or John Brownell) could decide what was best to do with it. Without Morgan Stanley's seal of approval on an excess expenditure—such as the approval Morgan Stanley gave to the MTD commission because it relied on the fraudulent invoice—there is no reasonable way to determine whether amounts the Cayre-Jemal partnership

spent on renovating 77 P Street should count as having been "returned" to Morgan Stanley.[6]

In sum, either there is no credit—because the funds were not truly returned to the victim—or the calculations necessary to separate out expenditures that primarily benefitted the Cayre-Jemal partnership from those which benefitted Morgan Stanley are so complicated that the loss "reasonably cannot be determined," and the Court should look instead to the defendants' gain. See U.S.S.G. § 2B1.1, App. Note 2(B).[7]

Finally, to the extent the Court determines that the funds the Cayre-Jemal partnership spent renovating 77 P Street were actually "returned" to Morgan Stanley, the sentence that would result from a zero loss calculation "would substantially understate[] the seriousness of the offense." See U.S.S.G. § 2B.1.1, App. Note 15(A). Under such circumstances, the Court should depart upward under the Guidelines to reflect the seriousness of the offense—an offense involving defendants' sophisticated fraud scheme to obtain $430,000 by duping Michael Rowe and by using a false MTD invoice printed on fifth generation-or-more MTD letterhead designed to conceal Douglas Development's ownership and control over that entity.

3. The Loss Need Only Be Proved By A Preponderance Of The Evidence

The defendant seeks to avoid the obvious amount of loss due and owing from a fraudulent invoice in the amount of $430,000, which is understandable but unavailing. But

---

[6]    To the extent Rothwell simply assumes that all moneys spent renovating a building are "returned" to a lender, without differentiating between moneys spent to further the owner's interests from funds spent to further the lender's interests, and without requiring that the money actually be given to the lender so the lender can decide whether it should go back to the owner, that non-binding, light-on-any-meaningful-analysis opinion is inconsistent with Application Note 2(E)(i) and should be disregarded.

[7]    The gain here is the value of the invoice, or $430,000.

defendant is incorrect in contending that the Court must hear proof of the loss amount above and beyond a preponderance of the evidence. The D.C. Circuit has made absolutely clear that a preponderance of the evidence standard is appropriate in this jurisdiction <u>even for acquitted conduct</u>, not just relevant conduct or conduct inherent to the convicted crime itself (as is the case here). See <u>United States</u> v. <u>Dorcely</u>, 454 F.3d 366, 373 (D.C. Cir. 2006) ("[B]efore <u>Booker</u>, we rejected the argument that facts at sentencing must be proved by a more stringent standard than preponderance of the evidence * * * including findings that the defendant engaged in conduct of which he was acquitted * * *. Nothing in <u>Booker</u> suggests a contrary result."). Moreover, the sentence defendant would receive if he is quite reasonably held to account for the full value of the $430,000 MTD invoice is not so extraordinary that it could ever require more than a preponderance of the evidence. In any event, the Court heard evidence at trial that establishes proof far beyond a preponderance of the evidence that the defendant intended a loss of $430,000 by submitting a fraudulent invoice to deprive Morgan Stanley of that amount—an amount to which defendants were not entitled and had to resort to fraud to obtain.[8]

Moreover, the defendant specifically declined to seek a special verdict on this Count or any other Count, to permit such a finding to be made by the jury:

> THE COURT: * * * [T]here was some discussion as well about the possibility of a special verdict form, but I understand that that request has been withdrawn.
>
> MR. WEINGARTEN: Yes.

---

[8]     Defendant's citation to a district court case from Massachusetts, <u>United States</u> v. <u>Pimental</u>, 367 F. Supp. 2d 143 (D. Mass. 2005), is wholly unavailing inasmuch as it takes the position that a sentence enhancement may not, post-<u>Booker</u>, be based on acquitted conduct—a position that has been <u>explicitly</u> rejected by the D.C. Circuit. See <u>Dorcely</u>, 454 F.3d at 374; see also <u>United States</u> v. <u>Edwards</u>, 417 F. Supp. 2d 17, 25-26 (D.D.C. 2006) (rejecting <u>Pimental</u>).

Tr. at 4648. The defense, having specifically declined to have the jury make this finding (beyond a reasonable doubt), cannot now claim that the jury should have done so.

### IV. THE COURT'S CONSIDERATION OF RELEVANT CONDUCT AND "ACQUITTED CONDUCT"

At sentencing, the Court should properly consider, without limitation, as much information about a convicted defendant as is relevant to the sentencing decision. As to this, the law cannot be more clear:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661.

In considering how the Court should factor in "acquitted conduct," it is important to note as a threshold matter that there are numerous cases where conduct that has not been the subject of a jury verdict and is in the nature of unproven criminal conduct is profoundly relevant to a proper sentence, and properly considered by the sentencing Court. Thus, for example, "other crimes" evidence may be excluded at trial, statements and physical evidence may be suppressed, evidence in codefendant cases may be excluded against one defendant because it unfairly prejudices another, evidence of related crimes in other jurisdictions may simply never be brought. In this case, for example, Mr. Esherick was not charged with, though he certainly committed, the exact same false deduction scheme in 1999 and 2000 as he did in 2001 and 2002.

