### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 05-0359 (RMU) |
| | : | |
| DOUGLAS JEMAL and | : | Document Nos.:    306, 307 **FILED** |
| BLAKE C. ESHERICK, | : | |
| | : | |
| Defendants. | : | MAR 1 2 2007 |

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### MEMORANDUM OPINION

**DENYING THE DEFENDANTS' MOTION FOR A NEW TRIAL; DENYING THE DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL**

### I. INTRODUCTION

A jury convicted the defendants, Douglas Jemal and Blake Esherick, of one count of wire fraud, in violation of 18 U.S.C. § 1343.[1]  Pending before the court are the defendants' post-trial motions, seeking either a judgment of acquittal or a new trial on their wire fraud convictions.  In their motion for a judgment of acquittal, the defendants argue that the government did not provide sufficient evidence of fraudulent intent and that the government failed to prove the materiality of the misrepresentations.  In the motion for a new trial, the defendants assert that the court gave an improper jury instruction and that the prosecutor made an improper propensity argument in his rebuttal during closing arguments.  Viewing the evidence in the light most favorable to the government, a reasonable jury could conclude that the defendants possessed the requisite fraudulent intent and that the misrepresentations made by the defendants were material.  The court accordingly denies the defendants' motion for a judgment of acquittal.  Because the

---

[1]      The jury also convicted Blake Esherick of two counts of tax evasion, in violation of 26 U.S.C. § 7201.

court's instructions on the wire fraud count reflected correct statements of law and because the

alleged improper prosecutorial remarks did not prejudice the defendants, the court also denies the

motion for a new trial.

## II. BACKGROUND

### A. Factual Background[2]

The actions underlying the defendants' fraud convictions consisted of submitting a false

invoice and false lien release information to Morgan Stanley and Joseph Cayre. Cayre and

defendant Jemal were each 50% owners in a partnership called Cayre-Jemal Gateway Holdings

("CJG"). In 1998, CJG bought the property and building at 77 P Street, NE, Washington, DC

(the "P Street property") for $5 million. Indictment at 21. Cayre "put up the money and [Jemal]

did all the work," Tr. 2114, and "[Cayre] got half the profit and [Jemal] got half the profit," Tr.

2115.

From 1998 to 2001, in an effort to develop the P Street property, CJG borrowed money

from various lenders. Indictment at 21. As of November 2002, CJG owed approximately $40

million on a construction loan[3] used in the development of the P Street property. *Id.* In addition,

---

      [2]      Because a jury convicted the defendants, the court recites the facts in the light most favorable to the government. *United States v. Martinez*, --- F.3d ----, 2007 WL 489217, at *1 (D.C. Cir. Feb. 16, 2007).

      [3]      "A construction loan is implicitly for the purpose of building a piece of commercial real estate, [and] a permanent loan is typically put in place once the construction has been completed, and the building or the property has . . . stabilized, which generally means that the leases are in place and the property is now performing at a stabilized level going forward." Tr. 1204.

the CJG partnership owed Cayre money, and defendant Jemal personally owed money to Cayre.[4]
*Id.*

On November 19, 2002, CJG entered into a loan agreement with Morgan Stanley. Pursuant to the loan agreement, Morgan Stanley lent CJG $67 million, secured by the P Street property. Of the $67 million, CJG used $41 million to pay off the outstanding construction loan. Tr. 1257, 2143. Morgan Stanley held back $19 million, which it would release to CJG when all the tenants had moved into the P Street property and were paying rent. Indictment at 22; Tr. 1212. Prior to the loan settlement, defendant Jemal and Cayre had agreed that Cayre would receive nearly all of the $19 million once Morgan Stanley released the money. Indictment at 23; Tr. 2143. The purpose of the agreement between Jemal and Cayre was to pay back Cayre for the money he loaned to CJG and to Jemal. Indictment at 23.

Morgan Stanley also held back approximately $7 million and placed it in escrow. Tr. 2145. "[T]his portion of the loan proceeds was referred to as a 'tenant improvement [TI] construction reserve' (tenant improvement reserve)," Indictment at 22, and was to be used for tenant improvements associated with the buildout of the unoccupied space at the P Street property, Tr. 2143; Govt's Opp'n to Defs.' Mot. for J. of Acquittal on Count Four or, in the Alternative, for a New Trial ("Govt's MJOA Opp'n") at 2. The purpose of the TI construction reserve was "to ensure that vendors and/or contractors that furnish invoices or receipts or other similar documentation are in fact then paid." Tr. 1216.