There cannot be the slightest suggestion that the Court should not consider such evidence at sentencing. Criminal prosecutions are not sport where the evidentiary rules that keep evidence from a jury operate to keep that same evidence from being appropriately considered by the Court

at sentencing. The legal constraints or considerations that keep certain "bad acts" or incriminating conduct from the jury do not require that such conduct and evidence be concealed from the Court or that the Court pretend that evidence that was not presented at trial does not exist. This would require the Court to close its eye to the unadmitted confession, suppressed evidence, non-venued but proven wrongdoing, or evidence that was excluded from a codefendant trial (in recognition of the rights of the other defendants). Indeed, in this case, as with nearly every case, it is not only the Government but the defendant who brings to the Court's attention at sentencing information that is far outside the narrow trial record.

The same reasoning supports the Court's proper consideration of what the defense refers to as "acquitted conduct." First, the requirement that the Court consider, without limitation, all conduct of the defendant has always been understood – pre-Guidelines, Guidelines, and post-Booker – as permitting the Court to consider "acquitted conduct" so long as it has been proved by a preponderance of the evidence. This is settled post-Booker law: "[A] sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury. In so holding, we agree with every circuit that has considered the question post-Booker." United States v. Dorcely, 454 F.3d at 371 (D.C. Cir. 2006) (citing cases).

The contention that considering such conduct is unfair or involves punishment for the acquitted offense is simply not accurate: "'[C]onsideration of information about the defendant's character and conduct at sentencing does not result in "punishment" for any offense other than the one of which the defendant was convicted.' *** Rather, the defendant is 'punished only for the fact that the present offense was carried out in a manner that warrants increased punishment ***.'" United States v. Watts, 519 U.S. 148, 155 (1997) (quoting Witte v. United

-12-

States, 515 U.S. 389, 401, 403 (1995)).  Simply put, an acquittal does not necessarily represent a

jury rejection of any particular facts and does not prove innocence. "[A]n acquittal is not a

finding of fact. *** Without specific jury findings, no one can logically draw any factual finding

inferences." United States v. Watts, 519 U.S. at 155  (quoting United States v. Putra, 78 F.3d

1386, 1394 (9th Cir. 1996) (C.J. Wallace, dissenting)).

The consideration of so-called acquitted conduct in the post-Booker sentencing, is

particularly appropriate.  As noted by one Judge of this Court:

> Booker itself provides strong support for enhancement of sentences
> based on acquitted conduct. See, e.g., United States v. Booker,
> [543 U.S. 220, 233 (2005)] ("when a trial judge exercises his
> discretion to select a specific sentence within a defined range, the
> defendant has no right to a jury determination of the facts that the
> judge deems relevant").   * * * The majority remedial opinion of
> Justice Breyer confirms that judges retain the authority, in an
> advisory Guidelines regime, to determine facts and relevant
> conduct for purposes of the traditional judicial role in sentencing.

United States v. Edwards, 427 F. Supp. 2d 17 (D.D.C. 2006) (Bates, J.).

Thus, at sentencing, the defense will make numerous representations about their clients

involving factual assertions far afield from the limited trial record.  They ask the Court to accept

as true letters from well-wishers and ask the Court to accept their representations of a defendant's

good points.  None of these are set forth in "evidence" to which the Court is required to make

findings; none of those representations have been proved or tested or been subject to cross-

examination.

Similarly, the government has brought forth some relevant information, and has taken

care to make sure there is record evidence to support its contentions as to its sentencing

recommendations.  As to the Guidelines calculation, for example, the Government simply asks

that the Court use as a measure of the loss: 1) the income the defendant reported in his amended returns, and, 2) the 1999 and 2000 false deductions for mortgage interest and state property taxes.[9] Because of rulings designed to expedite and streamline the codefendant trial, the amended returns (filed in 2005) were not introduced at trial – but they were properly relied on by Ms. Moses-Gregory, and moreover, the fact that they were not considered by the jury has nothing to do with keeping them from being considered by this Court.

Moreover, the government does not otherwise rely on the "acquitted conduct" but for a single point, albeit an important one.  The government does ask the Court to conclude that the trial record – by at least a preponderance of the record – demonstrates that Mr. Esherick engaged in numerous significant acts of dishonesty on behalf of Mr. Jemal.  The Court can appropriately consider the entirety of the trial record, including the evidence on the corruption counts in assessing the various sentencing factors, such as "the nature and circumstances of the offense and the reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and readily conclude that Mr. Esherick deserves significant punishment.

---

[9]     The Government would also be willing to call witnesses at the sentencing hearing to testify to the loss amount set forth in the IRS Agent's spread sheets.

WHEREFORE, the government requests this Court consider this Memorandum in imposing sentence.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:

Mark H. Dubester, D.C. Bar No. 339655
Timothy G. Lynch, D.C. Bar No. 456506
Assistant United States Attorneys
555 4th Street, NW,
Washington, D.C. 20530
(202) 514-7986

-15-