According to the loan agreement between CJG and Morgan Stanley, the funds in the TI

---

[4]    As of the year 2001, defendant Douglas Jemal owed his partner more than $19 million. Indictment at 21.

construction reserve were to be disbursed "directly to . . . third party vendors and/or contractors that provide invoices, receipts or similar written documents." Indictment at 22; Tr. 1215. The loan agreement did not define the term "third party vendor and/or contractor." Indictment at 22; Tr. 1215. The loan agreement also provided that the funds in the TI reserve were not to be disbursed directly to CJG. Indictment at 23; Tr. 1215, 1268.

On November 18, 2002, an employee at Douglas Development Corporation ("DDC"), a company owned by defendant Jemal, authored a memo to Cayre explaining the details of the loan, which stated in part: "Note that $7 million is being held back to fund the remaining tenant improvements and leasing commissions (all of these are to outside brokers)." Indictment at 24; Tr. 2145. Cayre understood the phrase "all of these are to outside brokers" to mean that defendant Jemal would not receive the money. Tr. 2145.

Two days after the loan settled, on November 22, 2002, DDC submitted its first draw request[5] to Morgan Stanley. Indictment at 24. Among the invoices submitted to justify the draw request was an invoice from MTD Real Estate Services, LLC ("MTD") to CJG for $430,039.08. *Id.* MTD had been incorporated by attorneys for DDC, a company owned by defendant Jemal, in August 2002. Indictment at 21.

The MTD invoice stated that the payment was a leasing commission due for MTD's representation of the District of Columbia Department of Transportation ("DC DOT"). *Id.*

---

[5]      The mechanics of accessing the funds in the $7 million in the tenant improvement construction reserve required that CJG, through its agent, DDC, submit a draw request to Morgan Stanley. Tr. 1219-20. The draw request contained the contractor or vendor invoices that DDC needed to pay. The vendor and contractor invoices had to include lien waivers, in which the contractor or vendor promised not to attach a lien on the property if it was paid the invoiced amount. *Id.* 1217-18.

4

Neither MTD nor DDC, however, had an agency relationship with the DC DOT.[6] Tr. 1005,

3065-3066. Additionally, DDC did not have an agency relationship with the DC DOT.[7] Tr.

4622. Further, the invoice set forth a commission schedule based on a 10-year lease. The DC

DOT's actual lease, however, was for 8 ½ years. Indictment at 25. The MTD invoice also

represented that defendant Esherick "approved" the invoice for payment. *Id.*

        After receiving the MTD invoice, Morgan Stanley requested a lien release and wiring

instructions for MTD. *Id.* In response to Morgan Stanley's request, the defendants obtained the

signature of one of Jemal's acquaintances on a lien release document (the acquaintance "had no

knowledge of the affairs of MTD and no knowledge of the representations in the document").

*Id.*; Tr. 1293-1294. On the basis of the invoice and the lien release, on December 12, 2002,

Morgan Stanley authorized the transmission by wire of $430,039.08 to the MTD bank account at

Adams National Bank.[8] Tr. 1228, 1287. On December 13, 2002, a DDC employee and

defendant Jemal's son wired $400,000 out of the MTD account to the account of a settlement

company.[9] Tr. 661, 666. Defendant Jemal and his son used that money to purchase a property in

Washington, DC. Indictment at 26-27; Tr. 870, 930. Gov't's Ex. 54.7; Gov't's MJOA Opp'n at 7-

8. Three days later, on December 16, 2002, defendant Jemal wrote a check from the MTD

---

        [6]        The invoice also represented that MTD was located at 6856 Eastern Avenue, NW, a
property owned by Douglas Development Corporation ("DDC"). The phone number on the invoice was
the number associated with a fax line at DDC. Tr. 1184-1185.

        [7]        The only two companies that were authorized to represent District of Columbia
government agencies, such as the DC DOT, were the Staubach Company and Cushman & Wakefield. Tr.
1005, 3065-66.

        [8]        Defendant Jemal opened the account on December 10, 2002. Tr. 657-658.

        [9]        At the time, the DDC operating account was overdrawn more than $180,000. Tr. 872.

5

account, payable to DDC in the amount of $30,000. *Id.* at 8; Tr. 667-72; Govt's Ex. 54.11.

## B. Procedural Background

On October 26, 2006, the jury convicted defendants Jemal and Esherick of one count of wire each fraud in connection with the MTD invoice. The defendants have filed two post-trial motions: one for a judgment of acquittal and one for a new trial. The court now turns to the defendants' motions.

## III. ANALYSIS

### A. The Defendants' Motion for Judgment of Acquittal

The defendants argue that the court should set aside the verdict and enter a judgment of acquittal because the evidence in insufficient to sustain a conviction. Mem. of Law in Supp. of Defs.' Mot. for J. of Acquittal on Count Four of the Indictment or, in the Alternative, for a New Trial Because the Verdict is Against the Weight of the Evidence ("Defs.' MJOA") at 1. According to the defendants, the evidence is insufficient to sustain a conviction because the government did not establish that the defendants possessed the requisite intent and because the government did not establish that the misrepresentations in the MTD invoice were material. *Id.* For its part, the government argues that the defendants fail to give the government the benefit of all reasonable inferences, that they make unwarranted credibility determinations, that the jury properly concluded that the defendants had the requisite intent, and that the misrepresentations in the MTD invoice, the lien releases and the memo to Cayre were material. Govt's MJOA Opp'n at 10, 16-23. For the reasons that follow, the court denies the defendants' motion for judgment

6

of acquittal.[10]

### (1) Legal Standard for a Rule 29 Motion for Acquittal

In ruling on a motion for judgment of acquittal, the trial court must determine whether "a reasonable jury *must necessarily* entertain reasonable doubt on the evidence presented." *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (emphasis in the original). In doing so, the court must view the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence. *Id.* The court must ask whether "a fair-minded and reasonable trier of fact [could] accept the evidence as probative of the defendant's guilt beyond a reasonable doubt." *In re Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993) (internal citation omitted). In other words, the court should deny the defendant's motion if "a fair-minded and reasonable trier of fact [could] accept the evidence as probative of [the elements of the offense] beyond a reasonable doubt." *In Re Levine*, 27 F.3d 594, 595 (D.C. Cir. 1994). "If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make." *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C. Cir. 1986) (quoting *Curley v. United States*, 160 F.2d 229, 237 (D.C. Cir. 1947)). Moreover, for the purposes of a motion for acquittal, "no legal distinction exists between circumstantial and direct evidence." *Holland v.*

---

[10]     In the alternative, the defendants move for a new trial, arguing that the verdict is against the weight of the evidence and "would result in a miscarriage of justice." Mem. of Law in Supp. of Defs.' Mot. for J. of Acquittal on Count Four of the Indictment or, in the Alternative, for a New Trial Because the Verdict is Against the Weight of the Evidence ("Defs.' MJOA") at 17-19. In particular, the defendants argue that "[t]he lack of any victims weighs heavily in favor of a determination that there was no crime at all, and thus that the verdict is against the weight of the evidence." *Id.* at 19. But, the purported lack of any victim is immaterial because, for purposes of the wire fraud statute, the government need not show that any person was defrauded. *United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir. 1976). For this reason and for the reasons discussed *infra*, the court also denies the defendants' motion for a new trial.

7

*United States*, 348 U.S. 121, 139-40 (1954); *accord Sutton*, 801 F.2d at 1358.

### (2) Sufficiency of the Evidence: Intent

The defendants contend that the government failed to establish that they intended to harm Morgan Stanley or Cayre, the victims of the defendants' wire fraud scheme according to the indictment.[11] Defs.' MJOA at 6. The defendants argue principally that the government only proved that the MTD invoice was false or misleading, but that it failed to prove that the defendants possessed the requisite fraudulent intent.[12] According to the defendants, the government was required to prove that they intended to harm Morgan Stanley's and Cayre's property interests. *Id.* And, the defendants reason that the government failed to prove that they intended to harm Morgan Stanley and Cayre's property interests because it did not prove "tangible injury from which the jury could have inferred an intent to defraud." Reply Mem. in Supp. of Defs.' Mot. for J. of Acquittal on Count Four of the Indictment or, in the Alternative,

---

[11]    In a footnote, the defendant Jemal also argues that the government failed to prove that he participated in the creation of the invoice with knowledge of its falsity. Defs.' MJOA at 6 n.3. But, considering the evidence presented by the government, a reasonable jury could conclude beyond a reasonable doubt that defendant Jemal participated in the creation of the invoice with knowledge of its falsity. First, Cayre testified that he talked to Jemal about the fraudulent invoice and that Jemal stated he created the false invoice to avoid fee disputes with Cayre. Tr. 2149. Second, Jemal directly benefitted from the profits of the scheme, as he used a portion of the commission payment to pay the settlement costs on a property that he purchased jointly with his son. Tr. 870, 930. Third, defendant Jemal opened MTD's bank account, and that bank account was used only in connection with the money from the MTD invoice. Tr. 657-674. *United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985) (stating that it is the jury's function to make draw inferences of fact and make credibility determinations).

[12]    The defendants make much of the fact that the court instructed the jury that "if a defendant knowingly submits an inaccurate or misleading document, honestly believing that the inaccuracies are not material, and that he did not intend defraud, as I have used that term, he is not guilty of mail or wire fraud." Defs.' MJOA at 4. The defendants argue that this instruction required the government to prove that they intended to harm the purported victims. The defendants, however, read too much into the instruction. Indeed, the instruction stands only for the unremarkable proposition that a false statement alone is not enough to convict someone of wire fraud.

for a New Trial Because the Verdict is Against the Weight of the Evidence ("Defs.' MJOA Reply") at 2.

In response to the defendants' arguments, the government asserts that it need not show that the defendants intended to harm Morgan Stanley and Cayre; that is, the government contends that the intent element in a wire fraud case is satisfied by proof of the defendants' knowing participation in the scheme to defraud. Govt's MJOA Opp'n at 16. In the alternative, the government argues that it showed that the defendants had an intent to harm Morgan Stanley and Cayre. *Id.* at 21.

The court need not decide whether the intent element in a wire fraud case is satisfied by showing that the defendants intended to deprive the victim of money or whether the intent element is satisfied by showing that the defendants knowingly participated in the scheme to defraud.[13] Assuming *arguendo* that the wire fraud statute requires the government to show that the defendants intended to harm Morgan Stanley's and Cayre's property interests, as the defendants argue, the court concludes that the government provided ample evidence at trial from which a jury could have inferred that the defendants possessed the intent to harm Morgan Stanley and Cayre.

"The requisite intent under the federal mail and wire fraud statutes may be inferred from the totality of the circumstances and need not be proven by direct evidence." *United States v.*

---

[13]    The defendants, relying on case law from the Second and Eighth Circuits argue that government was required to produce evidence (independent of the alleged scheme) that the defendants intended to harm the purported victims. Defs.' MJOA at 7. The government, relying on case law from the First, Seventh, and Tenth Circuits, argues that a jury may infer intent from the defendants' knowing participation in the scheme to defraud. Govt's Opp'n to Defs.' Mot. for J. of Acquittal on Count Four or, in the Alternative, for a New Trial ("Govt's MJOA Opp'n") at 16.

*Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979), *cert. denied*, 445 U.S. 918 (1980). In this case, the government presented evidence that showed that the defendants were not entitled to the $430,000. The invoice represents that MTD provided real estate brokerage services to DC DOT and that MTD was entitled to the $430,000 commission for those services. Govt's Opp'n Ex. 5. Although the defendants posit that they were entitled to the commission (and hence that the only false representation in the invoice relates to the identity of the entity providing the real estate brokerage services), Defs.' MJOA at 9, the government provided evidence from which a jury could infer that the defendants intended to harm Cayre and Morgan Stanley's property interests. First, a commission calculation based on the real DC DOT lease terms would have generated a commission of about $283,000. Tr. 882; Govt's Opp'n at 6 n.3. Thus, assuming that the defendants indeed provided real estate brokerage services, the government's evidence at trial showed that the $430,000 invoice still represents an inflated amount. *United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir. 1986) (holding that the government proved that the defendant acted with intent to defraud where the defendant created sham companies and used "circuitous and deceptive means in calculating" his costs and the defendant prevented the insurance company from estimating for itself how much he was entitled to recover). Second, the government presented evidence that neither MTD nor DDC were entitled to represent the DC DOT, Tr. 1005, 2065-3066, and a reasonably jury could have concluded that the defendants did not provide the services they claim to have provided. Third, despite the defendants' protestations that they were entitled to any commissions so long as the commission did not exceed 6% of the lease value, the evidence showed that as late as 2003, Cayre was arguing with defendant Jemal over commissions, despite the agreement the two men had reached. Tr. 2173. Fourth, the defendants

10

used the money from the false invoice for the purchase of a property in Washington, DC. *United States v. Welch*, 327 F.3d 1081, 1105 (10th Cir. 2003) (noting that a defendant's profiting from the deceptive scheme can support a jury's conclusion that the defendant possessed fraudulent intent). Fifth, the money belonged to the CJG partnership, of which Cayre was a 50% owner, and any unspent TI construction reserve funds would have been returned to the CJG partnership. Tr. 1268. Last, the government presented evidence showing that the defendants' scheme subjected Morgan Stanley to an increased investment risk. In particular, Morgan Stanley used the TI construction reserve as a means of protecting the value of the loan it gave to CJG by ensuring that "vendors and/or contractors that furnish invoices or receipts or other similar documentation are in fact then paid." Tr. 1216. Morgan Stanley's concern that vendors or contractors who did not get paid would place a lien on the property was based on its understanding that "ultimately it could become the lender's responsibility to pay [the vendors and/or contractors]." Tr. 1218. In other words, in taking money from the TI construction reserve that was not actually used to improve or lease out the P Street property, the defendants decreased the value of Morgan Stanley's cushion in the P Street property.[14]

The defendants' base their arguments that they were entitled to the money at issue solely on Cayre's and Morgan Stanley's testimony. But, the jury was not required to take their testimony at face value. Indeed, by asserting Carye's testimony as dispositive of the issue, the

---

[14]    Although the defendants contends that Morgan Stanley could not have lost money as a result of the false invoice because the loan was secured by the P Street building, Defs.' MJOA at 12-13, the defendants' actions deprived Morgan Stanley of information it deemed necessary for releasing loan proceeds. *See, e.g., United States v. Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979); *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 199). Moreover, the collateral provided by the defendants did not insulated Morgan Stanley from any potential liens, nor would the collateral reduce Morgan Stanley's risk that it would have to pay unpaid invoices.

defendants overlook salient realities of law and fact. Within the jury's function as fact finder lies

its prerogative to assign credibility or implausibility to any part of what a witness says.

*Singleton*, 702 F.2d at 1163; *see also United States v. Weidner*, 437 F.3d 1023, 1040 (10th Cir.

2006) (stating that the jury was not required to believe the defendant's testimony). Moreover, the

jury may determine a witness' motivation to speak more or less truthfully based on relationships

and prospective benefits which relationships may render. For example, Cayre testified that he

made "two tons of money" with Jemal and that his family and defendant Jemal's family are

related by marriage. Tr. 2151, 2156. Ben Black, a former Morgan Stanley employee, testified

that he was eager to do more deals with defendant Jemal because he had a "very large portfolio,

lots of lending business, growing portfolio in an excellent market." Tr. 1249. The jury was

entitled to consider Cayre's and Black's relationships with the defendants in making its

credibility determination. In this case, there was ample evidence from which a reasonable jury

could conclude that the defendants acted with the specific intent to harm Cayre and Morgan

Stanley's property interests.

### (3) Sufficiency of the Evidence: Materiality

The defendants also argue that the court should grant their motion for judgment of

acquittal because the government failed to prove that the defendants' misrepresentations were

material. Defs.' MJOA at 13. That is, the defendants assert that the misrepresentations were

material neither to Cayre nor Morgan Stanley. *Id.* at 14. The government, on the other hand,

argues that it presented "sufficient evidence for the jury to conclude that the series of false

representations satisfied the 'materiality' requirement." Govt's MJOA Opp'n at 21.

"In general, a false statement is material if it has "a natural tendency to influence, or [is]

12

capable of influencing, the decision of the decisionmaking body to which it was addressed."
*Neder v. United States*, 527 U.S. 1, 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509
(1995)). As the court instructed the jury, "[a] material fact is one which would reasonably be
expected to be of concern to a reasonable and prudent person in relying upon the representation
or statement in making a decision." Tr. 4321-22. "Because the issue is whether a statement has
a tendency to influence or is capable of influencing a decision, and not whether the statement
exerted actual influence, a false statement can be material even if the decision maker did not
actually rely on the statement." *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999);
*see also United States v. Moran*, 393 F.3d 1, 13 (1st Cir. 2004).

In this case, there was ample evidence from which a jury could conclude that the
misrepresentations were material to Cayre and Morgan Stanley. First, a reasonable jury could
conclude that the defendants' many misrepresentations were material to Cayre because: (1) the
government presented evidence that, despite the leasing commission agreement, the defendants
and Cayre continued to argue about commissions well into 2003, thereby undermining the
defendants' contention that Cayre did not care about paying any leasing commission so long as it
was less than 6% of the lease value, Tr. 2173; (2) Cayre testified that he believed the money
would not be going to the defendants, Tr. 2145; (3) Cayre testified that he was concerned about
fees to Jemal's companies, Tr. 2122-23; and (4) the defendants sent a letter to Cayre to assure
him that the money in the TI construction reserve was to be paid to unaffiliated entities, Tr. 2147-
48; Govt's Exs. 197a, 197b.

Second, a reasonable jury could conclude that the defendants' misrepresentations were
material to Morgan Stanley because: (1) Morgan Stanley released the money only after reviewing

13

the false invoice and the false lien release, Tr. 1228, 1287; (2) Morgan Stanley was concerned that entities affiliated with the borrower be paid last and Douglas Development had experienced difficulties in obtaining payments from Morgan Stanley in the past, Tr. 1229, 1231-36, 1264; and (3) Morgan Stanley was concerned with maintaining a cushion of reserves and maintaining the value of its investment, Tr. 1235-1236. In short, the government presented enough evidence from which a reasonable jury could conclude that a reasonable person in Cayre's or Black's position would not have approved the $430,000 payment were it not for the defendants misrepresenting the value of their brokerage services, the identity of MTD, and the lien releases.

## B. The Defendants' Motion for a New Trial

In addition to moving for a judgment of acquittal, the defendants move for a new trial. The defendants' main arguments are that the court gave an erroneous claim of right instruction and that the prosecutor made improper propensity arguments during its rebuttal in closing arguments. Mem. of Law in Supp. of Defs.' Mot. for a New Trial on Count Four of the Indictment ("Defs.' New Trial Mot.") at 1. The government opposes the motion for a new trial, arguing that the jury instruction was proper and that the rebuttal argument had no impact on the wire fraud count. Govt's Opp'n to Defs.' Mot. for a New Trial on Count Four of the Indictment ("Govt's New Trial Opp'n") at 3, 13. For the reasons that follow, the court denies the motion for a new trial.

### (1) Legal Standard for a Rule 33 Motion for A New Trial

The court may grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). The court, however, should not grant a Rule 33 motion based on insufficiency of evidence unless the evidence "preponderate[s] heavily against the verdict, such that it would be a

14

miscarriage of justice to let the verdict stand." *United States v. Walker*, 899 F. Supp. 14, 15

(D.D.C. 1995) (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985)). "This

power should be exercised with caution, and is invoked only in those exceptional cases in which

the evidence weighs heavily against the verdict." *United States v. Edmunds*, 765 F. Supp. 1112,

1118 (D.D.C. 1991). Moreover, "[e]ven where errors occur, a new trial should be granted only if

the moving party has shown that the error was substantial, not harmless, and that the error

'affected the defendant's substantial rights.'" *Walker*, 899 F. Supp. at 15 (quoting *United States

v. Johnson*, 769 F. Supp. 389, 395-96 (D.D.C. 1991)). In considering a Rule 33 motion, the court

"may weigh the testimony and may consider the credibility of the witnesses." *United States v.

Edmunds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991).

### (2) The Claim of Right Instruction

### (a) The Claim of Right Instruction Was Supported by the Evidence

The defendants argue that they never pursued a claim of right defense, and therefore, the

claim of right instruction "was confusing and interjected an issue that should not been before the

jury." Defs.' New Trial Mot. at 2. According to the defendants, they "contended that they were

entitled to the commission sought by the MTD invoice and merely used MTD as a vehicle to

obtain the commission to avoid the historic disputes between Douglas Jemal and Joe Cayre over

fees and leasing commissions." *Id.* at 4.

A claim of right is a defendant's assertion that he did not intend to harm the alleged

victims of a fraudulent scheme because he is entitled to the money. *United States v. Gole*, 158

F.3d 166, 168 (2d Cir. 1998). Contrary to the defendants' arguments, the defendants did argue

that they were entitled to the money at issue and that the submission of the fraudulent invoice did

15

not cause either Cayre or Morgan Stanley to lose any money. In particular, defense counsel asked Black whether the loan agreement prohibited DDC from getting funds from the TI construction and reserve and whether Morgan Stanley lost any money as a result of the MTD transaction. Tr. 1267-1268. Defense counsel also asked Cayre whether he lost any money as a result of the transaction and whether he believed the defendants overcharged him. Tr. 2179-2180. In response to defense counsel's questions, both Black and Cayre testified that they did not lose any money as a result of the MTD invoice. Tr. 1268, 2179-2180; *see also* Tr. 4626-27.

The defendants argue that they asked Black whether Morgan Stanely lost money because the loss amount is "an important sentencing issue." Reply Mem. in Supp. of Defs.' Mot. for a New Trial on Count Four of the Indictment at 3. The jury, however, could not have known the defendants' purpose in eliciting testimony about the loss amount. Without a jury instruction to address the loss issue, the jury may have assumed that the defendants' belief that the MTD transaction did not cause Morgan Stanley or Cayre to lose money excused their conduct.

### (b) The Claim of Right Instruction Was a Correct Statement of Law

The defendants also argue that the claim of right instruction "inadvertently contained a paragraph that the parties agreed was an erroneous statement of law" and that the instruction permitted a conviction even if the jury believed the defendants did not intend to harm Cayre or Morgan Stanley. Defs.' New Trial Mot. at 2, 10-11. The defendants rely on a Second Circuit case, *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998), in arguing that the court's instruction was in error. In *Rossomando*, the district court instructed the jury that

> [i]n considering whether or not the defendant acted in good faith, you are instructed that a belief by the defendant, if such a belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by

16

> you that he acted in good faith. No amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the [the fraud victims] will excuse fraudulent actions or false representations by him to obtain money.

*Id.* at 199. The Second Circuit held that this instruction was "at odds with the requirement that a defendant must have intended to harm his victim in order to be guilty of mail fraud." *Id.* at 201.

> In the instant case, the court instructed the jury that

> There is another consideration to bear in mind in deciding whether or not a defendant acted in good faith. You are instructed that if the defendant participated in the scheme to defraud, then a belief by the defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that the defendant acted in good faith. If a defendant participated in the scheme for the purpose of causing some financial or property loss to another, then no amount of honest belief on the part of the defendant that the scheme would ultimately make a profit for the investors will excuse fraudulent actions or false representations by him.

Tr. 4325. The court's instruction is based on Modern Federal Jury Instruction 44-34, and that instruction was designed to "address the concerns expressed by the Second Circuit" in *Rossomando.* 44-34 L. SAND, ET AL., MODERN FEDERAL JURY INSTRUCTIONS – CRIMINAL. In contrast to the language used by the district court in the *Rossomando* case, this court instructed the jury that it was only to consider the defendant's absence of bad faith if the defendant had participated in the scheme to defraud. The court also instructed the jury that it must find that a particular defendant "knew that his conduct as a participant in the scheme was calculated to deceive, and, nevertheless, he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another." Tr. 4325-26. As the government argues, "[t]he inclusion of that additional language led a post-*Rossomando* Second Circuit panel to find that the no-ultimate harm language taken from the [Modern Federal Jury Instructions] was not

17

erroneous." Govt's New Trial Opp'n at 7 (citing *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999).[15] Simply put, the court's instruction does not run afoul of *Rossomando*.[16]

The defendants also make much of the fact that the court orally instructed the jury that "[i]f the defendant participated in the scheme for the purpose of causing some financial or property loss to another, then no amount of honest belief on the part of the defendant that the scheme would ultimately make a profit for investors will excuse fraudulent actions or false representations by him." Tr. 4325. The written instructions provided to the jury stated "would (e.g., ultimately make a profit for investors)." According to the defendants, the written instruction is confusing and "essentially permitted the jury to 'fill in the blank.'" Defs.' New Trial Mot. at 11. The instruction, however, is not confusing, as it is tailored to the evidence: Cayre funded CJG while Jemal did the work, and Cayre stated that he did not lose any money (on the contrary, he testified that defendant Jemal made him "two tons of money," Tr. 2151). Cayre could thus be appropriately described as an investor in the P street project. Further, "[i]f a charge to a jury, considered in its entirety, correctly states the law, the incorrectness of one paragraph or

---

[15]    In *Berkovich*, the Second Circuit stated that the court's instruction that the jury could not find the defendant guilty unless it concluded that the defendant intended to cause a loss to someone was a "proper restatement of the law" and "greatly reduced" "[t]he possibility of confusion that troubled us in *Rossomando* was, therefore, greatly reduced by this proper restatement of the law." *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999*).*

[16]    The defendants also state that the instruction based on Modern Federal Jury Instruction 44-34 and *United States v. Berkovich* undermined their theory of the defense and contradicted the court's instruction that "if a defendant knowingly submits an inaccurate or misleading document honestly believing that the inaccuracies are not material, and that he did not intend to defraud . . . he is not guilty of wire fraud." Defs.' Mot. for New Trial at 10. Citing *McFarland v. United States*' language that it constitutes reversible error "if two instructions are in direct conflict and one is clearly prejudicial, for the jury might have followed the erroneous instruction," *id.* at 11, the defendants argue that the court should grant them a new trial. But, as stated *supra*, the court's instruction is a correct statement of law. Therefore, the *McFarland* reasoning does not apply.

one phrase standing along does not ordinarily constitute reversible error." *McFarland v. United States*, 174 F.2d 538, 539 (D.C. Cir. 1949).[17]

### (3) The Prosecutor's Rebuttal During Closing Arguments

The defendants' final argument is that "the prosecutor made an improper propensity argument in his rebuttal closing that unfairly invited the jury to cumulate the evidence on all charges to reach guilty verdicts." Defs.' Mot. for New Trial at 12. In particular, during the trial, the defendants objected to the prosecutor's statement that "[O]nce you understand that Mr. Esherick is willing and able and does that with his own taxes to get money for himself, it's certainly understandable that the same basic core conduct is going on for the invoices for Douglas Jemal and Douglas Development." *Id.* at 15. The court then gave a curative instruction, as requested by the defendants, informing the jury that "you heard Mr. Dubester argue, in essence, that the jury could reasonably infer, if it concludes that Mr. Esherick's tax returns are false, that the invoices submitted to the District are false too. You are hereby instructed that you

---

[17]    The defendants also make much of their allegation that the undersigned's law clerks stated that the court would delete the instruction based on Modern Federal Jury Instruction 44-34. After the court read the instruction to the jury, defense counsel objected to it, stating that the court had committed a "grievous" word processing error. To clear up the confusion caused by defense counsel's remark, the court held a conference in chambers to discuss the defendants' objections to Modern Federal Jury Instruction 44-34. At that conference, defense counsel and the prosecutor worked together to come up with an instruction that addressed the defense's concerns with Modern Federal Jury Instruction 44-34, and at that conference and on the record afterwards, the defendants expressed their satisfaction with the court's decision to add a sentence to the claim of right instruction that preceded the disputed instruction. Tr. 4356 (stating that the parties "worked together to provide a sentence that each side agrees would complete the description of what a claim of right is"). At no point during the conference did defense counsel ask this judge to delete the paragraph containing Modern Federal Jury Instruction 44-34. The court prides itself on many things – for example, its ability to conduct matters quickly and efficiently and its efforts to accommodate parties' schedules – but it does not pride itself on being a prescient body, capable of deducing counsel's wishes when those wishes are not clearly stated, or worse yet, not stated at all.

          Further, the court notes with displeasure defense counsel's penchant for expressing his disagreement with the court's legal rulings by characterizing those rulings as word processing errors.

must consider each count on its own." Tr. 4819.

The government responds to the defendants' argument by stating that the "defendants waived any claim to a new trial by suggesting and receiving a curative instruction rather than asking the Court to strike the argument or declare a mistrial." Govt's Opp'n to Mot. for New Trial at 13. In the alternative, the government argues that its argument did not cause any prejudice, "let alone substantial prejudice, for the jury acquitted the defendants on all counts related in any way" to the prosecutor's rebuttal arguments. *Id.* That is, the government argues that the allegedly improper propensity argument did not relate to the count in which the defendants were eventually convicted.

Although the defendants argue that the objectionable rebuttal argument related to the wire fraud count, the defendants' argument is disingenuous in light of their own understanding of the prosecutor's statements during rebuttal and in light of their requested curative instruction. Specifically, defense counsel stated to the court that the prosecutor argued "that the jury could reasonably conclude that because Esherick submitted false tax returns with false tax deductions that the defendant submitted false invoices to the District." Tr. 4813. Defense counsel then requested that the court instruct the jury that

> You heard Mr. Dubester argue, in essence, that the jury could reasonably infer if it concludes that Mr. Esherick's personal tax returns are false, that the invoices submitted to the District are false too. You are hereby instructed that you must consider each count on its own . . . Even if you conclude that Mr. Esherick's tax returns were incorrect, you may not use that conclusion to infer that the invoices submitted to the District of Columbia were false

*Id.* In response to defense counsel's request, the court read the defendants' proposed instruction to the jury. Tr. 4819. As the jury acquitted the defendants of the counts related to the District of

Case 1:05-cr-00359-RMU    Document 339    Filed 03/12/2007    Page 21 of 22

Columbia invoices, the defendants did not suffer any prejudice based on the prosecutor's argument that the jury could use Esherick's false tax returns to infer that the District of Columbia invoices were also false.

Assuming *arguendo* that the prosecutor's argument during rebuttal was related to the MTD invoice,[18] the court would nevertheless deny the defendant's motion for a new trial. In determining whether a prosecutor's closing arguments caused substantial prejudice to the defendant, courts have generally analyzed: (1) "the closeness of the case," (2) "the centrality of the issue affected by the error," and (3) "the steps taken to mitigate the effects of the error." *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1999). In this case, as discussed *supra*, the government provided ample evidence from which the jury could have concluded that the defendants committed wire fraud. Additionally, the prosecutor's statements in his rebuttal were only tangentially related to the wire fraud count. Indeed, the prosecutor's statements in his rebuttal focused almost wholly on the other counts of the indictment. Tr. 4781, 4782, 4784, 4785. The court, moreover, instructed the jury that lawyers' arguments are not evidence and that it should consider each charge separately. Tr. 4273, 4362, 4287, 4288, 4487. In short, the prosecutor's general reference to the invoices in the trial did not cause substantial prejudice to the defendants. *United States v. Clarke*, 24 F.3d 257, 270 (D.C. Cir. 1994) (affirming the jury's convictions despite the defendant's challenge to the government's closing argument by "heed[ing] the usual presumption of the law that the jurors followed the court's instructions and

---

[18]    The defendants argue that the prosecutor's rebuttal arguments inherently related to the MTD invoice because the prosecutor referred the "collection of false documents" in the case. Tr. 4782. The defendants, however, never objected to the prosecutor's statements about the "collection of false documents." *Id.*

21

disregarded the remark"); *United States v. Gatling*, 96 F.3d 1511, 1524 (D.C. Cir. 1996) (rejecting the defendant's claim for new trial based on prosecutor's closing argument where the court "instructed the jurors that the lawyers' closing arguments only reflected the positions of the government and the defense"). As the court has no reason to conclude that the jury did not follow its instructions, the court denies the defendant's motion for a new trial on the basis of the prosecutor's rebuttal arguments.

### IV. CONCLUSION

For the foregoing reasons, the court denies the defendants' motions for post-conviction relief. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 12 th day of March, 2007.

Ricardo M. Urbina
United States District Judge

22